# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Brian Waldner, individually and as the representative of a class of similarly situated persons, and on behalf of The 401(k) Savings and Retirement Plan, Sponsored by Natixis Investment Managers, L.P., | Case No. 1:21-cv-10273-LTS |
| Plaintiff, | |
| v. | **AMENDED COMPLAINT** |
| | **CLASS ACTION** |
| Natixis Investment Managers, L.P., Natixis Investment Managers, L.P. Retirement Committee, and John and Jane Does 1–20, | |
| Defendants. | |

## NATURE OF THE ACTION

1.     Plaintiff Brian Waldner ("Plaintiff"), individually and as the representative of the Class described herein, and on behalf of The 401(k) Savings and Retirement Plan sponsored by Natixis Investment Managers, L.P. (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA"), against Defendants Natixis Investment Managers, L.P. ("Natixis"), its Retirement Committee (the "Committee"), and John and Jane Does 1–20 (collectively, "Defendants"). As described herein, Defendants have breached their fiduciary duties and engaged in unlawful self-dealing with respect to the Plan in violation of ERISA, to the detriment of the Plan, its participants, and its beneficiaries. Plaintiff brings this action to remedy this unlawful conduct, recover losses to the Plan, and obtain other appropriate relief as provided by ERISA.

## PRELIMINARY STATEMENT

2.      As of the second quarter of 2020, Americans had approximately $8.9 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans.[1] Defined contribution plans are now the dominant vehicle for Americans' retirement savings and have largely replaced the defined benefit plans—or pension plans—that were predominant in previous generations.[2] By 2012, approximately 98% of employers offered defined contribution plans to their current employees, whereas only 3% offered pension plans.[3]

3.      The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. "In a defined-benefit plan, retirees receive a fixed payment each month, and the payments do not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Thole v. U. S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020). Because the employer is responsible for making sure that the plan is sufficiently capitalized, it bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. *See id.* But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015); *see also Thole*, 140 S. Ct. at 1618 (noting that in defined contribution plans, retirees' level of benefits "can turn on the plan fiduciaries' particular investment decisions"). Thus,

[1] *See* INVESTMENT COMPANY INSTITUTE, *Defined Contribution Plan Participants' Activities, First Three Quarters of 2020* (Nov. 2020), http://www.ici.org/pdf/20_rpt_recsurveyq3.pdf.
[2]  *See* Bankrate, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), https://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-plans-multiply-1.aspx.
[3] *Id.*

because all risks related to high fees and poorly performing investments are borne by participants, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent.

4.     The real-life effect of such imprudence on workers can be severe. According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career.[4] Put another way, excessive fees can force a worker to work an extra five to six years to make up for the excess fees that were paid.[5]

5.     For financial service companies like Natixis, the majority owner of several boutique mutual fund companies such as Oakmark, Vaughan Nelson, Loomis Sayles, and AEW, the potential for imprudent and disloyal conduct is especially high, because the plan's fiduciaries are in a position to benefit the company through the plan by, for example, using proprietary investment products that a non-conflicted and objective fiduciary would not select or retain.

6.     To safeguard retirement plan participants, ERISA imposes strict fiduciary duties of loyalty and prudence upon plan sponsors and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 204 (D. Mass. 2020) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)); *Glass Dimensions, Inc. v. State St. Bank & Tr.*, 931 F. Supp. 2d 296, 304 (D. Mass. 2013) (same). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

---

[4] *See* Melanie Hicken, *Your Employer May Cost You $100K in Retirement Savings*, CNN Money (Mar. 27, 2013), http://money.cnn.com/2013/03/27/retirement/401k-fees/.
[5] *Id.*

7.     Contrary to these fiduciary duties, Defendants fail to administer the Plan in the best interest of participants and fail to employ a prudent process for managing the Plan. Instead, Defendants have managed the Plan in a manner that benefits Natixis at participants' expense, using the Plan as an opportunity to promote Natixis's mutual fund business and maximize profits at the expense of the Plan and its participants.

8.     The favoritism shown to Natixis's proprietary investments (the "Natixis Funds") is evident through a simple comparison to other similarly sized retirement plans. Of the 3,618 defined contribution plans with at least $250 million in assets that are not affiliated with Natixis, 83% do not own a single Natixis-affiliated mutual fund. Among the 17% of plans that offer one or more investments affiliated with Natixis, Natixis Funds make up only 3% of their plan's assets (and 0.1% of the total assets in defined contribution plans), with no plan putting over 14% of its assets in such a fund. Yet the Plan has over 58% of its assets in Natixis Funds.

9.     Defendants' proclivity for proprietary mutual funds has cost Plan participants millions of dollars in excess fees. Between 2015 and 2017, plans with $250 million to $500 million in assets, like the Plan, had an average expense ratio of between 0.44% and 0.46%.[6] In contrast, the average expense ratio of the Plan's proprietary funds ranged from 0.70% to 0.80% during this period (and never fell below 0.55% during the entire statutory period). The expenses associated

---

[6] INVESTMENT COMPANY INSTITUTE, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2017, at 57 (Aug. 2020), https://www.ici.org/pdf/ 20_ppr_dcplan_profile_401k.pdf (hereinafter "2017 ICI Study"). The Investment Company Institute is the leading trade association for the mutual fund industry. Id. at 88. The report's measure of average total plan costs is derived from audited Form 5500 reports for more than 55,000 private-sector 401(k) plans for the 2017 plan year. Id. at 8. The measure of a plan's fees is derived from the fees reported on the Form 5500 reports as well as the fees paid through investment expense ratios. Id. at 9. Defendant Natixis Investment Managers is a member organization of the Institute. See https://www.ici.org/about_ici/membership/member_lists/organizations.

with the Plan's proprietary funds stood in stark contrast to the Plan's nonproprietary options, costing *five times* more than the Plan's nonproprietary options.

10.     Defendants' favoritism towards Natixis Funds has not only led to the retention of overpriced funds, but also the retention of underperforming proprietary funds. Since 2016, Natixis has experienced over $15 billion in outflows from its suite of affiliated mutual funds. These substantial outflows are the result of prolonged underperformance across many of Natixis's offerings, including those included in the Plan. For example, the Oakmark Investor Fund and Oakmark Select Investor Fund, two of the Plan's largest proprietary holdings, trailed their self-selected primary prospectus benchmark (the S&P 500 index) by 2.82% and 7.99% *per year* over the five-year period ending 2020. While this severe underperformance has driven the marketplace to look elsewhere, Defendants have retained these and other underperforming funds to stave off the consequences of an otherwise declining asset base.

