**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Brian Waldner, et al.,

                         Plaintiff,

v.

Natixis Investment Managers, L.P., et al.,


                         Defendants.

Case No.  1:21-cv-10273-LTS


**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

## Table of Contents

Introduction ........................................................................................................................ 1

Background ......................................................................................................................... 2

    A. The Plan ................................................................................................................. 2

        1. Overview of the Plan and its Investment Options. ...................................... 2

        2. Revenue Credits to Participants. ................................................................. 4

    B. The Complaint's Allegations ................................................................................. 5

The Motion To Dismiss Standard ...................................................................................... 6

Argument ........................................................................................................................... 7

    I. Count I Does Not State a Claim for Fiduciary Breach Under ERISA. ............................. 7

        A. Offering Some Proprietary Funds Does Not Give Rise to a Reasonable
        Inference of a Deficient Fiduciary Process. ................................................. 8

        B. The Funds' Expenses Do Not Give Rise to a Plausible Inference of a Deficient
        Fiduciary Process. ....................................................................................... 9

            1. ERISA Does Not Require Choosing the Cheapest Funds. ...................... 9

            2. The Complaint Relies on Overstated Fund Expenses. ............................ 9

            3. Expense Comparisons Between Actively- and Passively-Managed Funds
            Are Meaningless. .............................................................................. 11

            4. Expense Comparisons With Unidentified Funds Are Meaningless. ..................... 12

        C. Isolated Periods of Alleged Underperformance of a Minority of Funds Does
        Not Give Rise to a Plausible Inference of a Deficient Process. .................... 12

            1. 20/20 Hindsight Does Not Raise a Plausible Claim. ............................ 12

            2. The Complaint Notably Omits Reference to the Performance of the Vast
            Majority of Plan Funds. .................................................................... 13

            3. The Complaint Omits the Challenged Funds' Outperformance. ......................... 13

            4. The Complaint's Selective Fund Comparisons Fail to Provide Meaningful
            Benchmarks for the Challenged Funds. ............................................... 14

            5. The Complaint Selectively and Misleadingly Omits Some of the
            Challenged Funds' Prospectus Benchmarks. ...................................... 15

         D. Alleging the Plan Kept the Challenged Funds to "Stave Off the Consequences
        of an Otherwise Declining Asset Base" Makes No Sense. ......................... 17

    II. Count II Should Be Dismissed Because It Is Derivative of Count I. ............................... 17

    III. Plaintiff Lacks Standing to Assert Many of the Claims Asserted in the Complaint. ........ 18

        A. Plaintiff Lacks Standing to Bring Claims Regarding Funds in Which He Did
        Not Invest. ................................................................................................. 18

        B. Plaintiff Lacks Standing to Sue for Claims Before July 2017. ..................... 20

Conclusion ........................................................................................................................ 20

**Page(s)**

**Cases**

*Anderson v. Intel Corp.*,
2021 WL 229235 (N.D. Cal. Jan. 21, 2021) ..........................................................14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................6

*In re Bank of Bos. Corp. Sec. Litig.*,
762 F. Supp. 1525 (D. Mass. 1991) .......................................................................20

*Barchock v. CVS Health Corp.*,
2017 WL 1382517 (D.R.I. Apr. 18, 2017),
*aff'd,* 886 F.3d 43 (1st Cir. 2018) ............................................................................2

*Barchock v. CVS Health Corp.*,
886 F.3d 43 (1st Cir. 2018) ...............................................................................8, 18

*Bekker v. Neuberger Berman Grp. LLC*,
2018 WL 4636841 (S.D.N.Y. Sept. 27, 2018) ........................................................9

*In re Bos. Sci. Corp. ERISA Litig.*,
254 F.R.D. 24 (D. Mass. 2008) ..............................................................................18

*Bunch v. W.R. Grace & Co.*,
555 F.3d 1 (1st Cir. 2009) ................................................................................8, 12

*Clark v. Duke Univ.*,
2018 WL 1801946 (M.D.N.C. Apr. 13, 2018) ......................................................20

*Coleman v. Gen. Elec. Co.*,
643 F. Supp. 1229 (E.D. Tenn. 1986),
*aff'd,* 822 F.2d 59 (6th Cir. 1987) .........................................................................20

*Cunningham v. Cornell Univ.*,
2017 WL 4358769 (S.D.N.Y. Sept. 29, 2017) ........................................................2

*David v. Alphin*,
817 F. Supp. 2d 764 (W.D.N.C. 2011),
*aff'd,* 704 F.3d 327 (4th Cir. 2013) .......................................................................19

*Davis v. Salesforce.com, Inc.*,
2020 WL 5893405 (N.D. Cal. Oct. 5, 2020) .....................................................3, 11

*Davis v. Salesforce.com, Inc.*,
   2021 WL 1428259 (N.D. Cal. Apr. 15, 2021) .......................................................11

*Doucot v. IDS Scheer, Inc.*,
   734 F. Supp. 2d 172 (D. Mass. 2010) ............................................................. 2-3

*Dupree v. Prudential Ins. Co. of Am.*,
   2007 WL 2263892 (S.D. Fla. Aug. 7, 2007)........................................................8

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014).............................................................................................7

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*,
   493 U.S. 331 (1990)...........................................................................................18

*Gonzalez v. United States*,
   284 F.3d 281 (1st Cir. 2002)...............................................................................2

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ..............................................................................9

*Johnson v. Delta Air Lines, Inc.*,
   2017 WL 10378320 (N.D. Ga. Dec. 12, 2017).................................................19

*Kenney v. State St. Corp.*,
   694 F. Supp. 2d 67 (D. Mass. 2010) ...................................................................2

*Leber v. Citigroup, Inc.*,
   2011 WL 5428784 (S.D.N.Y. Nov. 8, 2011).....................................................13

*Marshall v. Northrop Grumman Corp.*,
   2017 WL 2930839 (C.D. Cal. Jan. 30, 2017) ...................................................19

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) ..................................................................11, 14, 15

*Michael v. Blue Cross of Cal.*,
   2020 WL 4586967 (C.D. Cal. Aug. 7, 2020).......................................................2

*Parmer v. Land O'Lakes, Inc.*,
   2021 WL 464382 (D. Minn. Feb. 8, 2021) ..................................................11, 15

*Patterson v. Capital Grp. Cos.*,
   2018 WL 748104 (C.D. Cal. Jan. 23, 2018) ........................................................9

*Patterson v. Morgan Stanley*,
   2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019)................................................15, 19

*Piazza v. Ebsco Indus., Inc.*,
    273 F.3d 1341 (11th Cir. 2001) ................................................20

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012) ............................................... 6-7

*Sims v. BB&T Corp.*,
    2017 WL 3730552 (M.D.N.C. Aug. 28, 2017) ........................20

