UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| BRIAN WALDNER, individually and as the representative of a class of similarly situated persons, and on behalf of The 401(k) Savings and Retirement Plan, Sponsored by Natixis Investment Managers, L.P., | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| NATIXIS INVESTMENT MANAGERS, L.P., NATIXIS INVESTMENT MANAGERS, L.P. RETIREMENT COMMITTEE, | ) ) ) ) |
| Defendants. | ) ) ) ) |

Civil Action No. 21-cv-10273-LTS

_____

## REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

**LEVENSON, M.J.**

Before the Court are Plaintiff's Motion for Class Certification (Docket No. 50 ("Plaintiff's Motion")) and the Defendants' Memorandum in Opposition (Docket No. 102 ("Defendants' Opposition")), together with supporting briefings.

I heard argument on this matter on December 22, 2022, and thereafter requested supplemental submissions from the parties. Docket Nos. 87, 89.

Plaintiff Brian Waldner sues individually and as the putative representative of a class comprised of certain participants in the 401(k) Savings and Retirement Plan (the "Plan") sponsored by Mr. Waldner's former employer, Defendant Natixis Investment Managers, L.P. ("Natixis"). Plaintiff sues under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, *et seq.*, alleging that Natixis and its Retirement

Committee (the "Committee") breached their fiduciary duties to the Plan.  In particular, Plaintiff alleges that, in selecting a menu of investment options for Plan participants, Defendants improperly favored mutual funds and other actively managed products that were offered by Natixis and other money managers with current or historical ties to Natixis.  Together, these are referred to as "proprietary" investment products.  Plaintiff alleges that Defendants acted imprudently and disloyally, in violation of ERISA, and that Defendants' favoritism for proprietary products harmed the Plan (and class members) by failing to offer more suitable products offered by competitors.

Plaintiff seeks to sue on behalf of all Plan members who selected proprietary investment products from the Plan menu.  Plan members who opted only for indexed and/or target-date funds would not be part of the proposed class, since there is no allegation of impropriety with respect to the selection of those menu options.

In opposing class certification, Defendants point out that different class members chose varying investment products from the menu offered by the Plan, so that any harms from mismanagement would affect each class member differently.  Defendants also contend that Mr. Waldner is atypical of the proposed class in three respects: (1) Mr. Waldner's sophistication and his job responsibilities put him in a position immediately to recognize defects in the Plan's investment offerings which – Defendants contend – triggered the running of the statute of limitations; (2) as a former Plan participant, Mr. Waldner has no personal interest in the ongoing governance of the Plan; and (3) having signed a termination agreement, Mr. Waldner faces defenses – waiver and release – that most class members do not.

As discussed below, common issues (*e.g.*, did Defendants breach their fiduciary duties? If so, which products were improperly included in the Plan menu?) predominate over questions

2

affecting only individual members.  If liability is established, determining the impact on each individual class member is primarily a computational exercise, albeit one that will require time and effort from record keepers and possibly from other financial professionals.  Mr. Waldner's claims are typical of the class, except with respect to his plea for injunctive relief regarding the ongoing operation of the Plan.

Accordingly, I recommend that the motion for class certification be **GRANTED** in part and **DENIED** to the extent that Mr. Waldner seeks to represent the class in seeking prospective injunctive relief.

## I.     Background

### A.     *Plaintiff's Claims*

In the first count of the Amended Complaint, Plaintiff alleges that Defendants have repeatedly, over the course of multiple years, violated the duties of loyalty and prudence imposed upon them by ERISA as fiduciaries of a retirement plan, thus running afoul of 29 U.S.C. §1104(a)(1)(A)-(B).  Amended Complaint, Docket No. 19, ¶¶ 76-84.  Plaintiff's core contention is that Defendants breached fiduciary duties to the Plan, which Natixis made available to its employees as a 401(k) retirement investment vehicle.  Defendants were responsible for assembling a menu of investment options for Plan participants, and Plaintiff challenges Defendants' decision-making process for selecting and retaining these menu options.

Plaintiff alleges that Defendants breached their duty of loyalty to the Plan by showing favoritism towards Natixis and its affiliates when picking funds to include in the Plan menu. Amended Complaint, ¶ 80.  Plaintiff alleges that Defendants improperly favored proprietary investment products and thus failed adequately to consider and include products – such as mutual funds sold by investment companies other than Natixis – that would have been more suitable in

terms of performance or expenses.  This, Plaintiff claims, led Defendants to retain proprietary funds that underperformed in comparison to prospectus benchmarks, and in comparison to funds available from other investment companies.  According to Plaintiff, "[a] prudent and loyal review of the marketplace would have revealed multiple superior, lower cost investment options, and would not have led to the addition of [the Natixis Funds] to the Plan."  *Id*. at ¶ 11.  Instead, Plaintiff alleges, the Committee's decisions served only to "advance Defendants' business interests."  *Id*.

Plaintiff alleges that, along with the alleged breach of the duty of loyalty, Defendants also breached a duty of care.  "Defendants failed to prudently and objectively monitor the Plan's proprietary investments to ensure that each of the Plan's proprietary investments were and remained appropriate for the Plan, and failed to remove those proprietary investments that were no longer appropriate."  Amended Complaint, Docket No. 19, ¶ 80.

In a second count of the Amended Complaint, Plaintiff alleges that Natixis breached its fiduciary monitoring duties by failing to:  monitor and evaluate the performance of the Committee; monitor the processes by which the Plan investments were selected, monitored, and retained; and remove Committee members whose performance was inadequate in selecting and retaining "imprudent, excessively costly, and poorly performing investments with the Plan, all to the detriment of the Plan and Plan participants' retirement savings."  *Id.* at ¶ 88.

Plaintiff claims that the Plan and its participants collectively suffered millions of dollars per year in losses as a result of Defendants' fiduciary breaches, in the form of excess fees and investment underperformance.  *Id.* at ¶¶ 82, 89.

###### B.     *The Ruling on Defendants' Motion to Dismiss*

Judge Sorokin's decision denying Defendants' Motion to Dismiss (Docket No. 33) forms the backdrop for the present question of class certification.  As Judge Sorokin found, the Complaint sets forth a series of factual allegations that – taken together – support an inference that Defendants employed an imprudent and disloyal process when it came to selecting and retaining proprietary funds in the Plan menu.  Docket No. 33, at 7.  As discussed below, it is significant to the class certification question that Plaintiff does not profess to have direct knowledge of the processes that Defendants employed in selecting and retaining investment products for the Plan.

Instead of describing particular failings in Defendants' process for selecting and retaining investment products for the Plan menu, the Complaint points to a variety of circumstances which, taken together, support an inference that Defendants breached their fiduciary duties.  In denying Defendants' motion to dismiss, Judge Sorokin focused on seven sets of allegations that cumulatively support the inferences Plaintiff urges in this case:  (1) a large portion – over half by one measure – of the non-indexed investment options available to participants in the Plan were Natixis products; (2) nearly all options that were added to the Plan during the statutory limitations period were Natixis products; (3) the Natixis products that were included in the Plan menu are products that few other ERISA plans have selected; (4) some of the Natixis products that were made available to Plan participants had unusually high expense ratios; (5) some of the Natixis products that were made available to Plan participants under-performed, relative to comparable products offered by competitors; (6) there was a history of outflows from Natixis products in the market at large; and (7) investment results for three particular products offered to Plan participants showed periods of negative alpha.  *Id.* at 8-9.

Judge Sorokin concluded that, taken together, the alleged circumstances "are sufficient to 'suggest' plausibly that had 'Defendants prudently monitored the investments within the Plan, in a process that was not tainted by self-interest,' many of the proprietary funds would not have been selected or would have been removed." *Id.* at 9 (quoting Amended Complaint, Docket No. 19, ¶ 47).  Judge Sorokin noted that it is only in *combination* that these circumstances suffice to make out a claim:

> Each of these allegations taken individually are not sufficient to plausibly state a claim—for example, merely claiming that proprietary funds exist within a plan. Under the totality of circumstances, however, these facts taken together have "nudged [Plaintiffs'] claims across the line from conceivable to plausible" that Defendants selected and managed the funds in the Plan with imprudence and disloyalty.  *See Twombly*, 550 U.S. [544, 547 (2007)].

