UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRIAN WALDNER, individually and as the
representative of a class of similarly situated
persons, and on behalf of The 401(k) Savings
and Retirement Plan, Sponsored by Natixis
Investment Managers, L.P.,

     *Plaintiff*,

v.

NATIXIS INVESTMENT MANAGERS, L.P.,
NATIXIS INVESTMENT MANAGERS, L.P.
RETIREMENT COMMITTEE,

     *Defendants*.

No. 21-cv-10273-LTS

## REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTIONS IN LIMINE

LEVENSON, U.S.M.J.

## INTRODUCTION

Plaintiff Brian Waldner sues individually and as the representative of a class (the "Class")

comprised of participants in the 401(k) Savings and Retirement Plan (the "Plan") sponsored by

Mr. Waldner's former employer, Defendant Natixis Investment Managers, L.P. ("Natixis"). Under

the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001,

*et seq.*, Plaintiff alleges that Natixis and its Retirement Committee (the "Committee" and

collectively, "Defendants") breached their fiduciary duties of loyalty and prudence. Specifically,

Plaintiff alleges that, in selecting a menu of investment options for Plan participants, Defendants

improperly favored mutual funds and other investment products that were offered by Natixis, or

by money managers with current or historical ties to Natixis, over more suitable products from Natixis' competitors. According to Plaintiff, this favoritism yielded a menu that was poorly balanced in terms of asset classes and investment styles.

Currently before the Court are Defendants' Motion for Summary Judgment (Docket No. 138), Defendants' Motion in Limine to Exclude Certain Opinions and Exhibits of Plaintiff's Expert Donald C. Stone (Docket No. 153), and Defendants' Motion in Limine to Exclude Certain Opinions of Plaintiff's Expert Brian C. Becker, PhD (Docket No. 155), together with the supporting briefings, the opposing briefings, and the Statement of Undisputed Material Facts in Support of Defendants' Motion for Summary Judgment (the "Statement of Undisputed Material Facts") (Docket No. 152-1).[1] Given the overlap in the issues raised by the three motions, I will address them in a single report and recommendation.[2]

## I.    Introductory Comments

As discussed in depth below, the First Circuit, in *Brotherston v. Putnam Investments, LLC*, 907 F.3d 17 (1st Cir. 2018), has set forth the parameters for summary judgment in cases such as this. In that decision, the First Circuit explicitly warned against deciding questions of investment

---

[1] Defendants also submitted a notice of supplemental authority, alerting the Court that one of the decisions cited in its summary judgment briefing, *Falberg v. Goldman Sachs Group, Inc.*, No. 19-cv-9910, 2022 WL 4280634 (S.D.N.Y. Sept. 14, 2022), had been affirmed by the U.S. Court of Appeals for the Second Circuit. Docket No. 169.

[2] Judge Sorokin referred this case to me for pretrial proceedings and for report and recommendation on dispositive motions. Docket No. 73. A motion to strike in a civil case is not among the enumerated "dispositive" motions requiring report and recommendation. *See* R. 3, Rules for Magistrate Judges (D. Mass.). However, when a motion to strike is filed in conjunction with dispositive motions (such as the present motion for summary judgment), courts in this district have bundled the motion to strike with the report and recommendation on the associated dispositive motion. *See, e.g.*, *Renart v. Raiser, LLC*, No. 19-12349, 2023 WL 2553966, at *5 (D. Mass. Mar. 17, 2023), *appeal dismissed sub nom. Renart v. Rasier, LLC*, No. 23-1336, 2023 WL 11054844 (1st Cir. June 12, 2023) (adopting the magistrate judge's recommendation concerning a motion to strike and motions for summary judgment).

suitability and comparability as a matter of law, particularly when there are competing expert views before the Court. Furthermore, in *Brotherston*, the First Circuit has set forth a framework for determining which party bears the burden of proof with respect to various aspects of causation and damages. This framework further constrains summary disposition. Against this backdrop, it is unsurprising that there are few issues ripe for summary judgment in this complex ERISA case.

As detailed below, summary judgment is appropriate only as to two issues in this case, of which one (the absence of evidence to support Plaintiff's claims with respect to Oakmark International Fund) is likely to have a material impact on the conduct of the trial or the outcome of the case.

## II.    Factual Background

The following recitation of facts is based primarily on the parties' Statement of Undisputed Material Facts.[3] *See* Docket No. 152-1.

During the Class Period, which began on February 18, 2015, Natixis offered the Plan, a 401(k) savings and retirement plan, to its employees and the employees of certain of its affiliates. *Id.* ¶ 2.[4] Participants in the Plan were offered a menu of investment options, which included both proprietary funds (*i.e.*, investment products sold by Natixis and its affiliates) and nonproprietary funds. *Id.* ¶ 69. The Plan's nonproprietary offerings were wide-ranging: they included actively-

---

[3] The parties publicly filed redacted versions of their supporting papers, with unredacted versions filed under seal. My ruling on the parties' joint motion to seal substantially cut back the amount of information that the parties may shield from public view. *See generally* Docket No. 182 (emphasizing the presumptive right of access to judicial documents). For clarity and consistency, I cite to the sealed (unredacted) papers in this report, although I avoid information that is not public (*i.e.*, personal identifiers, competitively sensitive information, and privileged materials).

[4] Except as noted (such as by use of the ¶ signal or transcript pin citation), record citations for exhibits are to the page number of the document as filed, rather than the page number of the original document. Such page number is reflected at the top of the page (*e.g.*, Page 5 of 49). Citations to supporting memoranda, by contrast, refer to the page numbers printed on the briefs.

and passively-managed funds, with funds in all major asset classes and most[5] major asset categories. *Id.* ¶¶ 74, 75, 76. Defendants offered 18 different proprietary funds in the Plan menu at various points during the Class Period; during each year of the Class Period there were between 12 and 14 proprietary options available to Plan participants. *Id.* ¶¶ 118, 120. The following actively-managed, proprietary funds were offered during the Class Period (the "At-Issue Funds"):

- AEW Global Properties Trust Fund
- AEW Global Focused Real Estate Fund (f/k/a AEW Real Estate Fund)
- AlphaSimplex Global Alternatives Fund
- Delafield Fund
- Gateway Fund
- Loomis Sayles Bond Fund
- Loomis Sayles Core Bond Fund
- Loomis Sayles Growth Fund
- Loomis Sayles Small Cap Growth Fund
- Loomis Sayles Small Cap Value Fund
- Mirova Global Sustainable Equity Fund
- Natixis Vaughan Nelson Mid Cap Fund
- Oakmark Equity & Income Fund
- Oakmark Fund
- Oakmark Select Fund
- Oakmark International Fund
- WCM Focused Emerging Markets Fund
- WCM Focused International Growth Fund

Docket No. 140-76, at iv.

When a participant enrolled in the Plan during the Class Period, he or she was automatically invested in a nonproprietary, passively-managed, low-cost target date suite of funds, the Vanguard Target Retirement Series Funds ("Vanguard TDFs"). *See* Docket No. 152-1, at ¶¶ 127–32. The Vanguard TDFs were, in other words, the Plan's Qualified Default Investment Alternative ("QDIA"). *Id.* ¶¶ 127, 128. Plan participants who wanted to invest in other options had to

---

[5] According to Plaintiff, "[t]he Plan menu did not include a non-proprietary money market/capital preservation fund until . . . July 2015." Docket No. 152-1, at ¶ 74.

affirmatively elect to do so. *See id.* ¶¶ 130–32. In every year of the Class Period, participants invested more than half of Plan assets in Natixis-affiliated funds. *Id.* ¶ 134.

The Committee, which was comprised of four to six senior Natixis executives throughout the Class Period, was responsible, among other duties, for selecting the Plan's investment options and for monitoring their performance. *Id.* ¶¶ 7, 9. This included responsibility for adding, removing, or replacing investment options. *Id.* ¶ 7. The Committee held meetings (although the parties dispute whether it met with sufficient regularity), during which the Committee reviewed, among other things, the performance of funds on the Plan menu. *See id.* ¶¶ 58, 79, 80, 82.

At some point prior to the Class Period (the exact date appears to be in dispute, *see id.* ¶ 34), the Committee engaged Mercer, the "world's largest investment consultant by assets under advisement," to provide investment consulting services to the Plan.[6] *Id.* ¶¶ 34–36. Mercer's responsibilities during the Class Period included (among other things) preparing quarterly investment performance evaluation reports for the Committee[7] (*id.* ¶ 41); attending Committee meetings (*id.* ¶ 45); providing updates on manager and organizational changes of the Plan's investment options, (*id.* ¶ 46); preparing an investment structure review for the Committee (*id.* ¶ 47); assisting with drafting, revising, and maintaining the Plan's Investment Policy Statement

---

[6] The parties do not dispute that it is a "best practice" to utilize an independent third-party consultant. Docket No. 152-1, at ¶ 37. Nor do they dispute that Mercer is a qualified consultant with a "good reputation in the retirement industry." *Id.* ¶¶ 38–40.

[7] The parties agree that Mercer prepared reports, but Plaintiff disputes whether the Committee reviewed them during quarters when the Committee did not meet. *See* Docket No. 152-1, at ¶ 41 ("[T]here is no evidence that . . . [the] materials [were circulated] to Committee members in quarters in which the Committee did not meet."). The parties also dispute whether Mercer provided the Committee with the same types of information concerning investment performance for both proprietary and nonproprietary funds. *See id.* ¶¶ 84–85. Plaintiff contends that "[u]ntil recently, of funds within asset classes that Mercer rates, only proprietary funds were unrated, not fully rated, or no longer rated . . . during the Class Period." *Id.* ¶ 84.

("IPS") (*id.* ¶ 50); and providing Committee governance services (*id.* ¶ 53). According to the minutes, the Committee reviewed recommendations from Mercer before deliberating and making decisions on the Plan menu. *Id.* ¶ 83.

In June 2016, the Committee engaged Sullivan & Worcester as external ERISA counsel. *Id.* ¶ 54. Since then, one or more Sullivan & Worcester attorneys have regularly attended Committee meetings, and the firm provided fiduciary training on at least two occasions (once in 2017 and again in 2019). *Id.* ¶¶ 58, 60.

It is undisputed that, on various occasions during the Class Period, both proprietary and nonproprietary funds were added to and removed from the Plan menu. *Id.* ¶ 89. Beyond this, the parties agree on little, with significant disagreements about the actual practices employed by the Committee and about the efficacy of those practices for considering the Plan's investment options.

For example, Defendants contend that the Committee meeting minutes—and the materials provided by Mercer—establish that the Committee considered each individual fund on the Plan menu. *See id.* ¶ 86. Plaintiff, by contrast, points to specific funds for which, he claims, there is no evidence that the Committee paid any particularized attention. *See id.* ("[T]here is no evidence that the Committee specifically considered its decision to offer both the Oakmark and Oakmark Select Fund on the Plan menu.").

Similarly, Defendants contend that, in deciding whether to add funds as offerings, the Committee considered the overall composition of the Plan menu, including whether and how new funds would complement existing options and provide participants with the opportunity to diversify. *Id.* ¶ 87. Plaintiff disputes whether this was a uniform practice. *See id.* (identifying Natixis Sustainable Futures Funds as an example of an exception).

### III.    Overview of Applicable Legal Standards

As a starting point, I will briefly review the broad contours of the legal duties at issue in this case—that is, the fiduciary obligations of ERISA trustees. I will also review the standards that govern motions for summary judgment generally, as well as the burden-shifting framework specific to ERISA claims, which the First Circuit enunciated *Brotherston*. I will delve more deeply into the case law as I review the parties' various contentions, but I note at the outset that ERISA cases are manifold, and it is not always clear whether summary judgment decisions from other circuits can be mapped to the *Brotherston* framework that controls here.

### A.    *Fiduciary Duties under ERISA: Loyalty and Prudence*

"ERISA section 404(a) . . .  imposes two duties upon a fiduciary: the duty of loyalty and the duty of prudence." *Ellis v. Fid. Mgmt. Tr. Co.*, 257 F. Supp. 3d 117, 126 (D. Mass. 2017), *aff'd*, 883 F.3d 1 (1st Cir. 2018).

As to the duty of loyalty, "section 404(a) requires an ERISA fiduciary to . . . 'discharg[e] his duties with respect to a plan solely in the interest of the participants.'" *Id.* (quoting 29 U.S.C. § 1104(a)(1)). This means that, although "an accompanying benefit to the fiduciary is not impermissible," *id.*, the fiduciary cannot "place its own interests ahead of those of the Plan fiduciary." *Id.* (quoting *Vander Luitgaren v. Sun Life Assurance Co. of Can.*, 765 F.3d 59, 65 (1st Cir. 2014)). "Accordingly, to succeed on a claim for breach of the duty of loyalty, a plaintiff needs to show that the fiduciary served an interest or obtained a benefit at the expense of the plan beneficiaries." *Id.*; *see also Brotherston*, 907 F.3d at 40 ("[I]n reviewing ERISA duty of loyalty claims, we have asked whether the fiduciary's 'operative motive was to further its own interests.'" (quoting *Ellis*, 883 F.3d at 6)).

As to the duty of prudence, ERISA requires that a fiduciary act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use . . . ." 29 U.S.C. § 1104(a)(1)(B). Thus, "[t]o establish a breach of the duty of prudence, a plaintiff must[] . . . show that the fiduciary's conduct fell below the '[p]rudent man standard of care.'" *Cunningham v. Cornell Univ.*, 86 F.4th 961, 983 (2d Cir. 2023) (third alteration in original) (quoting 29 U.S.C. § 1104(a)).

"An ERISA fiduciary acts imprudently 'by failing to properly monitor investments and remove imprudent ones.'" *Id.* (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 530 (2015)). "Accordingly, 'plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options' and they must 'remove [any] imprudent investment from the plan within a reasonable time.'" *Id.* (alteration in original) (quoting *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022)).

"When examining an alleged breach of the duty of prudence, the key question is 'whether the fiduciary took into account all relevant information' in performing its duties under ERISA." *Sellers v. Trs. of Bos. Coll.*, No. 22-10912-WGY, 2024 WL 1586755, at *6 (D. Mass. Apr. 11, 2024) (quoting *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 133 (D. Mass. 2021)). "Therefore, to determine whether a fiduciary acted prudently, a court will evaluate conduct under the 'totality of the circumstances' and assess a fiduciary's procedures, methodology and thoroughness, not the results of the investment's performance." *Id.* (citation omitted) (quoting *Tracey v. Mass. Inst. of Tech.*, 404 F. Supp. 3d 356, 361 (D. Mass. 2019)).

"A fiduciary who breaches the duty of prudence must 'make good' to the plan 'any losses to the plan resulting from . . . such breach . . . .'" *Id.* (quoting 29 U.S.C. § 1109(a)).

### B. **Summary Judgment Standards Generally**

Rule 56 of the Federal Rules of Civil Procedure provides that, as to "each claim or defense—or part of a claim or defense—on which summary judgment is sought," the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party[.]" *Rivera-Rivera v. Medina & Medina, Inc.*, 898 F.3d 77, 87 (1st Cir. 2018) (quoting *Cherkaoui v. City of Quincy*, 877 F.3d 14, 23–24 (1st Cir. 2017)).

The Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). But the showing required to stave off summary judgment need not be conclusive; there only needs to be sufficient evidence to permit the trier of fact to return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").