11.     Defendants' preference for proprietary investments has also harmed participants through the selection of new funds for the Plan. Despite losing favor both among similarly sized defined contribution plans and the general marketplace, Defendants *added* two Natixis Funds to the Plan during the statutory period. A prudent and loyal review of the marketplace would have revealed multiple superior, lower cost investment options, and would not have led to the addition of these funds to the Plan. Defendants selected these funds for the Plan to allow Natixis to stem the consequences of further depletion of fund assets and advance Defendants' business interests.

12.     Courts have resoundingly determined that similar conduct by other financial services companies is sufficient to state a claim for breach of fiduciary duty. *See, e.g.*, *Baker v. John Hancock Life Ins. Co. (U.S.A.)*, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) (allegations that proprietary funds underperformed relative to their custom benchmarks and to

similar market comparators, and that "no other fiduciary managing a like-sized plan chose to offer the proprietary funds," sufficiently stated a claim); *Velazquez v. Massachusetts Fin. Servs. Co.*, 320 F. Supp. 3d. 252, 259 (D. Mass. 2018) (claim for breach of fiduciary duties is sufficiently stated where a plaintiff "plausibly alleges that the higher fees were unjustified or otherwise improper"); *Main v. Am. Airlines Inc.*, 248 F. Supp. 3d 786, 793 (N.D. Tex. 2017) (allegation that proprietary mutual funds "were more expensive than similar alternatives" supported claim of fiduciary breach); *Moreno v. Deutsche Bank Am. Holding Corp.*, 2016 WL 5957306, at *6 (S.D.N.Y. Oct. 13, 2016) (allegations of excessive fees in connection with proprietary funds were sufficient to raise an inference that defendants' process was flawed); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *7 (C.D. Cal. Aug. 5, 2016) (allegations that proprietary mutual funds were selected to benefit plan sponsor, and that the retention of the high-cost investment options was to the detriment of participants, sufficiently stated a claim for breach of fiduciary duties).

13.    By selecting and retaining Natixis Funds as investment options within the Plan in lieu of superior alternative options, Defendants have failed to act in the best interest of participants and exercise appropriate care, costing participants tens of millions of dollars in excess fees and investment underperformance. *See Baker*, 2020 WL 8575183, at *1 ("[T]he long-term retention of a substantial number of underperforming funds at higher than comparable costs gives rise to a plausible inference of an objectively imprudent monitoring process. That the retained underperforming funds were all proprietary John Hancock funds and that in some cases the plan was one of the last investors propping up a failing fund gives rise to the plausible inference of a subjective motive inconsistent with the plan participants' best interest.").

14.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One). Plaintiff also asserts a claim against Defendant Natixis for its failure to monitor fiduciaries (Count Two).

## JURISDICTION AND VENUE

15.     Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(2) and (3), which provide that participants in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duties and other prohibited conduct, and to obtain monetary and appropriate equitable relief as set forth in 29 U.S.C. §§ 1109 and 1132.

16.     This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

17.     Venue is proper pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because this is the district where the Plan is administered, where the breaches of fiduciary duties giving rise to this action occurred, and where Defendants may be found.

## THE PARTIES

### PLAINTIFF

18.     Plaintiff Brian Waldner resides in Carlisle, Massachusetts. Plaintiff was a participant in the Plan from July 2017 until late February 2021, and was a current participant when the original Complaint in this matter was filed on February 18, 2021. As a Plan participant, Plaintiff Waldner was invested in multiple investment options managed by Natixis and its subsidiaries, including but not limited to the Gateway Fund, the AEW Real Estate Fund, and Oakmark International, and has been financially injured by the unlawful conduct described herein. Plaintiff Waldner's account would be worth more today had Defendants not violated ERISA as described herein.

**THE PLAN**

19.     The 401(k) Savings and Retirement Plan, Sponsored by Natixis Investment Managers, L.P. (the "Plan"), was established by Natixis on January 1, 1995.[7]

20.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34), covering all eligible current and former employees of Natixis and its subsidiaries, including Plaintiff. The Plan is a qualified plan under 26 U.S.C. § 401, and is of the type commonly referred to as a "401(k) plan."

21.     The Plan has held approximately $300 million to $440 million in assets during the statutory period. The Plan also had approximately 1,500 to 1,800 active participants with balances at any time during the relevant period.

22.     Participants may direct a portion of their earnings to their account in the Plan, and participants also may receive contributions from Natixis and participating affiliates as their employer. Participant contributions are held in trust in the designated investment alternatives Defendants have made available to participants.

23.     Participants in the Plan are responsible for directing the investment of contributions, choosing from among a lineup of options offered by the Plan.[8] Because the Committee determines the designated investment alternatives that are offered, the investment lineup maintained by the Committee is critical to participants' investment results and, ultimately, the retirement benefits they receive.

---

[7] Prior to 2017, the Plan's name was the 401(k) Savings and Retirement Plan Sponsored by Natixis Global Asset Management.

[8] Participants in a defined contribution plan are limited in their investment choices to the lineup of options offered by their plan. *See* INVESTMENT COMPANY INSTITUTE, *A Close Look at 401(k) Plans, 2012*, at 9 (Dec. 2014), https://www.ici.org/pdf/ppr_14_dcplan_profile_401k.pdf.

24.     During the statutory period, the majority of the Plan's designated investment alternatives have been proprietary to Natixis and its affiliates.

DEFENDANTS

*Natixis Investment Managers, L.P.*

25.     Defendant Natixis Investment Managers, L.P. ("Natixis") is headquartered in Boston, Massachusetts. Prior to 2017, Natixis operated under the name Natixis Global Asset Management, L.P. Subsidiaries and affiliates of Natixis include: AEW; AlphaSimplex Group, LLC; Gateway Investment Advisers, LLC; Hansberger Global Investors; Harris Associates, L.P.; Loomis, Sayles & Company, L.P.; Mirova; and Vaughan Nelson Investment Management.

26.     Natixis is the "plan sponsor" within the meaning of 29 U.S.C. § 1002(16)(B). Natixis is also a "named fiduciary" pursuant to 29 U.S.C. § 1102(a) because it has the ultimate authority to control and manage the operation and administration of the Plan. Moreover, because Natixis exercises discretionary authority or control with respect to management and administration of the Plan and disposition of Plan assets, Natixis is a functional fiduciary under 29 U.S.C. § 1002(21)(A).

27.     Natixis is also a fiduciary because it has authority to appoint and remove members to the Committee. It is well accepted that the authority to appoint, retain, and remove plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A). *See* 29 C.F.R. § 2509.75-8 (D-4); *Kling v. Fidelity Mgmt. Trust Co.*, 323 F. Supp. 2d 132, 142 (D. Mass. 2004) (citing *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996)).