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v.*
    *Morgan Stanley Inv. Mgmt. Inc.*,
    712 F.3d 705 (2d Cir. 2013) ..................................................7

*Stone v. Wall*,
    2015 WL 1137544 (D.R.I. Mar. 12, 2015) ..............................2

*Taveras v. UBS AG*,
    612 F. App'x 27 (2d Cir. 2015) ...........................................18

*Terraza v. Safeway Inc.*,
    241 F. Supp. 3d 1057 (N.D. Cal. 2017) ..................................2

*In re The First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) .....................................2

*Tracey v. Mass. Inst. of Tech.*,
    404 F. Supp. 3d 356 (D. Mass. 2019) ...................................18

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ...............................................13

*Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*,
    2016 WL 4507117 (C.D. Cal. Aug. 5, 2016) ......................19, 20

*Vander Luitgaren v. Sun Life Assur. Co. of Can.*,
    765 F.3d 59 (1st Cir. 2014) ...................................................9

*Warth v. Seldin*,
    422 U.S. 490 (1975) ..............................................................2

*Wehner v. Genetech, Inc.*,
    2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ........................12, 15

*White v. Chevron Corp.*,
    2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) .........................8

*White v. Chevron Corp.*,
   2017 WL 2352137 (N.D. Cal. May 31, 2017),
   *aff'd*, 752 F. App'x 453 (9th Cir. 2018) ...................................................................9

*Wilcox v. Georgetown Univ.*,
   2019 WL 132281 (D.D.C. Jan. 8, 2019) ...................................................................19

*Wildman v. Am. Century Servs., LLC*,
   362 F. Supp. 3d 685 (W.D. Mo. 2019) ......................................................................4

**Statutes and Rules**

Employee Retirement Income Security Act of 1974 (ERISA):

   § 404(a)(1), 29 U.S.C. § 1104(a)(1) ..........................................................................6

Fed. R. Civ. P. 12(b)(1) .................................................................................................2

**Other Authorities**

56 Fed. Reg. 10,724 (Mar. 13, 1991) .............................................................................9

H.R. Conf. Rep. No. 93-1280 (Aug. 12, 1974) .........................................................8-9

## INTRODUCTION

Like its predecessor, the amended complaint (Doc. No. 19, the "Complaint" or "Compl.")
fails to state a plausible claim that Defendants, the alleged fiduciaries of the 401(k) Savings and
Retirement Plan, Sponsored by Natixis Investment Managers, LLC (the "Plan"), breached any
fiduciary duties.[1]  Nothing about the Plan supports the Complaint's conclusory allegation that
Defendants "us[ed] the Plan as an opportunity to promote Natixis's mutual fund business and
maximize profits at the expense of the Plan and its participants."  Compl. ¶ 7.  To the contrary,
the Plan has all the hallmarks of a plan that is prudently managed in participants' interests.  Most
of the Plan's mutual funds are unaffiliated with Natixis, and participants are invested by default
into unaffiliated index mutual funds unless they affirmatively select a different investment.

The Plan provided participants who did not want to invest in a default unaffiliated fund
with a range of choices, including other index and actively-managed mutual funds and collective
investment trusts.  To be sure, of the Plan's 30+ investment options, between 12 to 15—the
number varied over the putative class period—were managed by seven different Natixis
affiliates.  This is only a fraction of the over 60 Natixis-affiliated funds offered in the market-
place, suggesting a careful curating of the Plan's menu.  Even as to the Plan's use of some
Natixis funds, the Complaint's own allegations show that the Plan was in good company:  of all
plans with over $250 million in assets, fully 17% offer Natixis funds to their participants as well.
And with good reason.  Natixis is one of the largest financial services firms in the world, and its
affiliated funds include some of the best in the industry, are overseen by award-winning
managers, and have performed well over long periods.

The Complaint does not contend otherwise.  Instead, in trying unsuccessfully to plead a

---

[1] The Plan's sponsor is Natixis Investment Managers, LLC ("Natixis"), which is the successor-in-interest via
statutory conversion to Natixis Investment Managers, L.P.

plausible claim, the Complaint focuses on the performance of just four funds, ignoring both the performance of most funds it challenges and the periods of out-performance by the small subset of funds whose performance it does highlight. And, when the Complaint identifies alleged underperformance, it relies heavily on clearly inapt comparators, such as measuring the Gateway Fund—ranked by Lipper as "Best Alternative Equity Market Neutral Fund" for the 5-year period ending November 30, 2020—against funds with entirely different investment strategies.

Moreover, the Complaint relies on incorrect and substantially overstated fund expenses to allege that Plan fiduciaries breached their duties. As the Complaint now concedes, the Plan provides generous revenue credits to participants that offset a substantial part of their costs. The original complaint (Doc. No. 1) simply ignored these revenue credits. The Complaint now contains two new flaws that are equally fatal: a series of arithmetic errors that continue to overstate the challenged funds' expenses, and nonsensical comparisons of those expenses to those of inapt funds. For these and the reasons below, the Complaint should be dismissed.

## BACKGROUND

### A. The Plan

1. Overview of the Plan and its Investment Options.

The Plan is a defined contribution retirement plan offered to eligible employees of Natixis and certain affiliates. An Decl., Ex. 8 at 1.[2] Natixis is a holding company that owns a

---

[2] The Court may take judicial notice of the Plan documents, documents filed with the U.S. Securities and Exchange Commission. ("SEC") or other agencies, fee and performance information, and media reports. *See, e.g.*, *Kenney v. State St. Corp.*, 694 F. Supp. 2d 67, 70 (D. Mass. 2010) (SEC filings and summary plan descriptions); *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 165 n.167 (D. Mass. 2009) (historical investment performance); *Stone v. Wall*, 2015 WL 1137544, at *1 (D.R.I. Mar. 12, 2015) (news reports); *Barchock v. CVS Health Corp.*, 2017 WL 1382517, at *1 (D.R.I. Apr. 18, 2017), *aff'd*, 886 F.3d 43 (1st Cir. 2018) (Forms 5500); *Michael v. Blue Cross of Cal.*, 2020 WL 4586967, at *3 (C.D. Cal. Aug. 7, 2020) (Forms 5500); *Terraza v. Safeway Inc.*, 241 F. Supp. 3d 1057, 1067 (N.D. Cal. 2017) (plan document; Forms 5500, and summary plan descriptions); *Cunningham v. Cornell Univ.*, 2017 WL 4358769, at *4 (S.D.N.Y. Sept. 29, 2017) (Forms 5500, prospectuses). Also, for a Rule 12(b)(1) standing analysis, the Court may consider materials outside the pleadings without converting this motion into a summary judgment motion. *Gonzalez v. United States,* 284 F.3d 281, 288 (1st Cir. 2002); *see also Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Doucot v. IDS Scheer, Inc.*, 734 F. Supp. 2d 172, 180 (D.

number of affiliated investment managers that offer over 60 mutual funds and over 200 investment products and strategies.[3]  Natixis is itself an indirect subsidiary of Groupe BPCE, the second largest banking group in France and one of the world's largest financial services companies.[4]  Natixis has contributed generously to the Plan—from 2015 and 2019, Natixis and its affiliates contributed over $52 million to participant accounts.  An Decl., Exs. 3-7 at pdf p. 27.  As of the end of 2019, the Plan had about $438 million in assets.  An Decl., Ex. 7, at pdf p. 16.