Docket No. 33, at 9-10.

## C.    *The Proposed Class*

The purported class here consists of over 1,200 members.  *See* Rule 1006 Summary of Putative Class Member Data, Docket No. 53-19, at 2.  The class is defined as follows:

> All participants and beneficiaries of the 401(k) Savings and Retirement Plan, Sponsored by Natixis Investment Managers, LLC (f/k/a The 401(k) Savings and Retirement Plan, Sponsored by Natixis Investment Managers, L.P., and The 401(k) Savings and Retirement Plan, Sponsored by Natixis Global Asset Management) ("the Plan") on or after February 18, 2015 who were invested in funds that were affiliated at any time with Natixis, excluding any persons with responsibility for the Plan's investment or administrative functions.

Plaintiff's Memorandum of Law in Support of Motion for Class Certification (redacted), Docket No. 64, at 13.[1]

---

[1] This class definition differs from the definition that Plaintiff previously proposed in that it includes Plan participants who – during the 6-year period prior to the Amended Complaint – invested in funds that were affiliated *at any time with* Natixis.  *Compare* Docket 19, ¶ 68; *with* Docket No. 64, at 13.  The revised definition makes sense and reflects the allegation in the Amended Complaint that Defendants' breaches included both favoritism in selecting funds and also imprudence in failing to weed out underperforming funds.

As discussed below, the members of this proposed class have in common that they were Plan participants who could have been harmed, in varying degrees, by the Defendants' alleged failures to meet their obligations as fiduciaries and alleged favoritism toward proprietary funds.

The Plan participants differ from one another as to which particular Plan offerings they chose to invest in, when they invested in those offerings, and how much money they invested in the various offerings. The class members also vary as to whether they continue to be employed by Natixis or whether, like Mr. Waldner, they have left the firm. Among class members who are no longer employed by Natixis, there are additional differences. Some, including Mr. Waldner, signed termination agreements that include releases and other provisions that may affect their rights. And among those who signed termination agreements, some, presumably, continue to be Plan participants, while others, including Mr. Waldner, have withdrawn or transferred their retirement savings out of the Plan.

**D.**    ***The Proposed Class Representative***

Mr. Waldner, the named Plaintiff who proposes to represent the class, served as Vice President, Strategic Marketing and Innovation, at Natixis from 2017 to 2018. He was a participant in the Plan from July 2017 until late February 2021. During that time, he invested his 401(k) dollars in several of the proprietary investment options that were included in the Plan menu. Docket No. 19, ¶ 18.

Mr. Waldner personally possesses considerable sophistication and expertise in the field of investment management. And his role at Natixis required intimate familiarity with Natixis' investment products. His LinkedIn profile describes his position and responsibilities at Natixis as follows:

> Oversaw the Investment Product and Investment Operations teams which were responsible for Head of North America Request for Proposal (RFP) team. Responsible for business development and product communication activities. development of marketing collateral, completion of research and due diligence requests and regulatory reporting.  Chaired Data Governance Committee for Natixis Distribution, L.P.

LinkedIn Profile of Plaintiff Brian Waldner, Docket No. 61-2.  His credentials include the designations of Chartered Financial Analyst (CFA) and Certified Financial Planner (CFP).  *Id.*

In connection with his separation from Natixis, Plaintiff signed a "Termination Agreement" setting forth various terms of his departure.  That letter agreement included an extensive release provision, the first two paragraphs and the last of which read as follows:

> 9.      In exchange for the severance payments and other benefits the Company is providing you as described in this letter agreement, you agree to release and forever  discharge the Company, its Affiliates (as defined below), and any of their past, present or future officials, agents, directors, officers, shareholders, members, managers, partners, joint venturers, representatives or employees, and any of their successors or assigns, and all other Persons (as defined below) connected with any of the foregoing, from any and all claims, charges, complaints, lawsuits, damages, contracts, and causes of action in law or equity, of any nature whatsoever, or any other actions in any court, administrative agency, arbitration forum, or other legal tribunal or authority, by reason of any matter or thing, including without limitation anything relating to, arising out of or connected with your employment with, or termination by, the Company, from the beginning of time through the date you execute this agreement, including but not limited to . . . the Employee Retirement Income Security Act; federal or state common law; and any and all other applicable federal, state or local law, statute, regulation or ordinance, all as may have been amended.

> This means that you may not sue Natixis Advisors, L.P. for any current or prior claims, including those arising out of your employment with or separation from the Company and including claims for age discrimination, whether under the Age Discrimination in Employment Act or under any other law, and claims for unpaid wages under state law.

> . . . . . . . . . . . . .

> You expressly acknowledge and agree that, but for providing the
> foregoing general release and waiver of claims in this Section [9], you would not
> be receiving the severance payments being provided to you under the terms of this
> letter agreement.

Termination Agreement, Docket No. 108-1.

As discussed below, Defendants contend that the second paragraph of Section 9,

beginning with "This means that you may not sue," amounts to a covenant not to sue,

with legal force independent of the more general release provisions of the first paragraph.

## II.    Legal Framework

The pending motion for class certification raises issues that recur with some frequency in

ERISA litigation. *Cf. Velazquez v. Massachusetts Fin. Servs. Co*., 320 F. Supp. 3d 252, 258–59

(D. Mass. 2018) (noting that "Counsel for both sides have routinely faced each other in similar

ERISA litigation across the country, and each relies on a line of fiduciary duty cases in its

favor.").

Before sorting through the parties' competing arguments, it makes sense to reiterate the

general framework for class certification under Rule 23 of the Federal Rules of Civil Procedure:

> Plaintiffs bear the burden of an initial showing that a proposed class satisfies the Rule 23
> requirements.  But plaintiffs need not make that showing to a degree of absolute
> certainty.  It is sufficient if each disputed requirement has been proven by a
> preponderance of evidence.  Once plaintiffs have made their initial showing, defendants
> have the burden of producing sufficient evidence to rebut the plaintiffs' showing.

*In re Nexium Antitrust Litigation*, 777 F.3d 9, 27 (1st Cir. 2015) (internal quotations and citations

omitted).

Under Rule 23, "a court may certify a class only if it finds that the proposed class

satisfies all the requirements of Rule 23(a) and that class-wide adjudication is appropriate for one

of the reasons set forth in Rule 23(b)." *Tracey v. MIT*, No. 16-CV-11620-NMG, 2018 WL

5114167, at *1 (D. Mass, Oct. 19, 2018) (citing *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 38 (1st Cir. 2003)).

Rule 23(a) sets out four prerequisites for a permitting a party to sue as a class:

(1) the class is so numerous that joinder of all members is impracticable ["numerosity"];

(2) there are questions of law or fact common to the class ["commonality"];

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ["typicality"]; and

(4) the representative parties will fairly and adequately protect the interests of the class ["adequacy"].

Fed. R. Civ. 23(a)(1)-(4).

Although the pertinent criteria are enumerated separately in Rule 23, the same facts and circumstances are often relevant to more than one category.  Notably, the factors of commonality (Rule 23(a)(2)) and typicality (Rule 23(a)(3)) "tend to merge" because they "serve as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated" that class interests are protected.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 n.5 (2011).  These two requirements also "tend to merge with the adequacy-of-representation requirement."  *Id*.  There is also some overlap among the certification criteria of commonality, typicality, and predominance (Rule 23(b)(3)).  *See In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6,19 (1st Cir. 2008).

In addition to satisfying Rule 23(a), a class must satisfy at least one of the prongs under Federal Rule of Civil Procedure 23(b).

Plaintiff seeks certification under Rule 23(b)(1), which would allow for a "mandatory" class, without "opt-out" provisions and with somewhat limited notice requirements.  *See Wal-*

*Mart Stores*, 564 U.S. at 362.  Rule 23(b)(1) provides that a class may be certified if prosecuting

separate actions by or against individual class members would create a risk of:

> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>
> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede the ability to protect their interests.