"The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in her favor." *Carlson v. Univ. of New Eng.*, 899 F.3d 36, 43 (1st Cir. 2018).

### C.    *Summary Judgment in ERISA Cases – The* **Brotherston** *Burden-Shifting Framework*

To decide a summary judgment motion, the Court must start with the applicable substantive law, identifying the elements essential to the non-moving party's case, as the Court must assess whether there is sufficient evidence that would permit a finder of fact to rule for the non-moving party.

Thus, we start with the elements of a Section 404(a) ERISA claim. "To prevail on a claim under [Section 404(a)], plaintiffs must show: (1) that defendants acted as the Plans' fiduciary; (2) that defendants breached their fiduciary duties; and (3) that the breach caused a loss to the Plan."

*Sellers*, 2024 WL 1586755, at *6. But there is an important kicker—namely a shift in the burden of proof—with respect to causation. "[O]nce an ERISA plaintiff has shown a breach of fiduciary duty and loss to the plan, the burden shifts to the fiduciary to prove that such loss was not caused by its breach, that is, to prove that the resulting investment decision was objectively prudent." *Brotherston*, 907 F.3d at 39; *see also Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 210 (D. Mass. 2020) ("The question whether [an] alleged lack of prudence actually led to any losses is one of causation: a question upon which the defendant bears the burden of proof."). Thus, according to *Brotherston*'s formulation, the concept of an "objectively prudent" investment decision is essentially a matter of loss causation; no damages may be assessed unless a failure to act prudently results in demonstrable harm.

The term "objectively prudent," as used in *Brotherston*, is a term of art that must be handled with some care. The term has a long pedigree and it is routinely used, precisely as the First Circuit used it in *Brotherston*, to identify a situation in which an *imprudent* investment decision did not cause a particular loss, akin to the colloquial "no-harm-no-foul" mode of sports officiating.[8] *See, e.g.*, *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014) (explaining that, "[t]o carry its burden, [the defendant] had to prove that despite its imprudent decision-making process, its ultimate investment decision was 'objectively prudent'"). This is evident in then-Judge Scalia's memorable explication in *Fink v. National Savings & Trust Co.*, 772 F.2d 951 (D.C. Cir. 1985). As noted in *Fink*, a fiduciary who fails to investigate investment decisions is not liable for damages if he "happened—through prayer, astrology or just blind luck—to make . . . objectively prudent investments." 772 F.2d at 962 (Scalia, J., concurring in part and dissenting in part). Used in this

---

[8] *See generally* Linda E. Carter, *The Sporting Approach to Harmless Error in Criminal Cases: The Supreme Court's "No Harm, No Foul" Debacle in* Neder v. United States, 28 AM. J. CRIM. L. 229, 230 n.3 (2001) (discussing the origins of the expression "no harm, no foul").

manner, the term is unavoidably oxymoronic: "objectively prudent" means "*im*prudent" but lucky.[9]

I raise this terminology-related point because the summary judgment briefing in this case reflects precisely the kind of confusion that one might expect when the term "objectively prudent" is used to describe imprudent but lucky conduct. As discussed below, a portion of Defendants' summary judgment motion purports to establish that Defendants' actions were "objectively prudent" by pointing to evidence that, if credited, would tend to show that Defendants acted reasonably (*i.e.*, that they were "prudent").

The use of "objectively prudent" in *Brotherston* as a shorthand for no-harm-no-foul reasoning is clear enough. Indeed, the "objectivity" of the analysis is readily grasped, since outcomes are compared based on actual market performance. But it is unclear how a court might determine that a fiduciary's decision was "objectively prudent"—as opposed to just plain "prudent"—in the manner that Defendants propose.

I note that some courts have endeavored to square the circle, treating the term "objective prudence" as a reminder that prudence must be gauged in light of the circumstances at the time of decision, without the distortions of hindsight. Thus, the Eleventh Circuit recently commented that the "duty of prudence is objective, judged by the information available at the time of each investment decision—not by the glow of hindsight." *Pizarro v. Home Depot, Inc.*, No. 22-13643, 2024 WL 3633379, at *3 (11th Cir. Aug. 2, 2024) (citing *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 107

---

[9] I am mindful that I am quibbling with wording employed by someone who has been hailed as one of the great writers in the history of the Supreme Court. *See* Justice Elena Kagan, *In Memoriam: Justice Antonin Scalia*, 130 HARV. L. REV. 5, 7 (2016) ("As a sheer writer, I think, Justice Scalia belongs in the company of Justices Holmes, Brandeis, and Jackson.").

(2d Cir. 2021)).[10] In a slightly different take, the Fourth Circuit has suggested that "objective prudence" depends on whether evidence shows that a prudent fiduciary "would" have, rather than "could" have, made the same decision. *See Tatum*, 761 F.3d at 363–65. But it is unclear how this "would" vs. "could" distinction helps a court sort through summary judgment arguments in an ERISA case. *Cf. id.* at 377 (Wilkinson, J., dissenting) ("Ultimately, the majority's and [the plaintiff's] minute parsings of the differences between 'would have' and 'could have' obfuscate rather than illuminate.").

Given that the First Circuit has not adopted the usage suggested in either *Pizarro* or *Tatum*, it seems pointless to wade into this swamp. Whatever "objective prudence" may mean as a term of art, the key point is that the duty of care analysis is not backward-looking. It asks whether, *at the time of the fiduciary's decision*, the fiduciary adequately considered the relevant facts and circumstances in making that decision.[11] As the First Circuit has noted:

> [W]hether a fiduciary's actions are prudent cannot be measured in hindsight . . . .
> The test [is] how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight.

*Bunch v. W.R. Grace & Co.*, 555 F.3d 1, 7 (1st Cir. 2009) (alterations in original) (internal quotation marks and citation omitted); *see also Sellers*, 2024 WL 1586755, at *16 ("In determining whether a fiduciary breached its duty of prudence, the Court must engage in a context-specific inquiry, without relying on hindsight, and ask whether the fiduciary employed the appropriate methods to investigate and evaluate an investment.").

---

[10] In the same opinion, the Eleventh Circuit notes that "an imprudent process can sometimes yield a prudent investment. That may happen, as then-Judge Scalia vividly put it, 'through prayer, astrology or just blind luck.'" *Pizarro*, 2024 WL 3633379, at *6 (quoting *Fink*, 772 F.2d at 962).

[11] By contrast, questions of loss and loss causation are inherently backward looking; they focus on investment outcomes, measured after the fact.

Terminology aside, the task here is to identify situations in which evidence of prudence is so compelling that there can be no genuine issue of material fact. There are indeed cases—including some in the First Circuit—in which the absence of a genuine issue of material fact about procedures or practices employed by fiduciaries provided a basis for summary judgment in favor of the fiduciary. *See, e.g.*, *Ellis*, 883 F.3d at 11 (affirming grant of summary judgment where the plaintiffs "do not point to any specific decision violating the duty of prudence" (quoting *Ellis*, 257 F. Supp. 3d at 131)). But demonstrating such an absence is no small feat. Given the multiplicity of factors that go into deciding whether an investment decision (or series of decisions) was prudent, this fact-bound inquiry is often ill-suited for determination at the summary judgment stage. For example, mere adherence to regular procedures does not affirmatively establish that a particular decision was prudent. *See Ellis*, 257 F. Supp. 3d at 129 ("Merely following a procedurally prudent process is not enough to establish that a fiduciary did not breach its duty.").

In any event, *Brotherston* dictates a hierarchy of questions in the context of summary judgment:

- First, is there evidence that could support a finding that the defendants breached their fiduciary duties in their management of the plan?

- Second, is there evidence that could support a finding that the breach(es) caused a loss?

*/ / / / / / / /*

13

- Third, once some loss to the fund has been established, the burden shifts to the defendants to prove a negative—*i.e.*, that losses[12] associated with any particular fund are not attributable to a breach of fiduciary duty by the defendants.[13]

Given the burden shift on loss causation, it will be incumbent on Defendants, in the context of summary judgment, to demonstrate that there is no evidence sufficient to create a genuine dispute of material fact as to whether particular investment losses can be attributed to a claimed breach of fiduciary duty. In effect, Defendants must preemptively disprove causation (or at least show the absence of any genuine issue of material fact on the point). This passageway is narrow indeed, as potential factual disputes are legion, and the *Brotherston* framework militates against summary judgment with respect to individual fund selections. It is thus unsurprising that, for

---

[12] As *Brotherston* reflects, in comparing investment options, the term "loss" encompasses relative underperformance in comparison with other investment opportunities. *See* 907 F.3d at 34 ("[T]o determine whether there was a loss, it is reasonable to compare the actual returns on that portfolio to the returns that would have been generated by a portfolio of benchmark funds or indexes comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so.").

[13] In arguing for summary judgment, Defendants quote, somewhat selectively, my previous observation that: "Plaintiffs will have to identify funds that, in any given period, should not have been on the menu, but were included due to Defendants' misfeasance, judged by what Defendants knew or should have known at the time." Docket No. 139-1, at 12 (quoting Docket No. 110, at 19). Defendants leave out the context in which I made that comment. Under *Brotherston*, the question of whether the retention of a particular fund on a plan menu caused actual damages is a backward-looking inquiry (as to which Defendants bear the burden of proof). Consistent with *Brotherston*, the sentence that Defendants quote is found in a discussion of "how to cull uninjured class members." *See* Docket No. 110, at 18. My comment was expressly addressed to the question of damages, as opposed to liability:

> The first task (assuming Plaintiffs prove liability) will be to identify which particular investment products may have been imprudently included in the Plan's menu of choices. This is a class-wide issue. Plaintiffs will have to identify funds that, in any given period, should not have been on the menu, but were included due to Defendants' misfeasance, judged by what Defendants knew or should have known at the time.

*Id.* at 19.

almost all of the challenged products at issue in this case, there are factual issues that preclude summary judgment.

## IV.    Defendants' Motion for Summary Judgment

Defendants offer a variety of arguments for summary judgment, both complete and partial. Defendants' argument for complete summary judgment turns on their contention that there is undisputed evidence about the robust procedures the Committee followed when making decisions for the Plan. Defendants contend that this evidence establishes conclusively that they did not breach any fiduciary duty. To a degree, this sweeping argument—which I refer to colloquially as Defendants' "wholesale" argument—is intertwined with Defendants' motion in limine seeking to exclude the testimony of Mr. Stone, whom Plaintiff has offered as an expert on standards of fiduciary conduct. As discussed below, there are factual disputes about the diligence with which Defendants adhered to their stated processes. There are also disputes about whether Defendants' decision-making processes, taken as a whole, comported with their fiduciary obligations of loyalty and prudence. Thus, Defendants' wholesale argument is ill-suited for determination on summary judgment.

Defendants also seek to isolate a variety of issues for which they contend there are no genuine issues of material fact, none of which would dispose of any claim in its entirety. I will address these "retail" arguments individually, but they fall into two broad categories: (1) arguments aimed at narrowing the kinds of evidence to be considered in weighing Plaintiff's claims that Defendants breached their fiduciary duties (*e.g.*, arguments that particular acts occurred outside the limitations period or that particular actions were not per se impermissible); and (2) arguments aimed at narrowing the categories of loss and/or damages at issue in the case (*e.g.*, arguments about the inclusion of particular investment products).

### A.    Defendants' "Wholesale" Argument

Defendants argue that they are "entitled to summary judgment because the undisputed record reflects that the process employed by the Committee fell well within ERISA's bounds."[14] Docket No. 139-1, at 4.[15] As to the duty of prudence, Defendants cite evidence that they contend illustrates that "[t]he Committee employed a robust process to monitor the Plan's investment lineup," as well as to select new investment options. *See id.* at 5–6. Defendants urge that summary judgment as to the duty of loyalty is also appropriate because "the record reflects that the Committee consistently put the interests of participants first, and that the Committee was not motivated by Natixis'—let alone their own—profit." *Id.* at 6–7. Defendants emphasize that "the Plan offered a variety of investment options, both proprietary and non-proprietary," and that "[t]he Committee . . . ensured that no participant invested in any proprietary fund unless they affirmatively chose to." *Id.* at 7–8.

Plaintiff opposes Defendants' summary judgment motion by contesting various aspects of the Committee's processes, and more broadly, by arguing that "[t]he totality of the circumstances reveals that the Committee's decision-making process is fundamentally flawed." Docket No. 147-1, at 8. Plaintiff contends that "the Committee used an inverted fiduciary process for fund selection that was designed to serve Natixis's business interests," that "the business interests driving the Committee's fund selection process went unchecked," and that "proprietary funds were held to

---

[14] Defendants contend that, to the extent they are entitled to summary judgment as to the first count of the Amended Complaint, they are entitled to summary judgment as to the second as well. *See* Docket No. 139-1, at 9 (explaining the derivative nature of the two counts).

[15] Both parties have filed corrected memoranda of law in connection with the pending motion for summary judgment. *See* Docket Nos. 141, 150. As noted above, I cite to the unredacted versions in this report and recommendation.

different standards." *Id.* at 8–9. Plaintiff points to record evidence that, in his view, supports each of these allegations. *See id.*

### 1.  Defendants' Arguments in Support of Wholesale Summary Judgment

Although Defendants' briefing is somewhat perfunctory, it is accompanied by an extensive Statement of Undisputed Material Facts (*see* Docket No. 152-1), together with a veritable data-dump of voluminous materials, including multiple iterations of the 100-plus page Board packages that Mercer provided to the Committee.

To establish that "[t]he Committee employed a robust process to monitor the Plan's investment lineup," Defendants point to evidence that the Committee:

- Maintained an IPS to assist the Committee in its "performance of its duties" (Docket No. 139-1, at 3);

- Held meetings "to discuss Plan administration and the monitoring of the Plan's investment options" (*id.* at 5);

- "[R]egularly availed itself of input and advice from respected independent advisors," including Mercer (*id.* at 2);

- Received from Mercer voluminous materials, including, for example, "quarterly investment performance evaluation reports," "updates on changes relating to the Plan's investment options," and "investment structure reviews" (*id.*);

- "[M]aintained a 'watch list' of Plan investment options warranting more focused attention," with Mercer's assistance (*id.* at 5); and

- Engaged an external ERISA counsel who "regularly attended Committee meetings, provided fiduciary training to the Committee, and met often with Natixis employees and Committee members to assist in their Plan responsibilities" (*id.* at 2–3).

Defendants also point to particular decisions that appear broadly consistent with acts that a disinterested, prudent fiduciary would undertake:

- The Committee chose to offer both proprietary and nonproprietary funds, and only a "small fraction" of funds were affiliated with Natixis[16] (*id.* at 7–8);

- The Committee "ensured that no participant invested in any proprietary fund unless they affirmatively chose to"; the Vanguard TDFs, a "non-proprietary, passively-managed, low-cost suit of target date funds," were chosen as the QDIA (*id.* at 8);

- The Committee at various times considered, but ultimately declined to add, other proprietary investments (*id.* at 9 n.2);

- The Committee added to and removed from the watch list both proprietary and nonproprietary funds (*id.* at 3); and

- The Committee added to and removed from the Plan menu both proprietary and nonproprietary funds (*id.*).