28.     The responsibility for appointing and removing members of such a committee carries with it an accompanying duty to monitor the appointed fiduciaries, and to ensure that they

9

are complying with the terms of the Plan and ERISA's statutory standards. 29 C.F.R. § 2509.75-8 (FR-17); *Moitoso*, 451 F. Supp. 3d at 221. Furthermore, this monitoring duty carries with it a responsibility "to take action upon discovery that the appointed fiduciaries [were] not performing properly." *Kling*, 323 F. Supp. 2d at 142 (quoting *Liss v. Smith*, 991 F. Supp. 278, 311 (S.D.N.Y. 1998)); *see also Moitoso*, 451 F. Supp. 3d at 221 ("A fiduciary who violates this ongoing duty to monitor is responsible for any breaches on the part of the appointed fiduciaries.").

***The Retirement Committee and Committee Members***

29.     Natixis delegates a portion of its fiduciary responsibilities for investing Plan assets to the Natixis Investment Managers, L.P. Retirement Committee (the "Committee"). The Committee is identified as a "named fiduciary" in the Plan document and identified as the "plan administrator" within the meaning of 29 C.F.R. § 2509.75-8 at D-3 on the Plan's Form 5500s. Thus, the Committee is a named fiduciary pursuant to 29 U.S.C. § 1102(a). Among other things, the Committee is responsible for maintaining the Plan's investment lineup, including monitoring the Plan's designated investment alternatives and making changes as appropriate. The Committee is therefore also a functional fiduciary pursuant to 29 U.S.C. § 1002(21)(A).

30.     Defendant John and Jane Does 1–20 (the "Doe Defendants") are members of the Committee. The identities of the Doe Defendants are not currently known to Plaintiff.

31.     Each Defendant identified above as a Plan fiduciary is also subject to co-fiduciary liability under 29 U.S.C. § 1105(a)(1)–(3) because it enabled other fiduciaries to commit breaches of fiduciary duties, failed to comply with 29 U.S.C. § 1104(a)(1) in the administration of its duties, and/or failed to remedy other fiduciaries' breaches of their duties, despite having knowledge of the breaches.

## ERISA FIDUCIARY DUTIES

32.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of

retirement plans. 29 U.S.C. § 1104(a)(1) states, in relevant part:

> [A] fiduciary shall discharge his [or her] duties with respect to a plan solely in the interest
> of the participants and beneficiaries and—
>
> > (A)     for the exclusive purpose of
> >
> > > (i)     providing benefits to participants and their beneficiaries; and
> > >
> > > (ii)     defraying reasonable expenses of administering the plan;
> >
> > (B)     with the care, skill, prudence, and diligence under the circumstances then
> > prevailing that a prudent [person] acting in a like capacity and familiar with
> > such matters would use in the conduct of an enterprise of like character and
> > with like aims . . . .

33.     "The fiduciary obligations of the [fiduciaries] to the participants and beneficiaries

of an ERISA plan are those of trustees of an express trust—the highest known to the law." *Hill v.*

*State St. Corp.*, 2011 WL 3420439, at *28 (D. Mass. Aug. 3, 2011) (quoting *Donovan v. Bierwirth*,

680 F.2d 263, 272 n.8 (2d Cir. 1982)); *Moitoso*, 451 F. Supp. 3d at 204.

### DUTY OF LOYALTY

34.     The duty of loyalty requires fiduciaries to act with "an eye single" to the interests

of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000); *Moitoso*, 451 F. Supp. 3d

at 204. "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display . . .

complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all

consideration of the interests of third persons." *Pegram*, 530 U.S. at 224 (quoting G Bogert et al.,

*Law of Trusts and Trustees* § 543 (rev. 2d ed. 1980)). Thus, "in deciding whether and to what

extent to invest in a particular investment, a fiduciary must ordinarily consider *only* factors relating

to the interests of plan participants and beneficiaries . . . . A decision to make an investment may

not be influenced by non-economic factors unless the investment, when judged *solely* on the basis of its economic value to the plan, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

### DUTY OF PRUDENCE

35.     ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 409–10 (2014) (citation omitted). This includes "a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. at 529. If an investment is imprudent, the plan fiduciary "must dispose of it within a reasonable time." *Id.* at 530 (quotation omitted). Fiduciaries therefore may be held liable for either "assembling an imprudent menu of investment options" or for failing to monitor the plan's investment options to ensure that each option remains prudent. *Bendaoud v. Hodgson*, 578 F. Supp. 2d 257, 271 (D. Mass. 2008) (citing *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).[9]

### DEFENDANTS' VIOLATIONS OF ERISA

### I.     DEFENDANTS USED A DISLOYAL AND IMPRUDENT PROCESS TO MANAGE THE PLAN

36.     Natixis creates and sells investment products (directly or through its affiliates) to a variety of individual and institutional investors, including retirement plans and their participants.

---

[9] It is no defense to the imprudence of some investments that others may have been prudent; "a fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds" available within the plan could have "theoretically . . . create[d] a prudent portfolio." *Bunch v. W.R. Grace & Co.*, 532 F. Supp. 2d 283, 289 (D. Mass. 2008), *aff'd*, 555 F.3d 1 (1st Cir. 2009) (quoting *DiFelice*, 497 F.3d at 423).

37.     In recent years, investors have been fleeing Natixis's products. Since 2016, Natixis has experienced negative net outflows of billions of dollars per year, with its industry market share dropping from 0.42% in 2016 to 0.32% in 2019, and cumulative net outflows of approximately $15.2 billion during that time.

38.     Natixis's standing in the retirement plan marketplace mirrors its unfavorable standing in the overall marketplace. Fiduciaries of other defined contribution plans have largely rejected the Natixis products that Defendants retained for the Plan. For example, as of the end of June 2020, Loomis Sayles & Company managed the greatest amount of assets within defined contribution plans of any of Natixis's affiliates, but managed just **0.1%** of total defined contribution plan assets in the United States. In contrast, Vanguard, Fidelity, Capital Group, T. Rowe Price, and J.P. Morgan, the five largest asset management companies within defined contribution plans, manage a combined $2.3 trillion in defined contribution assets, with Vanguard alone managing 87 times more 401(k) assets than Loomis Sayles. Fiduciaries of other defined contribution plans have largely looked past Natixis in the selection and retention of investment options in favor of more proven asset managers.

39.     Natixis's investment products fare no better in utilization among similarly sized plans. Eighty-three percent (83%) of the 3,620 defined contribution plans with $250 million or more in assets hold *no* Natixis-affiliated products.[10] Among the remaining 17% of plans that hold a Natixis-affiliated product, the average plan holds less than 3% of its assets in Natixis Funds. No plan (other than the Plan or plans of Natixis affiliates) held more than 14% of its assets in Natixis Funds. In stark contrast, throughout the statutory period, between 12 and 15 of the Plan's 21 to 23

---

[10] According to Form 5500 filings with the Department of Labor for plans with $250 million or more in assets as of the end of 2019.

investment options,[11] averaging 60% of total Plan assets, were managed by Natixis or its affiliates.[12]

40.    As indicated by the Plan's investment lineup, Defendants display favoritism toward Natixis's proprietary investments in managing the Plan's investment options. This favoritism has led to the payment of excessive investment management fees by participants to Natixis and its affiliates, a failure to prudently monitor and remove underperforming proprietary Plan investment options, and a failure to engage in a prudent and loyal process in the selection of new Plan investment options.