The Plan offers a diverse array of more than 30 passively- and actively-managed investment options.[5]  An Decl., Ex. 7 at pdf p. 39; *see* Exs. 10-16.  They include, among others: U.S. and international equity funds; several bond funds; a money market fund; target-date funds; and specialty funds that invest, for example, in real estate or that engage in special strategies designed to reduce volatility.  An Decl., Ex. 7 at pdf p. 39; *see* Exs. 10-16.

The investment options are provided by a wide variety of asset managers.  The majority—ranging from 17 to 20 over the putative class period—are managed by unaffiliated advisers such as Vanguard, State Street, SEI, Artisan, and Winslow; a minority (ranging from 12 to 15 funds over the putative class period) are managed by Natixis affiliates, such as AEW, AlphaSimplex Group, Gateway, Harris Associates (the Oakmark Funds' adviser), Loomis Sayles, Mirova, and Vaughan Nelson.  An Decl., ¶ 3, Exs. 3-7.  In this regard, fully 17% of plans with assets over $250 million make Natixis-affiliated funds available to their participants.

---

Mass. 2010).  For ease of reference, the Plan-related documents, public filings, and fee and performance information, even where publicly available online, are compiled as exhibits to the Declaration of James An ("An Decl."), Doc. No. 16, and the Declaration of Gina Faldetta filed concurrently with the motion to dismiss ("Faldetta Decl."), each referenced herein by Paragraph or Exhibit number.

[3] *See Affiliated Investment Managers,* Natixis Investment Managers, available at https://www.im.natixis.com/us/affiliated-investment-managers (last visited Apr. 19, 2021).

[4] *See* Homepage, Group BPCE, available at https://groupebpce.com/en (last visited Apr. 19, 2021).

[5] Actively-managed funds attempt to outperform a benchmark or market index by making strategic buying and selling decisions.  Passively-managed funds, which cost less to manage, seek to replicate a benchmark or index and closely match its performance. *Davis v. Salesforce.com, Inc.*, 2020 WL 5893405, at *2 n.3 (N.D. Cal. Oct. 5, 2020).

Compl. ¶ 8.  Their popularity is no accident.  Natixis-affiliated funds and managers have won

numerous awards over the last five years.  For example, Lipper, a leading source of mutual fund

industry data, ranked the Gateway Fund, which the Complaint vilifies as "underperforming," as

"Best Alternative Equity Market Neutral Fund" for the 5-year period ending November 30, 2020,

and ranked Oakmark International, another Natixis-affiliated fund in the Plan, "Best

International Multi-Cap Value Fund" over the 10-year period ending the same date.[6]

Participants who do not choose otherwise are automatically invested in an unaffiliated

age-appropriate Vanguard target-date fund.  An. Decl., Ex. 8 at 12.

### 2.  Revenue Credits to Participants.

Given the variety of investment management styles, the Plan's funds have a range of

investment expenses, from 0.04% to 1.24% on an annual basis.  *See* An Decl., Ex. 10 at 1; Ex. 16

at 1.  However, those expenses do not accurately capture the economic experience of Plan

participants.  Defendants have arranged for Schwab, the Plan's recordkeeper, to provide revenue

credits to the Plan that reduce fund expenses that would otherwise be borne by participants.  An

Decl., Ex. 1 at § 7.3(b); Ex. 7 at pdf p. 35 (note 7 to financial statements).[7]  As one court recently

observed, "it is uncommon for retirement plans to rebate revenue sharing paid by fund managers

to recordkeepers back to participants; only five to ten percent of retirements plans did so as of

2015."  *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 693 (W.D. Mo. 2019).  The

Plan is among that elite minority.  These credits are "allocated back" to participants "based on

---

[6] *Natixis Investment Managers Affiliated Funds Earn 2021 US Refinitiv Lipper Fund Awards* ("2021 Lipper Awards" hereafter), BUSINESSWIRE (Mar. 11, 2021), available at https://www.businesswire.com/news/home/20210311005755/en/.

[7] Revenue credits are a means by which a retirement plan's recordkeeper returns to the plan some of the revenue it receives with respect to the plan's funds.  The Plan allocates Schwab's revenue credits to accounts of participants whose fund investments generated the credit, thereby reducing the fund expense those participants would otherwise bear.  An Decl., Ex. 1 at § 7.3(b); Ex. 8 (2017 Summary Plan Description) at 12.

the size and nature of [the participant's] investment in the fund." An Decl., Ex. 8 at 12, pdf p.

16. The chart below lists the credits, as disclosed in the Plan's filings with the Department of

Labor ("DOL"), that Schwab provided to the Plan from 2015 to 2019 by dollar value, as a

percentage of the assets of the Natixis-affiliated funds plus the Artisan fund (which the

Complaint (¶ 44 n. 13) "assume[s to be] the only funds paying revenue credits"), and as "basis

points"—that is 1/100 of 1%, or 0.01%. Participants' fund expenses were offset by these credits,

effectively lowering participants' costs for those funds.

| A | B | C | D | E |
|---|---|---|---|---|
| Plan Year | Plan Assets in Natixis-affiliated and Artisan funds[8] | Revenue Credits[9] | Revenue Credits as Percentage of Assets (C/B) | Credits Percentage in Basis Points (D×100) |
| 2015 | $190,640,083 | $319,978 | 0.17% | 17 |
| 2016 | $204,580,203 | $389,365 | 0.19% | 19 |
| 2017 | $246,595,821 | $584,149 | 0.24% | 24 |
| 2018 | $227,030,325 | $664,829 | 0.29% | 29 |
| 2019 | $271,839,440 | $639,562 | 0.24% | 24 |

## B. The Complaint's Allegations

Plaintiff Brian Waldner participated in the Plan from July 2017 until days after bringing

this lawsuit. Compl. ¶ 18. Rejecting the default option of investing solely in an unaffiliated

Vanguard fund, Mr. Waldner chose to invest part of his account in three Natixis-affiliated funds:

the Gateway Fund, AEW Real Estate Fund, and Oakmark International Fund. Compl. ¶ 18.