Fed. R. Civ. P. 23(b)(1)(A) and (B).

Plaintiff argues that the putative class could also be certified under Rule 23(b)(3), which

would entail "opt-out" provisions and heightened notice requirements for class members.  *See*

*Wal-Mart Stores*, 564 U.S. at 362.

Overall, the decision whether to certify a class entails a more probing factual inquiry than

the pleadings-based consideration of a motion to dismiss.  As the Supreme Court has noted:

> We recognized in [*General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147 (1982)] that "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," 457 U.S., at 160 . . . . and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied," *id*., at 161 . . . .  Frequently that "rigorous analysis" will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. "'[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.,* at 160.

*Wal-Mart Stores*, 564 U.S. at 350–51 (multiple internal citations and quotations omitted).  In

other words, Rule 23 "'does not set forth a mere pleading standard.' Rather, a party must not

only 'be prepared to prove that there are in fact sufficiently numerous parties, common questions

of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by

Rule 23(a). The party must also satisfy through evidentiary proof at least one of the provisions of

Rule 23(b)." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Wal-Mart*, 564 U.S. at 350) (internal citations omitted).

### III.      Application of Rule 23

As noted above, the factors that determine the appropriateness of certifying a class are not hermetically distinct.  Thus, questions about shared – and differing – characteristics of class members can potentially be considered under the rubric of "commonality" under Rule 23(a)(2), as a matter of "typicality" under Rule 23(a)(3), as part of the prudential inquiry under Rule 23(b)(1), or in weighing "predominance" under Rule 23(b)(3).  I will address the successive subsections of the rule sequentially, addressing broad questions about the make-up and membership of the class before addressing the particular traits of the putative class representative.  Accordingly, I will address under the heading of "Commonality" the likelihood that no two Plan participants selected precisely the same investments from the Plan menu.  Questions specific to Mr. Waldner follow, in the "Typicality" discussion.

### A.  *Prerequisites for a Class under Rule 23(a)*

#### 1.  *Numerosity*

Numerosity requires that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Although Rule 23(a) does not specify a required threshold number of plaintiffs for satisfaction of the numerosity requirement, courts "generally find numerosity met when a class includes at least forty members."  *Grogan v. All My Sons Moving and Storage Business Development LLC*, No. 19-CV-11531-PBS, 2021 WL 2627972 (D. Mass. March 31, 2021).  Here there are over 1,200 purported class members, and the numerosity requirement is easily satisfied.

## 2. *Commonality*

Commonality requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Wal-Mart*, 564 U.S. at 350 (emphasis in original) (quoting Richard Nagareda, "Class Certification in the Age of the Aggregate Proof," 84 *N.Y.U. Law Rev.* 97, 132 (2009)). The requirement of commonality has been characterized as a "low bar," and "courts have generally given it a 'permissive application.'" *In re New Motor Vehicle,* 522 F.3d at 19 (quoting 7A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 1763, at 221 (3d ed. 2005)).

In this case, Plaintiff's claims relate to Defendants' alleged failures in the management of the Plan. Plaintiff posits that the common questions are as follows: "a. Whether Defendants are fiduciaries with respect to the Plan; b. Whether Defendants breached their fiduciary duties by engaging in the conduct described herein; c. The proper form of equitable and injunctive relief; and d. The proper measure of monetary relief." Amended Complaint, Docket No. 19, ¶ 72. Of these, the question of equitable and injunctive relief does *not* weigh in favor of class certification because I conclude – as discussed below – that Mr. Waldner, who is no longer a Plan participant, is not an appropriate Plaintiff to pursue prospective equitable relief regarding the ongoing operation of the Plan.

In more concrete terms, the key question that is common to the class is the central allegation identified by Judge Sorokin in denying the motion to dismiss: whether "Defendants

selected and managed the funds in the Plan with imprudence and disloyalty."  Order, Docket No. 33, at 10.  This threshold question of liability operates class-wide and will largely determine the outcome of this litigation.  If Defendants prevail on this issue, the case is over.

If Plaintiff can show imprudent or disloyal conduct, it then falls to Plaintiff to prove that such failures caused actual harm.  *See Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 158 (S.D.N.Y. 2017) ("[P]laintiffs will have to engage in a fund-specific inquiry to establish that the fiduciary breaches actually caused losses to the Plan—a prerequisite to establishing liability for any fiduciary breach[.]").  First, such proof of loss would entail showing that a properly-run selection and management process would have yielded different investment choices for Plan participants.  Judge Sorokin characterized this aspect of Plaintiff's claim as follows: "had 'Defendants prudently monitored the investments within the Plan, in a process that was not tainted by self-interest,' many of the proprietary funds would not have been selected or would have been removed."  *Id.* at 9 (quoting Amended Complaint, Docket No. 19, ¶ 47).[2]  Second, Plaintiff would need to show that such properly-chosen investment choices would ultimately have performed better, or been less expensive, than the choices that were made available to Plan participants.

In short, there are significant class-wide issues that are common to all class members, the resolution of which would go far toward bringing this case to conclusion.  In this regard, my

_____

[2] As a practical matter, evidence supporting a showing of liability (*i.e.* a disloyal or imprudent process) may well overlap with evidence showing impact.  Even in the redacted form available in the public docket, Plaintiff's submissions (supported by exhibits that are sealed), focus on instances when Defendants may have failed to act upon input from the Plan's investment advisor regarding the selection or retention of particular mutual funds in the Plan menu.  *See* Plaintiff's Memorandum Of Law In Support Of Motion For Class Certification, Docket No. 51, at 4-11.

reasoning is much the same as that adopted in *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936 (LGS), 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017):

> Plaintiffs raise numerous questions that are capable of classwide resolution, such as whether each Defendant was a fiduciary; whether Defendants' process for assembling and monitoring the Plan's menu of investment options, including the proprietary funds, was tainted by a conflict of interest or imprudence and whether Defendants acted imprudently by failing to control recordkeeping expenses.  Resolution of these questions will "generate common answers apt to drive the resolution" of Defendants' liability.  *Wal-Mart*, 564 U.S. at 350 (emphasis omitted). Indeed, numerous courts have found commonality where plaintiffs challenge a 401(k) plan's retention of investment products, including proprietary funds, alleging excessive fees.  *See, e.g., Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011); *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. 15 Civ. 1614, 2017 WL 2655678, at *4 (C.D. Cal. June 15, 2017); *Krueger v. Ameriprise Fin., Inc.*, 304 F.R.D. 559, 572 (D. Minn. 2014).

2017 WL 3868803, at *5.  *See also Falberg v. Goldman Sachs Grp., Inc.*, No. 19 CIV. 9910 (ER), 2022 WL 538146, at *6 (S.D.N.Y. Feb. 14, 2022), *leave to appeal denied sub nom. Goldman Sachs 401(k) Plan Ret. Comm. v. Falberg*, No. 22-404, 2022 WL 4126112 (2d Cir. June 29, 2022) ("Defendants' 'allegedly disloyal and imprudent conduct'—implicates the same concerns for all members of the proposed class invested in the challenged GS Funds during the relevant time period.").

To be sure, there are differences among the Plan participants who would be included in the proposed class.  It is, therefore, incumbent on the Court to consider the significance of those differences.  Among other arguments,[3] Defendants object that the proposed class includes

---

[3] Addressed in the "typicality" discussion below is Defendants' objection that the class definition includes Plan participants whose sophistication was such that – in Defendants' view – they should be deemed to have had actual knowledge of alleged fiduciary breaches prior to February 18, 2018, and whose claims, therefore, would be barred by ERISA's three-year statute of limitations for individuals with "actual knowledge."  Docket No. 102, at 18.  This is essentially the same argument as Defendants' contention that Mr. Waldner is meaningfully atypical with respect to the class because – due to his considerable sophistication – he should be deemed to have had notice of the alleged fiduciary breaches more than three years before he brought suit.

"uninjured class participants."  Docket No. 102, at 19.  Defendants point out that the Complaint

does not allege that each and every proprietary fund in the Plan menu performed poorly or had

excessive fees in comparison with competitive products.  *Id.*  It follows that some class members

may have invested only in proprietary products that performed well, in which case, they would

not have been harmed.