2. *Plaintiff's Riposte*

In opposition, Plaintiff points to his expert's observation that, while ERISA does not prohibit the inclusion of proprietary investments in a plan menu, the inclusion of such funds creates inherent conflicts of interest that must be properly addressed and managed. *See* Docket No. 140-70, at 14–15. Plaintiff also emphasizes that the mere fact that a plan includes nonproprietary

---

[16] As Defendants emphasize, the mere fact that the Plan menu included proprietary investment products does not by itself establish an ERISA violation. There is no per se prohibition against making such investment options available to plan participants. *See Lalonde v. Mass. Mut. Ins. Co.*, No. 22-30147, 2024 WL 1346027, at *8 (D. Mass. Mar. 29, 2024) (finding that the defendant's "use of proprietary funds . . . alone does not plausibly establish breach because the Department of Labor explicitly blessed the use of proprietary funds so long as the use otherwise complies with ERISA's statutory mandates"); *Moitoso*, 451 F. Supp. 3d at 204 ("It is not enough [to succeed on a breach of duty of loyalty claim] for a plaintiff to identify a potential conflict of interest from the defendant's investment in its own proprietary funds . . . ."); *Baker v. John Hancock Life Ins. Co.*, No. 20-cv-10397, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) ("Defendants correctly state that ERISA permits a financial services firm to offer its proprietary funds in its retirement plan and that this is a common practice in the industry."); *see also Bekker v. Neuberger Berman Grp. LLC*, No. 16-cv-6123, 2018 WL 4636841, at *6 (S.D.N.Y Sept. 27, 2018) ("[W]hile sponsor-affiliated funds are permitted under ERISA and do not, standing alone, support an inference that a defendant breached its fiduciary duties by including such a fund as an investment option, an allegation of such an affiliation can be coupled with other circumstantial factual allegations to suggest plausibly that a fiduciary acted imprudently or disloyally.").

investment options (*e.g.*, the fact that the Plan's QDIA was a nonproprietary target date suite of funds) does not preclude liability. *See* Docket No. 147-1, at 11.

Additionally, Plaintiff points to the following facts that, in Plaintiff's view, reflect genuine disputes that preclude summary judgment as to either prudence or loyalty:

- The Committee failed to adhere to a quarterly meeting schedule (*id.* at 2–3);[17]

- The Committee did not hold special, off-cycle meetings "when necessary to appropriately monitor the Plan's investments and to implement its decisions on a timely basis" (Docket No. 152-1, at ¶ 80);

- The Committee failed to implement a formal process for taking meeting minutes or notes (Docket No. 147-1, at 2–3);

- The Committee asked Mercer to evaluate—for potential inclusion in the Plan menu— proprietary funds that had less than three years of performance history, contrary to industry norms (*id.* at 9; *see also* Docket No. 152-1, at ¶ 85);

- There were delays in considering Mercer's recommendations, such as recommendations that the Committee remove certain proprietary funds, and there were delays in implementing decisions (*see* Docket No. 147-1, at 3–4); and

- The Committee ignored warnings from Mercer regarding the 'appropriateness' of certain proprietary funds (*id.* at 9).

In addition to these specific points of dispute, Plaintiff offers his own species of wholesale argument. Plaintiff points to the proposed testimony of Mr. Stone, his designated expert on the standards and expectations for ERISA fiduciaries. Based on a narrative review of the Committee's actions (and failures to act), Mr. Stone opines that the Committee "inverted" the fiduciary process. *See* Docket No. 140-70, at 18–19. Mr. Stone concludes that the Committee's selection of funds for

---

[17] Plaintiff further contends that, even when—in November 2016—the Committee formally decided to hold meetings quarterly, the Committee did not meet again for almost a full year. Docket No. 152-1, at ¶ 79. Plaintiff also argues that, after the Committee amended its IPS to require the Committee to "review the overall investment performance of investment options on a periodic basis but *no less frequent than semi-annually*," "nearly thirteen months passed before the Committee met again." *Id.*

the Plan menu was driven, in the first instance, by identifying various Natixis products and seeing if they might pass muster with Mercer. *See id.* In Mr. Stone's view, this was backwards; a loyal and prudent fiduciary should, instead, have begun by identifying the *types* of investment products (by asset class and/or investment objective) that ought to be included on the menu and then selecting high-quality exemplars. *See id.* at 18. By starting from particular Natixis products, the Committee elided the critical step of considering which types, and what mix, of investment products would be suited for the needs of the Plan participants and thus would belong on a well-balanced menu. *See id.* at 18–19. This "inversion," Mr. Stone opines, produced a poorly thought-out menu, with duplicative, and in some instances wholly inappropriate, selections.

Mr. Stone's opinion identifies particular ways in which he considers Defendants' selection process to have been imprudent. Some products, he opines, should not have been on the menu because there were better, competing products that would have filled the same niche. *See, e.g.*, *id.* at 33 (opining that "any unbiased fiduciary" would have selected a different fund because "[t]he materials presented establish that [it] had lower volatility, higher performance, and the lowest fees of the candidates presented for consideration"). Other products should not have been on the menu because there was no good reason to include any product of that *type*. *See id.* at 34–35 (arguing that AEW Real Estate Fund was an "anomalous offering amongst the Plan's similarly sized peers"); *see also* Docket No. 152-1, at ¶ 47 (pointing out that "Mercer noted that *none* of Natixis' financial services peers offered alternatives options," such as Gateway Fund and AlphaSimplex Global Alternatives Fund). In one instance, Mr. Stone posits that there was no reason to include two closely related funds that were both on the Plan menu. *See* Docket No. 140-70, at 70 ("The dual inclusion of the Oakmark Fund and Oakmark Select Fund is also evidence that the Committee failed to appropriately monitor the Plan lineup . . . ."); *see also* Docket No. 152-1, at ¶ 86 ("[T]here

is no evidence that the Committee specifically considered its decision to offer both the Oakmark and Oakmark Select Fund on the Plan menu."). Defendants, of course, dispute these contentions, but Mr. Stone's opinions provide factual support for Plaintiff's position.

### 3.    Discussion of Defendants' "Wholesale" Argument

There may be instances when a deliberative process employed by an ERISA fiduciary is so robust, and so well-documented, that there is no genuine issue of material fact as to the fiduciary's prudence.

As an example, Defendants cite *Falberg v. Goldman Sachs Group, Inc.*, No. 19-cv-9910, 2022 WL 4280634 (S.D.N.Y. Sept. 14, 2022), which was affirmed by the U.S. Court of Appeals for the Second Circuit. *See* Docket No. 139-1, at 6. There, the district court granted summary judgment to the defendants on the plaintiff's prudence claim. *Falberg*, 2022 WL 4280634, at *13. The court reasoned that the plaintiff's allegation that "the Committee did not engage in a prudent process because it did not set out in writing an IPS is at best speculation," while it was undisputed that "in advance of Committee meetings, Committee members received a packet of information from [its advisor]—including information about each of the [p]lan's investment options, monthly and quarterly performance reports, written reports summarizing [the advisor's] meetings with investment managers, and [the advisor's] commentary on different investment options and industry trends—and reviewed those materials in preparation for the meetings." *Id.* It was also undisputed, the court found, that the investment advisor "began each quarterly meeting by presenting information about [p]lan performance and that Committee members often heard presentations from investment managers of current or prospective [p]lan investment options." *Id.*

Assuming that *Falberg* is consistent with First Circuit law,[18] the undisputed facts on the record in this case fall short of the showing on which the *Falberg* summary judgment ruling rested. For example, Plaintiff identifies instances to support his contention that the Committee failed to implement recommendations to step up the cadence of meetings. Docket No. 147-1, at 2–3. In *Falberg*, by contrast, the retirement committee "met quarterly and also held *ad hoc* meetings, including eight *ad hoc* meetings during the class period." 2022 WL 4280634, at *4. Along the same lines, Plaintiff points to evidence indicating that the Committee sometimes received different types of information concerning investment performance for proprietary funds than for nonproprietary funds, which Plaintiff paints as evidence that the Committee employed an "inverted" process whereby investment decisions were dictated by the business interests of Natixis. *See* Docket No. 152-1, at ¶ 84. In *Falberg*, by contrast, committee members uniformly testified that "they applied no different standard for [proprietary] funds than for any other fund." 2022 WL 4280634, at *14.

There are, in short, genuine factual disputes with respect to Plaintiff's claims that Defendants breached their duties of loyalty and prudence. On the one hand, Defendants contend that any deviations from optimal procedures were isolated instances that should not be seen as part of any meaningful pattern. On the other hand, Plaintiff contends that the various incidents he identifies are, collectively, emblematic of a process in which the Committee failed in its duties of loyalty and prudence. The parties' disagreement, which turns on differing interpretations of a series of events over a period of several years, is a quintessential dispute of fact. *See Tracey*, 404 F. Supp. 3d at 362 (denying summary judgment with respect to the plaintiffs' claims that the defendant's

---

[18] The First Circuit noted in *Brotherston* that it is uncertain "whether the Second Circuit has adopted the burden-shifting approach" ultimately adopted in *Brotherston*. *See* 907 F.3d at 35 n.15.

"process for evaluating investments was deficient and lacked due diligence" where "the parties . . . set forth compelling and competing narratives").

To be sure, there are points where contemporaneous documentation permits a relatively clear view of the bare events. For instance, there are minutes that generally reflect the dates on which meetings were convened, as well as the broad topics discussed. But important details are in dispute: What aspects of Mercer's materials were actually reviewed by Committee members? What were the members' intentions, and how did they approach the review? It is impossible to ascertain from the present record whether Committee members sincerely engaged in critically considering the contents of the Plan menu as a whole, or whether they were merely reactive, taking corrective steps only if, and when, Mercer pressed for action. Any resolution of these factual issues will likely be informed by testimony from the members and from the parties' experts.

Defendants also raise a narrower fallback argument based on the timing of events. They argue that Plaintiff "point[s] to no genuine dispute regarding imprudence, *especially after 2018*." Docket No. 151-1, at 2 (emphasis added). Defendants contend that the disputed facts on which Plaintiff relies in arguing that there are genuine issues of material fact regarding breach of the duty of prudence (*i.e.*, questions about whether the Committee met frequently enough, reviewed materials between meetings, had an adequate process for monitoring fees, acted timely to review purportedly duplicative funds, and acted hastily in adding certain funds to the Plan) all "occurred before, or were resolved by, 2018." *Id.*

The flaw in Defendants' argument is that Plaintiff's evidence of liability does not rest solely on particularized process failures, such as missed meetings or delays in implementing decisions. In significant part, Plaintiff's case rests on Mr. Stone's expert testimony that purports to show—based on a review of the Committee's decisions and of the products that were ultimately

included in the Plan menu—that the Committee was biased toward proprietary products and thus failed to adopt and implement an appropriate strategy to build and maintain a well-balanced Plan menu. Plaintiff's contentions are not easily cabined by a bright-line, chronological cut-off, given that a fiduciary bears an ongoing obligation to correct and adapt strategies to repair prior missteps. *See Tracey*, 404 F. Supp. 3d at 361 ("[A] fiduciary must not only determine the prudence of each investment option at the outset of inclusion in a retirement plan but must continue to monitor each investment option available."). Plaintiff doubtless faces obstacles in proving his contentions about breach of fiduciary duty, and further obstacles in linking his theory of liability to particular losses, but the disputes about these issues are not time-limited in the manner Defendants suggest.

We have here two sides talking past each other. Viewed from either perspective, the disputes are matters of fact. Defendants have some evidence to support their broad-brush "procedural robustness" theory (as well as some evidence, discussed below, relating to particular decisions). Plaintiff has some evidence to support his broad-brush "inverted process" theory (as well as some evidence, discussed below, upon which to attack particular investment decisions). But Defendants' evidence is not so overwhelming—in either quantity or quality—as to foreclose genuine factual disputes. Neither party's theory is amenable to resolution on summary judgment. There are, in short, genuine disputes of material fact with respect to the parties' respective contentions about whether the Committee met its obligations of loyalty and prudence.[19]

---

[19] Count II of Plaintiff's Complaint—the claim for failure to monitor fiduciaries—is derivative of Count I. *See Tracey*, 404 F. Supp. 3d at 364 ("Ordinarily, a duty to monitor other fiduciaries is derivative of plaintiffs' other claims."); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 711 (W.D. Mo. 2019) (noting that the duty to monitor claim "is derivative of the breach of fiduciary duty claim"). Because I recommend denying Defendants' motion for summary judgment as to Count I in its entirety, I also recommend denying Defendants' motion for summary judgment as to Count II. *See Tracey*, 404 F. Supp. 3d at 364 ("[B]ecause the parties dispute the alleged underlying breach of fiduciary duty claims, plaintiffs' derivative claims that defendants breached their duty to monitor will also be preserved for trial.").

**B.     Defendants' "Retail" Summary Judgment Arguments**

As previewed above, Defendants raise various arguments for partial summary judgment, which can be characterized as either: (1) arguments aimed at narrowing the evidence to be considered in weighing Plaintiff's breach of fiduciary duty claims, or (2) arguments aimed at narrowing the categories of loss and/or damages at issue in this case.

I will address both categories in turn. But I note, as previewed above, that few of these arguments are ripe for summary judgment. And only one will meaningfully narrow the issues for trial.

**1.     Defendants' Attempts at Narrowing the Evidence**

**a.     Overlapping Investment Options**

Defendants first contend that the mere fact that some investment options on the Plan menu overlapped in investment strategy (*e.g.*, sector exposure, investment objectives, management style) does not mean they breached a fiduciary duty. *See* Docket No. 139-1, at 9–11. They cite various cases that support the proposition that duplication does not, by itself, amount to a breach of fiduciary duty. *Id.* at 10 n.3.

As a purely legal matter, Defendants are indisputably correct. There is no per se rule that prohibits an ERISA fiduciary from including options on a plan menu that overlap in one respect or another. *See Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 802 (D. Minn. 2018) ("A [p]lan that offers duplicative funds does not hurt plan participants, 'but instead provides them opportunities to choose the investments that they prefer.'" (quoting *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1350 (N.D. Ga. 2017))). But this legal truism does not narrow any real issues in this case.

There may not be a per se rule against including duplicative options on a plan's investment menu, but evidence of such duplicative offerings is likely relevant in considering Plaintiff's claims.

*Cf. Cunningham*, 86 F.4th at 980 (noting that the district court had properly considered evidence of the defendants' "putative deficiencies in monitoring the [p]lans' options and their retention of numerous investment options" even though the district court had previously ruled that such deficiencies, standing alone, would not suffice to state a claim). In this case, Plaintiff may properly argue that the inclusion of duplicative options on such a short Plan menu (the total menu had approximately 21 to 23 funds, of which approximately 8 to 9 were nonproprietary, *see* Docket No. 140-71, at 18) is one indicator, among others, that the range of choices on the menu was the product of an "inverted" selection process. Although it is hardly conclusive, such evidence tends to support Plaintiff's theory that the Committee failed to construct a balanced menu of appropriate and varied investment types and instead cobbled together a menu that was built to showcase investment products sold by Natixis and its affiliates.[20] There is, in short, no discernable basis for entry of summary judgment with respect to the issue of duplicative fund offerings.

      b.    "Objectively Prudent" Funds (Oakmark Fund and Oakmark Select Fund)

Citing *Brotherston*, Defendants contend that Oakmark Fund and Oakmark Select Fund were "objectively prudent,"[21] thereby entitling them to summary judgment as to both funds. Docket No. 139-1, at 12. Defendants point to what they have denoted as "indicia of objective

---

[20] Defendants also argue that Plaintiff fails to show that Plan participants were actually confused by overlapping choices. Docket No. 139-1, at 10; *see also* Docket No. 152-1, at ¶¶ 164–66. This misses the point. Plaintiff's contention is that the menu as a whole was improperly weighted toward proprietary funds with the result that it was distorted in terms of asset classes, investment objectives, and management style.