**A.    Defendants' Use of Proprietary Funds Caused Participants to Incur Excessive Fees**

41.    The Natixis Funds in the Plan are actively managed. While a fiduciary may consider higher-cost, actively managed mutual funds as an alternative to lower-cost alternatives, "[a]ctive strategies ... entail investigation and analysis expenses and tend to increase general transaction costs.... [T]hese added costs ... must be justified by realistically evaluated return expectations." *See* Restatement (Third) of Trusts § 90 cmt. h(2); *see also id.* § 90 cmt. b ("[C]ost-conscious management is fundamental to prudence in the investment function."). As discussed below, the Natixis Funds did not earn their fees. *See infra* at § I.B.

42.    Moreover, even in comparison to other *actively* managed funds, the Natixis mutual funds charged higher fees relative to non-proprietary alternatives used by similarly sized plans.

---

[11] This measure counts the funds suite of target-date funds as a single investment option, a common practice in assessing 401(k) plan menus. *See, e.g.*, 2017 ICI Study at 34 (displaying the "[t]arget date fund-adjusted average" number of investment options).
[12] This concentration of Plan assets in proprietary funds is not a result of participant preference, but instead the result of a lineup consisting of more than half proprietary investments.

14

Accordingly, it is reasonable to infer that Defendants failed to prudently investigate lower-cost, nonproprietary alternatives.

43.     Because the Plan is laden with high-cost, proprietary mutual funds managed by Natixis and its affiliates, the Plan's expenses are significantly higher than other comparable retirement plans. This is evidenced by comparing the expense ratio associated with the Plan's proprietary funds with the average expense ratio associated with 401(k) plans with between $250 and $500 million in assets:

|  | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Plan Expense Ratio (Proprietary Funds Only)[13] | 0.80% | 0.80% | 0.70% | 0.55% | 0.68% |
| Average 401(k) Expense Ratio[14] | 0.46% | 0.44% | 0.44% | N/A | N/A |

44.     The proprietary funds' overall excessive fees are not due to a single fund's exorbitant costs, but are instead the result of uniformly high fees across the Plan's proprietary investment options. Between 2015 and 2019, the Plan's proprietary funds were roughly five times more expensive than the Plan's non-proprietary funds. Among plans with $250 million to $500 million in assets in 2017, the average expense ratio for domestic equity funds was 0.44%.[15]

---

[13] The Plan expense levels in the Complaint are net of all revenue credits paid to participants, as are the expenses of each individual fund, to the extent determinable. Plaintiff's calculations assume the only funds paying revenue credits were the Plan's proprietary funds and the Artisan MidCap Fund.

[14] The reported average reflects the plan-weighted average expense ratio for 401(k) plans with $250 million to $500 million in assets. *See* INVESTMENT COMPANY INSTITUTE, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2015, at 53 (Mar. 2018), https://www.ici.org/system/files/attachments/pdf/ppr_18_dcplan_profile_401k.pdf; INVESTMENT COMPANY INSTITUTE, The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016, at 47 (June 2019), https://www.ici.org/system/files/attachments/pdf/19_ppr_dcplan_profile_401k.pdf; 2017 ICI Study at 57. Because ICI publishes averages roughly three years after the end of each plan year, average plan costs for 2018 and 2019 are not available.

[15] 2017 ICI Study at 62.

That same year, the Plan's proprietary domestic equity funds far exceeded this average, as well as the average expense ratio for actively managed domestic equity funds in the same asset class:

| Proprietary Domestic Equity Fund (Ticker) | Asset Class | Adj Net Expense Ratio[16] | Avg Expense Ratio - 401(k) Domestic Equity Funds[17] | % Excess Over 401(k) Domestic Equity Fund Avg | Avg Expense Ratio - Actively Managed Asset Class Category[18] | % Excess Over Actively Managed Asset Class Category Avg |
|---|---|---|---|---|---|---|
| Gateway Fund Y (GTEYX) | Large Cap | 0.59% | 0.44% | 34% higher | 0.40% | 48% higher |
| Loomis Sayles Growth Fund Y (LSGRX) | Large Cap | 0.48% | 0.44% | 9% higher | 0.40% | 20% higher |
| Loomis Sayles Sm Cap Growth I (LSSIX) | Small Cap | 0.77% | 0.44% | 75% higher | 0.67% | 15% higher |
| Loomis Sayles Sm Cap Value I (LSSCX) | Small Cap | 0.75% | 0.44% | 70% higher | 0.67% | 12% higher |
| Natixis Vaughan Nelson Mid Cap A (VNVAX) | Mid Cap | 1.04% | 0.44% | 136% higher | 0.72% | 45% higher |
| Oakmark Equity & Income Inv (OAKBX) | Target Risk | 0.69% | 0.44% | 57% higher | 0.47% | 47% higher |
| Oakmark Inv (OAKMX) | Large Cap | 0.73% | 0.44% | 66% higher | 0.40% | 83% higher |
| Oakmark Select Inv (OAKLX) | Large Cap | 0.85% | 0.44% | 93% higher | 0.40% | 113% higher |

---

[16] The "Adjusted Net Expense Ratio" reduces the net expense ratio by the average estimated revenue credit to proprietary funds in 2017. *See supra* note 13.

[17] The "Average Expense Ratio of Domestic Equity Funds" is the asset-weighted average expense ratio as a percentage of mutual fund assets among plans with audited 401(k) filings in the BrightScope database by mutual fund investment objective and plan size. 2017 ICI Study at 62.

[18] The "Average Expense Ratio of *Actively Managed* Funds – Asset Class Category" consists of the average expense ratio, as of 2017, of the least expensive share class of the twenty largest actively managed mutual funds by assets under management that are managed in a similar investment style. Averages are calculated separately for domestic large cap equity, domestic mid cap equity, domestic small cap equity, and target-risk/balanced categories. For example, the average actively managed asset class category expense ratio for the Large Cap category is a simple average of the expense ratios of the lowest-cost share class of the twenty largest actively managed mutual funds that invest in large cap domestic equities. The average expense ratio for each category does not reflect any revenue sharing rebates offered by the funds making up these averages. If such payments had been included (as they were for the Plan's proprietary funds), these averages would have likely been lower.