The Complaint focuses on a subset of the funds in which Mr. Waldner and other putative

class members could affirmatively choose for their Plan accounts. In particular, it alleges that in

2017, the 12 Natixis-affiliated funds then available had higher expenses than the average

---

[8] "Plan Assets in Natixis-affiliated and Artisan funds" aggregates per-fund figures in Schedule H, Line 4i – Schedule of Assets (Held at End of Year) of each Form 5500's "Supplementary Information" section. *See* An Decl., Exs. 3-7.

[9] "Revenue Credits" lists the revenue credits figure disclosed under the heading "Related Party Transactions and Party-in-Interest Transactions" in the "Notes to Financial Statements" at the end of the Financial Statements included in each Form 5500. *See* An Decl., Exs. 3-7.

expenses charged by the least-expensive share classes of the twenty largest funds in the same asset class. Compl. ¶¶ 41-47. The Complaint also challenges the performance of four Natixis-affiliated funds—the Gateway Fund, Oakmark Fund, Oakmark Equity & Income Fund, and Vaughan Nelson Mid Cap Fund—and alleges that those funds underperformed certain comparator funds or indexes. Compl. ¶¶ 50-60.

The Complaint contains two counts under ERISA against Natixis and the Natixis Retirement Plan Committee (the "Committee"). Count I alleges that Defendants breached fiduciary duties of loyalty and prudence under ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B),[10] by making proprietary funds available as Plan options and failing "to remove those proprietary investments that were no longer appropriate." Compl. ¶ 79. The Complaint does not specify which of those investments "were no longer appropriate," nor when they ceased being appropriate. Count II alleges that Natixis failed to appropriately monitor the Committee. As explained below, neither count states a claim for relief.

### THE MOTION TO DISMISS STANDARD

To survive dismissal, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Plausible ... means something more than merely possible, and gauging a pleaded situation's plausibility is a context-specific job that compels [the court] to draw on [its] judicial experience and common sense" in light of the well-pleaded factual allegations, "implications from documents attached to or fairly incorporated into the complaint," and "facts susceptible to judicial notice." *Schatz v. Republican*

---

[10] These duties require a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. §§ 1104(a)(1)(A) and (B).

6

*State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted).

To withstand dismissal, "the complaint must demonstrate 'more than a sheer possibility that a defendant has acted unlawfully.'" *PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (citation omitted). It must allege "*nonconclusory* factual content raising a *plausible* inference of misconduct" and must "not rely on "the vantage point of hindsight." *Id.* "[I]f the complaint relies on circumstantial factual allegations to show a breach of fiduciary duties under ERISA, those allegations must give rise to a '*reasonable* inference' that the defendant committed the alleged misconduct, thus permit[ting] the court to infer more than the *mere possibility* of misconduct." *Id.* at 718-19.

The Court's inquiry is necessarily rigorous. "[O]ne important mechanism for weeding out meritless [ERISA] claims [is] the motion to dismiss for failure to state a claim." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). "[C]areful, context-sensitive scrutiny of a complaint's allegations," through a motion to dismiss, is the appropriate way to accomplish the "important task" of "divid[ing] the plausible sheep from the meritless goats." *Id.*

## ARGUMENT

## I.    Count I Does Not State a Claim for Fiduciary Breach Under ERISA.

Count I should be dismissed because its non-conclusory allegations do not state a plausible claim that Defendants employed a disloyal or imprudent process. The Complaint contains no facts regarding the fiduciary process. Instead, it repeats the conclusory allegation that Defendants "fail[ed] to engage in a prudent and loyal process." Compl. ¶ 40; *see id.* ¶¶ 7, 47, 49, 53, 62. Saying it does not make it so.

The Complaint asks the Court to *infer* a deficient process based on allegations that a small minority of the funds selected by Plan fiduciaries underperformed and that *some* of those funds had high expenses. *See, e.g., id.* ¶ 53. Because fiduciaries are judged by their decision-

making process, the test for whether one satisfied ERISA's fiduciary duties is one of "*conduct*," and not the "*results*" of investment performance. *Barchock v. CVS Health Corp.*, 886 F.3d 43, 45 (1st Cir. 2018) (affirming dismissal) (emphases added). That means that plaintiffs cannot plead a fiduciary breach by simply alleging "that [p]lan participants would have done better in alternative investments" that were not offered. *White v. Chevron Corp.*, 2016 WL 4502808, at *18 (N.D. Cal. Aug. 29, 2016) (dismissing complaint). Decisions "cannot be measured in hindsight" given the inherent uncertainty of investment performance in ever-changing markets. *Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (internal punctuation omitted).

The Complaint's allegations and the public record do not establish a plausible inference of a deficient process, much less one tainted by a corporate profit motive. The Plan's default option for any participant who did not choose otherwise was an unaffiliated Vanguard fund. Unless a participant made an affirmative election to invest in a Natixis-affiliated fund, all Plan contributions, including the tens of millions of dollars Natixis contributed, would be invested, by default, in a competitor's product. This alone negates any inference of profit motive.

Even as to Natixis-affiliated funds into which Plan participants could affirmatively elect—which were only a fraction of the funds Natixis affiliates offer to the market—Mr. Waldner has no claim for a number of reasons.

### A. Offering Some Proprietary Funds Does Not Give Rise to a Reasonable Inference of a Deficient Fiduciary Process.

It is well established that including a plan sponsor's proprietary funds does not "give rise to an inference of" wrongdoing. *Dupree v. Prudential Ins. Co. of Am.*, 2007 WL 2263892, at *45 (S.D. Fla. Aug. 7, 2007). Congress and the DOL have both recognized it is "common practice" for financial services companies' own plans to offer participants the opportunity to invest in their employers' investment funds. H.R. Conf. Rep. No. 93-1280, at 5093 (Aug. 12,

1974); *accord* 56 Fed. Reg. 10,724, 10,730 (Mar. 13, 1991). Thus, courts have repeatedly held that "sponsor-affiliated funds are permitted under ERISA and do not, standing alone, support an inference that a defendant breached its fiduciary duties by including such a fund." *Bekker v. Neuberger Berman Grp. LLC*, 2018 WL 4636841, at *6 (S.D.N.Y. Sept. 27, 2018).[11] "ERISA section 404(a) does not require a fiduciary to don the commercial equivalent of sackcloth and ashes." *Vander Luitgaren v. Sun Life Assur. Co. of Can.*, 765 F.3d 59, 65 (1st Cir. 2014).

## B. The Funds' Expenses Do Not Give Rise to a Plausible Inference of a Deficient Fiduciary Process.

The Complaint's allegations that the Natixis-affiliated funds did not have the lowest possible expenses also fails to create a plausible inference of a deficient process.