Defendants' factual contention – that it is unlikely that everyone in the class will

ultimately be shown to have suffered an injury – is persuasive.  Even if they prevail in other

respects, it seems doubtful that Plaintiffs will prove that every one of the proprietary products on

the menu was imprudently selected.  Presumably, some of the products that were included in the

Plan menu were – if not best in class – sufficiently competitive that their inclusion could not be

attributed to a fiduciary breach.  Thus, there will, presumably, be some class members who did

not put their retirement savings into any wrongfully-included menu option.

Even among proprietary investments that may have been imprudently selected; moreover,

some may not ultimately have underperformed.  That is, there may be one or more periods when

the performance of a particular imprudently-selected investment matches or outperforms a

comparator investment.  Fiduciary standards under ERISA are judged *prospectively*, "under the

circumstances then prevailing." 29 U.S.C.A. § 1104 (a)(1)(B).  *See generally In re Unisys Sav.*

*Plan Litig.*, 74 F.3d 420, 434 (3d Cir.1996) (the ERISA care standard "focus[es] on a fiduciary's

conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary

employed the appropriate methods to investigate and determine the merits of a particular

investment."); *DeBruyne v. Equitable Life Assurance Soc'y of the U.S.*, 920 F.2d 457, 465 (7th

Cir.1990) (ERISA's "fiduciary duty of care ... requires prudence, not prescience.") (internal

quotation marks omitted).  Just as a well-chosen investment may under-perform, a poorly-chosen

investment may overperform.  Plan participants whose investments fall only into time periods when their choices performed as well as or better than a fair comparator would be uninjured.  It is impossible to assess, from the record as it stands now, how many Plan participants might land in the "uninjured" category, but the number may not be *de minimis.*

As to the legal significance of including uninjured Plan participants in the class, important guidance comes from the analysis employed by the Court of Appeals for the First Circuit in its decision in *Nexium.*  As a starting point, that decision makes clear that the mere prospect that a class definition may include some uninjured individuals is not *per se* fatal to class certification.  *See Nexium*, 777 F.3d at 21 ("[T]he Supreme Court in *Amgen* [*Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455 (2013)] and the circuits in other cases have made clear that the need for some individualized determinations at the liability and damages stage does not defeat class certification.").  *See also In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005) ("Typicality, as with commonality, does not require that all putative class members share identical claims. . . . Although [the plaintiffs] may not have suffered identical damages, that is of little consequence to the typicality determination when the common issue of liability is shared.") (internal quotes and citations omitted)

Under the guidance of *Nexium,* the essential question is whether there is "reason to think that [individualized] questions will overwhelm common ones and render that certification inappropriate[.]"  *Nexium*, 777 F.3d at 21 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014)).  Although *Nexium* involved a different kind of claim – alleged antitrust violations – and was decided under Rule 23(b)(3), the First Circuit's decision squarely addresses the governing principles that guide a decision whether to certify a class when some

individuals within the class may ultimately prove not to have been injured. The key issue is whether the sorting process can be handled effectively if liability is established:

> At the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members. The court may proceed with certification so long as this mechanism will be "administratively feasible," . . . and protective of defendants' Seventh Amendment and due process rights.

777 F.3d at 19–20 (citations omitted).

Of course, the sorting process in a particular case may be easier said than done. Indeed, Judge Kayatta dissented from the decision in *Nexium* on precisely this point. Judge Kayatta shared the majority's view "that certification of a class that includes uninjured consumers hinges on there being a method of identifying and removing those consumers prior to entry of judgment, and that any such method must be both administratively feasible and protective of the defendants' Seventh Amendment and due process rights." 777 F.3d at 33. But, in Judge Kayatta's view, the culling mechanism suggested in that case was insufficiently developed to uphold class certification on the record before the Court of Appeals. *See id.* ("As for the uninjured, the court simply kicked the can down the road[.]").[4]

In this case, the question of how to cull uninjured class members is not mysterious. Indeed, it should be resolvable based on existing financial records.

---

[4] In a similar vein, the Seventh Circuit, in *Spano v. The Boeing Co.*, 633 F.3d 574 (7th Cir. 2011), addressed the problem of "uninjured class members" in an ERISA claim under the rubric of "typicality" and concluded that the district court had failed adequately to delineate class boundaries in that case. In some important respects, the *Spano* case differs from the matter at bar; in *Spano*, two specific investment options were challenged as improper, whereas Plaintiff here claims that the Defendants' *process* for selecting funds was tainted and that this taint affected a substantial share of the menu options on the Plan. But it is unmistakable that here, as in *Spano*, the proposed class likely includes at least some uninjured individuals. The significant point is that in *Spano* the class certification decision under review had failed to address the issue concretely. *See* 633 F.3d at 586.

The process will entail the following steps:

- The first task (assuming Plaintiffs prove liability) will be to identify *which* particular investment products may have been imprudently included in the Plan's menu of choices.  This is a class-wide issue.  Plaintiffs will have to identify funds that, in any given period, should not have been on the menu, but were included due to Defendants' misfeasance, judged by what Defendants knew or should have known at the time.

- The second step will be to compare the performance and expenses of imprudently-included products with suitable comparators (*i.e.* products, or sets of products, that could and should reasonably have been offered in lieu of the imprudently-selected options).  Unless contemporaneous records – such as advice from the Plan's Investment Adviser – supply comparators, this second step may require expert testimony to assess the comparability of various investment products.  Even so, it is largely a computational exercise and it also operates class-wide.  At this step it will also be necessary to quantify the amount of harm associated with each investment product during any given time period.[5]  That is, whether, and to what degree, an imprudently-selected option may have underperformed *vis a vis* its comparators will vary from one period to the next.

- The third step *will* require individualized consideration.  The task will be to identify how much money particular Plan participants had invested in specific imprudently-selected products during which time periods.  Unlike the process under consideration

---

[5]  This will require specifying the relevant time periods; for example, a mutual fund that was reasonably included in the Plan menu during one period may be shown to be unsuitable for retention in a later period.

in *Nexium*, which contemplated collecting affidavits from class members, the third step here should rest on a straightforward analysis of existing financial records. ERISA plans are required to track each participant's investment selections and dollar amounts invested at any given time, a task that is typically handled by a third-party administrator that specializes in this record-keeping/custodial function. The computations may be intricate, but the process is essentially ministerial.

In sum, the allegation that Defendants breached their fiduciary duties of loyalty and prudence concerns Defendants' management of the Plan as a whole and thus concerns the entire class. Likewise, identifying harms attributable to such failures is a class-wide inquiry. Only the last step, apportioning damages to individual Plan members, requires individualized computations. And those computations rest on data that is part of the ordinary record-keeping for an ERISA plan.

The proposed class thus satisfies the commonality requirement.

### 3. *Typicality*

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "Typicality does not require that all putative class members share 'identical claims.'" *Tracey*, 2018 WL 5114167, at *4 (quoting *Garcia v. E.J. Amusements of N.H., Inc.*, 98 F. Supp. 3d 277, 289 (D. Mass. 2015)). However, the class representative's injuries must "arise from the same events or course of conduct" as the injuries of the class, and the representative plaintiff's claims must be "based on the same legal theory" as the claims of the class. *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008).

Here Plaintiff contends that his claims are typical of the class because his injuries arise from the Defendants' Plan-wide course of conduct and are based on legal theories that would apply to all members of the class. Further, he contends that his claims are not based on any unique facts specific to him or his particular investments. Rather he contends that he and other Plan participants were harmed by "an overarching course of self-interested, imprudent conduct by Defendants that permeated the Plan's investment lineup." Docket No. 51, at 21-22. Plaintiff contends that the breaches of fiduciary duties of loyalty and prudence that he alleges concern the Plan as a whole (*see* Amended Complaint, Docket No. 19, ¶¶ 80-88), and he claims that monetary injuries to the Plan and its participants resulted from Defendants' fiduciary breaches (*see* Amended Complaint, Docket No. 19, ¶¶ 82, 89).