[21] As discussed above, the term "objectively prudent" is, in my view, a misnomer. That the term "objectively prudent" engenders confusion is well illustrated by the argument Defendants offer on this score. Defendants' argument does not touch on the question of investment loss or comparative performance, which are the touchstones of the "objectively prudent" standard as the term is used in *Brotherston* and other decisions that address loss causation.

prudence" to support their contention that, at least with respect to Oakmark Fund and Oakmark Select Fund, there has been no breach of fiduciary duty. *See id.* at 11–12. Specifically, Defendants assert that: (a) the funds in question received an "A(T)" rating from Mercer throughout the Class Period[22]; and (b) large numbers of ERISA plans around the country included these funds. *Id.* at 11.

Although Plaintiff does not necessarily dispute Defendants' recitation of the bare facts, he vehemently disputes their import. For instance, Plaintiff acknowledges that the funds were indeed rated "A(T)," but notes that the "T" signals that the returns associated with the investment carried "high tracking error and susceptibility to volatile markets." Docket No. 147-1, at 19. Plaintiff further points out that this "T" rating at one point led Mercer to advise the Committee to "consider the appropriateness" of these funds for the Plan. *Id.*; *see also* Docket No. 152-1, at ¶ 177. As for Defendants' contention that the willingness of other plans to include these funds on their menus constituted an "indicia of objective prudence," Plaintiff emphasizes that when the inquiry is narrowed to ERISA defined contribution plans with assets over $200 million, Defendants were the *only* plan to include *both* funds on their menu. *See* Docket No. 147-1, at 19 ("So much for a crowd.").

As against Defendants' assertion that the two funds were "objectively prudent," Plaintiff offers the testimony of Mr. Stone, who challenges whether *either* fund would have been retained by an unbiased and diligent fiduciary, let alone whether *both* would have been retained, given the overlap in their investment strategies. *See* Docket No. 140-70, at 42–49 ("But for their proprietary affiliation, the Committee's stubborn retention of both funds is difficult to explain."). He also

---

[22] Defendants cite no authority for the proposition that a particular rating by a fund adviser is dispositive on the question of prudence. Common sense suggests that even a highly rated investment may be an imprudent selection if there are better options available.

points to evidence that he interprets as reflecting Mercer's "concerns" about the funds' "appropriateness," which he says the Committee left unaddressed for a year and a half. *See* Docket No. 152-1, at ¶ 177.

In sum, Defendants highlight evidence that tends to show that the Committee acted prudently. But merely pointing to some evidence in one's favor—what Defendants have dubbed "indicia of objective prudence"—is not the same thing as demonstrating that there is no genuine dispute of material fact for trial. As the non-moving party, Plaintiff has identified evidence that raises genuine disputes of material fact as to whether Defendants' inclusion, and subsequent retention, of Oakmark Fund and Oakmark Select Fund reflected a loyal and prudent exercise of due care. Under *Anderson* and *Celotex*, this is sufficient to preclude summary judgment.

c.    Oakmark International Fund

Alone among Defendants' various "retail" arguments, Defendant's arguments regarding Oakmark International Fund are both ripe for decision and material to the outcome in this case.

Defendants seek summary judgment based on the dearth of evidence suggesting that Oakmark International Fund was imprudently or disloyally selected for inclusion in the Plan menu. *See* Docket No. 139-1, at 12. Defendants emphasize that Plaintiff has "no admissible evidence that Mercer ever recommended during the Class Period that the Committee remove Oakmark International Fund from the Plan," Docket No. 152-1, at ¶ 179, and that "[n]one of Plaintiff['s] experts have opined that the Committee should have removed Oakmark International Fund from the Plan," *id.* ¶ 183. Plaintiff disputes neither point. Instead, Plaintiff contends that his wholesale challenge to the manner in which the Plan menu was constructed, and to the perpetuation of those menu choices thereafter, precludes summary judgment. *See, e.g.*, *id.* ¶ 185.

The disconnect between the parties' approach to this issue is reflected in their Statement of Undisputed Material Facts. Defendants offer that "[n]one of Plaintiff['s] experts have opined that

inclusion of the Oakmark International Fund in the Plan was imprudent or unreasonable" and that Mr. Stone "did not [even] discuss Oakmark International Fund in" his reports. *Id.* ¶¶ 184, 185. Plaintiff, for his part, disputes these facts only "insofar as Mr. Stone's opinions regarding the Committee's *procedural* failures to monitor the Plan menu apply to the menu as a whole." *Id.*

Plaintiff's argument—that all proprietary funds on the Plan menu, including Oakmark International Fund, were selected by an imprudent process that "inverted" the decision-making process required of a fiduciary—is perfunctory; Plaintiff does no more than point to the expert opinion of his fiduciary process expert, Mr. Stone. As explained above, Mr. Stone's opinion testimony suffices to create a dispute of material fact that precludes summary judgment on Defendants' "wholesale" argument about the regularity of their processes. But when it comes to Oakmark International Fund in particular, Mr. Stone is conspicuously silent. There is no connective tissue to link Mr. Stone's critique of the Committee and its processes to the selection or retention of this particular fund.

The opinion of Dr. Becker, Plaintiff's damages computation expert, does nothing to close the gap. The Prospectus Benchmark Scenario that Dr. Becker offers merely illustrates that Oakmark International Fund underperformed an index fund, which was also offered on the Plan menu, that offered exposure to a (different) set of international investments. *See* Docket No. 140-76, at 16, 28.

Thus, there is considerable force in Defendants' assertion that the summary judgment record is devoid of evidence that Defendants acted imprudently in putting Oakmark International Fund on the Plan menu. The controlling case law, however, is somewhat tangled and requires discussion.

On the one hand, the circumstances here track closely to the situation in *Ellis v. Fidelity Management Trust Co.*, where summary judgment on an issue was deemed proper when "plaintiffs ha[d] not identified any particular act or omission . . . that was imprudent." 883 F.3d at 11. The ruling in *Ellis* suggests that, given the absence of evidence tying Mr. Stone's critique of the Committee's processes to Oakmark International Fund, summary judgment may be appropriate.

On the other hand, there is language in *Brotherston* suggesting that partial summary judgment is inappropriate as to any particular constituent of a plan menu whenever a plaintiff can make out some showing of loss to the plan as a whole. After all, the burden-shifting framework in *Brotherston* potentially puts the burden on the fiduciary to disprove damages as to every product on the menu. When pressed on this issue at oral argument, this was the argument Plaintiff's counsel advanced.

To sort out this issue, it is important to consider the ruling in *Brotherston* with some care. In *Brotherston*, a portion of the plaintiff's expert testimony concerned loss computation: "[He] began by comparing one at a time the total return for each Putnam fund to the total return for two passive comparators[] . . . for every quarter from the beginning of the class period through mid-2016, and then adding together each quarterly differential." 907 F.3d at 32. "Where an automatically-included Putnam fund generated returns equal to or greater than its benchmark, [the expert] calculated no loss for that fund, and credited any differential gain to Putnam. But where an automatically-included Putnam fund generated lower returns than its benchmark, he deemed the differential to be a loss." *Id.*

In *Brotherston*, the expert's computation was, the First Circuit concluded, sufficient to shift the burden to the defendant to disprove loss causation.[23] The First Circuit explained that "[t]he presence of prudently managed Putnam funds in the [p]lan's investment menu suggests that a portion of [the expert's] estimate of total portfolio-wide loss may be subject to challenge for that reason," but it does not "establish that [the expert's] approach was across-the-board inadequate a matter of law." *Id.* at 33–34. Instead, *Brotherston* teaches, the burden simply shifts to the allegedly imprudent fiduciary "to prove that such loss was not caused by [the] breach." *Id.* at 39.

At first blush, the circumstances in the matter at bar might appear similar to those in *Brotherston*. Like the plaintiff's damages expert in *Brotherston*, Dr. Becker compares the performance of the At-Issue Funds to the performance of various passive comparators. And Oakmark International Fund is included in that catalogue of comparisons. Specifically, Dr. Becker compares Oakmark International Fund's returns to the returns of a passively-managed index with exposure to international investments. *See* Docket No. 140-76, at 16, 28.

There is, however, a critical difference between the role played by the plaintiff's expert in *Brotherston* and the role Dr. Becker plays here. The expert in *Brotherston* did more than compute differences in returns between various funds. He also offered opinion testimony that the funds being challenged, all of which carried the higher fees associated with active investment management, had been imprudently chosen over passive/index funds that he had identified as more suitable, and which he used as comparators. *See Brotherston*, 907 F.3d at 32–34. In this case, by contrast, Dr. Becker does not claim any expertise with regard to the selection of investment

---

[23] In so ruling, the First Circuit rejected the district judge's concern that "approving what it characterized as the broad sweep of the [p]laintiffs' 'procedural breach' theory, would implicitly decide, without proof on the matter, that every fund in the [p]lan's portfolio was per se imprudent, in the sense of being substantively an unwise investment." *Brotherston*, 907 F.3d at 33 (internal quotation marks and citations omitted).

products, and he does not purport to offer any expert view about the appropriateness of either the At-Issue Funds or the comparators he used in his computations. Instead, Dr. Becker reports simply that he has computed the differential dollar impact of various alternative investment choices, based upon instructions from Plaintiff's counsel. *See* Docket No. 140-76, at 15–16 (explaining that the fourteen "investable index funds" used as comparators for the "Prospectus Benchmark Scenario" were identified by Plaintiff's counsel).

In the present case it is Mr. Stone, not Dr. Becker, who supplies the expert opinions that provide the basis for Plaintiff's assertion that Defendants breached their fiduciary duties. Mr. Stone is the only identifiable source of expertise on which Plaintiff relies to identify appropriate comparators that could be used to compute damages.

In some instances, Mr. Stone identifies funds that he considers unsuitable for inclusion in the Plan's menu because there were superior (*i.e.*, cheaper or better performing) choices for the same investment strategy. In other instances, Mr. Stone points to particular funds that he considers unsuitable because the investment strategy itself was inappropriate for inclusion in the Plan. Either way, these opinions raise genuine disputes of fact with regard to Defendants' alleged breaches of fiduciary duty. But Mr. Stone is silent as to Oakmark International Fund:

- There is no suggestion that it was imprudent to include it on the Plan menu.

- There is no suggestion that it was subpar for funds of its type.

- There is no suggestion that there was any imprudence in including this type of fund (international exposure, active management) on the menu.

- There is no suggestion that it was imprudent to give Plan participants the option to choose between this actively-managed fund and a passive index fund that offered exposure to a (potentially overlapping) set of international equities.[24]

---

[24] Although neither party argues the point, a spot check of Mercer's reports to the Committee reflects that on multiple occasions during the Class Period, Oakmark International Fund surpassed

*Footnote continues on following page.*

At oral argument, Plaintiff acknowledged that Mr. Stone says nothing about Oakmark International Fund, but argued that no such evidence was necessary because *Brotherston* stands for the proposition that actively-managed investment products may properly be compared to passively-managed ones.

Plaintiff's spin on *Brotherston* elides a key point. In *Brotherston*, the First Circuit rejected the notion (which some other courts seem to have accepted[25]) that passive index funds are, as a matter of law, inapt comparators for actively-managed funds. The *Brotherston* ruling rests on the foundation that such disputes are quintessentially *factual*; whether a preference for active or passive management accords with a prudent exercise of fiduciary responsibility is a matter to be decided based on the evidence adduced at trial (including expert testimony). It is not an issue that can be resolved—in favor of one view or the other—as a matter of law:

> This is not to say that [the expert] necessarily picked suitable benchmarks, or calculated the returns correctly, or focused on the correct time period. Putnam raises some of these issues on appeal, arguing that [the expert's] comparators were not plausible and that he improperly focused on damages at a particular point in time. *But these are questions of fact*.

*Brotherston*, 907 F.3d at 34 (emphasis added).

---

the comparator fund on a 5-year risk/return matrix. *See, e.g.*, Docket No. 140-91, at 22 (Mar. 31, 2017); Docket No. 140-94, at 21 (Dec. 31, 2017).

[25] *See, e.g.*, *Bernard v. BNY Mellon, N.A.*, No. 18-cv-00783, 2022 WL 376999, at *10 (W.D. Pa. Feb. 7, 2022) ("[T]he manner in which [the expert] chose the cheapest index fund at each point in time as a comparator for measuring damages is contrary to industry standards; passively managed funds are not meaningful benchmarks for actively managed funds given their essential differences.") (internal quotation marks omitted); *In re LinkedIn ERISA Litig.*, No. 5:20-CV-05704, 2021 WL 5331448, at *7 (N.D. Cal. Nov. 16, 2021) (citing cases wherein courts "have granted motions to dismiss, holding that passively managed funds generally cannot serve as meaningful benchmarks for actively managed funds because the two types of funds have different aims, different risks, and different potential awards that cater to different investors") (internal quotation marks omitted).

*Brotherston* rejects the notion that a district court can, *a priori*, determine whether one particular fund is an apt comparator for another. Yet that is effectively what Plaintiff proposes. Invoking *Brotherston*, Plaintiff argues that the Court could, without evidence on the point, determine that the index fund that Plaintiff proposes as a comparator for Oakmark International Fund is a fair benchmark (or at least could find that Plaintiff's evidence creates a genuine dispute on the point), even though no expert has identified it as such.[26]

Contrary to Plaintiff's contention, *Brotherston* does not purport to impose a rule of general application regarding comparisons between active and passive investments. Instead, *Brotherston* recognizes that such comparisons raise nuanced questions of fact that require evidentiary development. Far from concluding that market index funds are per se more suitable than actively-managed funds, the court made clear that relevant comparisons must be based on an assessment of what a prudent investor would have done. 907 F.3d at 34 ("A prudent investor may have selected fee-burdened funds, perhaps even Putnam's specific funds, that over the relevant years performed worse than market index funds for reasons that would have been reasonably unforeseeable to or discounted by the prudent investor.").

It is one thing to say, as *Brotherston* does, that the law does not *preclude* comparisons between actively-managed investment products and passive index products that are "comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so." *Id.* But it is a different thing altogether to posit that the Court can, without evidence, determine that a particular actively-managed product can or should be compared to some particular index product that was offered in the same menu. Contrary to Plaintiff's suggestion, nothing in

---

[26] No expert for Plaintiff has even suggested what characteristics of Oakmark International Fund are pertinent for evaluation, on its own or in comparison with other funds.

*Brotherston* suggests that the Court could determine, in the absence of any evidence (by way of expert opinion or otherwise), that the comparators reflected in Dr. Becker's Prospectus Benchmark Scenario are reasonable or appropriate.

Even if *Brotherston* supported Plaintiff's reductionist premise that the First Circuit has somehow expressed a judicial preference for passive/index funds over actively-managed funds, this still would not help Plaintiff's present argument, which ignores the record in this case. Plaintiff's expert, Mr. Stone, criticizes Defendants' exercise of fiduciary duty in various respects. But one thing Mr. Stone does not say is that it was categorically imprudent to include actively-managed investment products on the menu. *See* Docket No. 152-1, at ¶ 249 (admitting that "Mr. Stone does not opine that it is imprudent or inappropriate as a general matter to include actively-managed funds on a retirement plan menu"). Unlike in *Brotherston*, there is no claim here that the Committee's alleged imprudence had anything to do with an unwonted preference for active over passive management. Nor does Mr. Stone suggest that it was imprudent to offer Plan participants menu options that included both actively- and passively-managed international funds.