45.     The Plan's other proprietary investments fared no better. For plans with $250 million to $500 million in assets in 2017, the average expense ratio for international equity funds was 0.60%.[19] The Plan's proprietary international equity fund, Oakmark International Investor, carried a 0.82% adjusted net expense ratio[20] in 2017, 37% higher than the average international equity fund in similarly sized plans.[21]

46.     This pattern of excessive fees extends across the Plan's entire proprietary lineup, and throughout the class period. Despite the high cost of the proprietary investments in the Plan, Defendants failed to consider removing these proprietary investments in favor of lower-cost, nonproprietary options because it would have been contrary to Defendants' business interests.

47.     Had Defendants prudently monitored the investments within the Plan, in a process that was not tainted by self-interest, Defendants would have removed the Plan's investments in proprietary funds in favor of other nonproprietary funds that offered comparable investment management services and superior performance at significantly less expense. Given the excessive fees charged by the proprietary funds in the Plan, and the availability of comparable or superior funds with significantly lower expenses, the compensation paid to Natixis and its affiliates for their services was unreasonably high.

**B.     Defendants Failed to Remove Underperforming Proprietary Funds**

48.     Defendants' favoritism toward proprietary investments is also displayed through the imprudent monitoring and retention of underperforming funds.

49.     In large part because of the high fees within the Plan's proprietary investments, those investments tended to underperform, costing the Plan tens of millions of dollars in lost

---

[19] 2017 ICI Study at 62.
[20] *See supra* note 16.
[21] *See* 2017 ICI Study at 62.

benefits that participants would have had in their accounts had the Plan's investments been managed in a prudent and impartial manner. A prudent fiduciary offering high-fee options like the Natixis Funds would continuously monitor whether the extra fees were justified by a reasonable expectation of increased returns. *See Baker*, 2020 WL 8575183, at *1 (noting that although ERISA "permits a financial services firm to offer its proprietary funds in its retirement plan ... an ERISA fiduciary has 'a continuing duty to monitor [plan] investments and remove imprudent ones.' " (citations omitted)). Yet it appears that Defendants failed to do so. The fact that Defendants maintained an investment lineup consisting of over 50% proprietary investments despite prolonged underperformance in comparison to their self-selected primary prospectus benchmarks[22] and superior marketplace alternatives is indicative of an imprudent and disloyal process tainted by Defendants' self-interest.

50.     One example of an imprudently retained fund is the Gateway Fund. The Gateway Fund strategy is designed to capture the majority of the returns associated with large company equity market investments, such as those within the S&P 500 index, while exposing investors to less risk than other equity investments through the purchase and sale of index option contracts. Unfortunately for participants, the Gateway Fund has failed to accomplish either objective. Fiduciaries of other large plans have taken note, as Plaintiff is not aware of any other similarly sized defined contribution plan other than the Plan offering this fund.

---

[22] Form N-1A, outlines the requirements for a mutual fund's prospectus. The SEC's Form instructions state that every mutual fund must compare its performance against an "appropriate broad-based securities market index." Securities & Exchange Commission, *Form N-1a Instructions*, Item 4(b)(2)(iii), https://www.sec.gov/about/forms/formn-1a.pdf. This is known within the investment industry as the "primary prospectus benchmark."

51.     On a rolling 3- and 5-year basis, the Gateway Fund has dramatically lagged its primary prospectus benchmark, the S&P 500,[23] as well as other funds that share similar investment objectives and risk, throughout the statutory period:

| Fund (Ticker) | Adj Net Expense Ratio (2020)[24] | 3-Year Performance (12/31/15) | 5-Year Performance (12/31/15) | 3-Year Performance (12/31/20) | 5-Year Performance (12/31/20) |
|---|---|---|---|---|---|
| Gateway Fund Y (GTEYX) | 0.47% | 4.91% | 4.54% | 4.51% | 5.77% |
| *Primary Prospectus Benchmark* | | | | | |
| S&P 500 TR USD | n/a | 15.13% | 12.57% | 14.18% | 15.22% |
| *Fund Comparators* | | | | | |
| Hartford Core Equity R6 (HAITX) | 0.39% | 18.88% | 14.87% | 16.03% | 15.07% |
| T. Rowe Price Dividend Growth I (PDGIX) | 0.50% | 14.44% | 12.25% | 13.88% | 14.63% |
| Vanguard Institutional Index I (VINIX) | 0.04% | 15.63% | 12.54% | 14.15% | 15.19% |

52.     This underperformance versus its primary prospectus benchmark was the product of the Gateway Fund managers' lack of skill, and not its risk profile, as demonstrated through an analysis of the fund's alpha.[25] The Gateway Fund's strategy of minimizing volatility and risk

---

[23] Though the S&P 500 does not engage in the purchase and sale of option contracts, as the Gateway Fund does, it remains the appropriate benchmark index for measuring the Gateway Fund's performance for a number of reasons. First, it is the fund's primary prospectus benchmark, and thus was selected by its own managers as an appropriate index against which to compare the Fund's performance. Second, the performance and fee disclosures provided to Plan participants used the S&P 500 as the only index against which to measure the Gateway Fund's performance. Third, the Gateway Fund invests its underlying assets entirely in large company domestic stocks similar to those that make up the S&P 500. Finally, the S&P 500 is identified by Morningstar as the Gateway Fund's "Best Fit" Index, given that the fund's returns have an 96.76% R-Squared, meaning correlation, to the S&P 500.

[24] The "Adjusted Net Expense Ratio" reduces the net expense ratio by the average estimated revenue credit to proprietary funds using 2019 revenue credits data, the last year for which such data is available. *See also supra* note 13.

[25] Alpha is a metric used to measure a manager's skill on a risk-adjusted basis. Positive alpha demonstrates skill, an alpha of zero demonstrates zero skill, and negative alpha shows the manager made decisions that were worse than simply tracking the benchmark.

would lead investors to expect a positive alpha, indicating fund returns commensurate with the
risk incurred. Instead, the fund carried a perpetually negative alpha:

| | 3-Year Alpha (12/31/15) | 5-Year Alpha (12/31/15) | 3-Year Alpha (12/31/20) | 5-Year Alpha (12/31/20) |
|---|---|---|---|---|
| **Gateway Fund Y** | -1.11 | -0.50 | -2.84 | -1.61 |
| *Fund Comparators* | | | | |
| **Hartford Core Equity R6** | 4.24 | 2.82 | 1.90 | 0.57 |
| **T. Rowe Price Dividend Growth** | 0.22 | 0.68 | 1.13 | 1.25 |
| **Vanguard Institutional Index I**[26] | 0.12 | 0.27 | -0.26 | 0.03 |