### 1. ERISA Does Not Require Choosing the Cheapest Funds.

As one court found in dismissing ERISA excessive-fee claims, "fiduciaries need not choose the cheapest fees available to the exclusion of other considerations—or all funds seeking investments from trusts and pension plans would have to charge the same fees regardless of the type of fund, management approach or services, performance, etc. in order to attract institutional clients." *Patterson*, 2018 WL 748104, at *5. Thus, courts regularly dismiss claims alleging the funds offered were not the cheapest in the marketplace, particularly where, as here, the complaint "simply provide[d] comparisons between funds that were in the Plan lineup and funds that plaintiffs claim were less expensive." *White v. Chevron Corp.* ("*White II*"), 2017 WL 2352137, at *14 (N.D. Cal. May 31, 2017), *aff'd*, 752 F. App'x 453 (9th Cir. 2018).

### 2. The Complaint Relies on Overstated Fund Expenses.

The Complaint uses incorrect fund expense figures that are substantially higher than the

---

[11] *See also Patterson v. Capital Grp. Cos.*, 2018 WL 748104, at *4 (C.D. Cal. Jan. 23, 2018) (dismissing claims); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009) (affirming dismissal, explaining no "statute or regulation prohibit[s] a fiduciary from selecting funds from one management company").

effective cost borne by participants.  The original complaint (Doc. No. 1) simply ignored the "revenue sharing" credits that were "allocated back" to participants "based on the size and nature of [the participant's] investment in the fund."  An Decl., Ex. 8 at 12, pdf p. 16.  The amended complaint purports to take those revenue credits into account.  It states that "Plaintiff's calculations assume the only funds paying revenue credits were the proprietary funds and the Artisan MidCap Fund" (Compl. ¶ 43 n.13),[12] but it then makes a series of arithmetic errors that continue to overstate participants' costs.  For 2015, 2016, 2017, and 2019, the Complaint mistakenly divides the revenue credit among <u>all</u> funds, rather than just "the proprietary funds and the Artisan MidCap Fund."  In 2016, moreover, the Complaint mistakenly copies the erroneous <u>2015</u> result instead of using 2016 data.  The chart below shows that other than in 2018, the Complaint overstates the expense ratio of the Natixis-affiliated funds by 0.06%-0.13% each year.

| | | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| A | Purported proprietary funds expense ratio in Complaint (¶ 43) | 0.80% | 0.80% | 0.70% | 0.55% | 0.68% |
| B | Expense ratio if revenue credit mistakenly allocated to <u>all</u> funds[13] | 0.80% | 0.74% | 0.71% | 0.66% | 0.68% |
| C | Corrected expense ratio if revenue credit were allocated as Complaint (¶ 43 n.13) purports to calculate[14] | 0.74% | 0.67% | 0.63% | 0.55% | 0.59% |
| D | Complaint's overstatement of expense ratio (A-C) | 0.06% | 0.13% | 0.07% | - | 0.09% |

Likewise, the "Adjusted Net Expense Ratios" (Compl. ¶ 44) suffer from arithmetic errors that also inflate those figures to make more misleading comparisons.  Assuming, as shown in the table on page 5 *supra*, an average revenue credit of 0.24% in 2017, the following chart shows the Complaint's figures compared to the corrected figures using the Complaint's methodologies:

---

[12] The Complaint does not explain why it assumes that the Artisan fund paid revenue credits.

[13] Calculated as (average net prospectus expense ratio of Natixis-affiliated funds weighted by Plan assets) minus (revenue credits (Column C from chart on page 5 *supra*) divided by total Plan assets (line 11 (one-ell) of Schedule H of each Form 5500)). *See* An Decl., Exs. 3-7 (Form 5500s providing Plan's assets in each Fund); Faldetta Decl. Exs. 27-32 (providing each fund's expense ratio for each year).

[14] Calculated as (average prospectus expense ratio of Natixis-affiliated funds weighted by Plan assets) minus (revenue credits (Column C from chart on page 5 *supra*) divided by Plan Assets in Natixis-affiliated and Artisan funds (Column B from chart on page 5 *supra*).

|  | Gateway Y | Loomis Sayles Growth Y | Loomis Sayles Small Cap Growth I | Loomis Sayles Small Cap Value I | Oakmark Equity & Income Investor | Oakmark Investor | Oakmark Select Investor |
|---|---|---|---|---|---|---|---|
| Adjusted Expense Ratio alleged in Complaint (¶ 44) | 0.59% | 0.48% | 0.77% | 0.75% | 0.69% | 0.73% | 0.85% |
| 2017 Expense Ratio (from Faldetta Decl Ex. 29) | 0.70% | 0.67% | 0.94% | 0.97% | 0.79% | 0.89% | 0.98% |
| Corrected Adjusted Expense Ratio (subtracting 0.24%) | 0.46% | 0.43% | 0.70% | 0.73% | 0.55% | 0.65% | 0.74% |

### 3. Expense Comparisons Between Actively- and Passively-Managed Funds Are Meaningless.

The Complaint (at ¶¶ 9, 41-47) misleadingly compares the expenses of the actively-managed Natixis-affiliated funds to ICI expense averages that "include both index and actively managed funds." An Decl., Ex. 9 at 59, 61, 62, 63, 64. "To show that a prudent fiduciary in like circumstances would have selected a different fund based on the cost ... of the selected fund, a plaintiff must provide a sound basis for comparison—a meaningful benchmark." *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018). Blended expense data that incorporate both actively- and passively-managed funds—such as ICI data in the Complaint—are not valid comparisons to just actively-managed funds.[15] The Complaint's expense ratio comparisons are therefore "insufficient to support an imprudence claim." *Davis v. Salesforce.com, Inc.*, 2021 WL 1428259, at *3 (N.D. Cal. Apr. 15, 2021); *see also Parmer*, 2021 WL 464382, at *5 (comparison of blended ICI data to plan expense data "insufficient to plausibly allege imprudence"). Likewise, the Complaint's contention (at ¶ 44) that "the Plan's proprietary funds were ... five times more expensive than the ... non-proprietary funds" is a meaningless comparison, given that the latter are primarily passively-managed. *See, e.g.,* An Decl. Ex. 7 at pdf p. 37 (listing

---

[15] *See, e.g., Davis*, 2020 WL 5893405, at *3 n.9 (comparison of actively managed funds offered in plan to ICI Median Fee not meaningful because "the ICI Median Fee reflects the fees of both passively and actively managed funds"); *Parmer v. Land O'Lakes, Inc.*, 2021 WL 464382, at *5 (D. Minn. Feb. 8, 2021) (because ICI study "fails to differentiate between passively and actively managed funds" expense ratios in study "are not meaningful benchmarks").

unaffiliated State Street and Vanguard index funds).