Plaintiff's contentions satisfy the threshold requirement of showing that he shares in a claim that is common to the putative class members. Accordingly, the burden shifts to Defendants to rebut Plaintiff's showing on this factor. *See In re Nexium Antitrust Litigation*, 777 F.3d at 27.

Defendants claim that Mr. Waldner is atypical, and thus unsuited to represent a class of Plan participants, for three main reasons. They argue: (A) because Mr. Waldner is a sophisticated investment professional who was thoroughly familiar with Natixis' products, the ERISA statute of limitations applies differently to him than to other class members; (B) because Mr. Waldner is no longer a Plan participant, he lacks standing to pursue forward-looking injunctive relief; and (C) because Mr. Waldner signed a release when he left Natixis' employ, there are defenses to his claim that are not shared by other Plan participants.

a.   ***Statute of Limitations***

To understand the typicality issue with respect to the statute of limitations, we start with the ERISA statute itself.  There are two different limitations periods that may govern ERISA claims, and the parties dispute which applies here.  Plaintiff points to the general six-year limitation period, while Defendants point to the three-year period applicable to plaintiffs who have "actual knowledge" of an ERISA violation.  If the three-year statute applies in the way Defendants urge, then all of Mr. Waldner's claims are time-barred.

The statutory provision at issue reads as follows:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.

As the statute reflects, the three-year limitations period is triggered when a plaintiff has "actual knowledge."  Thus, the issue turns on the meaning of "actual knowledge" in the circumstances of this case.

Before we examine the specific facts at issue in this case, we start with the First Circuit's decision in *Edes v. Verizon Commc'ns, Inc.*, 417 F.3d 133 (1st Cir. 2005), which sketched the contours of the "actual knowledge" standard for purposes of triggering the three-year ERISA

limitations period.[6]  In *Edes*, the court emphasized that, prior to amendments adopted in 1987,

the three-year limitations period could be triggered by *constructive* knowledge.  *See* 417 F.3d at

141 ("Prior to 1987, ERISA § 413 also 'contained a constructive knowledge provision, stating

that the three-year limitations period began when a plaintiff 'could reasonably be expected to

have obtained knowledge' from certain [publicly available] reports[.]'") (citations omitted).

"Given this explicit statutory alteration," the *Edes* decision noted, "'actual knowledge must be

distinguished from constructive knowledge'" in applying ERISA § 413.  *Id. (*quoting *Martin v.*

*Consultants & Administrators, Inc.*, 966 F.2d 1078, 1086 (7th Cir. 1992)).

      The words themselves, "actual knowledge," and "constructive knowledge," are not self-

defining.  And, as the First Circuit noted in *Edes*, it is not always obvious how those terms apply

to particular fact patterns.

      The verbal formulation is simple enough: "[T]here cannot be actual knowledge of a

violation for purposes of the limitation period unless a plaintiff knows "the essential facts of the

transaction or conduct constituting the violation." 417 F.3d at 142 (quoting *Martin*).  *Edes*

cautions, however, that this does not end the inquiry.  After noting variations in the terminology

employed by various other Courts of Appeals, the *Edes* decision emphasized the fact-specific

nature of the analysis:

---

[6]  In other circuits, courts have drawn a distinction between "illegal" or "prohibited" transactions, on the one hand, and "process-based fiduciary duty claims" on the other.  For "process-based" claims, "actual knowledge of the breach would usually require some knowledge of how the fiduciary selected the investment." *Fish v. GreatBanc Tr. Co.*, 749 F.3d 671, 686-87 (7th Cir. 2014) (citing and discussing *Brown v. American Life Holdings, Inc.*, 190 F.3d 856 (8th Cir.1999), *Maher v. Strachan Shipping Co.*, 68 F.3d 951, 956 (5th Cir. 1995), and *Waller v. Blue Cross of California*, 32 F.3d 1337, 1341 (9th Cir.1994)).

      Under this approach, Defendants' arguments fail. The Complaint in this case expressly alleges "process-based" claims, and there is no suggestion that Mr. Waldner knew "how the fiduciary selected the investment."

> Where the alleged breach arises out of a financial transaction involving ERISA plan funds, determining where the distinction between actual and constructive knowledge lies in a particular case may depend "on the level of generality employed in characterizing the transaction at issue," which may depend, in turn, on an examination of "the complexity of the underlying factual transaction, the complexity of the legal claim and the egregiousness of the alleged violation."

417 F.3d at 141 (quoting *Martin*).

Of particular relevance to the matter at bar, the court in *Edes* recognized that "determining the meaning of complex transactions may take some time; mere knowledge of facts indicating that "'something was awry'" does not always mean there is actual knowledge of a violation." *Id.* (quoting *Martin* and *Radiology Ctr., S.C. v. Stifel, Nicolaus & Co.*, 919 F.2d 1216, 1221 (7th Cir.1990)).

It is difficult – in the abstract – to draw a sharp line between mere knowledge that "something was awry" and actual knowledge of "the essential facts of the transaction or conduct constituting the violation."  But the facts of this case vividly illustrate the point raised in *Edes* that "complex transactions" are different from cases involving an isolated event or decision.  By way of example, the plaintiffs in *Edes* contended that they had been wrongfully excluded from an ERISA plan because they were not classified as employees on their employer's direct payroll.  The court found in *Edes* that the plaintiffs had acquired actual knowledge of the essential facts of the alleged violation when they learned, at the inception of their employment, that they would receive no ERISA benefits.  *Id.* at 142.  Since they knew they had been excluded – and since such exclusion was itself the claimed violation – it did not matter that the *Edes* plaintiffs lacked "actual knowledge of the plans' eligibility criteria" by which the company had deemed the *Edes* plaintiffs ineligible.  *Id.*

Another useful point of comparison and contrast is the district court's decision in *In re G.E. ERISA Litigation*, 17-CV-12123-IT, 2019 WL 5592864, at *3 (D. Mass. Oct. 30, 2019).

That case, like this one, involved challenges to the offerings in a menu of investment choices for participants in a defined-contribution ERISA plan.  It involved two different claims under ERISA, and it is instructive that, in applying the guidance of *Edes*, the court treated those two claims differently for limitations purposes.

The first claim at issue in *G.E. ERISA Litigation* was that trustees had improperly included *only* proprietary funds (*i.e.* investment vehicles sold by a GE financial subsidiary, GE Asset Management) "as the sole actively managed investment options," for the plan at issue. 2019 WL 5592864, at *3. The court found the first claim was time-barred under the three-year limitations period since the GE plan documents reflected on their face that only proprietary funds were available to those who wanted actively-managed funds, and therefore the plaintiffs had "actual knowledge [of this] the day [they] elected their Plan options."  *Id.* at *3.

The second claim in *G.E. ERISA Litigation* rested on allegations about defects in the *process* by which GE had selected investment options for its ERISA plan.  The plaintiffs alleged that the selection process had been tainted by a conflict of interest whereby the trustees had been motivated, not by their fiduciary obligations to the retirement plan, but by a desire "to generate management fees and maintain GE Asset Management's performance."  *Id*.  In particular, the plaintiffs alleged that plan trustees had been motivated to benefit GE Asset Management – at the expense of plan participants – because there was a plan afoot to sell GE Asset Management to another financial firm.  This additional motivation, the court noted, was not something the plaintiffs could have known about.  *Id.*  Under these circumstances, the court found, the plaintiffs' second claim was *not* governed by the three-year limitations period for "actual knowledge."  *Id.*

Turning to this case, the gist of Defendants' typicality challenge is that Mr. Waldner is an unusually sophisticated investor who was familiar with investment products generally and had specialized professional knowledge about Natixis' products in particular. Based on these circumstances, Defendants contend that Mr. Waldner should be deemed to have had "actual knowledge" of the problems with the Plan's menu of options from the time Mr. Waldner began participating in the Plan. Defendants contend that, for this reason, Mr. Waldner's claims are barred by the three-year limitations period. Defendants' Opposition, Docket No. 102, at 13-14.