Highlighting the critical absence of evidence is the fact that, in constructing his Prospectus Benchmark Scenario, Dr. Becker compares the performance of Oakmark International Fund to a passive index fund that was itself included on the Plan menu. Comparisons between challenged products and other (unchallenged) products on the same menu may make sense, *if* there is evidence to suggest that the challenged products should not have been on the menu at all. But absent evidence to indicate that Oakmark International Fund was inappropriately included on the menu, there is no discernable basis for comparing its performance to the performance of another menu choice. The fiduciaries were tasked with building a suitable *menu*, not with picking a single "best" investment option from that menu. With the benefit of hindsight there will always be winners and

losers.[27] But this has no bearing on whether Defendants violated their duties when they composed the menu.

In short, Plaintiff has failed to point to any evidence that would present a genuine factual dispute about whether Oakmark International Fund was imprudently or disloyally included in the Plan menu. Hence, the familiar summary judgment framework controls: "The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [its] favor." *Carlson*, 899 F.3d at 43. As to Oakmark International Fund, there is no genuine dispute of material of fact with respect to either breach of fiduciary duty or loss. Defendants are therefore entitled to summary judgment with respect to any harms attributed to Oakmark International Fund.

### d.    Delafield Fund

Defendants contend that they are entitled to a "summary judgment" to the effect that they did not breach the duty of loyalty with respect to Delafield Fund. Docket No. 139-1, at 12–13. Specifically, Defendants note that, because Delafield Fund was not proprietary to Natixis during

---

[27] Obviously, selections by plan participants will greatly impact the returns of an ERISA plan's portfolio as a whole. But that is irrelevant, unless participants' selections are shaped by imprudent actions by the fiduciaries (such as putting inferior or unsuitable products on the menu). This point is well illustrated in the First Circuit's decisions addressing challenges to conservative menu options. As a rule, when plan participants invest heavily in conservative products, portfolio performance will lag during rising markets (conversely, conservative choices may fare well in market downturns). The pertinent question remains the same: were the products imprudently included on the plan menu? It is irrelevant whether particular choices among other items on the menu might—in hindsight—have produced different results. Thus, in *Barchock v. CVS Health Corp.*, 886 F.3d 43 (1st Cir. 2018), the First Circuit affirmed the dismissal of an ERISA case that was premised on the notion that a "stable value fund" that was offered as a "conservative" option on a plan menu was too conservative. *Cf. Ellis*, 883 F.3d at 9, 10 (noting the absence of any standard by which to gauge whether a particular benchmark was "too conservative," particularly when there is no basis to say that plans "may not offer very conservative investment options," such as "money market funds or treasury bond funds").

the Class Period,[28] Plaintiff's inverted fiduciary process theory does not apply. *Id.* at 13. Defendants further note that Plaintiff has "no evidence that [Defendants] earned any financial benefit from the Plan's inclusion of the fund." Docket No. 151-1, at 1 (citing Docket No. 152-1, at ¶¶ 198–99).

Plaintiff challenges "Defendants' attempts to dodge liability" as to Delafield Fund, arguing that, although the fund was no longer proprietary by the time the Class Period began, Delafield Fund had been proprietary when it was added to the Plan and its "status as a former affiliate continued to inform the Committee's decision-making in 2015" (when the Committee ultimately decided to replace it). *See* Docket No. 147-1, at 13 n.6.

Here, Defendants have a "winning" argument, although the game is hardly worth the candle.

Plaintiff has not offered any evidence that Delafield Fund's status as a formerly proprietary fund created an active conflict of interest, let alone one that the Committee failed to address or manage. Plaintiff points to the deposition testimony of Committee member Duncan Wilkson "that the Committee's knowledge about the investment team from when the Delafield Fund was a proprietary investment 'was one of the factors and part of the information [the Committee] evaluated in 2015,'" when the Committee ultimately decided to replace the fund. *See* Docket No. 152-1, at ¶ 190 (alteration in original). More specifically, Mr. Wilkinson explained that the Committee's "knowledge of the investment team and their value approach helped [the members] understand why the funds had a percentage in cash that was one of the factors of the fund's relative performance." *Id.* ¶ 91.

---

[28] It is undisputed that, as of September 28, 2009, Delafield Fund was no longer proprietary to Natixis. *See* Docket No. 152-1, at ¶ 188.

The mere fact that, in 2015, the Committee drew on knowledge and information that it had garnered during previous periods (when Delafield Fund was still proprietary) does not plausibly articulate a cognizable conflict-of-interest theory. Given Plaintiff's failure to identify any evidence that Delafield Fund's prior status as a proprietary fund created a legally cognizable conflict of interest, Plaintiff's duty of loyalty claim fails as a matter of law.

Granting Defendants' motion in this limited aspect will have negligible impact on this case. Even without a breach of the duty of loyalty, Plaintiff's duty of prudence claim remains active with respect to Delafield Fund. The corporate separation of Delafield Fund from the Natixis family of funds may have alleviated any direct conflict of interest, but Plaintiff can, and does, point to facts that create a genuine issue as to whether Defendants breached their duty of *prudence* with respect to Delafield Fund. It seems likely that much of the same evidence will be relevant to the prudence claim as would have been offered on a loyalty claim: Plaintiff will, presumably, argue (in keeping with his contention that there was an "inverted" selection process) that Defendants' familiarity and comfort with the management practices of Delafield Fund resulted in an imprudent failure to promptly remove the fund from the Plan menu. It is, likewise, difficult to discern how any damage computation based on this prudence theory would differ from the breach of loyalty claim.

Defendants' motion on this point does little to narrow the evidence or issues for trial. But it should be granted.

e.      ERISA's Statute of Repose and Statute of Limitations

In another attempt to narrow the evidence before the Court, Defendants argue that they are "entitled to summary judgment that ERISA's six-year statute of repose precludes liability for any actions or conduct, including fund selection or monitoring, that occurred prior to February 18,

2015." Docket No. 139-1, at 13. According to Defendants, "[a]ny claim premised on stale breaches—or supposed breaches—is barred by the statute of repose." *Id.*

Defendants are correct, of course, that ERISA contains a statute of repose barring claims brought more than six years after a "fiduciary's breach of any responsibility, duty, or obligation." *See* 29 U.S.C. § 1113(1). Plaintiff does not dispute the import of ERISA's six-year statute of repose. *See* Docket No. 147-1, at 20 (acknowledging that "Plaintiff cannot recover losses caused by breaches prior to the statutory period"). It is therefore unclear what Defendants hope to gain by moving for summary judgment on this issue

Although the motion is styled as one for "summary judgment," the relief Defendants seek is more nearly in the nature of a motion in limine. Defendants suggest that the Court should exclude the "pages" of Mr. Stone's report "discussing supposed selection or monitoring lapses that occurred prior to February 18, 2015." Docket No. 139-1, at 13; *see also* Docket No. 154-1, at 11–12 (arguing, in the context of Defendants' motion in limine, that Mr. Stone's opinions "about events that occurred more than six years prior to the filing of the original complaint, and that therefore fall outside of ERISA's six-year statute of repose," should be excluded).

This issue would be better addressed in the context of pre-trial briefing than in a summary judgment motion. But, given that Defendants have seen fit to raise the point, I note that there is scant support—in precedent or logic—for Defendants' broad-brush effort to bar evidence about events prior to the Class Period. There is no good reason to pretend, as Defendants seem to urge, that events within the Class Period somehow arose without antecedent, or that they can be gauged in a vacuum. To the contrary, various courts have permitted evidence of pre-class period conduct to support non-time-barred ERISA claims. *See, e.g.*, *Johnson v. Parker-Hannifin, Corp.*, No. 21-cv-00256, 2023 WL 8374525, at *8 (N.D. Ohio Dec. 4, 2023) ("[A]llegations about the [funds']

improper selection are not time-barred *if* [the p]laintiffs also pleaded viable allegations that [the d]efendants improperly retained the [funds].”); *cf. Vellali v. Yale Univ.*, No. 16-cv-1345, 2023 WL 3727438, at *1 (D. Conn. May 30, 2023) (declining to preclude the plaintiffs from introducing evidence of pre-class period conduct because the plaintiffs showed “how pre-class period conduct is relevant to the plaintiffs’ claims of imprudent conduct during the class period and . . . that it is relevant for the jury to consider how the defendants managed the plan over a longer period of time”);[29] *Fleming v. Rollins, Inc.*, 655 F. Supp. 3d 1243, 1266 (N.D. Ga. 2023) (“Although [the p]laintiffs’ claims against the . . . [d]efendants are time-barred to the extent they are based on the initial selections of allegedly imprudent investment funds prior to [the first day of the repose period], [the p]laintiffs’ claims are *not* time-barred to the extent they are based on the . . . [d]efendants’ advice to select funds after [the first day of the repose period] and violation of their continuing fiduciary duty to advise the [other d]efendants to remove and replace imprudent investments during the repose period.”).

Without prejudging the amount or type of evidence that should be admitted, Defendants’ bid to categorically exclude any and all evidence of pre-Class Period conduct must fail.

Alongside their quixotic bid to block evidence of pre-statute conduct, Defendants revive their contention—previously advanced in their motion to dismiss—that Mr. Waldner’s individual claims are barred by ERISA’s three-year statute of limitations. Docket No. 139-1, at 13–14. In this regard, Defendants’ goal is apparently not to narrow the evidence before the Court, but rather “to ensure the issue is preserved for appeal.” *Id.* at 14 n.7. The Court has already parsed the legal

---

[29] Defendants argue that *Vellali v. Yale University*, No. 16-cv-1345, 2023 WL 3727438 (D. Conn. May 30, 2023), is inapposite because, in that case, the plaintiffs “sought to introduce evidence of circumstances that began before, but *continued into*, the class period.” Docket No. 162, at 5 n.6. Although the specific evidence at issue in *Vellali* may be distinguishable, the court’s rationale for declining to exclude it is still persuasive.

dimensions of this issue and rejected Defendants' position. *See* Docket No. 110, at 29 ("Evidence about Mr. Waldner's general sophistication in investment management—a quality that undoubtedly was prevalent among employees at Natixis—simply does not equate to evidence that Mr. Waldner had actual knowledge of the sort that would trigger the three-year limitations period."). There is no need to revisit the point. For the reasons set forth in the Court's prior decision on the question of class certification, Defendants are not entitled to summary judgment that Mr. Waldner's individual claims are barred by ERISA's three-year statute of limitations.

f.      Excessive Fees

Defendants make a passing argument that they are entitled to summary judgment with respect to any claim premised on the proprietary funds' excessive management fees. Docket No. 139-1, at 14. Defendants claim that, "[a]lthough the Complaint alleged that Defendants breached fiduciary duties by including in the Plan proprietary funds that supposedly charged excessive fees," Plaintiff has "abandoned that theory of liability," as his "experts do not analyze the At-Issue Funds' fees, compare those fees to peer funds or other comparators, or otherwise opine on those fees." *Id.* Given the absence of such evidence, Defendants contend, they are entitled to summary judgment on the question of fees, with respect to every At-Issue Fund. *Id.*

In his opposition brief, Plaintiff asserts that a general "failure to monitor investments encompasses a failure to monitor associated fees[.]" *See* Docket No. 147-1, at 13 ("[N]either performance nor fees of an investment are properly evaluated in a vacuum."). Plaintiff points to evidence that, he contends, demonstrates that "the Committee failed to monitor the Plan's fees and expenses" and argues that these facts show that "there are genuine issues of material fact regarding whether the Committee satisfy [sic] its obligations to monitor fees." *Id.* at 13 n.7. In the Statement of Undisputed Material Facts, however, Plaintiff articulates a slightly different argument. There, Plaintiff contests Defendants' assertion that Plaintiff's experts do not opine on the At-Issue Funds'

fees. Plaintiff argues, for example, that "Mr. Stone discusses numerous funds that were chronically underperforming their benchmarks, persistently ranked in the bottom quartile of their peers, and/or displayed below median risk-adjusted performance across numerous time periods—*all indications that they were not 'earning' their fees or worthy of retention in the Plan.*" Docket No. 152-1, at ¶ 223 (emphasis added). Plaintiff further notes that Dr. Becker's damages calculations "account for actual pocketbook losses based on the differences in the performance *and expense*" of the proprietary funds and their comparators. *Id.* (emphasis added).

Like several of Defendants' other "retail" arguments, this particular dispute is ill-suited for resolution at the summary judgment stage. Plaintiff claims that Defendants failed to monitor the Plan's investment offerings, resulting in inappropriate ones being selected or retained on the menu. These investments, Plaintiff contends, were inappropriate for various reasons, including that their poor performance meant they did not "earn" their fees. *See id.* The point may be of little consequence to this litigation because, as a practical matter, fee differences are often rolled into comparisons of net performance. But there is evidence—including expert testimony—to support Plaintiff's contention. *See, e.g.*, Docket No. 140-70, at 50 ("[I]t is my opinion that Mercer presented compelling evidence that the more expensive, worse performing AEW Real Estate Fund was not 'earning' its higher fees or continuing to justify its place on the Plan's menu.").

It may be that comparing fund performance net of fees tends to collapse together the investment performance and excessive fee inquiries. It may also be that Natixis' payment of various fund expenses diminishes the significance of those expenses. But evidence of the proprietary funds' fees is not wholly irrelevant to Plaintiff's claims, and Plaintiff has pointed to evidence suggesting that deficient fund performance may have been attributable to excessive fees. This is hardly an apt topic for summary judgment.

2.        *Defendants' Attempts at Narrowing Damages*

a.        The Prospectus Benchmark Scenario in its Entirety

Defendants claim that they are entitled to a summary judgment ruling to the effect that they "did not breach a duty encompassing every At-Issue Fund for the entire Class Period," thereby precluding Plaintiff from relying on Dr. Becker's damages calculation using the Prospectus Benchmark Scenario. Docket No. 139-1, at 15. Defendants argue that, "[r]ather than tying Defendants' supposed breaches to particular actions they took or failed to take during the Class Period, the [Prospectus Benchmark Scenario] assumes that Defendants breached a duty with respect to *every* At-Issue Fund and *throughout* the Class Period—in effect, that every At-Issue Fund should have been removed from the Plan on the first day of the Class Period and that none should ever have been available during the Class Period." *Id.* at 15–16. This assumption, Defendants argue, is "demonstrably false," as Plaintiff has "no record evidence, and no expert opinion, that it was a breach of duty to fail to remove each and every At-Issue Fund on February 18, 2015, the first day of the Class Period, or to maintain each and every such fund at all times the fund was made available during the Class Period." *Id.* Defendants point to testimony from Plaintiff's own expert that certain of the At-Issue Funds were prudent for at least part of the Class Period. *See id.* at 16–17.

Plaintiff, in response, again points to *Brotherston*. Plaintiff claims that Dr. Becker's Prospectus Benchmark Scenario follows the template that the First Circuit endorsed in *Brotherston*: "[W]here the nature of the breach implicates 'the entire portfolio of investment options[,] . . . to determine whether there was a loss, it is reasonable to compare the actual returns on that portfolio to the returns that would have been generated by a portfolio of benchmark funds or indexes.'" Docket No. 147-1, at 16 (quoting *Brotherston*, 907 F.3d at 34).