53.     A prudent fiduciary would have removed the Gateway Fund from the Plan given
its significant underperformance on both a risk-adjusted and absolute basis leading up to and
throughout the statutory period. The fact that Defendants retained the proprietary Gateway Fund
in spite of its consistent underperformance of its benchmark and negative alpha supports an
inference that Defendants' process for monitoring the Plan's investments was self-interested and
imprudent. *See* DOL Advisory Op. 88-16A, 1988 WL 222716, at *3; Restatement (Third) of Trust
§ 90, cmt. d ("The trustee must give reasonably careful consideration to both the formulation and
implementation of an appropriate investment strategy, with investments to be selected and
reviewed in a manner reasonably appropriate to that strategy. Ordinarily this involves obtaining
relevant information about … the nature and characteristics of *available investment alternatives*.")
(emphasis added).[27]

_____

[26] An index fund should have the same return (positive or negative) as the index it mimics. As a
result, an index fund's alpha will generally be approximately zero.
[27] *Accord Tussey v. ABB, Inc.*, 850 F.3d 951, 957 (8th Cir. 2017) (evidence of disloyalty includes
"not considering other possible" investments); *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 636
(D.N.J. 2010) ("Whether an investment decision could have been the result of prudent investing
depends on the ***alternatives available*** to the fiduciary to accomplish the same purpose, in light of
all the other relevant information about the investments.") (emphasis added); *Davidson v Cook*,

54.     Another good example of Defendants' flawed monitoring process is the retention of the Oakmark Investor Fund, which has been in the Plan throughout the statutory period. Oakmark Investor, like the Gateway Fund, has been a poor investment for Plan participants. Signs of struggle within the fund surfaced at the beginning of the statutory period, when it trailed its primary prospectus benchmark, the S&P 500 index,[28] by 1.42% over the 3-year period ending in 2015. Market confidence in the fund and its strategy dwindled thereafter, and the fund experienced over $3.4 billion in investor redemptions in 2016 alone. This exodus continued throughout the statutory period, with Oakmark Investor incurring, on average, over $2.3 billion in investor redemptions each year between 2016 and 2020, including a $4.3 billion outflow in 2020.

55.     These redemptions were not without reason, as Oakmark Investor struggled to perform on both a return and risk-adjusted basis. By the end of 2020, the fund had underperformed its primary prospectus benchmark by 6.43% and 2.82% per year over the prior 3- and 5-year periods, respectively, and in five of the six calendar years between 2015 and 2020. In addition to underperforming its benchmark over time, Oakmark Investor incurred great amounts of risk while doing so. Over these same 3- and 5-year periods, the Oakmark Fund took on over 30% *more* risk than the S&P 500 despite underperforming the index, resulting in alpha of -8.63 and -5.87, respectively. This indicates that the fund's significant underperformance was due entirely to the managers' lack of skill, and occurred despite the fund taking on *more* risk than its self-selected primary prospectus benchmark, the S&P 500.

---

567 F. Supp. 225, 236 (E.D. Va. 1983) ("The fiduciaries did not … compare [the loan investment] to other ***available investments***, but instead did their best to accommodate the [sponsor's] needs.") (emphasis added).

[28] The S&P 500 is also the only benchmark that Defendants provide to Plan participants in the 404a-5 annual fee and investment disclosures for the Oakmark Investor Fund.

56.     A prudent and objective review of comparable investments in the marketplace would have revealed other funds that were superior to the Oakmark Investor Fund retained by in the Plan. As an example, the following chart shows the performance of Oakmark Investor at the time the market began fleeing the fund as well as at the end of 2020 (when the fund saw its largest redemptions), compared to three other investments in the marketplace that had (1) similar investment objectives (investing in large company stocks classified across the spectrum from growth to value) and levels of risk (as measured by standard deviation), (2) comparable or lower expenses, and (3) consistent outperformance in comparison to Oakmark Investor:

| Fund (Ticker) | Adj Net Expense Ratio (2020)[29] | 3-Year Performance (12/31/15) | 3-Year Performance (12/31/20) |
|---|---|---|---|
| Oakmark Investor (OAKMX) | 0.68% | 13.71% | 7.75% |
| *Primary Prospectus Benchmark* | | | |
| S&P 500 TR USD | n/a | 15.13% | 14.18% |
| *Fund Comparators* | | | |
| JPMorgan US Equity R6 (JUEMX) | 0.44% | 16.14% | 16.43% |
| MFS Core Equity R6 (MRGKX) | 0.64% | 14.47% | 15.08% |
| Vanguard Growth & Income Adm (VGIAX) | 0.23% | 15.63% | 13.49% |

57.     The ongoing retention of the proprietary Oakmark Investor fund in the face of notably declining performance, disfavor within the marketplace, and superior alternatives that were available, further reflect a fiduciary process imprudently and disloyally tilted in Defendants' favor.

58.     Defendants also imprudently and disloyally retained the Oakmark Equity & Income Fund, which has been in the Plan throughout the statutory period. As of the end of 2020, the fund materially trailed its self-selected primary prospectus benchmark, the S&P 500 index, over the

---

[29] *See supra* note 24.

prior 3- and 5-year periods, with underperformance averaging 8.25% and 5.90% *per year*, respectively.[30]

59.     This underperformance is also reflected in earlier data. For example, as of the end of 2015, Oakmark Equity & Income underperformed its primary prospectus benchmark by an average of 6.91% per year over the prior three years and 5.74% over the prior five years, while underperforming the Dow Jones US Moderate Portfolio Index by 0.99% and 1.71% per year over these same time periods, respectively.

60.     A prudent and objective review of comparable investments in the marketplace would have revealed numerous available investments that were superior to the Oakmark Equity & Income Fund that Defendants retained in the Plan. As an example, the following chart shows the performance of the fund as of the end of 2015 and 2020 compared to four other investments in the marketplace that had (1) similar asset allocations and levels of risk, (2) comparable or lower expenses, and (3) consistent outperformance in comparison to Oakmark Equity & Income:

| Fund (Ticker) | Adj Net Expense Ratio (2020)[31] | 3-Year Performance (12/31/15) | 3-Year Performance (12/31/20) |
|---|---|---|---|
| Oakmark Equity & Income Investor (OAKBX) | 0.61% | 8.22% | 5.93% |
| American Funds American Balanced R6 (RLBGX) | 0.26% | 10.81% | 9.07% |
| Fidelity Balanced (FBALX) | 0.52% | 10.12% | 13.48% |
| T. Rowe Price Capital Appreciation I (TRAIX) | 0.59% | 13.15% | 14.13% |
| Vanguard Wellington Adm (VWENX) | 0.17% | 9.64% | 9.46% |

---

[30] Despite selecting the all-equity index (the S&P 500) as the Oakmark Equity & Income Fund's primary prospectus benchmark, the fund utilizes a balanced asset allocation, investing approximately 60–70% of its assets in equity securities and 30–40% in fixed income securities. However, the fund still significantly underperforms when comparing its performance to a benchmark more aligned with its asset allocation and investment strategy. Over the prior 3- and 5-year periods ending 2020, the fund trailed the Dow Jones US Moderate Portfolio Index, a benchmark approximately allocating 60% of its portfolio to equity securities, by 3.54% and 1.56% *per year* over the prior 3- and 5-year periods, respectively.
[31] *See supra* note 24.