        4.        Expense Comparisons With Unidentified Funds Are Meaningless.

Finally, the Complaint alleges that in 2017 the Natixis-affiliated funds had higher expenses than the average of the least-expensive share classes of the twenty largest funds "managed in a similar investment style." Compl. ¶ 44 n.18. The Complaint provides no explanation of how it determined those investment styles, why other funds in these "similar investment styles" are actually comparable, or which specific funds were included in each "average." Indeed, the Complaint identifies no specific funds with which to compare the fees of most of the challenged Natixis-affiliated funds. That lack of identification is also dispositive. Courts have dismissed claims based on similarly broad allegations that a plan includes funds with fees higher than a group of other plans where there "is no explanation of what those 'comparable plans' are and why they are comparable." *Wehner v. Genentech, Inc.*, 2021 WL 507599, at \*7 (N.D. Cal. Feb. 9, 2021).

        **C.      Isolated Periods of Alleged Underperformance of a Minority of Funds Does Not Give Rise to a Plausible Inference of a Deficient Process.**

Plaintiff's allegations about purported underperformance of four (out of more than a dozen) Natixis-affiliated funds at a snapshot in time, Compl. ¶¶ 48-61, made with 20/20 hindsight, do not raise a reasonable inference of fiduciary misconduct for several reasons.

        1.        20/20 Hindsight Does Not Raise a Plausible Claim.

Under ERISA, "[t]he test [is] how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight." *Bunch*, 555 F.3d at 7 (alteration in original; citation omitted). "While it is easy to pick an investment option in retrospect ..., selecting an investment beforehand is difficult. [A fiduciary] deserves discretion to the extent its *ex ante* investment choices were reasonable given what it knew at the time."

*Tussey v. ABB, Inc.*, 746 F.3d 327, 338 (8th Cir. 2014); s*ee also Leber v. Citigroup, Inc.*, 2011 WL 5428784, at *3 & n.4 (S.D.N.Y. Nov. 8, 2011) (dismissing a breach of fiduciary duty claim where the defendant continued to offer affiliated funds that failed to meet their benchmarks).

      2.      The Complaint Notably Omits Reference to the Performance
              of the Vast Majority of Plan Funds.

Leaving aside hindsight bias, the Complaint does not allege that most Natixis-affiliated and unaffiliated funds offered under the Plan performed poorly. The performance of four of over 30 options says nothing about the quality of the Plan's fiduciary selection or monitoring process.

The Complaint's reason for cherry-picking four funds is obvious. There is little or no basis to criticize the performance of the other funds in the award-winning Natixis complex or the unaffiliated funds used in the Plan. Numerous Natixis-affiliated funds in the Plan outperformed their benchmarks over the 5 years ending 2020, including the Loomis Sayles Bond Fund, Loomis Sayles Core Plus Bond Fund, and Mirova Global Sustainable Equity Fund. An. Decl., Ex. 12 at 9, pdf p. 10; Ex. 13 at 9, pdf p. 10; Ex. 19 at pdf p. 14. Half the Plan's Natixis-affiliated funds outperformed one or more of their benchmarks over the prior 1-year period, 5-year period, or both periods ending December 31, 2020 (or for one fund, January 31, 2021). An. Decl., Ex. 12 at 9, pdf p. 10; Ex. 13 at 9, pdf p. 10; Ex. 17; Ex. 18 at 6, pdf p. 7; Ex. 19 at pdf pp. 8, 14, 18.

      3.      The Complaint Omits the Challenged Funds' Outperformance.

The Complaint selectively focuses on the four challenged funds' underperformance during certain periods. However, all four of the challenged funds performed particularly well over more recent periods. For example, the following chart shows that in the 12 months ending March 31, 2021, the Oakmark Fund and Oakmark Equity & Income Fund outperformed each of the Complaint's cherry-picked comparators, sometimes by as much as 30%. *See* An Decl., Ex. 25 (providing data for chart).

| | 2021 Q1 | 1-year | | 2021 Q1 | 1-year |
|---|---|---|---|---|---|
| **Oakmark Fund** | **15.52%** | **87.43%** | **Oakmark Equity & Income** | **10.25%** | **53.68%** |
| JPMorgan US Equity R6 | 5.40% | 61.13% | American Funds Balanced R6 | 3.82% | 30.58% |
| MFS Core Equity R6 | 5.90% | 55.46% | Fidelity Balanced | 4.49% | 48.44% |
| Vanguard Growth & Income Adm | 6.92% | 58.55% | T. Rowe Price Cap Apprec. I | 4.10% | 39.86% |
| | | | Vanguard Wellington Adm | 3.55% | 32.95% |

In short, whether a fund over- or underperformed depends on the period selected; underperformance in select periods does not support an inference of fiduciary breach. If anything, the recent outperformance suggests that a reasonable fiduciary would retain the funds.

4. The Complaint's Selective Fund Comparisons Fail
   to Provide Meaningful Benchmarks for the Challenged Funds.

Even for the select periods that it isolates as to its few cherry-picked funds, the Complaint fails to offer meaningful benchmarks. As with allegations relating to cost, a plaintiff who claims that "a prudent fiduciary ... would have selected a different fund based on the ... performance of the selected fund must provide a sound basis for comparison." *Meiners*, 898 F.3d at 822. "[S]imply labeling funds as 'comparable' or 'a peer' is insufficient to establish that those funds are meaningful benchmarks against which to compare the performance of [the at-issue fund]." *Anderson v. Intel Corp.*, 2021 WL 229235, at *8 (N.D. Cal. Jan. 21, 2021).

Most notably, the Complaint misleadingly alleges that the Gateway Fund underperformed three supposed comparator funds—the Hartford Core Equity Fund, the T. Rowe Price Dividend Growth Fund, and the Vanguard Institutional Index—without *any* indication that these comparators shared similar investment objectives or strategies. In fact, these comparators are inapt on their face. Each employs a typical strategy of investing primarily in stocks. In contrast, the Gateway Fund's investment objective is "to capture the majority of the returns associated with equity market investments, while exposing investors to less risk than other equity investments." An Decl., Ex. 11 at 1. To achieve this objective, the fund "invests in a broadly diversified portfolio of common stocks, while also selling index call options and purchasing

index put options," which "provides steady cash flow" but "also reduces the Fund's ability to profit from increases in the value of its equity portfolio." *Id.* at 3. None of the Complaint's comparators employs anything resembling the low-volatility, hedging strategy used by the Gateway Fund to protect investors against losses during a market downturn.[16] Because of this hedging strategy, Morningstar classifies the Gateway Fund as using an "options-based" strategy, not a "large blend" strategy like the Complaint's three comparator funds. An Decl., Ex. 27.