Mr. Waldner is indeed an experienced and sophisticated financial analyst with thorough knowledge of Natixis funds due to his position with the company. Mr. Waldner was, at all relevant times, a sophisticated financial professional. Mr. Waldner had advised business clients about retirement plans, had participated in multiple retirement plans, was trained to advise clients how to invest their retirement savings, and had even chaired an investment committee for a previous employer. *See* Docket No. 102, at 13. As Defendants note, Mr. Waldner's job responsibilities at Natixis required him to be intimately familiar with all the Plan's proprietary funds, so he knew which funds in the Plan were proprietary and which were not. Mr. Waldner acknowledged in his deposition that he reviewed fund prospectuses for all of Natixis' domestic mutual funds. *See* Transcript of Deposition, Docket No. 108-1, at 93:4-94:19. Mr. Waldner was familiar with information about fees and expenses and fund performance over one, five, and ten years, and knew how the funds compared to benchmarks. *Id.*, at 97:4-101:8. He was involved in the creation and review of Natixis fund fact sheets, summary documents for investors and prospective investors that included information about fund fees and expenses, investment performance, comparisons to benchmarks, and statistical data about the funds. *Id.*, at 125:6-126:11; 92:4-17; 128:9-129:15.

26

Defendants further note that, as a Plan participant, Mr. Waldner carefully researched every Plan investment option before making his decisions about allocating his 401(k) assets. *Id*., at 170:5-171:10, 176:19-178:24.

In short, Defendants have established that Mr. Waldner was an exceptionally well-educated, well-informed, and careful investor.

Plaintiff counters that neither Mr. Waldner's investing acumen nor his familiarity with the Natixis product line equate to "actual knowledge" of Defendants' alleged failures of prudence and loyalty.  As Plaintiff points out, there is no evidence to suggest that Mr. Waldner knew anything about the processes Defendants employed in selecting, monitoring, evaluating, and removing investment options from the Plan's menu of choices.  *See* Plaintiff's Reply Memorandum in Support of Motion for Class Certification ("Plaintiff's Reply"), Docket No. 79, at 10.  Because Mr. Waldner was not privy to the actual selection process, Plaintiff contends, Mr. Waldner would not have known which competing products were actually available to the Plan, and on what terms.  *Id.* at 9.  At most, Mr. Waldner knew that the end-result of the Defendants' selection efforts was a menu which included a high percentage of proprietary funds.  *See id.* at 9.

In the abstract, there are myriad gradations along the spectrum from "constructive knowledge" to "willful blindness" to "actual knowledge."  But the particulars of this case easily place it at the "constructive" end of the spectrum.  This is apparent from Judge Sorokin's decision denying Defendants' motion to dismiss.  Docket No. 33.  The reasoning in that decision illustrates vividly the distinction between (a) having enough information to allege facts that, taken together, support a plausible inference that the Defendants acted imprudently or disloyalty, and (b) having actual knowledge of such imprudent or disloyal conduct.  As Judge Sorokin noted, it is only "under the totality of circumstances" that the facts alleged have "nudged

27

[Plaintiffs'] claims across the line from conceivable to plausible" to support an inference that Defendants selected and managed the funds in the Plan with imprudence and disloyalty. *Id*. at 9-10. This is a quintessential example of *constructive* – as opposed to *actual* – knowledge.

Defendants are likely correct in asserting that the information known to Mr. Waldner in 2017 "he could have used to make the same core factual allegations in 2017" as he set forth in filing the Complaint in 2021. Defendants' Opposition, Docket No. 102, at 13. But Judge Sorokin's decision on the motion to dismiss makes clear that those allegations are a far cry from any direct account of imprudence or disloyalty. Except to the extent that discovery may have supplied additional information, there is nothing in the record to suggest, even now, that Plaintiff has "actual knowledge" that Defendants violated ERISA. The Complaint does no more than allege facts that – taken together – support an inference of misfeasance, and Defendants make no showing that Mr. Waldner knew anything more than what is alleged in the Complaint. *Cf. Leber v. Citigroup 401(k) Plan Inv. Comm.*, 2014 WL 4851816, at *4 n.5 (S.D.N.Y. Sept. 30, 2014) ("[A] plaintiff must possess more facts to know of a breach than she must possess to plausibly allege that breach on information and belief.").[7] *See also Moreno*, 2017 WL 3868803, at *6 (finding that statute of limitations issues did not impede certification because "[t]he record on this motion does not show that any named Plaintiff or class member had—or even could have—'actual knowledge' of [the fiduciaries'] process" for selecting and monitoring investment options).

---

[7] As in *Leber*, the Defendants' current contention – that Mr. Waldner had "actual knowledge" of a violation sufficient to trigger the three-year limitations period – is difficult to square with Defendants' position, in moving to dismiss, that the allegations of the Complaint were insufficient even to state a claim. *See* 2014 WL 4851816, at *4 n.5 ("A plaintiff without enough facts to do more than speculate that a breach has occurred hardly has 'actual knowledge' of that breach.").

Evidence about Mr. Waldner's general sophistication in investment management – a quality that undoubtedly was prevalent among employees at Natixis – simply does not equate to evidence that Mr. Waldner had actual knowledge of the sort that would trigger the three-year limitations period.  He could not know whether the Committee selected investment options by diligently considering alternatives or whether they blindly threw Natixis products into the mix. He could not know whether the Committee heeded advice from its investment adviser, or whether they routinely disregarded such advice.  He could not know whether the Committee entertained pitches from Natixis fund managers who hoped to place their products on the Plan menu, or whether they eschewed such lobbying.

While Mr. Waldner may be more sophisticated than some other class members, in his lack of actual knowledge about how the Committee did business, Mr. Waldner is typical of the proposed class.

   **b.**   ***Mr. Waldner Is No Longer a Plan Participant***

Defendants argue persuasively that since Mr. Waldner is no longer a Plan participant, his interests diverge from those of current participants, insofar as the Complaint seeks changes to the Plan in the form of prospective injunctive relief.  Any such forward-looking relief would have no impact on Mr. Waldner.  Docket No. 102, at 17-18.  This is not simply a matter of typicality; ultimately it is a question of standing.  *See Donahue v. City of Bos.*, 371 F.3d 7, 14 (1st Cir. 2004) (reviewing cases); *see also Gratz v. Bollinger*, 539 U.S. 244, 284 (2003) ("To seek forward-looking, injunctive relief, petitioners must show that they face an imminent threat of future injury."); *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects.").

In *Garthwait v. Eversource Energy Co.*, 3:20-CV-00902-JCH, 2022 WL 1657469 (D. Conn. May 25, 2022), the district court addressed a factual scenario akin to the matter at bar.  In *Garthwait,* the proposed class representatives were, like Mr. Waldner in this case, *former* participants in a retirement plan.  The court concluded that these individuals had constitutional standing to sue for recovery of monetary losses to that plan but lacked standing to pursue a permanent injunctive relief.  2022 WL 1657469, at *8.  The court reasoned that since "the plaintiffs are no longer enrolled in the Plan and have not come forward with evidence that they reasonably expect to be enrolled in the Plan in the future, there is no threat of future injury from the defendants' future management (or mismanagement) of the Plan."  *Id*. at *5.

Ultimately, the *Garthwait* court exercised its discretion under Fed. R. Civ. P. 23(c)(4) to limit the claims in the case to those for retrospective relief and granted the plaintiffs leave to move to amend to add as a named plaintiff a member of the proposed class who would have standing to bring claims for prospective relief.  *Id*. at *16.

Mr. Waldner is no longer a member of the Plan and therefore does not have standing to bring claims for prospective relief; he cannot show that he would face any future harm from the Defendants' alleged violations of fiduciary duties.

Plaintiff's counsel has suggested that the Court could appoint independent fiduciaries to handle issues regarding prospective relief.  Hearing Transcript (December 22, 2022), Docket No. 90, at 14-15.  This seems a poor substitute for genuine adversary testing of competing claims.  The more practical approach is to certify the proposed class only as to Plaintiff's claims for

retrospective relief and to deny certification of the class insofar as Plaintiff seeks prospective injunctive relief.[8]

        **c.**      *Mr. Waldner's Termination Agreement*

Defendants raise several issues arising from the provisions of the termination agreement that Mr. Waldner signed when he left Natixis. They contend that the termination agreement presents legal issues that render Mr. Waldner atypical of the class he would represent.