In this instance, Plaintiff's reliance on *Brotherston* is well-founded. The burden-shifting framework adopted in *Brotherston* all but forecloses summary judgment based on challenges to the constituent parts of a comprehensive damages computation. In *Brotherston*, the First Circuit reversed the district court's finding that damages computations offered by the plaintiff's expert were insufficient to show loss. 907 F.3d at 33–34. In doing so, the court rejected an argument similar to the one Defendants raise here. As the court explained:

> The presence of prudently managed [proprietary] funds in the [p]lan's investment menu suggests that a portion of [the expert's] estimate of total portfolio-wide loss may be subject to challenge for that reason, among others. It does not, however, establish that [the expert's] approach was across-the-board inadequate as a matter of law.

*Id.*[30]

Much as in *Brotherston*, Dr. Becker's total loss calculation under the Prospectus Benchmark Scenario "may be subject to challenge." *See id.* But that does not mean the model is "across-the-board inadequate as a matter of law." *See id.* At trial, Defendants will have the opportunity to contest the inclusion of each At-Issue Fund in the Prospectus Benchmark Scenario. But granting summary judgment on the basis that the Prospectus Benchmark Scenario catalogues losses that are subject to contest would risk turning the *Brotherston* framework on its head. Under *Brotherston*, it is Defendants who have the burden to disprove damages as to each product offered on the menu. *See id.* at 39. Defendants argue that Plaintiff has failed to show that each and every At-Issue Fund is warranted for inclusion in the Prospectus Benchmark Scenario and that Plaintiff has failed to show that the pertinent comparison period is the entire Class Period. But these arguments simply attempt to shift the burden to Plaintiff. As such, Defendants' arguments cannot

---

[30] The *Brotherston* court noted that, practically speaking, fund-specific challenges are feasible because the expert "[broke] out the loss or gain for each fund in the portfolio." 907 F.3d at 33 n.13.

be squared with the holding in *Brotherston*. Defendants are not entitled to summary judgment on such a wholesale basis.[31]

          b.     Use of Comparators in the Alternative Funds Scenario

Under his second proposed method of calculating damages, the Alternative Funds Scenario, Dr. Becker purports to compare the performance of the At-Issue Funds to the performance of twenty-one funds "that Plaintiff alleges were appropriate investments that a prudent fiduciary could have selected as alternatives to 10 of the At-Issue Funds for the Plan" ("But-For Funds"). Docket No 140-76, at 17. Dr. Becker does not opine that the But-For Funds are appropriate comparators. Rather, he acknowledges that they were selected by Plaintiff's counsel, and he simply assumes—without concluding—that they were appropriate investments.[32] *Id.*

In their motion for summary judgment, Defendants do not contend that all twenty-one But-For Funds are ripe for disposition. They contend, however, that some of the But-For funds are not "suitable" as comparators, and they seek summary judgment with respect to these particular funds. *See* Docket No. 139-1, at 17–18. Specifically, Defendants argue that Plaintiff cannot show that (1) the Vanguard TDFs are suitable comparators for Oakmark Equity & Income Fund, AlphaSimplex

---

[31] This is not to say that the framework reflected in the Prospectus Benchmark Scenario is invulnerable to challenge. As noted above, some of the proposed comparisons appear to rest on little more than the say-so of Plaintiff's counsel.

[32] Dr. Becker elaborates on this point in his rebuttal report. There, he explains: "I do not view the But-For funds as substitutes or replacements. The identification of an appropriate But-For Fund is independent of the At-Issue Fund. That is, I assume the At-Issue Funds are not the correct investments. These But-For funds are not comparators to the At-Issue Funds. Rather, they have been identified to me as the appropriate investments, independent of the At-Issue Funds. Such appropriate investments do not need to be related to the At-Issue Funds." Docket No. 140-77, at 6.

Global Alternatives Fund, and Gateway Fund, or that (2) VINIX is a suitable comparator for Gateway Fund. *Id.*

Plaintiff, for his part, relies almost entirely on *Brotherston*, arguing that whether the comparators are "suitable" is a question of fact inappropriate for resolution on a motion for summary judgment. Docket No. 147-1, at 17.

At trial, Defendant may well be in a position to attack Plaintiff's choices of comparators. *Cf. Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008) ("Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio."), *quoted in Brotherston*, 907 F.3d at 34; *see also Sellers*, 2024 WL 1586755, at *36 ("[N]othing in *Brotherston* supports that a loss may be shown by comparing alleged imprudent investments to funds that cannot be said to be prudent." (quoting *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 710 (W.D. Mo. 2019))). *Brotherston* makes clear, however, that it is not for the Court to determine, as a matter of law, whether any particular comparator is a "prudent alternative" or a "suitable benchmark" for loss calculation purposes. *See Brotherston*, 907 F.3d at 34 (explaining that whether an expert "picked suitable benchmarks" is a "question[] of fact"). Indeed, the court concluded in *Brotherston* that any "challenge [to] comparators as a matter of law" must fail. *Id.* at 34 n.14. The recognition in *Brotherston* that these are factual issues all-but-precludes summary judgment with respect to the suitability of any given comparator.[33] *See Sellers*, 2024 WL 1586755, at *37.

---

[33] Some courts outside the First Circuit have reached the same or similar conclusions. *See Feinberg v. T. Rowe Price Grp., Inc.*, No. 17-427, 2021 WL 488631, at *8 (D. Md. Feb. 10, 2021) (stating that "[n]umerous courts have accepted [a given expert's] damages calculation methodologies as sufficient to establish loss on summary judgment and have rejected [the d]efendants' arguments that failure to specifically opine on the prudence of particular comparator funds is fatal at this stage," where the expert "offered three methodologies for calculating the losses associated with

*Footnote continues on following page.*

Defendants raise significant challenges to Plaintiff's choices of comparators,[34] but the issue simply is not amenable to disposition on summary judgment. *See Munro v. Univ. of S. Cal.*, No. 16-cv-06191, 2023 WL 2558415, at *2 (C.D. Cal. Jan. 19, 2023) ("[E]ven if [the p]laintiffs had timely introduced their theory of [p]lan losses based on a comparison with 'comparable' index funds, such a comparison could not be made without expert testimony. Although the historic performance of some index funds may be judicially noticeable, the designation of an index fund as a 'prudent' and 'comparable' alternative to some of the [p]lans' investment options is not."); *Moler v. Univ. of Md. Med. Sys.*, No. 21-cv-01824, 2022 WL 2756290, at *6 (D. Md. July 13,

---

those particular funds: (1) comparison to the best performing alternative; (2) comparison to comparable funds offered by Vanguard and Fidelity; and (3) comparison to market returns via index funds"); *Fuller v. SunTrust Banks, Inc.*, No. 11-CV-784-ODE, 2019 WL 5448206, at *28 (N.D. Ga. Oct. 3, 2019) ("[T]he determination of the appropriateness of the comparator funds used is a question for trial, not summary judgment.").

Some courts have held otherwise. *See, e.g.*, *Banks v. N. Tr. Corp.*, No. 20-55297, 2021 WL 3465763, at *1 (9th Cir. Aug. 6, 2021) (finding that "the district court properly granted summary judgment on [the p]laintiffs' investment-related breach of fiduciary duty claim" at least in part because the "[p]laintiffs failed to show that [the] Vanguard funds [were] appropriate comparators"). But the approach in such cases cannot readily be squared with the dictates of *Brotherston*.

[34] At the risk of editorializing, there may be good reason for skepticism with respect to Plaintiff's contention that the Vanguard TDFs are appropriate comparators for the At-Issue Funds. The Vanguard TDFs were the Plan's QDIA, and participants were automatically invested in them as a default; Plan participants who chose one or another of the At-Issue Funds had to affirmatively elect to do so. *See* Docket No. 152-1, at ¶¶ 127–31, 133. The question is not whether Plan participants would have been better off accepting the Plan's default option. The question is whether Defendants offered appropriate menu options for those participants who did not want the default option. *See Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1090 (D. Colo. 2020) (finding that an expert's testimony that "all [p]articipants . . . would be better off investing in" the QDIA "fails to account for the personal preference of [p]lan [p]articipants" who "knowingly elected to . . . expand their investment options to fit their individual preferred risk profile and investment strategy"), *aff'd*, 1 F.4th 769 (10th Cir. 2021). This suggests that appropriate comparators would be investments that are in the same asset classes, or that pursue similar strategies, which a fiduciary might have considered when constructing the Plan menu.

2022) ("Determination of the adequacy or sufficiency of comparable benchmarks is a fact-intensive inquiry . . . that may require expert opinion").

As explained above, no expert opines that all the comparators utilized by Dr. Becker are appropriate.[35] Dr. Becker simply adopts a list of But-For Funds provided by Plaintiff's counsel and assumes, without more, that they "were appropriate investments that a prudent manager could have selected for use in the Plan." Docket No 140-76, at 17; *see also* Docket No. 152-1, at ¶ 236 (Dr. Becker acknowledged "he is 'not offering' 'an opinion that the but-for funds that' he 'used as comparators are themselves prudent investments'"). And Mr. Stone, for his part, does not opine that each of the named But-For Funds represents a "prudent" or "suitable" alternative. This lack of expert testimony could have doomed Plaintiff's case, but Plaintiff is saved—for purposes of the present summary judgment motion—by the fact that Mr. Stone offers *at least some* support for the challenged comparators (*i.e.*, enough to create a genuine dispute of fact):

- **Vanguard TDFs as comparators for Oakmark Equity & Income Fund** – Mr. Stone opines that "it is uncommon to offer both target date funds and a balanced fund," such as Oakmark Equity & Income Fund, "in an investment menu since they serve a similar purpose." Docket No. 140-70, at 69. He further explains that, in his experience, plans that "added target date funds after the passage of the Pension Protection Act of 2006[] typically removed any balanced fund in the menu at the same time and after 2010 it became atypical to see a plan with both." *Id.* at 70; *see also* Docket No. 152-1, at ¶ 243 (emphasizing that Mr. Stone opined that "typical industry practice was to replace balanced funds (i.e., Oakmark Equity & Income) with target date funds"). According to Plaintiff, Mercer also "recommended replacing the balanced fund with the TDFs." Docket No. 152-1, at ¶¶ 167, 255 (citing Docket No. 140-107).

- **Vanguard TDFs as comparators for AlphaSimplex Global Alternatives Fund** – Mr. Stone offers that, when AlphaSimplex Global Alternatives Fund was removed from the Plan, its assets were mapped to the Vanguard TDFs. Docket No. 140-70, at 62. He further opines that "mapping the [fund's] assets to the QDIA was an appropriate decision" and

---

[35] That I expected to see expert testimony on the "comparability of various investment products" is reflected in the report and recommendation I issued on the class certification question. *See* Docket No. 110, at 19. There, I noted (albeit in the context of culling uninjured class members) that "compar[ing] the performance and expenses of imprudently-included products with suitable comparators" would likely "require expert testimony." *Id.*

that, if the fund "had been removed at any earlier time, including before the Class Period began, [he] would have recommended its assets be mapped to the QDIA also."[36] *Id.*

- **Vanguard TDFs as comparators for Gateway Fund** – Mr. Stone opines that, "[b]ecause there was no similar investment option strategy in the Plan, it is reasonable to assume that the Gateway Fund assets would be mapped to . . . the Vanguard TDFs." *Id.* at 57.

- **VINIX as comparator for Gateway Fund** – Dr. Becker states that VINIX is an index fund that tracks the performance of Gateway Fund's primary and secondary prospectus benchmarks.[37] Docket No. 140-76, at 20.

It remains to be seen whether such evidence will prove persuasive to the trier of fact. But it is sufficient under *Brotherston* to survive summary judgment. Because the First Circuit has all-but-foreclosed summary judgment with respect to the prudence and/or suitability of comparator funds, I recommend that the Court deny Defendants' summary judgment motion on this issue.

> c.    AEW Real Estate Fund

Finally, Defendants argue that they are entitled to summary judgment as to whether they breached their fiduciary duties with respect to AEW Real Estate Fund prior to October 1, 2019. Docket No. 139-1, at 19. At first blush, this might seem to fit within the first category of Defendants' "retail" arguments, those that attempt to narrow the evidence before the Court. But this particular argument is mostly aimed at parsing the words of Mr. Stone's report. In reliance on Mr. Stone's testimony that a prudent fiduciary would have replaced AEW Real Estate Fund by

---

[36] As Defendants point out, Mr. Stone stated that the assets were mapped to the QDIA "[i]n part because there was no similar investment option already in the Plan line-up." Docket No. 140-70, at 62. While this fact weighs in Defendants' favor, it is insufficient to demonstrate that there are no genuine issues of material fact. The absence of similar investment options may itself suggest that an "alternative" fund, such as AlphaSimplex Global Alternatives Fund, should not have been included on the Plan menu. It is by no means obvious how to identify comparators for a purportedly unsuitable investment, particularly when Plan participants rejected the QDIA in order to select that investment.

[37] Plaintiff admits that Mr. Stone "did not opine that VINIX is an appropriate comparator for Gateway Fund." Docket No. 152-1, at ¶ 270.

October 1, 2019, Defendants seek to exclude the portion of Dr. Becker's damages computation for AEW Real Estate Fund attributable to the period between February 18, 2015, and September 30, 2019. *See id.* (citing Docket No. 152-1, at ¶¶ 285–86) (focusing on the particular words used by Mr. Stone—"*by* October 1, 2019").

Plaintiff, for his part, argues that Defendants misunderstand Mr. Stone's opinion and "materially misstate the record." Docket No. 147-1, at 17 n.9. Plaintiff points out that Mr. Stone "does not opine that the AEW Real Estate Fund was appropriate *until* October 1, 2019." *Id.* Rather, Plaintiff contends, "none of the Plan's specific alternative investment options—including the AEW Real Estate Fund—were appropriate investment options for the Plan." *Id.*

In part, the issue here is whether Mr. Stone's choice of words ("by October 1, 2019") means that his more general comments disparaging the purportedly "inverted" investment approach adopted by the Committee apply only after that date.[38] But Defendants' narrow focus elides key aspects of Mr. Stone's opinion. Mr. Stone's testimony offers at least some support for the argument that AEW Real Estate Fund was *never* an appropriate option for the Plan. Specifically, he opines that, while REITs are "not entirely uncommon," they can be imprudent investment options in certain circumstances. *See* Docket No. 140-70, at 34–35. Mr. Stone posits that the addition of AEW Real Estate Fund "risked creating participant confusion" and "added no diversification to a menu that already offered exposure to REITs through its mid-cap exposures." *Id.* He points out that, perhaps for this reason, "the Plan was one out of a small handful of the 2,000+ defined contribution

---

[38] There is also a narrower discrepancy regarding the relevant date. Mr. Stone opines that "an objective fiduciary . . . would have voted to remove the AEW Real Estate Fund from the Plan no later than the March 5, 2019 [Committee] meeting" and that "it is reasonable to assume that this change could have been implemented in approximately 4 months, such that any of the three non-proprietary candidates could have replaced the AEW Real Estate Fund on the Plan's lineup by October 1, 2019." Docket No. 140-70, at 38. Defendants offer no explanation for their focus on October, rather than March, as a proposed cut-off date.

plans with more than $200 million in assets that included the AEW Real Estate Fund in their line-up." *Id.* at 35.