61.     The foregoing examples are illustrative of overall struggles with Natixis's proprietary funds generally. Given the high cost and poor track record of the Natixis Funds, their challenges in the marketplace, and their lack of utilization among fiduciaries of other similarly sized plans, it was imprudent to retain these funds in the Plan. Defendants improperly retained these funds to serve Natixis's business interests, not participants' interests, and generate additional investment fee income for Natixis and its affiliates. The retention of the Plan's proprietary funds under these circumstances is indicative of Defendants' breaches of their fiduciary duties of prudence and loyalty.[32]

### C.     Defendants Utilized an Imprudent and Disloyal Fund Selection Process

62.     Defendants' imprudent and disloyal process extends to the selection of new funds for the Plan as well. Despite the market's and other fiduciaries' exodus from Natixis Funds, Defendants *added* proprietary funds to the Plan during the statutory period. In fact, since 2014 the Plan has added *only* proprietary funds to the Plan. This fact, along with the existence of multiple superior nonproprietary alternatives managed in the same investment style as the proprietary funds that *were* added, demonstrates that Defendants' fund selection process does not consider nonproprietary options.

---

[32] When asset management companies such as Natixis favor retention of their own funds when acting as service providers, this favoritism has empirically resulted in worse performance within defined contribution plans. Veronica Pool et al., *It Pays the Menu: Mutual Fund Investment Options in 401(k) Plans*, 71 J. FIN. 1779 (Aug. 2016). Further, this poor performance tends to persist, empirically demonstrating that "the decisions to retain poorly performing affiliated funds is not driven by information about the future performance of these funds." *Id.* at 1781, 1808–10. A study of third-party administrators such as Natixis similarly shows that plans administered by asset management firms tend to have the highest fees and the lowest net returns, and that both the higher fees and lower returns are attributable to the use of proprietary mutual funds. Thomas Doellman & Sabuhi Sardarli, *Investment Fees, Net Returns, and Conflict of Interest in 401(k) Plans*, 39 J. FIN. RES. 5 (Spring 2016).

63.    In 2018, Defendants removed the nonproprietary Delafield Fund from the Plan, replacing it with the proprietary Natixis Vaughan Nelson Mid Cap Fund. Instead of considering the full range of investment options in the marketplace and objectively evaluating this investment against marketplace alternatives, Defendants displayed favoritism toward their own proprietary investment.

64.    As of year-end 2017, the time period immediately preceding the fund's inclusion in the Plan, the Natixis Vaughan Nelson Mid Cap Fund trailed its self-selected primary prospectus benchmark by 4.18% and 2.16% *per year* over the prior 3- and 5-year periods, respectively. This underperformance was not the result of a more conservative investment approach, as demonstrated through the fund's negative risk-adjusted performance over each time period.[33] A prudent and objective review of comparable investments in the marketplace would have revealed other mid-cap funds that were superior to the Natixis Vaughan Nelson Mid Cap Fund that Defendants included in the Plan. As an example, the following chart shows the performance of the fund as of the end of 2017 and 2020 compared to three other investments in the marketplace that had (1) similar asset allocations and levels of risk, (2) comparable or lower expenses, and (3) consistent outperformance in comparison to the Natixis Vaughan Nelson Mid Cap Fund:

| Fund (Ticker) | Adj Net Expense Ratio (2020)[34] | 3-Year Performance (12/31/17) | 5-Year Performance (12/31/17) | 3-Year Performance (12/31/20) | 5-Year Performance (12/31/20) |
|---|---|---|---|---|---|
| Natixis Vaughan Nelson Mid-Cap A (VNVAX) | 1.02% | 4.82% | 12.52% | 6.46% | 7.60% |
| Vanguard Mid-Cap Index I (VMCIX) | 0.04% | 9.40% | 15.02% | 12.04% | 13.29% |

---

[33] As of the end of 2017, the Natixis Vaughan Nelson Mid Cap A Fund had an alpha of -4.42 and -2.73 *per year* against its primary prospectus benchmark index over the prior 3- and 5-year periods, respectively.
[34] *See supra* note 24.

| Parnassus Mid-Cap I (PFPMX) | 0.75% | 10.26% | 13.85% | 11.62% | 13.42% |
| Fidelity Mid-Cap Stock (FMCSX) | 0.86% | 9.75% | 14.50% | 9.30% | 12.24% |

65.     As Defendants should have realized based on these 2017 performance numbers, the Plan would have been far better served by selecting a nonproprietary option. Defendants' inclusion of the Natixis Vaughan Nelson fund in the Plan reflects a fiduciary process imprudently and disloyally tilted in favor of Natixis.

## II.   PLAINTIFF LACKED KNOWLEDGE OF DEFENDANTS' CONDUCT AND PRUDENT ALTERNATIVES

66.     Plaintiff did not have knowledge of all material facts (including, among other things, the availability of less expensive alternative investments, the costs of the Plan's investments compared to those in similarly sized plans, and investment performance versus other available alternatives in similarly sized plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA, until shortly before this suit was filed. Further, Plaintiff does not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting, monitoring, evaluating, and removing Plan investments), because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth above.

## CLASS ACTION ALLEGATIONS

67.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to obtain for the Plan the remedies provided by 29 U.S.C. § 1109(a). Plaintiff seeks certification of this action as a class action pursuant to this

statutory provision and Fed. R. Civ. P. 23.

68.     Plaintiff asserts his claims in Counts I–II on behalf of a class of participants and

beneficiaries of the Plan defined as follows:[35]

> All participants and beneficiaries of the 401(k) Savings and Retirement
> Plan, Sponsored by Natixis Investment Managers, L.P. (f/k/a 401(k)
> Savings and Retirement Plan, Sponsored by Natixis Global Asset
> Management, L.P.) invested in funds managed by Natixis and its affiliates
> at any time on or after February 18, 2015, excluding any persons with
> responsibility for the Plan's investment or administrative functions.

69.     Numerosity: The Class is so numerous that joinder of all Class members is

impracticable. The Plan had approximately 1,500 to 1,800 participants at all relevant times during

the applicable period.

70.     Typicality: Plaintiff's claims are typical of the Class members' claims. Like other

Class members, Plaintiff participated in the Plan during the class period and suffered financial

harm as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff

consistently with other Class members with regard to the Plan. Defendants' imprudent and disloyal

investment decisions affected all Plan participants similarly.