Lipper, when comparing the Gateway Fund to true comparators, ranked the Gateway Fund as "best Alternative Equity Market Neutral Fund" for the 5-year period ending November 30, 2020.[17] That the Gateway Fund underperformed entirely inapt equity funds in a period of rising equity markets says nothing about either the Gateway Fund or the quality of the Plan's fiduciary process. "The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice at the outset." *Meiners*, 898 F.3d at 823. The Complaint's "conclusory assertion that the funds were similar is belied by the facts actually set forth in and incorporated into the Complaint," making the comparison meaningless. *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *12 (S.D.N.Y. Oct. 7, 2019) (dismissing complaint).[18]

### 5. The Complaint Selectively and Misleadingly Omits Some of the Challenged Funds' Prospectus Benchmarks.

The Complaint is also misleadingly selective regarding which prospectus benchmarks it

---

[16] The advantage of the Gateway Fund's low-volatility hedge strategy to protect investors in down markets is illustrated by the fact that in 2008, at the height of the financial crisis, the Complaint's selected comparator funds and index suffered *double* the losses of the Gateway Fund. *See* An Decl., Ex. 20 (Gateway and S&P 500); Exs. 21-22 (Hartford); Ex. 23 (T. Rowe Price); Ex. 24 (Vanguard) (showing 2008 returns of -13.77% (Gateway); -37.00% (S&P 500); -38.81% (Hartford); -33.26% (T. Rowe Price); -36.95% (Vanguard)).

[17] 2021 Lipper Awards, *supra* note 6.

[18] *See also Wehner*, 2021 WL 507599, at *8-9 (dismissing breach of fiduciary duty claim where plaintiff failed to make an "apples-to-apples" comparison of funds); *White II*, 2017 WL 2352137, at *14 (same); *Parmer*, 2021 WL 464382, at *5 (dismissing breach of duty of prudence claim where complaint failed to provide "meaningful benchmarks").

uses to compare to the funds' performance. The SEC has promulgated Form N-1A (available at https://www.sec.gov/files/formn-1a.pdf) to set forth the information that must be disclosed in a mutual fund prospectus. The SEC requires that the prospectus compare performance to an "appropriate broad-based securities market index," but then goes on to explain that a "[f]und is encouraged to compare performance not only to the required broad-based index, but also to other more narrowly based indexes that reflect the market sectors in which the [f]und invests" and that the fund "also may compare its performance to an additional broad-based index." Form N-1A at 62-63. Consistent with the SEC's instructions, the prospectuses for several of the challenged funds include multiple benchmarks to gauge the fund's performance. Rather than include each benchmark, the Complaint always picks the one that makes the fund's performance appear poor—which the Complaint calls the "primary" benchmark—and omits any benchmark that makes the fund's performance appear strong. Selectively choosing one prospectus benchmark over another, and not mentioning the omitted benchmark(s), does not give rise to plausible claim of underperformance or of a deficient fiduciary process.

For example, the Gateway Fund prospectus lists two benchmarks: the S&P 500 and the Bloomberg Barclays U.S. Aggregate Bond Index. An Decl., Ex. 11 at pdf p. 8. The Complaint refers only to the S&P 500, and omits any reference to the Bond Index. The reason for this omission is obvious: the Gateway Fund outperformed the Bond Index benchmark over 1-, 5-, and 10-year periods. *Id*. Moreover, the fund's prospectus discloses that the fund's strategy is to limit risk in equity investments and that it will generally underperform the S&P 500 and the domestic equity market in general: "the Fund expects to generally have lower long-term returns than a fund consisting solely of equity securities." *Id.* at pdf p. 4. When a fund has a strategy that intentionally limits risk with the expectation that it will outperform the bond market and

underperform the stock market, criticizing the fund for doing exactly that—or criticizing fund fiduciaries for choosing a fund that did what it told investors it would do—makes no sense at all.

Likewise, another of the four funds the Complaint challenges for alleged underperformance, the Oakmark Equity & Income Fund, also provides multiple prospectus benchmarks:  the Lipper Balanced Funds Index, along with the S&P 500 and the Barclays U.S. Government/Credit Index.  As of December 31, 2019, the fund beat two of the three benchmarks over some or all of the preceding 1-, 5-, and 10-year periods.  An Decl., Ex. 15 at 4.  The Complaint mentions just the S&P 500—the only benchmark the fund did not beat—and omits any mention of even the existence of the other two benchmarks.  Compl. ¶ 58.

### D. Alleging the Plan Kept the Challenged Funds to "Stave Off the Consequences of an Otherwise Declining Asset Base" Makes No Sense.

The Complaint also contends that the Plan fiduciaries retained the Oakmark Fund and Oakmark Select Fund "to stave off the consequences of an otherwise declining asset base." Compl. ¶ 10.  This conclusory allegation is completely implausible.  Removing those funds from the Plan would have had virtually no impact on either fund.  According to the most recent Form 5500 filed with the DOL, Plan participants had invested approximately $31 million in the Oakmark Fund, and approximately $18 million in Oakmark Select Fund.  An Decl., Ex. 7 at pdf p. 39.  According to their SEC-filed 2019 annual reports, the Oakmark Fund and Oakmark Select Fund had net assets of over $16 billion and over $4 billion respectively. An Decl., Ex. 26, at 6, 12 (pdf pp. 12, 18).  The Plan's investments in each fund amount to much less than 0.5% of either fund's assets, which is insufficient to stave off anything.

## II. Count II Should Be Dismissed Because It Is Derivative of Count I.

Count II should also be dismissed.  As explained above, the Complaint fails to plead a plausible underlying fiduciary breach in Count I.  Count II is premised on the allegation that

Natixis failed to monitor the Committee—which means it "is derivative" of Count I and cannot stand on its own. *Tracey v. Mass. Inst. of Tech.*, 404 F. Supp. 3d 356, 364 (D. Mass. 2019); *Barchock*, 886 F.3d at 48 (affirming dismissal of monitoring claim in absence of cognizable underlying fiduciary breach claim).

## III. Plaintiff Lacks Standing to Assert Many of the Claims Asserted in the Complaint.

Not only are the Complaint's allegations insufficient to state any claim, but Mr. Waldner lacks standing to pursue many of those deficient claims in any event.

### A. Plaintiff Lacks Standing to Bring Claims Regarding Funds in Which He Did Not Invest.

A plaintiff's Article III standing is a "threshold question in every federal case," *Warth*, 422 U.S. at 498, because without it courts lack subject matter jurisdiction. To establish Article III standing, a plaintiff must show that she "personally has suffered some actual or threatened injury as a result of the putatively illegal conduct." *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 335 (1990) (citation omitted).

Mr. Waldner lacks standing to challenge the Plan's inclusion of funds in which he never invested, because "Plan participants who were not harmed" do not "have standing to represent those who were." *In re Bos. Sci. Corp. ERISA Litig.*, 254 F.R.D. 24, 32 (D. Mass. 2008). That eliminates most funds the Complaint purports to challenge. Mr. Waldner invested in the Gateway Fund, Oakmark International Fund, and AEW Real Estate Fund. Compl. ¶ 18. The Complaint does not—and cannot—allege that he invested in other Natixis-affiliated funds, including three of the four funds the Complaint challenges based on its selective performance allegations.