It is true that "[b]oth typicality and adequacy may be defeated where the class representatives are subject to unique defenses which threaten to become the focus of the litigation." *DeRosa v. Massachusetts Bay Commuter Rail Co.*, 694 F. Supp. 2d 87, 100 (D. Mass. 2010) (citations omitted). But contentions that a putative class representative is atypical based on unique defenses require scrutiny. There are always differences among individuals; the question is whether those differences are material. As ever, the preeminent concerns are efficiency and fairness to those whose rights may be adjudicated on a representative basis. Thus, the Court must assess whether a potential defense threatens to sidetrack or delay proceedings, or put the representative at odds with other class members. *See In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) ("Given the formulaic nature of damages calculations in securities fraud cases, it is unlikely that the issues raised by defendants will either cause the Fund's interests to diverge from those of other class members or be a major focus at trial.")

Unsurprisingly, there is considerable caselaw on the general topic of ERISA plaintiffs with termination agreements. Two of the leading appellate cases, *In re Schering Plough Corp.*

---

[8] At hearing on the motion, I suggested that Plaintiff could also propose an additional class representative – someone who is still a Plan participant. Hearing Transcript (December 22, 2022), Docket No. 90, at 14. No such additional class representative has come forward, however.

*ERISA Litigation*, 589 F.3d 585, 599-602 (3d Cir. 2009), and *Langbecker v. Electronic Data Systems Corp.*, 476 F.3d 299, 313 (5th Cir. 2007), are instructive.  In both cases, those courts remanded class certification decisions to the district court, finding that careful consideration was needed with respect to the impact of releases signed by class members.

To flesh out the issue in this case, I ordered the parties to submit supplemental materials addressing the "significance of the release and covenant not to sue in Plaintiff's termination agreement with Natixis, as they relate to Plaintiff's typicality for purposes of class certification" and to provide information about "the proportion (and absolute numbers) of the proposed class that may have signed releases or covenants not to sue."  Docket No. 89.  I further invited the parties "to address the legal significance of Plaintiff's covenant not to sue, as distinct from the question whether in the ERISA context an individual's waiver of rights is binding upon a Plan and its participants."  *Id.*

As a signer of a termination agreement, Mr. Waldner is very much in the minority of the proposed class.  Defendants estimate that less than one-sixth of the proposed class contains former employees who have received severance payments since 2015.  Defendants note, moreover, that not all such former employees necessarily signed termination agreements, so the total "is likely lower than this estimated number of Terminated Employees."  Defendants' Supplemental Memorandum, Docket No. 96, at 3-4.

Given that the termination agreement is a distinguishing feature for Mr. Waldner, it is incumbent on the Court to weigh the significance of this distinction.  Is the termination agreement likely to become a centerpiece of the litigation, or a major distraction?  Or is it tangential?

32

Plaintiff advances two arguments, one formal and one practical, why Mr. Waldner's termination agreement should not disqualify him as a typical class member. Plaintiff's Reply, Docket No. 79, at 7-8.

As a formal matter, Plaintiff argues, any release contained in the termination agreement is without force. The premise of this argument is that the ERISA claims at issue here are *derivative*, they are brought on behalf of the Plan. To the extent that the Plan may have been harmed by imprudent or disloyal conduct, Mr. Waldner was not in a position – when he signed his termination agreement – to release any claims on behalf of the Plan. *See, e.g., Leber*, 323 F.R.D. at 161 ("In cases brought on behalf of a plan, most courts have held that 'individuals do not have the authority to release a defined contribution plan's right to recover for breaches of fiduciary duty'; the consent of the plan is required for a release of 29 U.S.C. §1132(a)(2) claims.") (collecting cases). *See also Moreno*, 2017 WL 3868803, at *6 ("[N]umerous courts have held that under ERISA, individuals do not have the authority to release a defined contribution plan's right to recover for breaches of fiduciary duty.") (citing *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 75 (S.D.N.Y. 2006)).

Although Plaintiff's formal argument is correct as far as it goes, it does not resolve the issue of whether Mr. Waldner is an appropriate class representative. That Mr. Waldner was not in a position to release the Plan's claims does not mean he is typical of a class that might sue to vindicate those claims. Plaintiff phrases the issue in terms of whether the release is "valid." Plaintiff's Supplemental Memorandum of Law in Support of Motion for Class Certification, Docket No. 94, at 5. But this misses the point. Even if Mr. Waldner's release is not effective as a waiver of the rights of the Plan, that does not mean it is nugatory; on its face the release does waive – at least some of – Mr. Waldner's rights.

This brings us to Plaintiff's second, more practical, argument.  Focusing on the language of the termination agreement itself, Plaintiff notes that the release language is essentially backward looking.  By its terms, the release only applies "from the beginning of time through the date you execute this agreement" (*i.e.* through May 1, 2018).  Docket No. 108-1.  Given that Mr. Waldner continued as a member of the Plan until late February 2021 (Complaint, Docket No. 19, ¶ 18), there remains a period of several years, after he left Natixis, which are unaffected by the release.  Indeed, of the time when Mr. Waldner was a Plan participant, the greater portion was *after* he signed the release.  There is, moreover, no reason to suppose that Defendants' practices in selecting and retaining investment options in the Plan menu differed in the periods before and after Mr. Waldner signed the termination agreement.  *See* Defendants' Supplemental Memorandum in Further Opposition to Plaintiff's Motion for Class Certification ("Defendants' Supplemental Memo"), Docket No. 96, at note 8.

Assuming that the release provisions in Mr. Waldner's termination agreement are binding on Mr. Waldner, they do not render him meaningfully atypical of the class.  At most, they simply limit the periods for which Mr. Waldner may ultimately recover compensation.  As noted in the discussion of commonality, it is unlikely that any two class members will be identically situated in terms of the precise time periods when their retirement funds were invested in particular options from the Plan menu.  In this regard, Mr. Waldner is on much the same footing as any other class member.  *See Moore v. Comcast Corp.*, 268 F.R.D. 530, 538 (E.D. Pa. 2010) ("While [plaintiff's] specific claim may occur over a shorter or different time period than other class members' claims, there is a 'strong similarity of legal theories' based on a single 'course of conduct' by defendants."); *accord Tigges v. AM Pizza, Inc.*, 2016 WL 4076829, at * 9 (D. Mass. July 29, 2016).

34

In short, the termination agreement in this case does not pose the kind of complication or conflict that would render Mr. Waldner meaningfully atypical.  As other courts have noted, this is hardly a unique circumstance.  *See Moore*, 268 F.R.D.  at 534-38 (where only 1.5% of class members had signed releases similar to the one signed by the sole named plaintiff, the court nonetheless found that members' "shared interest in establishing defendants' liability [   ] vastly outweighs" individual concerns); *see also Taylor,* 2008 WL 2333120, at *4 (signing of releases does not affect typicality where ERISA claims alleged damages to the Plan as a whole); *Leber*, 323 F.R.D. at 161 (certification not precluded where employees "routinely" signed releases waiving all claims against the defendant employer).

Defendants offer a further argument against typicality.  This argument rests on the following language in the agreement: "This means that you may not sue Natixis Advisors, L.P. for any current or prior claims, including those arising out of your employment with or separation from the Company."  Docket No. 108-1.  Defendants contend that this language constitutes not merely a release, but also a binding covenant not to sue. Such a covenant, they contend, raises questions that are distinct from whether the agreement released claims on behalf of the Plan.  Defendants' Supplemental Memo, at 8-10.