In short, Defendants put too much weight on their parsing of Mr. Stone's words. The distinctions they point to may be appropriate fodder for cross-examination at trial, but there are genuine disputes of fact here that cannot be resolved on summary judgment. Mr. Stone's testimony regarding the timing of the Committee's breach of fiduciary duty with respect to AEW Real Estate Fund is not as black-and-white as Defendants suggest. Summary judgment is therefore inappropriate.

## V.   Defendants' Motions in Limine

In their two motions in limine, Defendants ask the Court to exercise its discretion to exclude—before trial—much of Plaintiff's proposed expert testimony. Defendants do not contend that Plaintiff's experts are unqualified. Instead, in the case of Mr. Stone, they complain that Plaintiff's counsel's staff prepared some of his exhibits for him. And in the case of Dr. Becker, Defendants raise, in the context of the gatekeeping function of Rule 702 of the Federal Rules of Evidence, much the same arguments as they offered for summary judgment (*i.e.*, that Dr. Becker has relied on assumptions supplied by Plaintiff's counsel that may not hold up under cross-examination). While there may be occasion to revisit these issues when they are presented concretely at trial, Defendants' limine motions are not ripe for decision.

Sometimes motions in limine are helpful; other times, they are premature. Trial judges enjoy broad discretion in deciding whether—and when—to decide them.[39] *See Doucette v. Jacobs,*

---

[39] This is particularly so in bench trials. *See Issokson v. Ins. Co. of N. Am.*, No. 18-cv-30070, 2023 WL 4195941, at *1 (D. Mass. May 4, 2023) (noting that "[t]here is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself," thereby supporting a "less stringent application of Daubert in bench trials" (alteration in original) (quoting *Marrero-Rolon v. Autoridad de Energia Electrica*, No. 15-1167, 2018 WL 8805485, at *2 (D.P.R. Sept. 10, 2018))).

106 F.4th 156, 169 (1st Cir. 2024) (explaining that the court should not "exclude unreliable, and therefore inadmissible, expert testimony when deciding a motion for summary judgment . . . profligately," as a "trial setting normally will provide the best operating environment for [such] triage" (alteration in original) (internal quotation marks and citation omitted)); *Fusco v. Gen. Motors Corp.*, 11 F.3d 259, 263 (1st Cir. 1993) ("[M]ost district judges are very cautious about making a definitive ruling *in limine* that evidence will not be received at trial. Trial judges know better than most that many issues are best resolved in context and only when finally necessary.").

As discussed below, I see no value in excluding—at this stage in the proceedings, before the fact-finding process is really underway—substantial portions of Plaintiff's experts' opinions. *See Cortes-Irizarry v. Corporacion Insular De Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("[G]iven the complex factual inquiry required by *Daubert,* courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record."). If Plaintiff is ultimately unable to make the requisite showing of facts upon which his experts rely, the experts' opinions (or the challenged portions therein) will be given little weight.

### A.    Motion in Limine as to Mr. Stone

Defendants ask the Court to exclude certain exhibits from Mr. Stone's rebuttal report, namely Exhibits 8A, 8B, 9A, 9B, 10, 11A, 11B, and 12 (the "Challenged Exhibits"), as well as the opinions Mr. Stone formed concerning the Challenged Exhibits. Defendants contend that the Challenged Exhibits do not meet the Federal Rules of Evidence's authentication and foundation requirements, because the exhibits were prepared by Plaintiff's counsel's staff. Defendants also seek to exclude Mr. Stone's opinions concerning events outside ERISA's six-year statute of repose, arguing that they are both irrelevant and prejudicial. I recommend denying Defendants' motion in limine as to Mr. Stone in its entirety.

*1.    Exclusion of the Challenged Exhibits*

Defendants argue that the Challenged Exhibits should be excluded because Plaintiff cannot (1) meet his burden to authenticate the exhibits under Federal Rule of Evidence 901 or (2) lay a proper foundation under Federal Rule of Evidence 702. *See* Docket No. 154-1, at 6. Defendants rely on Mr. Stone's deposition testimony that he did not author the Challenged Exhibits, review the underlying data (as he did not have access to it), or verify the accuracy of the data in the Challenged Exhibits.[40] *Id.* In short, Defendants' limine motion seeks to parlay a technical defect into a winner. Unfortunately for Defendants, they misapprehend the technical issue on which they hope to capitalize. *See In re Viagra Liab. Litig.*, 658 F. Supp. 2d 950, 963–64 (D. Minn. 2009) (declining to exclude an expert's opinion where "there [was] no indication that the chart [p]laintiffs' counsel prepared for [the expert] was incapable of verification or meaningful review" and the moving party did "not argue that the chart misrepresents the data available").

To set the table, I note that most[41] of the Challenged Exhibits consist of anonymized summaries of records that Schwab, the Plan's record keeper, maintained for the Plan (*i.e.*, records

---

[40] Plaintiff attempts to clarify Mr. Stone's statements by explaining that Mr. Stone understood Defendants' questions "to mean did he confirm that the anonymized entries in the spreadsheets produced by Schwab and summarized in the exhibits accurately reflected the original recordkeeping data in Schwab's recordkeeping system," which he did not have access to. Docket No. 159-1, at 4. Had Mr. Stone understood the questions, Plaintiff explains, he would have testified (as he now attests) that he "reviewed the summaries themselves to confirm that the staff at [Plaintiff's counsel's firm] had correctly summarized the relevant information from the Schwab spreadsheets, but [he] did not compare the summaries line-by-line against the Schwab spreadsheets to confirm that every entry in the summary corresponded to an entry in the Schwab spreadsheets." *Id.* at 5 (second alteration in original). All of this is plausible, but it need not concern the Court unless there is a live issue at trial.

[41] Exhibit 12 differs from the others in that it "is not a summary of the recordkeeping data produced by Schwab, but instead is a tabulation of the total amount of Plan assets held in one of the investment funds at issue in this case, the AEW Real Estate fund, in comparison to the overall total of assets held in that fund at various times." Docket No. 159-1, at 4. Plaintiff explained that Exhibit

*Footnote continues on following page.*

containing the raw data showing which Plan participants invested in which funds, at which times, and—by deduction—what returns on investment they received). Docket No. 159-1, at 3. The exhibits reflecting this data were apparently created by Plaintiff's counsel's staff at Mr. Stone's direction. *Id.* at 3–4. Specifically, "[t]o create [most of the Challenged Exhibits], Mr. Stone met with Plaintiff's counsel to discuss the information in the Schwab data that would be helpful, and he provided a set of objective criteria to identify relevant entries in the Schwab spreadsheets to be extracted and summarized in the exhibits." *Id.* at 3.

Although anything is possible, it seems unlikely that there will be any significant difficulty in establishing the authenticity of the Schwab records; such issues are typically addressed by stipulation. In any event, Defendants offer nothing to suggest that there is any dispute as to the authenticity of the underlying records.

a.    Authentication Under Rule 901

Defendants argue that Plaintiff cannot satisfy the requirement—set forth in Rule 901(a)—that the proponent of an item of evidence authenticate it by "produc[ing] evidence sufficient to support a finding that the item is what the proponent claims it is." Docket No. 154-1, at 6–7 (alteration in original) (quoting Fed. R. Evid. 901(a)). They posit that Mr. Stone "is not a '[w]itness with [k]nowledge' of what the Challenged Exhibits are, how they were prepared, or whether they are accurate." *Id.* at 7 (alterations in original) (quoting Fed. R. Evid. 901(b)(1)). Defendants further contend that Mr. Stone "cannot rely on Rule 1006, which permits a 'proponent [to] use a summary,

_____

12 was "prepared for Mr. Stone by Plaintiff's counsel" and that it "involve[d] some analysis of data from various sources." *Id.* at 13. If no stipulation is reached, Plaintiff will have to present the testimony of a witness, presumably *not* Plaintiff's counsel themselves, who supervised or reviewed Exhibit 12's preparation, in order to authenticate it. *See Colon-Fontanez v. Mun. of San Juan*, 660 F.3d 17, 31 (1st Cir. 2011). If Plaintiff is unable to do so, the Court ultimately might find the exhibit inadmissible.

chart, or calculation to prove the content of voluminous writings,' . . . to evade Rule 901's authentication requirements." *Id.* (alteration in original).

In advancing these arguments, Defendants apparently fail to apprehend that expert testimony is generally not required to authenticate a summary chart (or its underlying evidence). Even if Defendants are correct that Mr. Stone is not the right witness to authenticate the Challenged Exhibits, this does not mean that the Challenged Exhibits are inadmissible, nor does it prevent Mr. Stone from commenting on them as an expert witness.

It is true, as Defendants contend, that Rule 1006 does not allow a party to dodge the authentication requirements. "[F]or summary evidence to be admitted into court, there must be, like all evidence, a proper foundation laid for its admission." *Colon-Fontanez v. Mun. of San Juan*, 660 F.3d 17, 31 (1st Cir. 2011). Specifically, "[t]he proponent [of a summary chart under Rule 1006] must show that the voluminous source materials are what the proponent claims them to be and that the summary accurately summarizes the source materials." *United States v. Milkiewicz*, 470 F.3d 390, 396 (1st Cir. 2006). To meet this requirement, the First Circuit has noted, the proponent "should present the testimony of the witness who supervised its preparation." *Colon-Fontanez*, 660 F.3d at 31 (quoting *United States v. Bray*, 139 F.3d 1104, 1110 (6th Cir. 1998)).

Defendants contend that Plaintiff cannot offer Mr. Stone's testimony to demonstrate that the Challenged Exhibits are what Plaintiff claims them to be or that they accurately summarize the underlying data. *See* Docket No. 154-1, at 6–7. But Defendants ignore the critical point: Plaintiff need not rely on *Mr. Stone* to introduce the Challenged Exhibits. There is nothing to prevent Plaintiff from authenticating the Challenged Exhibits through the testimony of a different (non-expert) witness, such as the staff member who prepared them. *See Colon-Fontanez*, 660 F.3d at 31–32 (finding no error in the district court's acceptance of counsel's paralegal's testimony

regarding "her method of preparing and summarizing the exhibits").[42] Likewise, if there is a dispute about the authenticity of the underlying data, that would be addressed by testimony from the relevant keeper(s) of records.

"It is hard to imagine an issue on which a trial judge enjoys more discretion than as to whether summary exhibits will be helpful." *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 67 (1st Cir. 2002). If there are any real issues of authentication at trial, the trial judge will be in a position to rule. But there is no reason at this stage to exclude summary exhibits solely because Mr. Stone did not personally prepare them.

b.    Foundation Under Rule 702

Considering that expert testimony is not typically required for introducing summary charts, compilations, and the like, Defendants' invocation of the gatekeeping standards of Federal Rule of Evidence 702 is misplaced, and even a bit ironic. In their eagerness to play "gotcha," Defendants overlook the obvious implication of their observation that the Challenged Exhibits are decidedly not the stuff of expert testimony. *See* Docket No. 154-1, at 7–8 (setting forth Defendants' contention that "[t]he only 'technical[] or specialized knowledge' that Mr. Stone demonstrated when he included [the Challenged Exhibits] in his report was his facility at copying and pasting charts created by others." (second alteration in original)). Mr. Stone is not an essential witness for admission of the Challenged Exhibits, even if he is expected to comment upon or rely on them in his testimony. Defendants' effort to exclude the Challenged Exhibits is premature, at best.

---

[42] There are other rules, as well, through which summary charts may be admitted. *See Milkiewicz*, 470 F.3d at 397 ("A trial judge . . . may allow use of a chart or other summary tool under [Federal Rule of Evidence 611(a)], which gives the trial court 'control over the mode . . . [of] presenting evidence.'" (second alteration in original)), 397–98 ("[A] court also has discretion under Rule 703 to provide the jury in some circumstances with the 'facts or data' underlying an expert's opinion, and such material may be presented in the form of a summary chart.").

2. *Exclusion of Various Opinions*

a. Exclusion of Opinions Based on the Challenged Exhibits

Based on the premise that the Challenged Exhibits should be excluded, Defendants contend that Mr. Stone's opinions about those exhibits (the "Challenged Opinions") should be excluded as well. *See* Docket No. 154-1, at 10 ("Given their grounding in the Challenged Exhibits, the Challenged Opinions should likewise be excluded."). The opinions that Defendants seek to exclude "relat[e] to or are premised on whether some participants (i) invested in 'duplicative' fund options; (ii) consolidated investments into a non-diversified investment option or asset class; or (iii) supposedly 'misused' target date funds," as well as regarding "matters concerning the Plan's ownership of AEW Global Focused Real Estate Fund." *Id.* at 9 (citations omitted). Because I recommend denying Defendants' limine motion with respect to the Challenged Exhibits, I also recommend rejecting this subsidiary argument.

b. Exclusion of Opinions Concerning Events Prior to the Class Period and Outside the Six-Year Statute of Repose

In the same vein as their partial summary judgment argument discussed above (*see supra* Section IV.B.1.e), Defendants seek to exclude Mr. Stone's opinions concerning "events that occurred more than six years prior to the filing of the original complaint." *See* Docket No. 154-1, at 11. According to Defendants, these opinions—which focus on (1) the Committee's decision to add AlphaSimplex Global Alternatives Fund to the Plan menu in September 2010; (2) the Committee's consideration of Aurora Horizons Fund in October 2013; and (3) the Committee's decision to add AEW Real Estate Fund to the Plan menu in November 2003—are irrelevant and prejudicial. *See id.* at 4–5; *see also id.* at 11–12.

Plaintiff counters that, "[w]hile the limitations period may bar the recovery of damages incurred before February 2015, it 'does not operate to bar the introduction of evidence that predates

the commencement of the limitations period but that is relevant to events during the period.'" Docket No. 159-1, at 13–14 (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 365 (2d Cir. 2001)). In Plaintiff's view, "the self-serving manner in which proprietary funds were initially selected for the Plan . . . is highly relevant and thus admissible under Rule 401," given that "[a]n ERISA fiduciary has an ongoing duty to monitor trust investments and remove imprudent ones and . . . review investments at regular intervals." *Id.* at 14–15 (alteration in original) (quoting *Tracey*, 404 F. Supp. 3d at 361). As for Defendants' prejudice argument, Plaintiff agrees that the evidence is "prejudicial," noting that the First Circuit has stated that "by design, all evidence is meant to be prejudicial." *Id.* at 15 (quoting *United States v. Ross*, 837 F.3d 85, 90 (1st Cir. 2016)). Plaintiff further notes that Rule 403 "does not protect parties against *any* prejudicial evidence" but rather against "evidence for which the 'probative value is substantially outweighed by a danger of . . . *unfair* prejudice.'" *Id.* (quoting Fed. R. Evid. 403)).

As an abstract matter, Plaintiff has the better of this quarrel. Evidence concerning events that pre-date the Class Period and are outside the statute of repose may be admissible and relevant; the process used to select the At-Issue Funds may "inform whether the Plan acted prudently in subsequently retaining" them. *See Mattson v. Milliman, Inc.*, No. 22-0037, 2024 WL 340589, at *2 (W.D. Wash. Jan. 30, 2024) (declining to exclude the plaintiff's expert's pre-statute of repose testimony regarding selection of funds because "the process used by the [p]lan in selecting the [f]unds could inform whether the [p]lan acted prudently in subsequently retaining the [f]unds"); *see also Johnson*, 2023 WL 8374525, at *8 ("[A]llegations about the [funds'] improper selection are not time-barred *if* [the p]laintiffs also pleaded viable allegations that [the d]efendants improperly retained the [funds]."); *cf. Vellali*, 2023 WL 3727438, at *1 (declining to "preclude [the p]laintiffs from introducing evidence of [the defendant's] process for monitoring [p]lan

service providers or investment options before the start of the class period" because the plaintiffs have explained "how pre-class period conduct is relevant to the plaintiffs' claims of imprudent conduct during the class period and have shown that it is relevant for the jury to consider how the defendants managed the plan over a longer period of time."). Moreover, as Plaintiff notes, Defendants do not offer a compelling argument that the pre-Class Period evidence's "probative value is substantially outweighed by a danger of . . . unfair prejudice." *See* Fed. R. Evid. 403.