71.     Adequacy: Plaintiff will fairly and adequately protect the interests of the Class.

Plaintiff's interests are aligned with the Class that he seeks to represent, and Plaintiff has retained

counsel experienced in complex class action litigation, including ERISA litigation. Plaintiff does

not have any conflicts of interest with any Class members that would impair or impede his ability

to represent such Class members.

72.     Commonality: Common questions of law and fact exist as to all Class members and

predominate over any questions solely affecting individual Class members, including but not

---

[35] Plaintiff reserves the right to propose other or additional classes or subclasses in their motion
for class certification or subsequent pleadings in this action.

limited to:

    a.   Whether Defendants are fiduciaries with respect to the Plan;

    b.   Whether Defendants breached their fiduciary duties by engaging in the conduct described herein;

    c.   The proper form of equitable and injunctive relief; and

    d.   The proper measure of monetary relief.

73.    Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecuting separate actions against Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

74.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual Class members, as a practical matter, would be dispositive of the interests of the other persons not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests. Any award of prospective equitable relief by the Court would be dispositive of non-party participants' interests. The accounting and restoration of the property of the Plan that would be required under 29 U.S.C. §§ 1109 and 1132 would be similarly dispositive of the interests of other Plan participants.

75.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual Class members, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct as described in this Complaint applied uniformly to all members of the Class. Class members do not have an interest in pursuing separate actions against Defendants, as the amount of each Class member's individual claims is relatively small compared to the expense and burden of individual prosecution, and Plaintiff is

unaware of any similar claims brought against Defendants by any Class members on an individual basis. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

**COUNT I**
**Breach of Fiduciary Duties of Loyalty and Prudence**
**29 U.S.C. § 1104(a)(1)(A)–(B)**

76.     As alleged above, Defendants are fiduciaries with respect to the Plan and are subject to ERISA's fiduciary duties.

77.     29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon the Defendants in connection with the administration of the Plan and the selection and monitoring of Plan investments.

78.     The scope of the fiduciary duties and responsibilities of Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the plan, and acting with appropriate care, skill, diligence, and prudence. Further, Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting and retaining prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent ones, and taking all necessary steps to ensure that the Plan's assets are invested prudently. This duty includes "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble*, 575 U.S. at 530.

79.     As described throughout the Complaint, Defendants failed to prudently and objectively monitor the Plan's proprietary investments to ensure that each of the Plan's proprietary

29

investments were and remained appropriate for the Plan, and failed to remove those proprietary investments that were no longer appropriate. Defendants retained proprietary funds as Plan investments despite the availability of superior alternative investments from other firms that would have cost Plan participants significantly less. Further, Defendants imprudently selected proprietary investments for the Plan and improperly favored proprietary investments over superior non-proprietary investment alternatives in their investment selection process.

80.     Each of the above-mentioned imprudent actions and failures to act in a prudent and objective manner illustrate Defendants' failure to monitor the Plan's investments and make Plan investment decisions based solely on the merits of each investment and what was in the interest of Plan participants. Instead, Defendants' conduct and decisions were influenced by their desire to drive revenues and profits to Natixis and its affiliates. Through these actions and omissions, Defendants failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries of the Plan, and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of their fiduciary duty of loyalty under 29 U.S.C. § 1104(a)(1)(A).

81.     Further, each of the actions and omissions described in paragraph 79 above and elsewhere in this Complaint demonstrate that Defendants failed to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, in violation of 29 U.S.C. § 1104(a)(1)(B).

82.     As a consequence of Defendants' fiduciary breaches, the Plan and its participants suffered millions of dollars in losses.

83.     Defendants are liable, under 29 U.S.C. §§ 1109 and 1132, to make good to the Plan all losses resulting from the aforementioned fiduciary breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from their breaches of fiduciary duties.

84.     Each Defendant knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
## Failure to Monitor Fiduciaries

85.     The Committee and its members (as well as Natixis) are fiduciaries of the Plan with responsibilities relating to the selection and monitoring of Plan investment options.

86.     Natixis is responsible for appointing and removing members of the Committee. Natixis therefore has a fiduciary responsibility to monitor the performance of the Committee and its members.

87.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA.

88.     Natixis breached its fiduciary monitoring duties by, among other things:

      a.   failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

b.  failing to monitor the processes by which Plan investments were selected, monitored, and retained, which would have alerted a prudent fiduciary to the breaches of fiduciary duties outlined above; and

c.  failing to remove Committee members whose performance was inadequate in that they selected and retained imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan participants' retirement savings.

89.  As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars per year in losses due to excessive fees and investment underperformance.

90.  Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Natixis is liable to restore to the Plan all losses suffered as a result of the fiduciary breaches that resulted from its failure to properly monitor its appointed fiduciaries on the Committee.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brian Waldner, individually, as the representative of the Class defined herein, and on behalf of the Plan, prays for relief as follows:

A.  A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.  Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.  A declaration that Defendants breached their fiduciary duties under ERISA;

D.  An order compelling Defendants to personally make good to the Plan all losses that the Plan incurred as a result of the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.  An accounting for profits earned by Natixis and its affiliates from, or in respect of, the Plan;

F.  An order granting equitable restitution and other appropriate equitable monetary relief against Natixis including, but not limited to, disgorgement of profits; imposition of a constructive trust on all assets of the Plan transferred to Natixis or its affiliates as a result of Defendants' unlawful conduct in violation of ERISA; or a surcharge against Defendants to prevent unjust enrichment from unlawful conduct

involving the Plan;

G.      An order enjoining Defendants from any further violations of ERISA;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

I.      An award of pre-judgment interest;

J.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

K.      An award of such other and further relief as the Court deems equitable and just.


Dated: May 11, 2021                    **NICHOLS KASTER, PLLP**

                                       s/Kai Richter
                                       Paul J. Lukas, MN Bar No. 022084X*
                                       Kai Richter, MN Bar No. 0296545*
                                       Brock J. Specht, MN Bar No. 0388343*
                                       Patricia C. Dana, MN Bar No. 0400803*
                                       *admitted pro hac vice*
                                       4700 IDS Center
                                       80 South 8th Street
                                       Minneapolis, MN 55402
                                       Telephone: 612-256-3200
                                       Facsimile: 612-338-4878
                                       lukas@nka.com
                                       krichter@nka.com
                                       bspecht@nka.com
                                       pdana@nka.com

                                       **BLOCK & LEVITON, LLP**

                                       Jason M. Leviton (BBO #678331)
                                       260 Franklin Street, Suite 1860
                                       Boston, MA  02110
                                       Telephone: 617-398-5600
                                       jason@blockesq.com


                                       **ATTORNEYS FOR PLAINTIFF**

33

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 11, 2021, a true and correct copy of the foregoing was served by CM/ECF to the parties registered to the Court's CM/ECF system.

Dated: May 11, 2021                                  <u>s/Kai Richter</u>
                                                     Kai Richter