A plaintiff lacks standing to bring a fiduciary-breach claim regarding *specific* funds in a plan's line-up if the plaintiff did not invest in those funds. *See, e.g.*, *Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015) ("An ERISA plan participant lacks standing to sue for ERISA

violations that cause injury to a plan but not individualized injury to the plan participant.").[19]

The few cases that have held that a plaintiff had standing to sue over funds in which he did not invest are distinguishable, because those plaintiffs' claims were based on blanket fund-selection processes that applied to *every option* in those plans. The plaintiffs' alleged harm in those cases related to the defendants' "[p]lan management and fund selection process as a whole rather than the unique factual nature of individual funds." *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2016 WL 4507117, at *5 (C.D. Cal. Aug. 5, 2016).

Here, the Complaint does not—and cannot—allege a breach of fiduciary duty regarding the fund-selection process as a *whole*. Although the Plan included up to fifteen affiliated funds, the Complaint contains allegations about the performance of just four of those funds, Compl. ¶¶ 50-60, and allegations about the expenses of those four funds and four others. Compl. ¶ 44; s*ee also id.* at ¶ 79 (alleging a breach due to a failure to remove "*those* proprietary investments that [allegedly] *were no longer appropriate*." (emphasis added)). The Complaint says nothing about the performance of most of the Plan's affiliated funds, or about the expenses of nearly half of them. Indeed, the Complaint does not challenge the majority of funds in the Plan; it does not challenge the Vanguard target-date funds into which participants are defaulted, nor does it include anything else about the 21 funds unaffiliated with Natixis that were available at various times during the putative class period. In other words, the Complaint alleges only that "defendants breached their fiduciary duties when selecting ... *specific* ... affiliated funds[s]."

---

[19] *See also Patterson v. Morgan Stanley*, 2019 WL 4934834, at *7 ("Plaintiffs lack standing to bring this suit as to" funds they did not invest in, and "their claims regarding those funds must therefore be dismissed."); *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *9 (D.D.C. Jan. 8, 2019) (dismissing ERISA claim for lack of standing because "[p]laintiffs cannot allege an individual violation of ERISA as to the Vanguard funds, which is an investment option neither [p]laintiff selected."); *Marshall v. Northrop Grumman Corp.*, 2017 WL 2930839, at *8 (C.D. Cal. Jan. 30, 2017) (dismissing claims as to a fund in which plaintiffs did not invest); *Johnson v. Delta Air Lines, Inc.*, 2017 WL 10378320, at *2 (N.D. Ga. Dec. 12, 2017) ("Plaintiffs have not alleged that they were invested in the criticized funds or paid the allegedly excessive fees. Therefore, Plaintiffs do not have standing."); *David v. Alphin*, 817 F. Supp. 2d 764, 782 (W.D.N.C. 2011) (same), *aff'd*, 704 F.3d 327 (4th Cir. 2013).

*Urakhchin*, 2016 WL 4507117, at *5 (emphasis added).  Accordingly, because the Complaint focuses only on the selection of *certain* affiliated funds, Mr. Waldner has no standing to challenge the selection or monitoring of those funds in which he did not invest.[20]

**B.      Plaintiff Lacks Standing to Sue for Claims Before July 2017.**

The Complaint purports to assert claims going back to February 2015.  Mr. Waldner first became a Plan participant in July 2017.  Compl. ¶ 18.  It is well established that plan fiduciaries do not owe prospective plan participants duties under ERISA.  *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1350 (11th Cir. 2001) ("Defendants did not owe Piazza a fiduciary duty before he became an ... employee, and Piazza can have no claim for breach of that duty before it arose").[21]

Accordingly, the Plan's fiduciaries owed Mr. Waldner no duties under ERISA before he joined the Plan.  To the extent that Mr. Waldner seeks relief for periods before July 2017, those claims should be struck.  *In re Bank of Bos. Corp. Sec. Litig.*, 762 F. Supp. 1525, 1531 (D. Mass. 1991) (named plaintiff must "have *standing* to assert the claims for which each class seeks to recover") (emphasis in original); *Piazza*, 273 F.3d at 1350; *Coleman*, 643 F. Supp. at 1235.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.  Because Plaintiff has now had two bites at the apple, he should not be allowed to further replead, and dismissal should be with prejudice.

---

[20] *See also Clark v. Duke Univ.*, 2018 WL 1801946, at *4 (M.D.N.C. Apr. 13, 2018) (distinguishing cases where plaintiff has standing regarding alleged breach relating to the *entire* plan from cases where plaintiff lacks standing regarding "allegations that the ERISA fiduciaries breached their duties [about] specific funds in which the named plaintiff did not invest"); *Sims v. BB&T Corp.*, 2017 WL 3730552, at *4 (M.D.N.C. Aug. 28, 2017) ("Here the plaintiffs' theories of liability rest on the defendants' flawed process for selecting, administering, and monitoring *all* of the Plan investments, not just a few specific funds.").

[21] *See also Coleman v. Gen. Elec. Co.*, 643 F. Supp. 1229, 1235 (E.D. Tenn. 1986) ("A fiduciary relationship does not exist towards potential participants in a plan and such potential participants have no standing to sue for ... breach of fiduciary duty under ERISA"), *aff'd,* 822 F.2d 59 (6th Cir. 1987).

Dated:  June 2, 2021

Respectfully submitted,

*/s/ James O. Fleckner*
James O. Fleckner (BBO# 641494)
James An (BBO# 704284)
Goodwin Procter LLP
100 Northern Ave.
Boston, MA 02210
Telephone: (202) 570-1000
Facsimile: (617) 523-1231
jfleckner@goodwinlaw.com
jan@goodwinlaw.com

Michael K. Isenman (admitted *pro hac vice*)
Goodwin Procter LLP
1900 N Street NW
Washington, DC 20036
Telephone (202) 346-4000
Fax: (202) 346-4444
misenman@goodwinlaw.com

Elizabeth M. Zito (admitted *pro hac vice*)
Goodwin Procter LLP
620 Eighth Avenue
New York, NY 10018
Telephone:  (212) 459-7050
Facsimile:  (646) 558-4080
ezito@goodwinlaw.com

*Counsel for Defendants Natixis Investment Managers,*
*LLC and Natixis Investment Managers, LLC Retirement*
*Committee*

**<u>CERTIFICATE OF SERVICE</u>**

  I hereby certify that on June 2, 2021, I caused a true and correct copy of the foregoing to be served by electronic means, via the Court's CM/ECF system, on all counsel registered to receive electronic notices and caused copies of the aforementioned document to be served via first class mail, postage prepaid upon any non-CM/ECF participants.

             */s/ James O. Fleckner*
             James O. Fleckner