Defendants urge the Court to equate Mr. Waldner's termination agreement with covenants not to sue that – in other cases – have been interpreted to bar signers from serving as class representatives.  But the language of this particular agreement will not bear such a construction.  The clause that Defendants identify as the purported "covenant not to sue" is not meaningfully separated from the agreement to "release and forever discharge the Company, its Affiliates. . . from any and all claims, charges . . . , including claims for . . . the Employee Retirement Income Security Act."  Docket No. 108-1.  It is in the same numbered section of the

document and directly follows the paragraph containing the release of claims.  Indeed, the

numbered section of the agreement concludes with a reference to "the foregoing release and

waiver of claims."  *Id.*  The words "covenant," "agreement," or "not to sue" do not appear; there

is nothing to suggest an intent to create any covenant not to sue that would be distinct from the

release provision.  By its terms, the clause in question is plainly an explanation of the release

provisions that immediately precede it: "*This means that* you may not sue Natixis Advisors, L.P.

for any current or prior claims, including those arising out of your employment with or

separation from the Company."  Docket No. 108-1 (emphasis added).

There is, in short, no covenant that is separate and distinct from the release or that

imposes additional promises.[9]  In this respect, the circumstances of this case differ materially

from those that have been found to bar class certification.  The covenants in those cases were

unequivocal, and used terms that were very different terms from the termination agreement in

this case.  *See, e.g.*, *In re Schering Plough*, 589 F.3d at 592 n. 4 ("Furthermore, I promise that I

will not file a lawsuit against the Company in connection with any aspect of my employment or

termination."); *Alfonso v. Cumulus Media, Inc.*, 20-CV-847-TWT, 2021 WL 5033479, at *2 (N.

D. Georgia, Oct. 15, 2021) ("Employee further agrees not to bring, continue, or maintain any

legal proceedings of any nature whatsoever against Cumulus.").

The Termination Agreement does not render Mr. Waldner meaningfully atypical and thus

poses no impediment to class certification.

---

[9]  Even if the Termination Agreement were ambiguous as to whether there is an independent
covenant not to sue, it would properly be construed against the drafters,  presumably Defendants.
*See* Restatement (Second) of Contracts § 206 ("In choosing among the reasonable meanings of a
promise or agreement or a term thereof, that meaning is generally preferred which operates
against the party who supplies the words or from whom a writing otherwise proceeds.").

### 4.   *Adequacy of Representation*

Representation is adequate when "the representative parties will fairly and adequately protect the interest of the class.  Fed. R. Civ. P. 23(a)(4).  Plaintiff has attested that he understands his responsibilities as a class representative and is willing to undertake all attendant responsibilities.  Waldner Declaration, Docket No. 52, ¶¶ 6-7.  Plaintiff has further represented that he is not aware of any conflicts of interest between himself and other Plan participants.  Waldner Declaration, Docket No. 52, ¶ 8.  Based on this declaration, the Court finds that Plaintiff shares common interests with the class members whom he seeks to represent.  Further, his claims under ERISA are based on the same legal theory as those of the purported class.

There is no question that Plaintiff's counsel is well-qualified to bring an ERISA class action.  Attorneys from Plaintiff's law firm, Nichols Kaster, PLLP, have been cited for their "great deal of experience in handling class actions, particularly in cases alleging breach of fiduciary duty."  *Falberg,* 2022 WL 538146, at *12.  The adequacy requirement is satisfied.

### B.   *Class Certification under Fed. Civ. P. 23(b)(1)*

The Court finds that the purported class satisfies the certification requirements of Rule 23(b)(1).  Under ERISA, Defendants owed fiduciary duties to the Plan, duties that were intended to protect the "interest of the participants and beneficiaries" collectively.  *See* 29 U.S.C. § 1104.  If Defendants breached those duties and caused harm, as the Complaint alleges, any remedy will be owed to the Plan itself, even though individual Plan participants may ultimately benefit.

As noted above, the class claims here are derivative.  That is, Plaintiff may sue only on behalf of the Plan, and any recovery the class might realize will be a sum certain, the amount of which will determine the amounts available for distribution to individual Plan members.  Separate actions by individual class members would create a risk of "inconsistent or varying

adjudications" regarding the same claims of investment mismanagement and "would establish

incompatible standards of conduct" to judge Defendants' actions.  Fed. R. Civ. P. 23(b)(1)(A).

This case fits comfortably with the many decisions that have certified ERISA fiduciary

cases as class actions under Rule 23(b)(1).  As Judge Woodlock noted in *Hochstadt v. Boston*

*Scientific Corp.*, 708 F. Supp. 2d 95 (D. Mass. 2010), "[g]enerally, an action charging a breach

of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class

of beneficiaries, requiring an accounting or similar procedure to restore the subject of the trust is

a classic example of the type of case appropriate for certification under Rule 23(b)(1)(B)." 708 F.

Supp. 2d at 105 (internal quotations and citations omitted).  Reviewing a sample of the caselaw,

Judge Woodlock noted:

> Not surprisingly, therefore, "[i]n light of the derivative nature of ERISA § 502(a)(2)
> claims, breach of fiduciary duty claims brought under § 502(a)(2) are paradigmatic
> examples of claims appropriate for certification as a Rule 23(b)(1) class, as numerous
> courts have held." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 604 (3d Cir.
> 2009); *Evans v. Akers*, No. 04–11380–WGY, slip op. at 4 (D. Mass. Oct. 7, 2009)
> (finding class certification appropriate under Rule 23(b)(1)(B) because "[g]iven the Plan-
> representative nature of Named Plaintiffs' breach of fiduciary duty claims, there is a risk
> that failure to certify the Settlement Class would leave future plaintiffs without relief");
> *Stanford v. Foamex L.P.*, 263 F.R.D. 156, 174 (E.D. Pa. 2009) ("because of the unique
> and representative nature of an ERISA § 502(a)(2) suit, numerous courts have held class
> certification proper pursuant to Rule 23(b)(1)(B)"); *In re Nortel Networks Corp. ERISA
> Litig.*, No. 03–MD–01537, 2009 WL 3294827, at *15 (M.D. Tenn. 2009) (finding class
> certification appropriate under Rule 23(b)(1)(B) because "[i]f individual adjudications
> would be dispositive of the interests of other Plan Participants, it would be better for
> those Plan Participants to be members of a class"); *Jones v. NovaStar Fin., Inc.*, 257
> F.R.D. 181, 193 (W.D. Mo. 2009) (certifying a class under Rule 23(b)(1)(B) because
> "[g]iven that [named plaintiff]'s claim seeks 'Plan-wide relief, there is a risk that failure
> to certify the class would leave future plaintiffs without relief ' ") . . ..

*Id.*

For the same reasons, the class is properly certified under Rule 23(b)(1)(B) because there

is a risk of "adjudications with respect to individual class members that, as a practical matter,

would be dispositive of the interests of the other members not parties to the individual

adjudications or would substantially impair or impede the ability to protect their interests."  Fed. R. Civ. P. 23(b)(1)(B).

C.  ***Class Certification under Fed. R. Civ. P. 23(b)(3)***

Plaintiff argues in the alternative that the purported class satisfies Rule 23(b)(3) because common questions predominate.  Defendants object to certification under Rule 23(b)(3) on the ground that Plaintiff's motion "does not and cannot offer a plan to address the individualized statute of limitations and injury-in-fact inquiries for the members of the proposed class."  *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 58 (1st Cir. 2018).  Defendants' argument carries no greater force with respect to class certification under Rule 23(b)(3) than it does for certification under Rule 23(b)(1)(A) and (B).  However, while certification under Rule 23(b)(3) might be permissible, it would be cumbersome, at best, and would poorly suit the need – if liability is established – for relief directed to the Plan itself.

IV.  **Conclusion**

For the reasons set forth above, I recommend that Plaintiff's Motion for Class Certification (Docket No. 50) be GRANTED in part and DENIED in part.  The proposed class should be certified as to Plaintiff's claims for retrospective relief.  Insofar as Plaintiff seeks to certify a class pursuing prospective injunctive relief, Mr. Waldner lacks standing to pursue such a claim.

I recommend that the Court reconsider class certification for prospective relief if a member of the proposed class with standing to bring such claims were to move for leave to

intervene as an additional class representative within 30 days of this Report and Recommendation.[10]


/s/ Paul G. Levenson
United States Magistrate Judge

Date:     March 24, 2023

---

[10] The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).