Ultimately this will not be an abstract matter. At trial, the Court will have plenary authority to control the amount of evidence that it will hear on a given topic, and the Court may limit the amount of time to be spent on events outside the statute of repose. In the present posture, however, Defendants' motion should be denied.

### B.      Motion in Limine as to Dr. Becker

In their motion in limine to exclude certain opinions of Dr. Becker, Defendants repackage some of the same arguments that they offer in support of their summary judgment motion. Whether couched as dispositive legal issues or as evidentiary/gatekeeping issues, the issues Defendants raise—which go to the weight and persuasiveness of Dr. Becker's computations—are not ripe for resolution on an incomplete record. They are quintessential trial issues.

Defendants mostly take aim at three aspects of Dr. Becker's anticipated testimony regarding: (1) the Prospectus Benchmark Scenario, which they seek to exclude in its entirety; (2) particular comparators featured in the Alternative Funds Scenario; and (3) the chronological bounds of damages associated with AEW Real Estate Fund.

Defendants start from the largely unworkable premise that the gatekeeping function of Federal Rule of Evidence 702 can or should be used to narrow Dr. Becker's testimony. Under Rule 702, a qualified expert may testify if the proponent of the testimony shows the Court that it "is more likely than not that":

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[43] A party offering expert testimony need not "demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct." Fed. R. Evid. 702, Advisory Committee Notes to 2023 Amendment (quoting Advisory Committee Notes to 2000 Amendment). Rather, the offering party need only "demonstrate by a preponderance of [the] evidence that the[] opinions are reliable." *Id.* (quoting Advisory Committee Notes to 2000 Amendment).

Defendants' argument ignores that what Dr. Becker offers is, essentially, a computation of damages.[44] Defendants do not challenge Dr. Becker's competence to perform the mathematical

---

[43] The 2023 amendment to Rule 702 underscores the importance of the judge's gatekeeping responsibility. *See* Fed. R. Evid. 702, Advisory Committee Notes to 2023 Amendment ("[T]he rule has been amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule."). Defendants contend that, in light of the 2023 amendment, Plaintiff's case law distinguishing between "weight" and "admissibility" is no longer valid. *See* Docket No. 163, at 1–2. This is not necessarily so. As the advisory committee notes state, "[s]ome challenges to expert testimony will [still] raise matters of weight rather than admissibility . . . ." Fed. R. Evid. 702, Advisory Committee Notes to 2023 Amendment ("[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence."); *see Rodríguez v. Hosp. San Cristobal, Inc.*, 91 F.4th 59, 70 & n.6 (1st Cir. 2024) (differentiating between weight and admissibility and opining that "the application of [Rule 702] to this case is not affected by the 2023 changes").

[44] There is room for debate as to whether computational efforts such as Dr. Becker's even constitute expert testimony. *See Milkiewicz*, 470 F.3d at 401 (noting that "[t]he only arguably 'expert' evidence" in summary charts of financial transactions was the calculation of tax liabilities, since "creating summaries of [routine financial records] took patience but not expertise").

computations in question. Nor do they challenge the usefulness of some kind of testimony along these lines. In other words, Defendants do not really challenge Dr. Becker's work. Instead, they challenge his incorporation of assumptions that have been supplied by others, such as Mr. Stone or Plaintiff's counsel. As discussed in connection with the summary judgment motion, Dr. Becker does not purport to offer any opinion regarding, nor does he claim any expertise with respect to, those assumptions (*i.e.*, assessing suitable investments or identifying comparators).

### 1.    Opinions Regarding the Prospectus Benchmark Scenario

As in their argument for summary judgment, Defendants contend that the "Court should exclude Dr. Becker's opinions regarding loss calculated under the Prospectus Benchmark Scenario because they are predicated on an assumption that is not 'properly grounded in'—and indeed is contradicted by—'the evidence.'" Docket No. 156-1, at 6–7 (quoting *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, No. 15-13488-FDS, 2019 WL 13180450, at *6 (D. Mass. Apr. 18, 2019)). Defendants reiterate their contention that the Prospectus Benchmark Scenario "rests on the assumption that each At-Issue Fund was an imprudent or disloyal investment on the first day of the Class Period (or on the day added to the Plan if added during the Class Period) and remained so as long as it remained in the Plan." *Id.* at 4. This assumption is improper, according to Defendants, because Plaintiff cannot demonstrate that it is more likely than not that "*every* At-Issue Fund should not have been on the Plan menu at *any* time during the Class Period." *Id.* at 7.[45]

---

[45] To the extent Defendants argue that the assumptions underlying the Prospectus Benchmark Scenario are improper simply because they were provided by Plaintiff's counsel, that argument is not persuasive at this stage of the proceeding. *See Raab v. Wendel*, No. 16-cv-1396, 2017 WL 7371180, at *3 (E.D. Wis. Dec. 18, 2017) ("The use of counsel-provided assumptions is generally an appropriate and efficient means of narrowing the scope of the expert's analysis."); *ORP Surgical, LLP v. Howmedica Osteonics Corp.*, No. 20-cv-01450, 2021 WL 5280192, at *6 (D. Colo. Nov. 12, 2021) ("It is neither surprising nor a ground for exclusion of [an expert's testimony] testimony that [she] relied on or assumed the truth of information provided by . . . counsel.").

As discussed above, Defendants' argument is foreclosed by *Brotherston*. There, the court considered a nearly identical question and determined that the expert's damages calculation was not "inadequate as a matter of law" simply because it was overinclusive. *See Brotherston*, 907 F.3d at 33–34. "The presence of prudently managed [proprietary] funds in the [p]lan's investment menu," the court held, "suggests that *a portion* of [the expert's] estimate of total portfolio-wide loss may be subject to challenge," but does not "establish that [the expert's] approach was across-the-board inadequate as a matter of law." *Id.* (emphasis added).

Leaving *Brotherston*—which is rooted in substantive legal principles—aside, Defendants' argument is misplaced as a matter of evidence law. Defendants do not dispute the soundness of Dr. Becker's principles and methodology. Rather, they attack the factual assumptions underpinning his computations. Such arguments may ultimately be persuasive, but they are typically matters for trial. The First Circuit recently reaffirmed this very point:

> The objective of the "flexible" inquiry envisioned by Rule 702 is to ascertain "the scientific validity and thus the evidentiary relevance and reliability" of the proffered expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594–95, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S. Ct. 2786. Therefore, "'[w]hen the factual underpinning of an expert's opinion is weak,'"—because, for instance, the expert's conclusion is arguably contradicted by aspects of the record—but the expert's methodology itself is sound, that "'is a matter affecting the weight and credibility of the testimony' and thus 'a question to be resolved by the jury.'" *Rodríguez v. Hosp. San Cristobal, Inc.*, 91 F.4th at 70 (quoting *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 22 (1st Cir. 2011)).

*Doucette*, 106 F.4th at 169.

Evidence that contradicts the assumptions underpinning the Prospectus Benchmark Scenario may warrant recalibration of Dr. Becker's loss computations, or it may discredit his

computations altogether.[46] But that is what trials are for. As noted above, there are genuine disputes of material fact that preclude pre-deciding these issues. As the First Circuit has noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quilez-Velar v. Ox Bodies, Inc.*, 823 F.3d 712, 720 (1st Cir. 2016) (quoting *Daubert*, 509 U.S. at 596).

### 2.    Opinions Regarding the Alternative Funds Scenario

In their attack on Dr. Becker's Alternative Funds Scenario, Defendants reprise their arguments for partial summary judgment, again attacking the underlying factual assumptions—rather than the methodology—of Dr. Becker's computations. *See* Docket No. 156-1, at 11–19. Here too, Defendants invite the Court to pre-decide factual questions that are not ripe for determination.

I note that another court, faced with strikingly similar summary judgment and limine motions regarding the same expert, Dr. Becker, has intimated that such matters could be addressed via a motion under Rule 702. *See Mills v. Molina Healthcare, Inc.*, 694 F. Supp. 3d 1272, 1288 n.10 (C.D. Cal. 2023) ("The Court's finding that [the d]efendants have not met their summary judgment burden on loss causation does not preclude them from attempting to show in their anticipated *Daubert* motions that Becker's methodology is flawed and that he has selected improper comparators."). Here, however, because Defendants only challenge Dr. Becker's

---

[46] *See Ramos*, 461 F. Supp. 3d at 1090 (finding that the assumptions upon which the expert opinion relied "significantly undermine[d] the reliability of [the expert's] estimate of losses" where the expert "assumed that all offerings were inappropriate" and "entirely failed to account for the presence of appropriate investment options").

assumptions (not his methodology), there is scant value in trying to assess the validity of those assumptions without the benefit of actual trial testimony.

With respect to the Alternative Funds Scenario, Defendants raise two factually distinct arguments: (1) that an S&P index fund is not a suitable comparator for Gateway Fund, Oakmark Fund, or Oakmark Select Fund; and (2) that the Vanguard TDFs are not suitable comparators for Gateway Fund, Oakmark Equity & Income Fund, or AlphaSimplex Global Alternatives Fund. *See* Docket No. 156-1, at 12–15 (S&P index fund), 15–19 (Vanguard TDFs). Both of these arguments rely on the same legal premise: Defendants contend that Dr. Becker's testimony should be excluded because the comparators were chosen by Plaintiff's counsel and therefore lack the evidentiary support required under Federal Rule of Evidence 702.

As discussed in connection with the summary judgment motion (*see supra* Section IV.B.2.b), there is at least some evidence in the record to support using the challenged comparators, even though Plaintiff does not offer an expert to opine that each of the But-For Funds in Dr. Becker's Alternative Funds Scenario represent "prudent" and "suitable" alternatives to the challenged funds.[47] It remains to be seen whether this evidence will be persuasive, and such determinations will obviously affect Dr. Becker's computations. But *Brotherston* all-but-precludes deciding whether an alternative is a suitable comparator on a cold record. The issue is best addressed at trial, with the benefit of both testimony and cross-examination.

---

[47] Defendants challenge two additional comparators in their limine motion that they do not challenge in their summary judgment motion: the use of an S&P index fund as a comparator for Oakmark Fund and Oakmark Select Fund. With respect to these funds, Mr. Stone opined: "Because the S&P 500 is the primary prospectus benchmark for both funds, and in light of the other existing funds on the Plan's menu, it is my opinion that mapping the funds' assets to the S&P 500 would be a reasonable choice." Docket No. 140-70, at 48–49.

To be sure, there are instances when courts have excluded expert testimony in ERISA cases based on insufficient evidence to establish the suitability of the comparators used. *See, e.g.*, *Lucas v. MGM Resorts Int'l*, No. 20-cv-01750, 2024 WL 1199514, at *8–9 (D. Nev. Mar. 19, 2024) (finding the expert's "methodology is too flawed to permit th[e] court to rely on her opinion" where the expert used a collective-investment trust ("CIT") as a comparator, noting that "there is an abundance of authority suggesting that CITs generally aren't proper comparators for mutual-fund share classes[]"); *Cunningham*, 86 F.4th at 982 (concluding that the district court did not abuse its discretion in excluding the testimony of two experts because "neither offered any cognizable methodology in support of their conclusions, instead simply referencing their knowledge of the relevant industry and a few examples of other university plans that paid lower fees, though without explaining how these putative comparators were selected"). Those decisions are difficult to square with *Brotherston*, which counsels against deciding such questions without a complete factual record.

The timing of limine rulings is entrusted to the Court's discretion and, as a matter of prudence, there is no good reason to rule on these evidentiary issues at this juncture. Rule 702(d) requires the Court to consider whether an "expert's opinion reflects a reliable application of the [expert's] principles and methods to the facts of the case." Fed. R. Evid. 702(d). But nothing in the rule requires, or even recommends, that a court decide "the facts of the case" before trial. Indeed, the most recent Advisory Committee notes to Rule 702 recognize precisely this point:

> It will often occur that experts come to different conclusions based on contested sets of facts. Where that is so, the Rule 104(a) standard does not necessarily require exclusion of either side's experts. Rather, by deciding the disputed facts, the jury can decide which side's experts to credit.

Fed. R. Evid. 702, Advisory Committee Notes to 2023 Amendment.

By attacking the factual assumptions on which Dr. Becker's computations rest, Defendants effectively recapitulate—in the context of Rule 702—the issues they raise in their motion for summary judgment. Those issues are not ripe for decision at this time. The suitability of comparators is a "question of fact," as to which—in this case—there are genuine disputes. The Court cannot conclude, at this stage, that Dr. Becker's computations, which are based on the relative performance of the At-Issue Funds and various proposed comparators, must be excluded as a matter of law.

### 3.    *AEW Real Estate Fund*

In the same vein as their other efforts to pare down Dr. Becker's testimony, Defendants import their summary judgment arguments about the timing of the alleged fiduciary breach with respect to AEW Real Estate Fund. *See* Docket No. 156-1, at 19–20. Here too, the same factual disputes that precluded summary judgment (*see supra* Section IV.B.2.c) militate against any pre-trial decision on the merits of the parties' respective factual contentions. For the same reasons that I recommend denying Defendants' motion for summary judgment on this point, I recommend denying their motion in limine. As noted above, Mr. Stone's report provides at least some support for Plaintiff's contention that AEW Real Estate Fund should never have been included on the Plan menu. *See* Docket No. 140-70, at 34–35. Given that there is an open factual issue requiring trial on the point, it would make little sense to pre-decide the point for the sake of a limine motion.

### CONCLUSION

For the reasons detailed above:

I RECOMMEND that the Court DENY Defendants' Motion for Summary Judgment [Docket No. 138], except as to Defendants' arguments with respect to Oakmark International Fund and with respect to the alleged breach of the duty of loyalty in connection with Delafield Fund.

I RECOMMEND that the Court ALLOW Defendants' Motion for Summary Judgment [Docket No. 138], to the extent that it seeks dismissal of claims pertaining to an alleged breach of fiduciary duty based on the inclusion of Oakmark International Fund on the Plan menu.

I RECOMMEND that the Court ALLOW Defendants' Motion for Summary Judgment [Docket No. 138], to the extent that it seeks dismissal of claims pertaining to an alleged breach of the duty of loyalty with respect to Delafield Fund.

I RECOMMEND that the Court DENY Defendants' Motion in Limine to Exclude Certain Opinions and Exhibits of Plaintiff's Expert Donald C. Stone [Docket No. 153].

I RECOMMEND that the Court DENY Defendants' Motion in Limine to Exclude Certain Opinions of Plaintiff's Expert Brian C. Becker, PhD [Docket No. 155].[48]

.

/s/ Paul G. Levenson
Paul G. Levenson
U.S. MAGISTRATE JUDGE

Dated: August 20, 2024

---

[48] The parties are advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).