UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| BRIAN WALDNER, individually and as the representative of a class of similarly situated persons, and on behalf of the 401(k) Savings and Retirement Plan, Sponsored by Natixis Investment Managers, L.P., | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | )    Civil No. 21-10273-LTS |
| | ) |
| NATIXIS INVESTMENT MANAGERS, L.P., et al., | ) ) |
| | ) |
| Defendants. | ) ) |

_____

FINDINGS OF FACT AND CONCLUSIONS OF LAW

June 26, 2025

SOROKIN, J.

## I.    INTRODUCTION

Plaintiff Brian Waldner brings this class-action lawsuit to recoup money supposedly lost—or, rather, not gained—due to mismanagement of his employee retirement plan. For this, Waldner blames the plan's sponsor, his former employer Natixis Investment Managers, L.P.—an investment-management firm—as well as the committee Natixis appointed to run the plan. In essence, Waldner alleges that the committee both failed to adequately monitor the performance of funds on the plan menu and improperly favored specialty investment funds offered by Natixis or its affiliated firms. After a two-week bench trial, the Court now makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court finds in favor of the defendants.

II.    <u>PROCEDURAL HISTORY</u>

This action arises under the Employment Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001 <u>et seq</u>.  At issue is an employee retirement plan, known as the

401(k) Savings and Retirement Plan (the "Plan"), sponsored by Natixis and overseen by Natixis

Investment Managers, L.P. Retirement Committee (the "Committee" and collectively with

Natixis, "Defendants").[1]  Waldner asserts two claims: Count I, against both Defendants, for

breach of the fiduciary duties of loyalty and prudence, pursuant to 29 U.S.C. § 1104(a)(1)(A) and

(B); and Count II, against Natixis only, for failure to monitor fiduciaries (i.e., the Committee),

pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3).

Waldner's claims rest on two broad theories.  First, Waldner's "wholesale" theory of

breach relates to Defendants' management of the Plan overall.  It alleges that Defendants

breached their duty of loyalty by prioritizing the business interests of Natixis over the interests of

Plan participants in selecting and retaining certain of the investment options (called "funds") on

the Plan.  It also alleges that Defendants breached their duty of prudence by failing to adequately

monitor the performance of funds already on the Plan.  Second, Waldner's "retail" theory of

breach relates to five specific funds on the Plan (the "At-Issue Funds").  For each At-Issue Fund,

the theory alleges that Defendants breached their duty of loyalty, duty of prudence, or both, in

failing to remove the fund from the Plan (or failing to do so sooner for those Defendants did

eventually remove).

Waldner first brought this case in February 2021, suing in his individual capacity, as the

representative of a class of similarly situated persons, and on behalf of the Plan itself.  Doc. No.

---

[1] Natixis Investment Managers, L.P., is the predecessor-in-interest via statutory conversion to
Natixis Investment Managers, LLC.  Natixis Investment Managers, L.P., was also formerly
known as Natixis Global Asset Management, L.P.  The differences among these entities have no
bearing on this case, and the Court refers to all three as "Natixis."

1.[2]  After Waldner filed an amended complaint, Defendants moved to dismiss the case in its

entirety.  Doc. No. 24.  As relevant here, Defendants argued that Waldner lacked standing to

bring claims regarding funds in which he did not invest.  The Court denied the motion to dismiss

on December 20, 2021, rejecting Defendants' standing argument.  Doc. No. 33 at 4.

In September 2022, Waldner moved to certify a class of similarly situated Plan

participants.  Doc. No. 50.  Among their arguments opposing class certification, Defendants

pointed out that Waldner, upon leaving Natixis's employ, signed a termination agreement that

subjected him to defenses—waiver and release—that most class members did not face.  Doc. No.

60-1 at 16–17.  Therefore, they contended, Waldner failed Federal Rule of Civil Procedure

23(a)(3)'s typicality requirement as a class representative, and the proposed class could not be

certified.  Id.; see also Doc. No. 96.  After the Court referred the class-certification motion to

Magistrate Judge Levenson, he invited the parties to submit additional information addressing

the significance of the termination agreement.  Doc. No. 89.  The parties did so, and, in a

comprehensive report and recommendation, Magistrate Judge Levenson rejected Defendants'

termination-agreement argument.  Doc. No. 110 at 31–37.  On May 15, 2023, the Court adopted

Magistrate Judge Levenson's report and recommendation, certifying a class consisting of:

> All participants and beneficiaries of the 401(k) Savings and Retirement Plan,
> Sponsored by Natixis Investment Managers, LLC (f/k/a The 401(k) Savings and
> Retirement Plan, Sponsored by Natixis Investment Managers, L.P., and The 401(k)
> Savings and Retirement Plan, Sponsored by Natixis Global Asset Management)
> ("the Plan") on or after February 18, 2015 [(the "Class Period")] who were invested
> in funds that were affiliated at any time with Natixis, excluding any persons with
> responsibility for the Plan's investment or administrative functions.

---

[2] Citations to "Doc. No. __" refer to documents appearing on the court's electronic docketing
system ("ECF"); pincites are to the page numbers in the ECF header or, where applicable, to
paragraph numbers contained in the cited document.

Doc. No. 122 (incorporating by reference class definition described at Doc. No. 110 at 6).[3]

Next, in October 2023, Defendants moved for summary judgment.  Doc. No. 138.  Soon thereafter, Defendants also filed motions in limine to exclude certain opinions and exhibits of Plaintiffs' experts Donald C. Stone and Dr. Brian C. Becker, Ph.D.  Doc. Nos. 153, 155.  In another thorough report and recommendation, Magistrate Judge Levenson largely rejected Defendants' arguments as to summary judgment.  See generally Doc. No. 193.  He did, however, recommend granting judgment in Defendants' favor on two issues: (1) Plaintiffs' claims with respect to the Oakmark International Fund, a Natixis-affiliated fund as to which Plaintiffs failed to introduce evidence of any fiduciary breach, id. at 28–36; and (2) Plaintiffs' claim for breach of the duty of loyalty with respect to the Delafield Fund, a fund which, though previously affiliated with Natixis, was entirely independent during the Class Period, id. at 36–38.  The latter recommendation did not touch Plaintiffs' claim for breach of the duty of prudence with respect to the Delafield Fund.  Id. at 38.  Magistrate Judge Levenson then recommended that the Court deny Defendants' motions in limine as not ripe while noting the possibility that they could ripen at trial.  Id. at 51–66.  On September 10, 2024, the Court adopted Magistrate Judge Levenson's report and recommendation, denied the motion for summary judgment except as to the two above-mentioned issues, and denied the motions in limine.  Doc. No. 196.

The case then proceeded to a bench trial, which lasted from January 21, 2025, to February 3, 2025.  At trial, the Court heard fact testimony from: Waldner; current and former Committee members James Cove, Marina Gross, Kathryn Karazia, Susan St. Germain, and

---

[3] The Court refers to this as the "Class."  Waldner is the lone named plaintiff of the Class.  For clarity, from here on the Court uses "Plaintiffs" when referring to Waldner as a litigant on behalf of the Class and the Plan.  The Court uses Waldner's name when referring to him in his individual capacity (e.g., when referring to him as a Natixis employee or Plan participant).

Duncan Wilkinson; the Committee's primary outside consultant, Peter Grant; the Committee's primary outside ERISA counsel, David Guadagnoli; and Natixis executive Jérôme Urvoy. Plaintiffs also presented expert testimony from Donald Stone on the topic of breach and Dr. Brian Becker on the topics of loss and damages.  Dr. Becker provided two analyses of loss and damages in this case: (1) a "Prospectus Benchmark Scenario," in which he compared the returns of certain funds on the Plan to the returns of passive benchmark funds over the Class Period; and (2) an "Alternative Fund Scenario," in which he compared the returns of some of the same funds to the returns of comparable "But-For Funds."  Defendants presented expert testimony from Kathleen Mann on breach, Dr. Jonathan Reuter, Ph.D., on loss and damages, and Rebecca Kirk Fair on participant demographics and preferences.  After trial, the parties submitted excerpted transcripts from the depositions of former Committee members Maureen O'Neill and Beverly Bearden.  During trial, Defendants filed a motion to decertify the Class as to the remaining Delafield Fund claim and to dismiss that claim.  Doc. No. 231.  The parties fully briefed that motion after trial.  The Court then heard closing arguments, including on the motion, on March 24, 2025.

III.    THRESHOLD EVIDENTIARY RULINGS

Before reaching the merits, the Court turns to certain evidentiary issues on which it reserved during trial.

A.    Plaintiffs' Objection to the Testimony of Rebecca Kirk Fair[4]

Plaintiffs argue that the testimony of Defendants' expert witness Rebecca Kirk Fair should be excluded under Federal Rules of Evidence 402 and 403.  Specifically, Plaintiffs

---

[4] In the parties' joint pretrial memorandum, Plaintiffs also anticipated objecting to certain testimony of Defendants' expert witness Dr. Jonathan Reuter on the topic of the statistical significance of fund underperformance.  Dr. Reuter did not address this topic at trial, and, as a

contend that Kirk Fair's survey of Plan participants is irrelevant and therefore inadmissible under Rule 402. In the alternative, they say, the survey presents an issue of undue delay, waste of time, and cumulative evidence, making it excludable under Rule 403.

Kirk Fair's survey is relevant to both breach and loss. Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "is of consequence in determining the action." Fed. R. Evid. 401; see also Fed. R. Evid. 402 (making irrelevant evidence inadmissible). As to breach, the survey's evidence regarding the financial sophistication of Plan participants informs whether the Committee acted prudently in offering sophisticated investment options. See 29 U.S.C. § 1104(a)(1)(B) (defining duty of prudence in terms of "the circumstances then prevailing"); see also Wildman v. Am. Century Servs., LLC, 362 F. Supp. 3d 685, 706 (W.D. Mo. 2019) (considering sophistication of plan participants in finding plan offerings prudent). As to loss, the investment preferences of Plan participants may also bear on the selection of appropriate comparator funds. If Plan participants show a preference for actively managed funds, a passively managed index likely would not be the appropriate comparator for an actively managed fund. See Wildman, 362 F. Supp. 3d at 711 (finding plaintiffs failed to prove loss because, in part, expert witness's selection of comparator funds did not account for plan participants' preferences). The survey thus qualifies for admission under Rule 402.

The Court declines to exclude Kirk Fair's survey under Rule 403. That rule allows for the exclusion of evidence where "its probative value is substantially outweighed by a danger of," as relevant here, "undue delay, wasting time, or needlessly presenting cumulative evidence."

---

result, Plaintiffs lodged no objection. To the extent Plaintiffs still object to Dr. Reuter's testimony, that objection is OVERRULED.

Fed. R. Evid. 403.  The presentation of Kirk Fair's survey was short, efficient, and primarily focused on evidence not otherwise in the record.  The primary issue presented by her testimony is the weight to be given it, not its admissibility.  Plaintiffs' objection to Kirk Fair's testimony is OVERRULED.

      B.   <u>Plaintiffs' Documentary Objections</u>

Plaintiffs challenge the admission of a cache of emails (the "Challenged Emails") that they assert Defendants untimely disclosed.[5]  This cache primarily consists of two buckets of emails: (1) daily emails sent out to Natixis employees with data on the performance of proprietary funds; and (2) periodic emails to Natixis employees with attached documents describing the inflows and outflows of proprietary funds.  The Challenged Emails were not produced to Plaintiffs as part of Defendants' initial disclosures or during discovery in response to Plaintiffs' documentary requests.  Instead, Defendants disclosed them only a month before trial, when serving Plaintiffs with their preliminary exhibit list.

Federal Rule of Civil Procedure 26 requires a party to disclose at the outset of a case "all documents . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses."  Fed. R. Civ. P. 26(a)(1)(A)(ii).  Moreover, a party must supplement is disclosure "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect."  Fed. R. Civ. P. 26(e)(1)(A).  Under Rule 37, where a party fails to disclose information, "the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 36(c)(1).  "The harmlessness evaluation can be thought of as a 'balancing of fairness, burden, and case

---

[5] The challenged documents originally also included records from the Plan's recordkeeper and publicly filed documents.  Before the final pretrial conference, Defendants withdrew the former, and Plaintiffs assented to admission of the latter.

management needs[.]'" Hudson-RPM Distribs., LLC v. Bowditch & Dewey, LLP, No. 4:19-CV-40095-TSH, 2022 WL 22902243, at *3 (D. Mass. Mar. 29, 2022) (alteration in original) (quoting Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 198 (1st Cir. 2006)).

Defendants' failure to include the Challenged Emails in their initial disclosures does not warrant their exclusion. First, it seems that Defendants did not know that they would use these emails to support their case until much later in the litigation. This means that the emails did not fall within Defendants' initial-disclosure obligations. And there is no evidence that, once they realized the Challenged Emails would be used, Defendants delayed in disclosing the emails. Even if Defendants did, the Court finds any late disclosure harmless. The Challenged Emails did not drastically change the course of trial. Nor were the Challenged Emails a great surprise to Plaintiffs, seeing as the emails contained mostly public, garden-variety information about fund performance, and Waldner received many of them. Gagnon, 437 F.3d at 197 ("Surprise and prejudice are important integers in this calculation." (quotations omitted)).

Plaintiffs also argue that the emails fell within several of their document requests. Even assuming this is so, the late disclosure was harmless for the reasons described above. Exclusion of these emails is not justified in this case, and Plaintiffs' objections are OVERRULED.

C.    Defendants' Objections to Certain Opinions of Donald Stone

In their pretrial memorandum, Defendants renewed their objection to the admission of Exhibits 8A, 8B, 9A, 9B, 10, 11A, 11B, and 12 (the "Challenged Exhibits") to the rebuttal report of Plaintiffs' expert witness Donald Stone, as well as the opinions Stone formed based on the Challenged Exhibits. Plaintiffs did not offer any of the Challenged Exhibits into evidence at trial, however; nor did Plaintiffs expressly question Stone on the Challenged Exhibits. Defendants therefore at no point during the trial raised an objection to the Challenged Exhibits or to Stone's opinions regarding the Challenged Exhibits. The Court OVERRULES the objections.

8

D.     Defendants' Objections to Certain Opinions of Brian Becker

Defendants objected at trial—as they did at summary judgment—to the admission of certain opinions of Plaintiffs' damages expert Dr. Brian Becker. Specifically, Defendants argue, under the fitness element of Federal Rule of Evidence 702, that Dr. Becker's "Prospectus Benchmark Scenario" for calculating damages does not fit the facts of this case. That is so, Defendants say, because Plaintiffs have not challenged the inclusion of actively managed funds as opposed to index funds, so comparing actively managed funds in the Plan to index funds does not fit the claims at issue. The Court reserved judgment on Defendants' objection at trial. See generally Doc. No. 245 at 206:14–213:13.[6]

Defendants make two errors. First, because this is a bench trial, the requirements of Rule 702 need not be met as stringently. The Court need not play as much of a gatekeeping role where the fact finder is the Court itself. See Friedman v. Cent. Me. Power Co., No. 2:20-CV-00237-JDL, 2024 WL 1327344, at *2 (D. Me. Mar. 28, 2024) ("[L]ess stringent application of [the Rule 702] factors is appropriate in a bench trial where [the] usual concern—keeping unreliable expert testimony from the jury—is not present." (quotations omitted)). Second, Defendants' arguments go toward the weight to be accorded Dr. Becker's opinions, rather than their admissibility. That Plaintiffs have not shown, for each challenged fund, that the proper comparator would be an index fund does not mean that Dr. Becker's Prospectus Benchmark Scenario completely fails Rule 702's fitness requirement. Rather, it simply suggests that the Court should discount Dr. Becker's calculations with respect to those Plan funds for which an index fund would not be the proper comparator. Although Defendants seem to assume this is a take-it-or-leave-it situation, the Court need not adopt the entire Prospectus Benchmark Scenario.

---

[6] The trial transcripts appear at Doc. Nos. 239–50.

Instead, the Court can accept Dr. Becker's calculations on those Plan funds for which an index

fund would be the proper comparator and reject his calculations for all other Plan funds.  For

these reasons, Defendants' objections to Dr. Becker's opinions regarding the Prospectus

Benchmark Scenario are OVERRULED.

E.    Parties' Objections to Journal of Finance Article

At trial, Plaintiffs sought to elicit testimony from their expert witness Donald Stone about

an article published in the Journal of Finance titled, "It Pays to Set the Menu: Mutual Fund

Investment Options in 401(k) Plans."  PX-1141.[7]  The article examined whether service

providers to 401(k) plans displayed favoritism toward affiliated funds.  Plaintiffs then offered the

article into evidence.  Defendants objected on the grounds that the article was not in the list of

materials considered by Stone for his report.  The Court provisionally allowed the line of

questioning.  The Court did not allow the article to be admitted as an exhibit, but it allowed

statements from the article to be read into evidence as part of a learned treatise pursuant to

Federal Rule of Evidence 803(18).  See Doc. No. 244 at 223:5–225:16; Doc. No. 245 at 37:18–

41:14.

The Court finds Plaintiffs' line of questioning on the article—and the admission of

statements from the article as a learned treatise—proper.  Stone not only cited but also quoted

from the article in note 112 of his report:

> See, e.g., Veronika K. Pool, et al., It Pays to Set the Menu: Mutual Fund Investment
> Options in 401(k) Plans, 71 J. FINANCE 1779, 1802 (2016) ("Affiliated funds are
> more likely to be added and are less likely to be deleted from a plan. More
> importantly, fund additions and deletions are less sensitive to prior performance for
> affiliated than for unaffiliated funds.").

---

[7] Citations to "PX-___" refer to exhibits offered by Plaintiffs and admitted at trial.  Citations to
"DX-___" refer to exhibits offered by Defendants and admitted at trial.  And citations to "JX-___"
refer to exhibits offered jointly by the parties and admitted at trial.

Doc. No. 140-70 at 42 n.112.  Stone also cited to and parenthetically quoted the article in two footnotes in his rebuttal report.  Doc. No. 140-74 at 5 n.14, 6 n.9.  Stone testified on direct examination that he viewed the article as a reliable authority in the field of retirement-plan research.  This is sufficient to make statements from the article admissible under Rule 803(18) and questioning on the article proper.  Defendants' objections are OVERRULED.

Later, on direct examination of their expert witness Dr. Jonathan Reuter, Defendants sought to elicit additional testimony about the article.  Plaintiffs objected that such questioning was beyond the scope of Dr. Reuter's report.  Again, the Court provisionally allowed the line of questioning.  See generally Doc. No. 249 at 101:9–106:15.  The Court now confirms that provisional ruling.  Dr. Reuter did not address the article in his rebuttal report, but Defendants were still entitled to elicit testimony from Dr. Reuter to impeach Stone's testimony about the article.  Plaintiffs' objections are OVERRULED.

IV.  FINDINGS OF FACT

    A.  The Parties

Natixis is an investment-management firm.  Natixis is affiliated with fifteen other investment-management firms, including: AEW Capital Management, L.P.; Flexstone Partners; Gateway Investment Advisers, Inc.; Harris Associates; Loomis, Sayles & Company L.P.; Mirova; Vaughan Nelson Investment Management; and WCM Investment Management.  Natixis was also previously affiliated with AlphaSimplex LLC; Aurora Investment Management LLC; Reich & Tang Asset Management, LLC; McDonnell Investment Management, LLC; and Ostrum Asset Management U.P., LLC.  Natixis and its affiliates largely offer actively managed investment products to individuals and institutional investors, including other companies' retirement plans.   From 2015 to 2022, Natixis and its affiliates managed between $870.3 billion and $1.151 trillion in assets.

The named plaintiff, Brian Waldner, is a former Natixis employee who served as Vice President of Strategic Marketing and Innovation from April 2017 to May 2018. Waldner participated in the Plan from July 2017 to February 2021. As a Plan participant, Waldner invested in a Vanguard Target Date Fund, the Gateway Fund, the AEW Real Estate Fund, and the AEW Global Property Trust Fund.

B.    The Wholesale Evidence

As limned above, Plaintiffs' case relies on two interrelated sets of facts: "wholesale" evidence and "retail" evidence. The Court briefly outlines the wholesale evidence before coloring in with retail facts.

1.    *The Plan*

Since 1999, Natixis has offered the Plan to eligible employees, including the employees of most of its affiliates, the relevant exceptions being Harris Associates and Vaughan Nelson. Throughout the Class Period, the Plan has had between 1,500 and 1,800 active participants. During that time, the Plan has held between $300 million and $470 million in assets.

Since around 2008, the Plan has had the following structure. Each Plan participant maintains her own individual investment account, into which she can contribute a portion of her salary. Natixis will match a participant's contributions up to a certain threshold. Each participant may then allocate the assets in her account into any number of funds on the Plan menu. The Plan menu is selected by the Committee, acting on Natixis's behalf. If a participant does not self-allocate, her money is automatically invested in a Qualified Default Investment Alternative ("QDIA"), also chosen by the Committee. Since 2008, the Plan's QDIA has been a suite of Vanguard Target Date Funds ("TDFs"). Each TDF comprises a balanced portfolio of stocks and bonds, with the exact composition shifting over time, as determined by the participant's age and expected retirement date (i.e., the "target date"). For example, if a twenty-

five-year-old participant—presumably far from retirement—did not self-allocate, she would be sorted into a TDF with a target date forty years away.  At the start, the TDF's composition would slant more toward higher-risk, higher-reward equity investments.  As the target date approached, the TDF would adjust, leaning more toward the safer but less lucrative bond market.  Of course, a participant can also self-allocate to any funds in the Plan, including any of the TDFs—even those not "age appropriate" for the participant.

At the beginning of the Class Period, the Plan menu numbered twenty-one investment options, counting the Vanguard TDFs as one option.  The Plan has maintained a roughly similar number of options throughout the Class Period.  This number is in line with industry standards.  For example, in 2021, the average number of options on defined-contribution plans across all industries was 20.9 and the median was twenty.  For plans offered by only Natixis's financial-services peers, the average was 27.1 and the median was twenty-four.

At all relevant times, the Plan's menu has included both actively managed and passively managed funds.  An actively managed fund is one in which the fund manager tries to outperform a specified benchmark—such as an index fund—by selecting investments using research and market forecasting.  A passively managed fund, by contrast, is one that is designed to track, rather than beat, the performance of a specified index.  At the start of the Class Period, the Plan offered seventeen active funds and four passive funds.

The Plan's menu has also included a mix of proprietary and non-proprietary funds.  A proprietary fund is an investment option managed by Natixis or one of its affiliates, while a non-proprietary fund is one managed by a third party.  At the start of the Class Period, the Plan included eight non-proprietary options (though one of those, the Delafield Fund, was managed by a former Natixis affiliate).  It also included thirteen proprietary options.  The non-proprietary

13

options were a mix of actively and passively managed funds, while the proprietary options were all actively managed. Throughout the Class Period, this composition has changed somewhat, but not substantially: the Plan has maintained between twelve and fourteen proprietary options during each calendar year.

Generally, the Plan's options can be sorted into four tiers. Tier I consists of the Vanguard TDFs as the Plan's QDIA. Tier II comprises the Plan's "Passive Core Options," currently four non-proprietary, passively managed index funds. Tier III includes the Plan's "Active Core Options," or its broad-based actively managed funds, encompassing nineteen options over the entire Class Period, fourteen of which have been proprietary. Finally, Tier IV is made up of so-called "Specialty Options," those specialized and actively managed investment options that are for participants with more financial knowledge. Four funds have slotted into Tier IV during the Class Period, all proprietary. These tiers are not communicated to Plan participants; rather, they are an organizing principle used internally by the Committee and its outside advisors.

The Committee has also maintained a Watch List of Plan funds to which it intends to pay particular attention. Generally, a fund might be put on the Watch List for underperformance, for a shift in its investment strategy, or for a change in its management team. There is no set timeframe for how long a fund remains on the Watch List. Once placed there, a fund can eventually be taken off the Watch List (e.g., if performance improves) or removed from the Plan entirely (e.g., if performance continues to decline).

A summary of the Plan menu over the Class Period, including the date of addition or removal for those funds added or removed during the Class Period, can be seen in Table 1 below.

| Table 1. Summary of Plan Menu | | | | | |
|---|---|---|---|---|---|
| Tier | Fund | Active or Passive | Proprietary or Non-proprietary | Added | Removed |
| I | Vanguard TDFs | Passive | Non-proprietary | | |
| II | Vanguard Total Bond Market Index Fund | Passive | Non-proprietary | | |
| | Vanguard Institutional Index Fund | Passive | Non-proprietary | | |
| | State Street Russell Small/Mid Cap Index Fund | Passive | Non-proprietary | 9/24/2019 | |
| | SSgA Global Equity ex US Index Fund | Passive | Non-proprietary | | |
| III | Delafield Fund | Active | Non-proprietary | | 1/8/2018 |
| | Loomis Sayles Bond Fund | Active | Proprietary | | |
| | Loomis Sayles Core Plus Bond Fund | Active | Proprietary | | |
| | Loomis Growth Fund | Active | Proprietary | | |
| | Loomis Sayles Small Cap Growth Fund | Active | Proprietary | | |
| | Loomis Small Cap Value Fund | Active | Proprietary | | |
| | Mirova Global Sustainable Equity Fund | Active | Proprietary | 9/24/2019 | |
| | Vaughan Nelson Value Opportunities Fund | Active | Proprietary | 1/8/2018 | |
| | Oakmark Equity & Income Fund | Active | Proprietary | | |

| Table 1. Summary of Plan Menu | | | | | |
|---|---|---|---|---|---|
| Tier | Fund | Active or Passive | Proprietary or Non-proprietary | Added | Removed |
| III | Oakmark Fund | Active | Proprietary | | |
| | Oakmark Select Fund | Active | Proprietary | | 1/13/2021 |
| | Oakmark International Fund | Active | Proprietary | | |
| | WCM Focused Emerging Markets Fund | Active | Proprietary | 5/12/2022 | |
| | WCM Focused International Growth Fund | Active | Proprietary | 11/30/2021 | |
| | Artisan Mid Cap Fund | Active | Non-proprietary | | |
| | Reich & Tang Daily Income Money Market Fund | Active | Proprietary | | 7/24/2015 |
| | Vanguard Prime Money Market Fund | Active | Non-proprietary | 7/24/2015 | |
| | Vanguard Short-Term Federal Fund | Active | Non-proprietary | | |
| | Winslow Large Cap Growth Fund | Active | Non-proprietary | | |
| IV | AEW Real Estate Fund | Active | Proprietary | | 10/15/2020 |
| | AEW Global Properties Trust Fund | Active | Proprietary | 10/15/2020 | |
| | AlphaSimplex Global Alternatives Fund | Active | Proprietary | | 10/20/2021 |
| | Gateway Fund | Active | Proprietary | | |

2.    *The Committee*

The Committee oversees the Plan, including by selecting, monitoring, and removing funds on the Plan menu.  The Board of Managers of Natixis appoints Committee members and monitors the Committee's performance.

Throughout the Class Period, the Committee has consisted of four to six executives from Natixis and its affiliates: Kathryn Karazia (2015–2019); Duncan Wilkinson (2015–2023); Marina Gross (2015–Present); Jeffrey Plunket (2015–2018); Beverly Bearden (2015–2020); Eric Ward (2018–Present); Maureen O'Neill (2019–2022); James Cove (2019–Present); Warren Besser (2021–Present); and Susan St. Germain (2023–Present).[8]  Karazia, O'Neill, and St. Germain are or were high-ranking human-resources officers at Natixis; accordingly, each has successively served as the chair of the Committee and primary point of contact for its independent consultants.  As relevant here, Wilkinson also served as CEO of Natixis affiliate AlphaSimplex for his entire Class Period tenure on the Committee, and Gross has served as Co-Portfolio Manager of the Natixis Sustainable Future TDF since 2018.

3.    *The Committee's Independent Consultant and Counsel*

During the entirety of the Class Period, the Committee has used Mercer Investments LLC as an outside consultant.  The Committee hired Mercer in 2010.   Pursuant to a June 2011 statement of work, Mercer's responsibilities include attending quarterly Committee meetings, providing continuous updates on funds in the Plan, performing investment structure reviews, and developing investment policies.  One or more Mercer consultants have attended every Committee meeting during the Class Period, though these meetings have not been quarterly as

---

[8] The Court here uses 2015 as the start date for all Committee members whose tenure began prior to the Class Period.

suggested by the statement of work.  The primary Mercer consultant throughout the Class Period has been Peter Grant.

One of Mercer's primary responsibilities has been to compile quarterly reports on the Plan's performance.  The reports include grades for each fund in the Plan.  The grades are assigned not by Mercer's consulting team, but by its independent research team.  There are six primary grades that can be given with the following meanings:

- "A": above-average prospects of outperforming benchmarks (that is, the index or blend of indices to which it is compared);

- "B+": above-average prospects of outperforming benchmarks but with some reservations;

- "B": average prospects of outperforming benchmarks;

- "C+": below-average prospects of outperforming benchmarks;

- "N": not rated; and

- "R": Mercer either has not completed its full research process or previously completed its full research process but no longer maintains full research coverage.

In addition, a Mercer rating can include one of three indicators along with any grade. Only one indicator is relevant here; a "(T)" mark indicates a high tracking error, referring to how closely a given fund will match the returns of its benchmark.  A tracking error of zero means the fund matches its benchmark exactly, while a high tracking error signals that the fund's returns may vary widely from its benchmark, either positively or negatively.  Thus, a "(T)" indicator tells a plan fiduciary that it should not expect the fund to perform in lockstep with its benchmark.

Mercer's reports also include recommendations for the Watch List, as well as for funds to be added to or removed from the Plan entirely.  When the fiduciary of a defined-contribution plan seeks Mercer's help in finding a new fund to add to its plan menu, Mercer generally only

recommends funds it has rated as "A" or "B+." However, Mercer may recommend "N" or "R" funds, as well, as those ratings, for the most part, simply indicate that few Mercer clients are currently using such funds. And where Mercer is consulting regarding funds already on a plan menu, it does not generally recommend removal of a fund just because it has a grade of "B."

In June 2016, the Committee began retaining the law firm Sullivan & Worcester as ERISA counsel. Since then, an attorney from Sullivan & Worcester has attended every Committee meeting. Sullivan & Worcester partner David Guadagnoli has served as the primary attorney advising the Committee. Guadagnoli has provided training to the Committee on its fiduciary duties under ERISA at least three times: in November 2017, December 2019, and September 2024.

4.   *The Committee Meetings*

In order to fulfill its duty to monitor the Plan, the Committee holds meetings to review the performance of funds on the Plan, determine whether to add new funds, and decide whether to remove existing funds. Table 2 below lists the Committee's meetings from the beginning of the Class Period up to March 2023.

| Table 2. Committee Meeting Dates | |
| --- | --- |
| Year | Month and Day |
| 2015 | June 18 |
| | September 9 |
| 2016 | June 20 |
| | November 30 |
| 2017 | November 21 |
| 2018 | December 19 |
| 2019 | March 5 |
| | September 5 |
| | December 9 |
| 2020 | February 20 |
| | May 26 |
| | September 23 |
| 2021 | March 2 |
| | June 3 |
| | October 19 |
| | November 30 |
| 2022 | March 4 |
| | June 16 |
| | November 29 |
| 2023 | March 24 |

As this list shows, early in the Class Period, the Committee met infrequently, as little as once per year.  On several occasions, the Committee resolved to meet more regularly—or its

consultants suggested doing so—only to continue its irregular schedule.  There were also at least three meetings during this initial run where no one on the Committee compiled minutes of the meetings.  However, around 2019, the Committee began meeting roughly three times per year.  Similarly, the Committee added the taking of meeting minutes to Mercer's statement of work starting in 2019.

During Karazia's tenure as Committee chair, from the start of the Class Period until 2019, Mercer provided its quarterly reports to her alone.  If the Committee had a meeting that quarter, Karazia forwarded the report to the other Committee members.  Otherwise, neither Karazia nor Mercer distributed the reports to the rest of the Committee.  However, beginning around 2020, Mercer began distributing the reports to the entire Committee, regardless of whether the Committee had a meeting scheduled that quarter.

### 5.  *The Investment Structure Review*

An investment structure review is a comprehensive evaluation of a defined-contribution plan's menu of investment options.  The Committee's last investment structure review before the Class Period came in 2009.  Mercer's 2011 statement of work included conducting an investment structure review as one of its responsibilities.  The Committee did not begin its next investment structure review until May 2020, though.  It completed that review, with a report from Mercer, in March 2021 and discussed the report at its meeting on March 2.

Materials in Mercer's report included a review of investment decision-making personalities, plan demographics, tier-by-tier recommendations, and a comparison of the Plan to similar retirement plans offered by peer companies.  Most notably, Mercer recommended streamlining Tier III—the "Active Core Options"—and revisiting the appropriateness of Tier IV—the "Specialty Options"—noting that no peer plans offered a similar tier of alternative funds.  This was not, per Mercer consultant Peter Grant, a recommendation that the Committee

eliminate Tier IV entirely, only that it should consider how the characteristics of funds in Tier IV compare to other options on the Plan.  In fact, Mercer's report also noted that over one-third of peer plans at the time used a "brokerage window," through which plan participants could invest more broadly in stocks or funds not on a plan menu, including funds that might be classified as specialty options.  JX-37 at 115.

###### 6.    *The Investment Policy Statement*

An investment policy statement ("IPS") acts as a defined-contribution-plan fiduciary's charter.  Prior to the Class Period, the Committee had no IPS.  After engaging Sullivan & Worcester as ERISA counsel, Karazia told Guadagnoli, via email, that the Committee had worked on an IPS before but had never formally adopted one.  She asked whether Guadagnoli recommended that the Committee have an IPS, to which he responded, "[y]es, definitely you should have one."  JX-227.  At the next meeting after that email, in November 2017, the Committee adopted its first IPS, which took effect January 1, 2018.

#### C.    The Retail Evidence

In addition to the wholesale evidence, the parties presented retail evidence about the Committee's monitoring of the five At-Issue Funds.[9]  The Court summarizes only the basic facts as to each At-Issue Fund below, saving additional details for its Conclusions of Law.

###### 1.    *AlphaSimplex Global Alternatives Fund*

The AlphaSimplex Global Alternatives Fund ("ASG") was on the Plan menu from September 2011 until October 2021.  Waldner did not invest in ASG as a Plan participant.

---

[9] In prior submissions to the Court and during trial, Plaintiffs challenged at least twelve additional funds.  However, at closing arguments, Plaintiffs clarified that they seek damages only as to the five At-Issue Funds.  As such, the Court discusses the other funds here or in its Conclusions of Law only to the extent the Committee's handling of those funds bears on Plaintiffs' wholesale theory of breach or their theories of breach with respect to the At-Issue Funds.

ASG was an actively managed fund that focused on global equity, bond, currency, and commodity markets to mimic the risk and return characteristics of a diversified portfolio of hedge funds (i.e., a "fund of hedge funds").  Whereas a true fund of hedge funds offers a high return and low volatility but with high fees and limited liquidity, ASG sought to offer the same benefits with lower fees and more liquidity.  At the start of the Class Period, ASG had a "B" rating from Mercer and qualified as a Tier IV Specialty Option.  ASG was an offering from AlphaSimplex, which was a Natixis affiliate from 2007 until April 2023.  From 2014 to 2023, Wilkinson served both as a Committee member and as CEO of AlphaSimplex.

ASG was not in many other retirement plans.  For example, in 2016—the first full year of the Class Period—out of 3,039 defined-contribution plans of a similar size (i.e., over $200 million in assets), only five included ASG.  The numbers are similar for 2017 (two out of 3,669) and 2018 (two out of 3,539).

In its first-quarter 2016 report, Mercer recommended placing ASG on the Watch List due to "unprecedented" underperformance over the prior twelve months.  JX-56 at 18.  The Committee's first meeting after that report was set for June 20, 2016.  Four days before, Karazia—who received the report directly from Mercer—emailed Wilkinson to let him know that about Mercer's recommendation.  At the meeting, the Committee followed that recommendation and put ASG on the Watch List.

Mercer upgraded ASG to a "B+" rating in its second-quarter 2016 report.  However, around the third quarter of 2018, Mercer downgraded ASG to an "R" rating, indicating that it no longer maintained full research coverage on ASG.

ASG remained on watch for over three years.  At its December 2019 meeting, the Committee removed ASG from the Watch List.  The fund was returned to the Watch List at the Committee's September 2020 meeting.

In March 2021, Mercer completed its structural review of the Plan menu.  In its report, Mercer recommended revisiting the appropriateness of the Tier IV funds—including ASG—as none of Natixis's financial-services peers offered such specialty funds.  In another report that May, Mercer noted that ASG's assets under management had fallen to $600 million—down from $4 billion at the start of 2015.  Mercer further noted that "investors are left without a clear means of assessing ASG," due to its lack of a benchmark index.  JX-95 at 2.

By August 2021, the Committee had decided to remove ASG from the Plan.  Wilkinson, still ASG's CEO, did not recuse himself from the vote but did vote in favor of ASG's removal.  Participant assets invested in ASG were mapped to age-appropriate Vanguard TDFs.

### 2.  *Delafield Fund*

The Delafield Fund was added to the Plan some time before 2009, well before the Class Period began.  When added, Delafield was a Natixis affiliate, but in 2009, Natixis sold its share of Delafield.  This means that, for the entirety of the Class Period, the Delafield Fund was non-proprietary.  In terms of strategy, it was an actively managed fund that invested in the equity securities of undervalued domestic companies.  Waldner did not invest in Delafield at any point during his time as a Plan participant.

Mercer began recommending Delafield's removal from the Plan at the very start of the Class Period.  In its fourth-quarter 2014 report, Mercer recommended reviewing Delafield for possible removal, citing its underperformance and the availability of reasonably similar options on the Plan, such as the Loomis Sayles Small Cap Value Fund.

24

This report was shared with Karazia in March 2015—the first full month of the Class Period.  Karazia did not share this report with the rest of the Committee, though.  Two months later, Mercer consultant Peter Grant emailed Karazia to again recommend a review of Delafield for poor performance.  A few days later, in June 2015, Grant emailed Karazia again, highlighting the potential termination of Delafield and attaching a PDF of Mercer's research on the Vaughan Nelson Value Opportunities Fund as a possible Delafield replacement.  Vaughan Nelson is a Natixis affiliate, and its Value Opportunities Fund focuses on mid-cap equity investments.  Mercer's report showed Vaughan Nelson as an "A(T)" fund.  At its meeting on June 18, 2015, the Committee agreed to remove Delafield but requested additional analysis from Mercer about potential replacements, including Vaughan Nelson.

At the same time, the Committee and Mercer were beginning to consider making other changes to the Plan.  The proposed changes centered around fund share classes.  These changes would not alter what funds were offered on the Plan; rather they would affect which classes of shares from the existing funds would be available to participants.  Thus, in the same email in which Grant attached Mercer's research on Vaughan Nelson, he also listed topics for the Committee's upcoming meeting, including "[u]se of lower cost share classes."  JX-106.  Mercer followed up ten days later by sharing with Karazia an analysis of the Plan's share classes.

By that August, Mercer had sent Karazia its report on potential Delafield replacements.  The report presented three options: the Transamerica Mid Cap Value Opportunities Fund; the WEDGE Mid Cap Value CIT; and the Vaughan Nelson Value Opportunities Fund.  The report showed that, between WEDGE and Vaughan Nelson, Vaughan Nelson had the better performance over the first quarter of 2015, but WEDGE slightly outperformed Vaughan Nelson over the prior one year, three years, five years, and seven years.  JX-109A at 37.

On August 13, 2015, Karazia forwarded the report to the other Committee members. Karazia noted that neither the WEDGE fund nor the Vaughan Nelson fund was on the Schwab platform participants used to invest in Plan options and that it could take several weeks for Schwab to add either.[10]  Regarding the proposed share-class changes, Karazia noted, "[o]ur goal is to make all the fund changes (including a possible Delafield change) at the same time."  JX-109.  Twelve minutes later, Gross responded with a vote in favor of Vaughan Nelson.  Two days later, Wilkinson concurred.  While acknowledging WEDGE had a lower fee and slightly better performance, Wilkinson opined that "the value of knowing better what [Vaughan Nelson] is doing gives it an edge over . . . WEDGE."  JX-179 at 1.  Three days after that, Plunkett—Natixis's general counsel as well as a Committee member—responded that he wanted Mercer's perspective on the Committee's legal obligations regarding the selection.  On September 9, 2015, at a specially convened conference-call meeting of the Committee, its members voted to replace Delafield with Vaughan Nelson.

Yet the change to Vaughan Nelson took over two years.  Two days after the Committee meeting, on September 11, one of Karazia's subordinates emailed Natixis's Schwab contact, copying Karazia, to inform Schwab that the Committee had decided to remove Delafield and add Vaughan Nelson to the Plan.  The next week, on September 17, the Schwab representative responded, laying out what the process for the swap-out and the nine share-class changes would be once the latter were approved by the Committee.

On October 1, the Schwab representative reached back out to confirm that eight out of the nine share classes were available on Schwab's platform.  The last, Vaughan Nelson, would be on the platform by November 6.  After that, Schwab would stand ready to make the changes once it

---

[10] "Schwab" is short for Schwab Retirement Plan Services, Inc., the Plan's recordkeeper.

received certain documents from Natixis. With seemingly no response, the Schwab representative emailed again on October 15 to confirm that the Plan changes could be made effective by mid-January 2016 and that Schwab was still waiting on documents from Natixis. Karazia separately confirmed with her subordinate the next day that those documents were being reviewed by Mercer. Then, on October 27, the Schwab representative informed the Karazia subordinate that Vaughan Nelson was now available on the Schwab platform and reaffirmed that Schwab still needed documents from Natixis to carry out the changes.

Two months later, on January 20, 2016, Karazia received another email from Schwab about the outstanding documents. Similarly, on March 1, a Mercer consultant emailed Karazia to note that Schwab had been waiting on Natixis's documents to begin the implementation process. Finally, on May 17, Karazia sent an email to the Schwab representative to say that the documents were ready, but Mercer needed to review them with the Committee's ERISA counsel, David Guadagnoli, first. On June 20, the Committee held a meeting. The next day, Karazia emailed Grant, noting that the Committee had discussed ten changes at the meeting, with the removal of Delafield being one. Karazia asked whether "there was a mapping recommendation on the Delafield Fund?" She also asked Grant to check whether the Plan met the minimum investment requirement for the share classes the Committee planned to use.

Four months went by. In October 2016, a Schwab representative again emailed Karazia about getting the necessary documents to complete the planned changes. On November 28, though, Guadagnoli shared with Karazia a memo, which concluded that the Plan would violate ERISA if the Committee were to go forward with its planned share-class changes. Two days later, on November 30, the Committee met to discuss, inter alia, Guadagnoli's conclusion.

At the same time, the Committee began considering another change to the Plan. Until then, the Plan had used a revenue-sharing system to pay the fees that Plan funds charged, meaning Plan participants shouldered some of the costs. But, as a Mercer consultant informed Karazia on December 19, 2016, Schwab had recently developed the ability to credit revenue shares back into participants' accounts. As a result, on December 27, the Committee sent a memo to Plan participants explaining that, effective January 1, 2017, Natixis would be paying all Plan costs.

But the Committee was not yet ready to move forward on the share-class changes or the Delafield-for-Vaughan-Nelson swap. On January 18, 2017, Karazia asked Mercer for help with the share-class changes, and Mercer responded on January 27 that it was reevaluating what share class the Vaughan Nelson fund should be when added to the Plan. On March 15, Karazia emailed Guadagnoli saying that she had asked Mercer to pull together a comprehensive table of share classes. Based on Mercer's analysis, Karazia said, there would be few changes, and the Committee was ready to move forward, pending Mercer's follow-up.

Mercer did follow up on March 23, suggesting that the Committee reconsider its decision to map assets from Delafield to Vaughan Nelson, noting that Vaughan Nelson's "performance has been difficult." JX-130. Karazia forwarded that email to Guadagnoli but could not recall sharing it with the other Committee members. Guadagnoli responded, noting some concern about the performance of Vaughan Nelson that had not previously been discussed by the Committee. But on April 1, Mercer confirmed its recommendation to replace Delafield with Vaughan Nelson.

Six months later, implementation of the changes began. On October 19, 2017, Karazia emailed Natixis's Schwab representative to authorize two changes: (1) replacing Delafield with

Vaughan Nelson; and (2) changing the share class of one unrelated fund on the Plan.  A week later, Schwab confirmed that the two changes would take effect January 8, 2018.  As promised, Vaughan Nelson took Delafield's place on the Plan menu that January, with all Plan assets invested in Delafield transferred to Vaughan Nelson.

　　　　　3.　*Gateway Fund*

The Gateway Fund was added to the Plan before the Class Period, in July of 2008. Waldner invested some portion of his Plan assets in Gateway.

Gateway is an actively managed, proprietary fund offered by Natixis affiliate Gateway Investment Advisers, Inc.  It seeks to garner returns close to those of the equity market but with less risk by essentially buying insurance against large negative returns, giving up a claim on large positive returns in the process.  Gateway can be classified as an alternative-investment option, and Mercer places it in Tier IV of the Plan menu.

At least through 2018—the last year for which the Court has evidence—Gateway was rarely included in defined-contribution-plan menus other than Natixis's.  For example, in 2016, out of 3,039 similarly sized defined-contribution plans, only four included Gateway on their plan menus.  For 2017, it was six out of 3,669, and for 2018, five out of 3,539.  On the other hand, Thompson Reuters ranked Gateway as the top "Alternative Equity Market Neutral" fund over the preceding five-year periods in 2017, 2018, and 2021.

The Committee's discussions around Gateway primarily focused on its benchmark.  At the start of the Class Period, Mercer used the S&P 500 index as a benchmark for Gateway's performance.  In June 2015, Mercer switched to using a benchmark comprised of 30% of the S&P 500 and 70% of the Barclays Bond Aggregate index as a benchmark.  Like Gateway, this benchmark was intended to capture most of the returns of the equity market (via the S&P 500) but with less risk (via the Barclays Bond Aggregate, bonds being less risky than equity).

In its first-quarter 2016 report, Mercer noted that Gateway had underperformed its benchmark over the prior one-, three-, five-, and ten-year periods.  As a result, Mercer recommended that "Natixis review [Gateway], at least putting it on the watch list, if not removing [it] from the Plan as part of the other planned fund changes."  JX-56 at 17.

At its next meeting, on June 20, 2016, the Committee discussed Mercer's recommendation.  However, the Committee concluded—and Mercer agreed—that the issue was not Gateway but its benchmark: the Barclays Bond Aggregate was not an appropriate constituent for Gateway's blended benchmark.  Because of this mismatch, the Committee decided not to place Gateway on the Watch List.  The Committee also asked Mercer to look into alternative benchmarks, including one referred to as the Morningstar Option-Writing Composite.[11]

Based on that request, in August 2016, a Mercer consultant emailed Karazia recommending a new benchmark for Gateway.  Mercer recommended against the Morningstar benchmark and instead suggested using a blend composed 30% of the S&P 500 and 70% of the U.S. Treasury Bills index.  This new benchmark would, according to Mercer, match Gateway's strategy.  Mercer further recommended keeping the 30% S&P 500 / 70% Barclays Aggregate benchmark in order to allow the Committee to compare Gateway against "conservative multi-asset class options."  JX-118.

The Committee evidently agreed with Mercer's recommendation.  In its next report, for the second quarter of 2016, Mercer used both the new 30% S&P 500 / 70 % U.S. Treasury Bill benchmark and the old 30% S&P 500 / 70% Barclays Aggregate.  While Gateway's returns were

---

[11] The Committee also checked how many Plan participants, out of the 203 who had invested any amount in Gateway, had invested their full accounts in the fund.  That number was two.

higher than the new benchmark's over the preceding three-month and one-, three-, five-, and ten-year periods, they still lagged behind the old benchmark's returns over each of those periods.

The Committee did not revisit Gateway's benchmark again until 2022.  In its fourth-quarter report that year, Mercer provided an analysis of Gateway against four benchmarks: the 30% S&P 500 / 70% U.S. Treasury Bill blend; the 30% S&P 500 / 70% Barclays Aggregate blend; and two new blended benchmarks, one of 35% S&P 500 / 65 % Barclays Aggregate and one of 35% S&P 500 / 65% Bloomberg Aggregate.  Grant presented these four benchmarks at the Committee's next meeting in March 2023, and, after some discussion, the Committee opted to use the two new blended benchmarks going forward.

### 4.    *Oakmark Equity & Income Fund*

The Oakmark Equity & Income Fund ("Oakmark E&I") has been on the Plan menu for the entire Class Period.  Waldner did not invest any of his Plan assets in Oakmark E&I.

Oakmark E&I is a Tier III, actively managed fund offered by Natixis affiliate Harris Associates.  It is a "balanced fund," in that it invests in a relatively even mix of equity and fixed-income products.

This approach is similar to that of the Vanguard TDFs.  However, where Oakmark E&I offers an allocation between equity and fixed income that remains static, a TDF changes that allocation over time: when the target date is far off and a participant's assets are not needed, the TDF slants toward the higher-risk, higher-return equity market; as the target date approaches and a participant's appetite for risk falls, the TDF tilts in the fixed-income direction to protect the assets invested and earned.

In its 2021 Investment Structure Review, Mercer recognized that Oakmark E&I's strategy overlapped with the Vanguard TDFs.  The review noted a recent trend of defined-contribution plans replacing their balanced fund options with TDFs.  As a result, at its March

31

2021 meeting, the Committee asked Mercer to conduct additional research on the demographics of Plan participants invested in Oakmark E&I. Mercer's next quarterly report, for the first quarter of 2021, thus provided a comparison of participants' asset allocations in Oakmark E&I versus the Vanguard TDFs. The comparison showed that most Plan participants who were invested in Oakmark E&I seemed to be using the fund correctly. Based on their ages, that is, if they invested in a Vanguard TDF, it would likely have a composition of equity and fixed income similar to that of Oakmark E&I.

Committee members also discussed Oakmark E&I outside of meetings. On May 27, 2021, St. Germain—then an invitee to Committee meetings as a Natixis human-resources officer—emailed Committee member Cove—then the Senior Vice President of Investment Product Management and Operations—asking for a follow-up demographic analysis. The Committee's hunch: that most of the Plan assets invested in Oakmark E&I were "legacy assets," left in by participants who were no longer investing new assets in Oakmark E&I. JX-160 at 2. But Cove's analysis contradicted that hypothesis, as most participants in Oakmark E&I were still actively investing in the fund. St. Germain took Cove's analysis and shared it with then-Committee chair O'Neill, Mercer consultant Grant, and outside ERISA counsel Guadagnoli. In response, Guadagnoli suggested it would be fine to keep Oakmark E&I on the Plan so long as its performance stood up well against other balanced funds. Grant was more measured, noting that participant usage could be a basis for keeping the fund, though it should be a secondary consideration to performance.

At the next meeting, on June 3, 2021, the Committee discussed Mercer's and Cove's analyses. The meeting minutes are sparse on this subject, but, ultimately, the Committee decided to maintain Oakmark E&I as a Plan option in addition to the Vanguard TDFs.

5.    *Oakmark Select Fund*

The Oakmark Fund ("Oakmark") and the Oakmark Select Fund ("Oakmark Select") are two additional actively managed funds offered by Natixis affiliate Harris Associates. The two funds pursue a similar strategy of investing in undervalued large-cap equities. Indeed, Oakmark Select is largely a more concentrated version of Oakmark, investing primarily in a subset of the equities in which Oakmark invests. For example, in 2021, 82.8% of Oakmark Select holdings overlapped with Oakmark holdings. The idea, in the words of Committee member Wilkinson, is that Oakmark Select is the "best ideas" of Harris Associates. Doc. No. 241 at 24:17. Waldner invested in neither fund during his time as a Plan participant.

Both Oakmark and Oakmark Select were added to the Plan menu well before the Class Period began. As early as 2010, though, Mercer recommended that the Committee evaluate the need for both Oakmark and Oakmark Select on the Plan menu. Instead, Mercer suggested removing Oakmark Select and moving any Plan assets in Oakmark Select over to Oakmark. The Committee did not act on Mercer's advice at that time.

The first rumblings in the Class Period came in 2016. That year, in its second-quarter report, Mercer rated both funds as "A(T)"—a rating they would retain for the entire Class Period. The report also noted "the potential for another investment misstep," especially for Oakmark Select given its more concentrated approach. At that time, Oakmark Select invested in only approximately twenty stocks. The report did not recommend that the Committee take any specific action with respect to either Oakmark or Oakmark Select.

By 2018, though, that changed. In its first-quarter 2018 report, Mercer recommended adding Oakmark Select to the Committee's Watch List. It did the same in the second quarter, and in the third quarter, Mercer recommended both Oakmark and Oakmark Select be put on the

Watch List.  However, the Committee did not meet that year until December 19.  At that point, the Committee acted on Mercer's recommendations and placed both funds on the Watch List.

In its next quarterly report, for the fourth quarter of 2018, Mercer advised that both funds' "high tracking error and susceptibility to volatile markets should be assessed in the context of appropriateness for the Plan."  JX-67 at 26–27.  Mercer noted that Oakmark Select had been added to the Watch List due to underperformance and that it had continued to underperform during the fourth quarter.  Oakmark similarly underperformed its benchmark in the fourth quarter.  At the following meeting, on March 5, 2019, Mercer consultant Grant recommended that the Committee consider removing Oakmark Select from the Plan menu.  But he also suggested the Committee defer any action until after Mercer met with the team behind Oakmark Select at Harris Associates.  As a result, the Committee voted to keep both Oakmark and Oakmark Select on the Watch List.

The Committee discussed Oakmark and Oakmark Select at its next two meetings, in September and December of 2019, as well.  Both times, the Committee chose to keep the two funds on the Watch List.  At the February 2020 meeting, Mercer reported, first, that Oakmark and Oakmark Select had experienced performance recoveries in the last quarter of 2019 and, second, that Mercer's research team had evaluated the funds favorably.  The Committee directed Mercer to conduct an analysis of whether Oakmark Select was more closely correlated to Oakmark or to the S&P 500 index in order to inform where to map Plan assets if Oakmark Select were removed from the Plan.

In its report for the second quarter of 2020, Mercer recommended removing Oakmark Select from the Plan and mapping its assets to Oakmark.  At the very next meeting, on

September 23, 2020, the Committee voted to enact that recommendation, moving $14 million in Plan assets from Oakmark Select to Oakmark. That move was completed by January of 2021.

6. *Other Funds*

Although Plaintiffs do not seek damages with respect to any but the above At-Issue Funds, the Court briefly summarizes events surrounding a few other relevant funds here.

In addition to ASG, Delafield, and Oakmark Select, the Committee removed two other funds from the Plan menu during the Class Period. First, the Committee removed the Reich & Tang Daily Income Money Market Fund from the Plan on July 24, 2015. This was an actively managed, proprietary fund that was undergoing liquidation in 2015. It was replaced by the Vanguard Prime Money Market Fund, an actively managed, non-proprietary fund recommended by Mercer as one of two options for the replacement.

Second, the Committee removed the AEW Real Estate Fund from the Plan on October 15, 2020. This was a Tier IV, actively managed fund offered by Natixis affiliate AEW, investing in real estate investment trusts ("REITs"). At the start of the Class Period, AEW Real Estate focused solely on U.S.-registered REITs (though those REITs could have included foreign assets). The Committee put AEW Real Estate on the Watch List in November 2017 due to a change in the fund's management team. In June 2019, the fund changed its mandate from a focus on purely U.S.-registered REITs to a mix of American, European, and Asian REITs. At its next meeting, in September 2019, the Committee discussed AEW Real Estate's management-team changes, some recent underperformance, and the shift in its mandate. The Committee then agreed to review alternatives to the fund. Following the Committee's agreement, Mercer conducted a search and presented at the next meeting in December a short list of eight replacement candidates across three categories: actively managed, U.S.-focused real estate funds; passively managed, U.S.-focused real estate funds; and global-focused real estate funds. One of

35

those funds was the AEW Global Property Trust Fund, another Tier IV, actively managed fund from Natixis affiliate AEW that focused on global real estate.  Based on Mercer's presentation, the Committee selected AEW Global Property as one of two finalists for the Plan menu—along with a fund from an unaffiliated firm, Principal.  The Committee invited representatives from the two finalist funds to attend their February 2020 meeting for interviews.  Afterward, the Committee voted to replace AEW Real Estate with AEW Global Property.

The Committee also added seven funds to the Plan menu during the Class Period.  These include two non-proprietary funds and five proprietary funds.  On the non-proprietary end, the Committee added the Vanguard Prime Money Market Fund to replace the proprietary Reich & Tang fund in July 2015, as mentioned.  It also added the State Street Russell Small/Mid Cap Index Fund in September 2019 after Mercer recommended filling a gap on the Plan menu in the passively managed, small/mid-cap equity space.  Neither Natixis nor any of its affiliates offered a small/mid-cap equity index fund.

As to the proprietary additions, Vaughan Nelson replaced Delafield and AEW Global Property replaced AEW Real Estate, as explained above.  The Committee also added the Mirova Global Sustainable Equity Fund ("Mirova") to the Plan in September 2019.  Mirova is an actively managed, proprietary fund in Tier III that uses an environmental, social, and governance strategy ("ESG") and began operating in 2016.  Shortly after a Natixis salesman and Plan participant asked Committee member Gross about getting Mirova added to the Plan in November 2017, the Committee asked Mercer to look into potential ESG additions to the Plan, including Mirova.  Ultimately, Mercer presented three ESG candidates, and the Committee invited the client portfolio managers of two—Mirova and a non-proprietary fund—to present at its March 2019 meeting.  At the end of that meeting, the Committee voted to add Mirova to the Plan.  After

36

that vote but before the addition had been put into effect, another Natixis salesman and Plan participant emailed Committee member O'Neill about the urgency of getting Mirova on the Plan due to its declining seed money.  Two months later, Mirova's addition became effective.

The Committee later added two funds from Natixis affiliate WCM.  In July 2019, Natixis acquired a 24.9% stake in WCM.  That December, a Natixis salesperson and Plan participant emailed Committee member O'Neill about adding the WCM Focused Emerging Markets Fund ("WCM Emerging Markets") to the Plan.  In September 2020, O'Neill asked Mercer to evaluate WCM Emerging Markets and the WCM Focused International Growth Fund ("WCM International") for the Plan.  After WCM announced, in October 2021, that WCM International would be closing to new investors at the end of November 2021, the Committee fast-tracked consideration of WCM International.  At a special meeting on October 19, the Committee voted to add WCM International to the Plan over three other international funds.  At its next regularly scheduled meeting in November, the Committee voted to add an emerging-markets fund to the Plan and decided to invite managers from three funds, including WCM Emerging Markets, to the next meeting.  After hearing from those fund managers in its March 2022 meeting, the Committee opted for WCM Emerging Markets.  Thus, both WCM International and WCM Emerging Markets were added to the Plan.

The Committee also sought to add two other funds just before and during the Class Period.  First, in December 2012, the Committee asked Mercer to evaluate the Aurora Horizons Fund for the Plan.  Aurora, a Natixis affiliate, had just opened the Horizons Fund with a unique daily-traded hedge-fund strategy.  But in October 2014, Mercer recommended against adding the

Horizons Fund to the Plan, and the Committee agreed.[12]  Second, the Committee sought to add the Natixis Sustainable Future TDF, another proprietary ESG fund for which Committee member Marina Gross later became Co-Portfolio Manager in 2018.  A Natixis salesman and Plan participant asked the Committee to consider the Sustainable Future TDF for the Plan on February 27, 2017, one day before it officially launched on February 28, 2017.  Karazia asked Mercer to evaluate the fund for the Plan on March 1, 2017.  That October, though, Mercer recommended against adding the Sustainable Future TDF to the Plan, and the Committee followed that recommendation.  In 2020, in response to another participant request, Gross prodded O'Neill about the Sustainable Future TDF, O'Neill asked Mercer to evaluate it for the Plan again, Mercer again recommended against adding it, and the Committee again agreed not to add it.  Gross seems to have pushed the Committee to reconsider in 2021, but as of trial, the Sustainable Future TDF had not been added to the Plan menu.

The Committee made no other changes to the Plan menu during the Class Period.

V.    DEFENDANTS' MOTION TO DECERTIFY AND DISMISS AS TO DELAFIELD FUND CLAIM

Before reaching the merits of Plaintiffs' claims, the Court must resolve the motion filed by Defendants during trial.  That motion asks the Court to: (1) "decertify that portion of the Class . . . that relates to Plaintiff's claim regarding the implementation of the decision to remove the Delafield Fund"; and (2) "dismiss that Delafield claim for lack of standing" pursuant to Federal Rule of Civil Procedure 12(b)(1).  Doc. No. 231 at 1.  In essence, Defendants argue that Waldner did not invest in the Delafield Fund, so the alleged breach of fiduciary duty with respect to the Delafield Fund did not harm Waldner or otherwise derive from a course of conduct that harmed

---

[12] The events surrounding the Horizons Fund occurred entirely before the Class Period and so cannot support a finding of liability.  Nevertheless, the Court considers them here for context.

Waldner.  As a result, Defendants say, the Class must be decertified as to the Delafield claim because Waldner fails the typicality and adequacy-of-representation requirements for a named plaintiff of a class.  And Waldner's claim as to Delafield must then be dismissed, Defendants argue, because Waldner lacks standing to pursue that claim as an individual litigant.  As explained below, however, Defendants are incorrect on both arguments.  Their motion is therefore DENIED.

      A.   <u>Motion to Decertify</u>

     Decertification is not warranted in this case.  Where a class has already been certified but is later found to fail Rule 23's requirements, the court may decertify the class at any time before final judgment.  <u>Baker v. Equity Residential Mgmt., L.L.C.</u>, 390 F. Supp. 3d 246, 259 (D. Mass. 2019); <u>see also</u> Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment.").  However, "[a] decision to decertify a previously certified class is not taken lightly" and "should only be done where defendants have met their heavy burden of proving the necessity of taking such a drastic step."  <u>Donovan v. Philip Morris USA, Inc.</u>, No. CIV.A. 06-12234-DJC, 2012 WL 957633, at *4 (D. Mass. Mar. 21, 2012) (quotations omitted).  "Doubts regarding the propriety of class certification should be resolved in favor of certification."  <u>Id.</u> (alteration in original) (quotations omitted).  Here, Defendants assert that Waldner, as the Class's representative, no longer satisfies the typicality and adequacy-of-representation requirements of Rule 23.

     Waldner's role as the named plaintiff does not raise a typicality issue.  Rule 23(a)(3) provides that class certification is appropriate only if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Generally, "[t]he representative plaintiff satisfies the typicality requirement when [his] injuries arise from the same events or course of conduct as do the injuries of the class and when plaintiff's claims and those

of the class are based on the same legal theory." In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008). This requirement is "not highly demanding because the claims only need to share the same essential characteristics, and need not be identical." Gonzalez v. XPO Last Mile, Inc., 579 F. Supp. 3d 252, 262 (D. Mass. 2022).

Waldner meets this low bar. Although Waldner never invested in Delafield, his claims arise from the same course of conduct as the claims of Class members that did invest in Delafield. His claims derive both from the Committee's alleged failure to monitor the performance of funds on the Plan menu and from the Committee's alleged disloyalty in selecting funds for that menu. While Plaintiffs' Delafield claim no longer relates to the Committee's alleged disloyalty due to this Court's summary-judgment ruling, it still arises from the Committee's allegedly imprudent monitoring of the Plan. For example, a central component of Waldner's claims is that the Committee failed to meet regularly. Plaintiffs' Delafield claim focuses on the Committee's delay in removing Delafield from the Plan after it made the decision to do so; that removal might have been executed more quickly had the Committee met more frequently in the interim. Granted, there are details unique to Plaintiffs' Delafield claim—the impact of other Plan changes at the time—but the overall legal theory is the same. See Boley v. Universal Health Servs., Inc., 36 F.4th 124, 134 (3d Cir. 2022) ("So long as the alleged cause of the injury remains the same across all funds, even relatively pronounced factual differences will generally not preclude a finding of typicality." (quotations omitted)); see also Glynn v. Me. Oxy-Acetylene Supply Co., No. 2:19-CV-00176-NT, 2020 WL 6528072, at *4 (D. Me. Nov. 5, 2020)

("The fact that the [complaint] contains additional specific allegations of misconduct against the named Plaintiffs does not destroy typicality.").[13]

Waldner is not an inadequate class representative, either. The adequacy requirement, embodied in Rule 23(a)(4), mandates that a class representative "fairly and adequately protect the interests of the class." This requires, foremost, "that the interests of the representative party will not conflict with the interests of any of the class members." Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985). But "[p]erfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable." Karth v. Keryx Biopharmaceuticals, Inc., 334 F.R.D. 7, 16 (D. Mass. 2019), aff'd, 6 F.4th 123 (1st Cir. 2021) (quotations omitted). That Waldner did not suffer an individual injury with respect to the Delafield Fund does not mean that he cannot adequately represent those who did. See Leber v. Citigroup 401(k) Plan Inv. Comm., 323 F.R.D. 145, 164 (S.D.N.Y. 2017) ("[E]ven though [named plaintiffs] only have a clear financial stake in proving the claims of class members who invested in [one fund], there is no fundamental conflict between their interests and those of class members who invested in other funds.").

Defendants have not met their burden on decertification. Waldner remains a typical plaintiff and an adequate representative, and the Court will not disturb its prior certification order.

B.    Motion to Dismiss

Defendants also seek partial dismissal on the ground that Waldner lacks standing to assert a claim with respect to the Delafield Fund. "[T]o establish standing, a plaintiff must show

---

[13] Defendants also argue that Waldner is atypical because, upon leaving Natixis, he signed a termination agreement that included a release of "any current or prior claims." DX-2196 at 3. Magistrate Judge Levenson and this Court already considered and rejected that contention. Doc. No. 110 at 34–36; Doc. No. 122. The Court will not revisit the issue here.

(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021).  A plaintiff must make this showing for "each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006).  And the threshold requirements of standing apply with equal force in the class-action setting: "[E]ven named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Lewis v. Casey, 518 U.S. 343, 357 (1996) (quotations omitted).

While the Court already found Waldner to have standing at the pleading stage, that does not end the inquiry.  For "each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992).  Still, "in order to establish standing, a plaintiff does not need to show that her rights have actually been abridged: such a requirement would conflate the issue of standing with the merits of the suit." Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 52 (1st Cir. 2014) (quotations omitted).  "Instead, a plaintiff need only show that she has a colorable claim to such a right." Id. (quotations omitted).

Here, Defendants urge that even if Waldner had standing to bring the Delafield claim at the pleading stage, the Court's summary-judgment ruling and the facts adduced at trial establish that Waldner has not suffered an injury-in-fact with respect to Delafield.  The Court disagrees.

That Waldner did not invest in Delafield does not mean he does not have standing. Indeed, "[a]lthough in certain types of matters courts have found that a plaintiff cannot suffer an

injury from an investment that he or she did not purchase, courts have declined to apply the above bright-line rule when addressing ERISA claims for breach of fiduciary duties." Khan v. PTC, Inc., No. CV 20-11710-WGY, 2021 WL 1550929, at *2 (D. Mass. Apr. 20, 2021) (citation modified).  The key question is "whether the pleaded injury relates to the defendants' management of the Plan as a whole."  Id. (emphasis in original).  In other words, "for the purpose of constitutional standing, a plaintiff need not have invested in each fund at issue, but must merely plead an injury implicating defendants' fund management practices." Velazquez v. Mass. Fin. Servs. Co., 320 F. Supp. 3d 252, 257 (D. Mass. 2018).

Based on that standard, Waldner has standing individually as to the Delafield claim for much the same reason he still satisfies Rule 23(a)'s typicality and adequacy requirements. Waldner asserts an injury relating to the Committee's imprudent overall management of the Plan as a whole, and Plaintiffs' duty-of-prudence Delafield claim colorably arises under that wholesale theory.  Moreover, Plaintiffs adduced at trial sufficient evidence to support those theories for standing purposes.[14]  For example, Waldner has shown that the Committee failed to meet regularly, failed to review Mercer's reports on a quarterly basis, and failed to conduct a structural review of the Plan until 2021.  These facts go toward Plaintiffs' wholesale theory of breach of the duty of prudence.  See Khan, 2021 WL 1550929, at *3 (finding plaintiffs pled injury to plan as whole where plaintiffs alleged defendant "failed to investigate and select lower-cost alternative funds," "failed to utilize lower-cost share classes," "failed to utilize lower-cost passively managed and actively managed funds," and "failed to monitor and control the Plan's

---

[14] The Court expressed at trial its tentative view that this wholesale prudence theory failed on the merits, but that does not prevent the theory from supporting standing.  Merrimon, 758 F.3d at 52.

recordkeeping expenses").  With that, Waldner can bring the Delafield claim as part of Plaintiffs'
broader duty-of-prudence claims.

Waldner also has class standing.  Where an ERISA plaintiff represents a class, he "has
class standing if he alleges personal injury caused by the defendant and . . . such conduct
implicates the same set of concerns as the conduct alleged to have caused injury to other
members of the putative class by the same defendants."  In re Biogen, Inc. ERISA Litig., No. 20-
CV-11325-DJC, 2021 WL 3116331, at *3 (D. Mass. July 22, 2021).  In this case, the injuries
Waldner suffered from the funds in which he did invest implicate the same course of conduct as
Plaintiffs' Delafield claim for the reasons discussed above.  See Boley, 36 F.4th at 132 (finding
named plaintiff had standing as to claim that "relates to [defendant's] conduct regarding the
administration of the Plan as a whole, not specific funds").  In sum, Waldner retains standing to
bring the Delafield claim on behalf of the Plan and the Class.  Defendants' motion to decertify
and dismiss is DENIED.

VI.    CONCLUSIONS OF LAW

A.    Applicable Law

ERISA was enacted in 1974 to "protect . . . the interests of participants in employee
benefit plans and their beneficiaries."  29 U.S.C. § 1001(b).  The Plan falls within the ambit of
ERISA as an "employee pension benefit plan" under § 1002(2)(A) and a "defined contribution
plan" under § 1002(34).[15]

ERISA imposes on the fiduciaries of such plans two primary duties: a duty of loyalty and
a duty of prudence.  29 U.S.C. § 1104(a).  These duties are among "the highest known to the
law."  Moitoso v. FMR LLC, 451 F. Supp. 3d 198, 204 (D. Mass. 2020) (quoting Braden v. Wal-

---

[15] Unless otherwise indicated, all statutory citations in the text of this decision are to Title 29 of
the U.S. Code, which contains all relevant provisions of ERISA.

Mart Stores, Inc., 588 F.3d 585, 598 (8th Cir. 2009)).  In addition, where one fiduciary—such as Natixis—appoints a separate fiduciary—such as the Committee—the former also obtains another duty: a duty to monitor the appointed fiduciary.  See id. at 221.

ERISA provides to plan participants a private right of action for a breach of fiduciary duties.  29 U.S.C. § 1132(a)(1)(B).  In order to prevail on a claim for breach of an ERISA fiduciary duty, a plaintiff must prove: "(1) that defendants acted as the Plan['s] fiduciary; (2) that defendants breached their fiduciary duties; and (3) that the breach caused a loss to the Plan."  Sellers v. Trs. of Bos. Coll., 729 F. Supp. 3d 136, 148 (D. Mass. 2024).

The parties do not dispute the first element of Plaintiffs' ERISA claims, fiduciary status.  Natixis, as the "plan sponsor" with the ultimate authority to control and manage the operation and administration of the Plan, is both a "named fiduciary" under § 1102(a) and a functional fiduciary under § 1002(21)(A).  The Committee, as the appointed managing body of the Plan, is also a named fiduciary under § 1102(a)(2) and a functional fiduciary under § 1002(21)(A).

Under the second element, Plaintiffs must show a breach of either the duty of loyalty or the duty of prudence.  The duty of loyalty requires a fiduciary to act "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).  "[I]n reviewing ERISA duty of loyalty claims, we have asked whether the fiduciary's 'operative motive was to further its own interests.'"  Brotherston v. Putnam Invs., LLC, 907 F.3d 17, 40 (1st Cir. 2018).  "Accordingly, to succeed on a claim for breach of the duty of loyalty, a plaintiff needs to show that the fiduciary served an interest or obtained a benefit at the expense of the plan beneficiaries."  Ellis v. Fid. Mgmt. Tr. Co., 257 F. Supp. 3d 117, 126 (D. Mass. 2017), aff'd, 883 F.3d 1 (1st Cir. 2018); see also Vander Luitgaren v. Sun Life Assur. Co. of Can., 765 F.3d 59, 65 (1st Cir. 2014) ("What

[ERISA] does require is that the fiduciary not place its own interests ahead of those of the Plan beneficiary.").  However, "[i]t is not enough for a plaintiff to identify a potential conflict of interest"; rather, "the Court must take into account the fiduciary's subjective motivation in making a decision for the plan." Moitoso, 451 F. Supp. 3d at 204.

The duty of prudence, meanwhile, requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  This encompasses both a "duty to exercise prudence in selecting investments at the outset" and a "continuing duty to monitor trust investments and remove imprudent ones." Tibble v. Edison Int'l, 575 U.S. 523, 529 (2015); see also Hughes v. Nw. Univ., 595 U.S. 170, 176 (2022) ("[E]ven in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options.").  But "[w]hether a fiduciary's actions are prudent cannot be measured in hindsight." Barchock v. CVS Health Corp., 886 F.3d 43, 45 (1st Cir. 2018) (alteration in original) (quotation omitted).  Instead, "[t]he test of prudence—the Prudent Man Rule—is one of conduct, and not a test of the result of performance of the investment." Id. at 44–45 (alteration and emphasis in original) (quotations omitted).  "Therefore, to determine whether a fiduciary acted prudently, a court will evaluate conduct under the 'totality of the circumstances' and assess a fiduciary's procedures, methodology and thoroughness," focusing on "whether the fiduciary took into account all relevant information in performing its duties under ERISA." Sellers, 729 F. Supp. 3d at 149.

The third element of an ERISA claim has two parts: loss and causation.  Pursuant to 29 U.S.C. § 1109(a), a fiduciary that breaches its duty must "make good" to the plan for "any losses to the plan resulting from such breach."  A breaching fiduciary is liable for "the amount required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered."  Brotherston, 907 F.3d at 32 (alteration in original) (quoting Restatement (Third) of Trusts, § 100).  But loss in this context does not refer to an absolute loss.  Rather, it encompasses underperformance relative to comparable investment opportunities.  Brotherston, 907 F.3d at 34.  Generally, "[l]osses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio."  Evans v. Akers, 534 F.3d 65, 74 (1st Cir. 2008).  But the proper comparison depends on the underlying breach.  To establish loss, an ERISA plaintiff must "show a 'prudent alternative' or 'suitable benchmark' for which to compare the challenged investments against for purposes of calculating loss."  Sellers, 729 F. Supp. 3d at 186.  For each allegedly improper fund, then, Plaintiffs bear the burden of identifying a comparable fund that outperformed the improper Plan fund.  That is the loss part of the third element of their claims.

On the causation part of this element, though, Defendants bear the burden.  "[O]nce an ERISA plaintiff has shown a breach of fiduciary duty and loss to the plan, the burden shifts to the fiduciary to prove that such loss was not caused by its breach, that is, to prove that the resulting investment decision was objectively prudent."  Brotherston, 907 F.3d at 39.  "A fiduciary shows objective prudence when it provides evidence that a prudent fiduciary 'would' have rather than 'could' have made the same decision."  Sellers, 729 F. Supp. 3d at 178 (citing Tatum v. RJR Pension Inv. Comm., 761 F.3d 346, 365 (4th Cir. 2014)).  "'[C]ould' describes

what is merely possible, while 'would' describes what is probable." <u>Tatum</u>, 761 F.3d at 365.  As Magistrate Judge Levinson's report and recommendation on Defendants' summary-judgment motion nicely summarized, "objectively prudent" really means imprudent but lucky.  Doc. No. 193 at 11.  That is, objective prudence is shown where a defendant proves that, although it acted imprudently or disloyally and the selected funds underperformed relative to comparable funds, a fiduciary acting prudently or loyally—based on the information available at the time of the challenged decisions—would have selected the same funds or other funds that performed the same or worse than the selected funds.

In reviewing each of Plaintiffs' claims, therefore, the Court considers first whether Plaintiffs have proven a breach has occurred.  The Court then turns to whether Plaintiffs have shown that such breach resulted in the selection or retention of a fund that underperformed relative to comparators.  Finally, if Plaintiffs make those two showings, the Court examines whether Defendants have shown that even a prudent, loyal fiduciary, based on the information available at the time of decision, would have selected or retained the challenged fund or another fund that performed the same or worse.

B.    <u>Wholesale Theories</u>

As mentioned above, Plaintiffs set forth theories of breach relating to Defendants' management of the Plan as a whole and retail theories of breach relating to the At-Issue Funds specifically.  The Court considers Plaintiffs' wholesale theories first.

1.    *Duty of Loyalty*

Plaintiffs primarily assert that Defendants breached the duty of loyalty by employing an "inverted" process for managing the Plan.  Under this inverted process, Plaintiffs say, Defendants prioritized the business interests of Natixis over the interests of Plan participants, leading Defendants to select and retain proprietary funds that did not belong on the Plan menu.

In particular, Plaintiffs argue that Defendants sought to include at least one fund from each Natixis affiliate on the Plan menu.  The Court concludes that Defendants did not breach their duty of loyalty in the selection and retention of proprietary funds on the Plan generally.

Neither the Committee's makeup nor the Plan's menu inherently violated the duty of loyalty.  The Committee consisted entirely of officers of Natixis or its affiliates, and the Plan was predominantly comprised of proprietary funds, with eighteen out of the twenty-eight funds that appeared on the Plan over the course of the Class Period being proprietary.  But ERISA permits an employer or an officer of an employer to act as the fiduciary of a plan.  Pegram v. Herdrich, 530 U.S. 211, 225 (2000).  ERISA simply requires that "the fiduciary with two hats"—those of an employer and a committee member—"wear only one at a time, and wear the fiduciary hat when making fiduciary decisions."  Id.  Similarly, ERISA does not forbid a fiduciary from selecting proprietary funds for a plan.  See Moitoso, 451 F. Supp. 3d at 203 ("It is not enough for a plaintiff to identify a potential conflict of interest from the defendant's investment in its own proprietary funds.").  Indeed, "it is not disloyal as a matter of law to offer only proprietary funds."  Wildman, 362 F. Supp. 3d at 701 (emphasis added); see also Mattson v. Milliman, Inc., No. C22-0037 TSZ, 2024 WL 3024875, at *22 (W.D. Wash. June 17, 2024) ("Likewise, retaining proprietary investments—even if they underperform—without more, is not evidence of disloyalty.").  And the Committee did not offer only proprietary funds.  Notably, for example, the Tier I default fund and all the passive Tier II funds were non-proprietary.  The Court therefore must look to specific instances to determine whether Defendants took any actions with a subjective, disloyal motivation.  Brotherston, 907 F.3d at 40–41.

Plaintiffs have failed to show a disloyal motivation in the Committee's selection of funds. The Committee added seven funds to the Plan menu during the Class Period: two non-

proprietary and five proprietary.  The Committee also explored but ultimately decided against adding two other proprietary funds to the Plan either just before or during the Class Period.  Both non-proprietary additions—the Vanguard Prime Money Market Fund and the State Street Russell Small/Mid Cap Index Fund—were largely driven by Mercer.  In both cases, Mercer highlighted the need to replace an existing fund or fill a gap in the Plan menu, and the Committee, after some deliberation, agreed.  In one case, the non-proprietary fund was replacing a proprietary fund. The five proprietary additions were driven more by the Committee.  The same goes for the two proprietary funds considered but not added.  In almost all, the Committee asked Mercer to either evaluate a specific proprietary fund for the Plan or look into adding an option from the same space as a proprietary fund.  For example, shortly after Mirova launched, a Natixis salesman prodded the Committee about adding it to the Plan, and the Committee then asked Mercer to look at ESG funds, including Mirova.  In this way, the Committee seemed to drive the consideration of proprietary funds for the Plan menu, while Mercer seemed to initiate the consideration of non-proprietary funds.

This differential treatment of proprietary and non-proprietary funds could suggest a disloyal motivation.  See Fuller v. SunTrust Banks, Inc., No. 1:11-CV-784-ODE, 2019 WL 5448206, at *24 (N.D. Ga. Oct. 3, 2019) ("Defendants' differing treatment of the [proprietary fund] versus non-proprietary funds—and acknowledgement thereof—suggests Defendants may have prioritized benefitting [the plan sponsor] over benefitting plan participants."); Baird v. BlackRock Institutional Tr. Co., N.A., 403 F. Supp. 3d 765, 779–80 (N.D. Cal. 2019) (finding that defendants' patience with proprietary funds on plan watch list as compared to short leash with non-proprietary funds on watch list helped support inference of disloyalty at pleading stage).  It does not, however, lead inexorably to that conclusion.  The Court must consider not

only how funds came under consideration for the Plan but also the processes used once they were being considered.

The processes for evaluating funds for the Plan do not support a finding of disloyalty. In most cases where a fund was under consideration—whether proprietary or not—the Committee followed a similar process: it asked Mercer to evaluate multiple options, rather than a single fund; it received a report from Mercer on its options; it discussed that report in at least one meeting; it narrowed its options down to two or three finalists, inviting personnel from those finalists to present at a Committee meeting; and it then selected from those finalists a fund for addition to the Plan. The Committee never selected an underperforming proprietary fund. Instead, when it did select a proprietary fund, it was one of the top-performing funds presented by Mercer. This is not the process of a Committee seeking to sneak proprietary funds onto the menu (or, for that matter, making disloyal decisions to retain proprietary funds). Cf. Fuller, 2019 WL 5448206, at *24 (finding sufficient evidence of disloyalty at summary judgment where fiduciary used different processes for evaluating proprietary funds on plan watch list as opposed to non-proprietary funds).

Take, for example, the replacement of AEW Real Estate with AEW Global Properties. First, the Committee decided to remove the proprietary AEW Real Estate. Then it asked Mercer to recommend replacement options. Mercer presented eight, from which the Committee chose two finalists to be interviewed at the following meeting. One finalist was a non-proprietary fund, while the other was the proprietary AEW Global Properties fund. From those finalists, the Committee selected AEW Global Properties. There is no evidence that the Committee asked Mercer to include AEW Global Properties in its recommendations or that the Committee otherwise tilted the playing field toward AEW. True, AEW Global Properties is a globally

51

focused fund, and one impetus for the Committee's decision to remove AEW Real Estate was its shift from a U.S. focus to a global focus. But the Committee also dumped AEW Real Estate due to underperformance, an issue not clearly presented by AEW Global Properties. Moreover, the Committee discussed AEW Real Estate's replacement across several meetings, considered both U.S.-focused and globally focused options, and ultimately concluded that a globally focused fund best fit the Plan after all. Without more, that process shows not disloyalty but deliberation.

One addition that did not follow this process was WCM International. The Committee seemingly fast-tracked WCM International's addition because the fund was about to close to new investors. The quick consideration of WCM International—alongside three other international candidates—does not indicate the Committee sought to add the fund only because it was offered by a Natixis affiliate, though. The Committee simply sought to ensure it had the opportunity to add WCM International before it was too late. Without more, that does not rise to the level of disloyalty. It also counts in Defendants' favor that, when Mercer recommended against adding a proprietary fund, as with the Aurora Horizons Fund and the Natixis Sustainable Future TDF, the Committee listened. See Wildman, 362 F. Supp. 3d at 702 ("Plan participants also continuously requested different [proprietary] funds to be added to the lineup, but the Committee did not act to add proprietary funds at every opportunity, something they would have done if they were motivated by acting in [the plan sponsor's] interests and not the Plan participants'." (footnote omitted)).

Even if the Committee had an incentive to choose proprietary funds, it was at best a marginal incentive. Obviously, Natixis benefits by having proprietary funds on the Plan. It increases the assets under management for Natixis and its affiliates, and it allows Natixis sales associates to tell customers—including other retirement plans—that Natixis has so much

confidence in its funds it puts them on its own plan.  Nevertheless, the amount of money in the

Plan as a percentage of assets under management by Natixis has been tiny throughout the Class

Period: through 2022, the Plan held at most $470 million, while Natixis managed, at its lowest,

$870.3 billion, meaning the Plan could never account for more than 0.054% of Natixis's assets

under management even if all participants invested only in proprietary funds.  See Wildman, 362

F. Supp. 3d at 702 (finding "no particular incentive" to add proprietary funds where plan

investments in proprietary funds were only 0.35% of defendant's assets under management).  As

for the sales theory, it is an interesting rationale unsupported by any evidence.  Plaintiffs offered

no proof that Natixis actually touted the use of its funds on the Plan.  Instead, the only evidence

to that effect was an online article posted by Natixis affiliate Harris Associates on March 9,

2016, entitled, "The Case for Eating Your Own Cooking."  PX-1151.  That article bragged that

Harris Associates employees invested in the firm's own funds.  This carries little weight here,

however, as Harris Associates employees were not included in the Plan.

Moreover, each Committee member to testify credibly stated that he or she did not

personally receive financial incentives for putting proprietary funds on the Plan.  Any other

benefits to Natixis were not proven.  For instance, while a Natixis sales associate did email

Committee chair O'Neill about getting Mirova onto the Plan menu before its seed money ran out,

that email came after the Committee had already followed a deliberative process and voted to

add Mirova to the Plan.  The email therefore does not prove that the Committee had Mirova's

seed money in mind when voting to add it to the Plan.  No other evidence suggests the

Committee knew anything of this issue at the time of its vote.

And the evidence that Natixis executives not on the Committee pushed for the addition of

proprietary funds is limited.  For example, in October 2017, when the Committee, upon Mercer's

recommendation, voted not to add the Natixis Sustainable Future TDF to the Plan, Natixis CEO

David Guinta responded: "Disappointed, but understandable."  JX-255.  Even when Gross, who

served on the Committee and as Co-Portfolio Manager of the Sustainable Future TDF, pushed

for the fund's inclusion, the Committee voted against it.  These circumstances do not suggest that

Committee members were swayed by pressure to add proprietary funds.

Finally, the assumption underlying Plaintiffs' wholesale loyalty theory—that the

Committee wanted to have at least one fund from each Natixis affiliate on the Plan menu—is a

shaky one.  There is no direct evidence of such a motivation, and circumstantial evidence

suggests otherwise.  For example, in 2015, before the Committee voted to replace the Delafield

Fund with the Vaughan Nelson Value Opportunities Fund, the Plan included no funds from

Vaughan Nelson, a Natixis affiliate.  If the Committee were disloyally motivated, it presumably

would have expedited the Vaughan Nelson fund's addition.  Instead, the Committee delayed

swapping out the by-then-unaffiliated Delafield Fund for the proprietary Vaughan Nelson fund

for over two years.  This is hardly the conduct of a Committee disloyally seeking to assure every

affiliate had a fund on the Plan.

There is one other problem with Plaintiffs' case, at least in regards to the selection of

funds for the Plan: Plaintiffs do not seek damages for any fund added to the Plan during the Class

Period.  The five At-Issue Funds were all on the Plan menu at the start of the Class Period.

Plaintiffs only seek damages for the retention of those five funds.  Even if the Committee had

been disloyal in its selection of funds for the Plan during the Class Period, then, Plaintiffs'

wholesale duty-of-loyalty claim would still fail, at least as to the selection of Plan funds.

Plaintiffs' wholesale theory runs into a similar problem when it comes to the retention of

proprietary funds.  Even if the Court were persuaded that the Committee acted disloyally and that

disloyalty infected the entire Plan menu, Plaintiffs have waived damages with respect to all but the five At-Issue Funds. For that reason, the Court will consider whether the Committee breached its duty of loyalty in the retention of funds below, when it reaches Plaintiffs' retail theory and dissects the five At-Issue Funds individually. However, Plaintiffs have failed to prove liability on their wholesale theory of breach of the duty of loyalty.

Certainly, there was a prevalence of proprietary funds on the Plan. But three factors convince the Court this was not the result of improper motives. First, a vocal contingent of Plan participants wanted proprietary funds on the Plan. On several occasions, Natixis employees asked Committee members about adding specific proprietary funds to the Plan. The Committee was entitled to take these requests into account. It could not lean on them entirely, but it could consider them. See 29 C.F.R. § 2550.404a-1(c)(3) ("The plan fiduciary of a participant-directed individual account plan does not violate the duty of loyalty . . . solely because the fiduciary takes into account participants' preferences in a manner consistent with the requirements of [the duty of prudence]."); but see Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. 409, 421 (2014) (explaining requirement that ERISA fiduciary act with exclusive purpose of providing benefits to plan participants "must be understood to refer to the sort of financial benefits (such as retirement income) that trustees who manage investments typically seek to secure for the trust's beneficiaries," not "nonpecuniary benefits" (emphasis in original)). Here, the Committee did not force the requested funds onto the Plan menu; rather, each time, it asked Mercer to evaluate the requested fund in comparison to non-proprietary funds in the same sector, and it proceeded further only if Mercer recommended doing so. Cf. Tussey v. ABB, Inc., 850 F.3d 951, 957 (8th Cir. 2017) (affirming finding of breach of duty of loyalty based, in part, on fiduciaries' failure to consider alternatives before making decision that benefited themselves).

Second, Committee members believed that Natixis-affiliated funds were the best funds and that adding those funds to the Plan menu was in the best interests of Plan participants. See Mattson, 2024 WL 3024875, at *22 (finding no disloyalty where defendants kept proprietary funds on plan "because they genuinely believed that continuing to offer the [proprietary funds] served the best interests of the Plan participants, as opposed to those of" defendants). This belief does not constitute disloyal motivation, so long as the Committee members acted with the purpose of benefiting participants. See Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 6 (1st Cir. 2018) (holding that fiduciary is not disloyal "merely because it took action aimed at furthering an objective it shared with the beneficiaries"). On the one hand, the Committee often did not even consider a sector of funds until Natixis or its affiliates had an offering in that space. For example, the Committee did not look to add an ESG fund to the Plan until the Natixis Sustainable Future TDF and Mirova Global Sustainable Equity Fund launched. On the other hand, once it became interested in a sector in this way, the Committee considered non-proprietary funds and, ultimately, added a proprietary fund only if Mercer recommended it. For instance, when the Committee asked Mercer to evaluate the Sustainable Future TDF for the Plan, Mercer recommended against adding the fund, and the Committee dropped it. The Committee did not drop the subject of ESG, though. Instead, shortly thereafter, it asked Mercer to conduct a broader review of ESG options, including Mirova. The Committee added Mirova only after Mercer recommended it for the Plan. Additionally, the Committee's belief in proprietary funds did not prevent it from adding non-proprietary funds. When Mercer identified a gap in the Plan's Tier II offerings, for instance, the Committee added the non-proprietary State Street Russell Small/Mid Cap Index Fund. All of this demonstrates that the Committee was not simply

serving Natixis's interests but was rather considering the best interests of Plan participants in determining whether to add, retain, or remove funds from the menu.

Third, there has been an array of non-proprietary funds on the Plan menu throughout the Class Period. These include the default Vanguard TDFs in Tier I, passively managed funds in Tier II, and actively managed funds in Tier III. Only Tier IV has featured no non-proprietary funds. Any participant who does not want to self-allocate is automatically put into a non-proprietary Vanguard TDF. A participant who wants some control but would rather stick to index funds has the pick of non-proprietary options. Even participants who seek to beat the market can invest in non-proprietary Tier III options. Thus, the Plan allows most participants to avoid proprietary funds entirely. This structure does not evince a Committee bent on forcing participants to prop up Natixis-affiliated funds. Cf. Baker v. John Hancock Life Ins. Co. (U.S.A.), No. 1:20-CV-10397-GAO, 2020 WL 8575183, at *1 (D. Mass. July 23, 2020) (finding breach-of-duty-of-loyalty claim survived at pleading stage where plaintiffs alleged defendants only selected and offered proprietary funds as plan options).

Considering the totality of the evidence, Plaintiffs have failed to prove a breach of the duty of loyalty on their wholesale theory. The Committee was not disloyal in its selection, retention, or removal of funds from the Plan menu.

### 2. *Duty of Prudence*

Plaintiffs' other wholesale theory asserts that Defendants breached the duty of prudence by failing to properly monitor and review the Plan's makeup. Plaintiffs point to a scattershot of Committee failings to support this theory. In the end, the Court does not find that any overall mismanagement by the Committee amounted to a breach of the duty of prudence.

Prudent procedures include "appointing an independent fiduciary, seeking outside legal and financial expertise, holding meetings to ensure fiduciary oversight of the investment

decision, and continuing to monitor and receive regular updates on the investment's performance." Tatum, 761 F.3d at 358.  These procedures are not a "uniform checklist," but rather indicators that a fiduciary is "engag[ing] in a reasoned decision-making process, consistent with that of a prudent man acting in a like capacity."  Id. (citation modified).

The Committee showed prudence in several ways.  Though Natixis did not appoint an independent fiduciary to manage the Plan, the Committee did seek outside legal and financial expertise.  The Committee took advice from Mercer as its independent financial consultant regularly throughout the entire Class Period.  For example, Mercer provided the Committee with quarterly reports on the performance of all funds on the Plan, and where the Committee was considering adding a fund to the Plan, it asked Mercer to perform an evaluation and suggest multiple options for addition.  Moreover, beginning in June 2016, the Committee retained independent ERISA counsel from Sullivan & Worcester, led by David Guadagnoli, an experienced lawyer qualified for the task.  Shortly thereafter, in November 2017, the Committee received training in its fiduciary duties from Guadagnoli; he led two more trainings in December 2019 and September 2024.  The Committee consulted Guadagnoli in drafting its IPS and in making changes to the share classes of several funds on the Plan to ensure it was complying with ERISA.  Every Committee meeting also included at least one representative from Mercer and one from Sullivan & Worcester.  But see Sellers, 729 F. Supp. 3d at 162 ("[W]hile hiring an advisor and having a review process for investments can be evidence of prudence, the presence of a review process and an independent investment advisor does not have a talismanic effect." (quotations omitted)).

On the other hand, the Committee met sparsely for the first four years of the Class Period, twice going approximately a full year without meeting.  Even after the Committee adopted its

IPS, effective January 2018, and committed to meeting semi-annually, it immediately violated

that commitment by meeting only once in 2018.  Since 2019, though, the Committee has met at

least three times per year.  Relatedly, until 2019, most of the Committee members did not receive

Mercer's reports every quarter; Karazia only circulated Mercer's reports when the Committee

had a meeting.  Because the Committee met so infrequently early in the Class Period, Committee

members could go three quarters without receiving a report.  Cf. Wildman, 362 F. Supp. 3d at

704 (finding prudent behavior where committee met three times per year, and "before and at

each meeting, the Committee thoroughly monitored the independent merits of each fund . . . to

determine whether it was a prudent investment and should remain in the lineup").  Along similar

lines, the Committee had no formal procedure for taking meeting minutes, and at least three

meetings—June 2015, June 2016, and November 2017—had no minutes.  But see, e.g., Sellers,

729 F. Supp. 3d at 167 n.25 (rejecting argument that "the meeting minutes' lack of detail shows a

lack of discussion" and collecting cases that find similarly).

The Committee also failed to conduct an investment structure review for much of the

Class Period.  Before the Class Period, the Plan's last investment structure review came in 2009,

and the Committee did not initiate another one until May 2020.  While Defendants' expert

Kathleen Mann noted that there is no set interval at which a plan fiduciary should conduct

investment structure reviews, Plaintiffs' expert Donald Stone credibly testified that ten or more

years was a long time for a plan fiduciary to wait.  Still, under these circumstances, the

Committee's failure to conduct an investment structure review sooner does not tip the scales in

Plaintiffs' favor.  That is so for two reasons.  First, the Committee was not flying blind prior to

the investment structure review.  At each meeting, it reviewed a detailed report from Mercer on

the performance of every fund on the Plan.  These reports could also identify holes in the Plan—

as with the small/mid-cap equity space filled by the State Street Russell fund—or recommend removing potentially duplicative options—as with the Oakmark Select fund.  In essence, these reports performed much of the function of an investment structure review.  Second, as explained further below, Plaintiffs have not sufficiently tied the Committee's delay in conducting an investment structure review to any specific breach.

When Mercer completed the review in 2021, the Committee acted prudently.  It dedicated at least sixty minutes of its March 2021 meeting to discussing the review, and it followed up on at least one point at its June 2021 meeting.  Although the Committee did not ultimately act on the few recommendations posed by Mercer in its review, Plaintiffs have not shown either that the Committee did not adequately consider Mercer's recommendations or that the failure to act was itself imprudent.

The Committee also acted prudently in responding to underperforming funds.  The Committee maintained the Watch List, regularly adding and removing funds based on performance or changes in fund management or strategy.  See Wildman, 362 F. Supp. 3d at 707 (citing as evidence of prudence that "the record shows the Committee continually monitored the funds on the Watch List and came to a reasoned decision to allow them to remain in the Plan").  And the Committee made changes to the Plan's lineup throughout the Class Period, showing that it had not fallen asleep at the wheel at any point.  See Sellers, 729 F. Supp. 3d at 164 ("Lastly, the Committee did make changes to its investment lineups during the Class Period, . . . which may provide some evidence that the Committee did engage in prudent monitoring.").  For example, the Committee acted quickly in replacing the Reich & Tang Daily Income Money Market Fund.  In April 2015, Wilkinson emailed his fellow Committee members to note that the fund was liquidating and to ask about a replacement plan.  Some time that month, Mercer also

recommended replacing the fund.  By June, the Committee had a report from Mercer with recommendations for replacements, and by the end of July, the fund had been removed from the Plan.  These are not the actions of an inattentive fiduciary.

The Plan's overall makeup does not support a finding of imprudence, either.  There were not too many or too few options, as the number of funds on the Plan menu aligned with the number on peer plans.  Nor was it imprudent for the Plan to include the specialty options of Tier IV.  Generally, "plans are under no duty to offer any particular type or mix of funds."  Moitoso, 451 F. Supp. 3d at 211.  And in this case, the Plan's participant base included some sophisticated investors who wanted specialty options on the Plan.  Of course, not all Plan participants had a background in finance, but the Plan defaulted inactive investors into the Vanguard TDFs and offered simpler, passively managed options for less sophisticated investors.  See Wildman, 362 F. Supp. 3d at 692 (noting plan fiduciaries included wide range of options on plan with sophisticated participant base in mind).  Plaintiffs raise challenges to the inclusion of specific funds on the Plan menu—and the Court deals with those challenges below—but the overall Plan menu does not show imprudence on the part of Defendants.

In any case, Plaintiffs have not shown that the Committee's generalized shortcomings led to any specific breaches of the duty of prudence.  To establish a breach of the duty of prudence, a plaintiff must "point to a specific moment when [the fiduciary] should have made a different decision"; it is not enough to "vaguely challenge the Portfolio's overall structure without reference to any specific events."  Ellis, 257 F. Supp. 3d at 130.  Here, Plaintiffs cannot tie any specific decision to the Committee's process failures, with one exception the Court will address in its analysis of the Plaintiffs' retail theories below.  For example, Plaintiffs' expert Stone testified that, had the Committee performed an investment structure review in 2015, Mercer

would have recommended the removal of the Oakmark E&I Fund at that point.  But, as explained below, the Court finds that it was not imprudent for the Committee to keep Oakmark E&I on the Plan for the whole Class Period.  Moving Mercer's recommendation forward in time does not change that conclusion.  Without specific imprudent decisions tied to the Committee's poor procedures, Plaintiffs are only gesturing toward a vague idea of imprudence.  "This is simply not a sufficient basis on which to construct a finding of imprudence."  Id. at 130.

Accordingly, Plaintiffs have failed to prove their wholesale theory of breach.  Although the Committee's monitoring of the Plan was less than perfect—especially early in the Class Period—its actions do not rise to the level of imprudence.

C.    Retail Theories

1.    *AlphaSimplex Global Alternatives Fund*

Plaintiffs assert that Defendants breached their duties of prudence and loyalty in retaining the AlphaSimplex Global Alternatives Fund on the Plan menu past the first day of the Class Period, February 18, 2015.  In essence, Plaintiffs contend ASG should have never been on the Plan menu.  The Court considers first the duty of loyalty, then the duty of prudence, ultimately concluding that Defendants' conduct as to ASG breached neither.

a.    Duty of Loyalty

The Committee did not breach its duty of loyalty in retaining ASG on the Plan menu until October 2021; Plaintiffs have not established that the Committee acted with a subjective motivation to serve any interests other than participants'.

Principally, there is no evidence that removing ASG would have been in the best interests of Plan participants at the start of the Class Period.  As explained below, the Court is not convinced that the Committee erred in offering a fund like ASG (i.e., one seeking to mimic a fund of hedge funds).  And ASG was performing relatively well in early 2015.  It had

outperformed its benchmark, the HFRI Fund of Funds Composite Index, in four of the past five years—2010, 2011, 2013, and 2014.  JX-56 at 38.  Plaintiffs' expert Stone conceded that the HFRI Fund of Funds Composite Index was not an inappropriate benchmark.  And in the first quarter of 2015, ASG ranked in the top quintile for both its three-year and five-year rolling peer group rankings.  DX-08.  Although Mercer rated ASG a "B" at the start of the Class Period, Mercer does not automatically recommend removing "B" funds.  These metrics suggest the Committee did not act against the interests of Plan participants in not removing ASG on February 18, 2015.  Plaintiffs have presented no evidence that the Committee was otherwise motivated by its own or Natixis's interests at that point, either.  The Committee therefore did not breach its duty of loyalty by failing to remove ASG at the start of the Class Period.

Next, nothing suggests that the Committee acted disloyally in keeping ASG on the Plan after that point.  The first serious sign of trouble with ASG came after the first quarter of 2016, one year into the Class Period.  In its quarterly report, Mercer noted that ASG had lost 8.4% in the first quarter of 2016 and recommended ASG be placed on the Watch List.  The only evidence of subjective motivation that Plaintiffs offer from this period is an email from Committee chair Karazia to fellow Committee member Wilkinson, sent four days before the Committee's June 2016 meeting, informing Wilkinson that Mercer was recommending that the Committee place ASG on the Watch List.  Wilkinson was then serving as AlphaSimplex's CEO and did not recuse himself from Committee discussions about ASG.  However, Plaintiffs have presented no evidence that Wilkinson was not wearing his fiduciary "hat"—as opposed to his CEO "hat"—in Committee meetings.  Pegram, 530 U.S. at 225.  In any event, the Committee placed ASG on the Watch List at the following meeting.  It remained there—aside from a brief interlude between December 2019 and September 2020—until its removal from the Plan in October 2021.

Finally, even though the removal of ASG from the Plan menu was procedurally imperfect, those imperfections were not the result of disloyalty. When to pull the trigger on removing a fund from a plan is a difficult question. The Committee voted to remove ASG from the Plan menu in August of 2021, with the move made effective that October. There is no evidence that the Committee waited until that point to pull the trigger out of disloyalty, rather than out of prudent consideration of when to act. Again, ideally, perhaps Wilkinson should have recused himself from any removal discussion and vote. But Wilkinson voted in favor of ASG's removal, undercutting any suggestion that he, or the Committee, was acting in the interests of AlphaSimplex rather than of Plan participants. Indeed, the incentive to keep ASG on the Plan was minimal. Although ASG's assets under management fell from $4 billion to $600 million during the Class Period, the Plan's assets were not "propping up" ASG; only $2.2 million of Plan assets were invested in ASG, making up less than 0.5% of the fund's assets under management. Cf. Baker, 2020 WL 8575183, at *2 ("[T]hat in some cases the plan was one of the last investors propping up a failing fund gives rise to the plausible inference of a subjective motive inconsistent with the plan participants' best interest."). In sum, the Court heard no credible testimony or persuasive evidence that the Committee disloyally favored keeping ASG within the Plan prior to its removal.

b. Duty of Prudence

Plaintiffs have failed to demonstrate that the Committee breached its duty of prudence by not removing ASG from the Plan menu on February 18, 2015. In considering whether it was imprudent to keep a specific fund, such as ASG, on the Plan, the Court must consider: (1) "whether the Committee had reason to be concerned about the challenged investments' performance during the Class Period—in other words, whether the challenged investments'

64

performance necessitated additional review beyond its normal procedures"; and (2) "whether the Committee engaged in a thorough, prudent, and reasoned decision-making process in deciding to retain the challenged investments despite these performance concerns." Sellers, 729 F. Supp. 3d at 163.[16]

As to the first inquiry, the Committee did not have reason to be concerned about ASG at the start of the Class Period, but reason for concern did arise shortly thereafter. As covered above, ASG had a history of strong performance coming into the Class Period. Given that record, a prudent fiduciary would not have removed ASG on February 18, 2015. Nevertheless, ASG's performance did slip such that, by 2016, it needed additional review. That underperformance alone, though, did not necessitate its removal from the Plan. Indeed, it might have been imprudent to drop ASG too quickly. See Wildman, 362 F. Supp. 3d at 707 (removing funds immediately upon poor performance not necessarily prudent because "[p]lan participants would be forced to sell their shares at a lower price and miss out on any subsequent improved performance").

As to the second inquiry, Plaintiffs have not carried their burden in showing that the Committee's decision-making process on ASG was so flawed as to constitute imprudence. The Committee put the fund on the Watch List at its first meeting after the underperformance became apparent. Handwritten notes from that meeting, attributed to Committee member O'Neill, state, "[w]atch w/ asg and f/u conversation w/ marina," presumably referencing a planned follow-up conversation regarding ASG with Committee member Marina Gross. JX-508. Although Gross

---

[16] Sellers dealt with a summary-judgment motion and thus preceded these two questions with the threshold inquiry of "whether there are factual disputes as to the Committee's procedures and general practices in monitoring and evaluating funds, with the understanding that these procedures and general practices alone will not demonstrate prudence." 729 F. Supp. 3d at 163. Nevertheless, the Court finds the Sellers framework helpful even in the bench-trial context.

could not recall this particular conversation on the stand, she testified that having individual follow-up conversations regarding specific funds on the Watch List would have been consistent with the Committee's practices at the time. Further, Mercer included a review and recommendation on ASG in each quarterly report while the fund was on the Watch List. While Karazia only distributed those reports to the Committee when it had a meeting, Wilkinson credibly testified that the Committee discussed and monitored ASG's performance at each meeting. In other words, Plaintiffs have not shown that ASG's performance was not actually considered by the Committee. Nor have Plaintiffs shown that ASG's performance was so bad that a prudent fiduciary would have removed it from the Plan earlier.

Finally, the Court rejects the notion that the Committee was imprudent to include a fund of ASG's type—one that seeks to mimic a fund of hedge funds—on the Plan at all. Although ASG was a specialty fund, that does not mean it was a high-risk investment option. Rather, ASG's strategy sought to provide lower risk than equity markets. Plaintiffs' expert Dr. Reuter showed that ASG specifically provided a lower risk profile than the Vanguard Institutional Index (a stand-in for the U.S. equity market) or the State Street Global Index (a stand-in for the global equity market). So ASG's inclusion on the Plan did not expose Plan participants to unnecessary risk. And Plaintiffs have not shown that ASG's inclusion confused Plan participants. As of December 2015, for instance, only 12% of Plan participants invested in ASG, and the average percentage of assets each of those participants had in ASG was 10%. Those percentages indicate that Plan participants were using ASG appropriately as a specialty option for profile diversification. In light of all of these facts, the Committee was not imprudent to offer ASG in the first place or to retain it for the period it did.

2.    *Delafield Fund*

Plaintiffs' sole remaining claim with respect to the Delafield Fund is that Defendants breached their duty of prudence by failing to remove Delafield from the Plan menu within a reasonable time.  Mercer first recommended that the Committee consider removing Delafield in March 2015.  The Committee voted to remove Delafield and replace it with Vaughan Nelson on September 9, 2015.  However, the Committee did not authorize Schwab to make that change until October 19, 2017, with the change becoming effective on January 8, 2018.  That delay, Plaintiffs contend, resulted from a lack of appropriate diligence and care on the part of Defendants.   Even though the Court finds Defendants' conduct indeed breached the duty of prudence, Plaintiffs have failed to establish a loss resulting from that breach.

a.    Breach

The Committee's delay in removing Delafield constituted a breach of the duty of prudence.  Hughes, 595 U.S. at 176 ("If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty.").

To begin with, Plaintiffs argue that the Committee waited too long to vote to remove Delafield from the Plan.  The Court disagrees.  The earliest the Committee had notice of Mercer's recommendation to remove Delafield was March 13, 2015.  On that date, a Mercer consultant emailed Karazia a report for the fourth quarter of 2014, suggesting the Committee "[r]eview Delafield fund for possible termination" in light of its "continued poor performance" and the existence of "reasonably similar options in the plan with competitive returns (e.g., Loomis Small Cap Value Fund)," among other reasons.  JX-103.  On April 15, Karazia received a request from a Natixis employee that the Vaughan Nelson Value Opportunities Fund be added to the Plan.  Karazia responded that the Committee would need Mercer to review the fund first,

listing several factors the Committee considers in evaluating funds for the Plan and noting that, "[f]or fiduciary/ERISA reasons we need to be able to clearly show that we are not adding a fund just because they are part of" Natixis.  JX-105.  On June 2, Grant emailed Karazia research on the Vaughan Nelson fund, noting that it could be a possible replacement for Delafield and that a potential issue with its high tracking error could be addressed "during the manager search process."  JX-106.

The Committee then met on June 18, its first meeting since Mercer's March 13 recommendation on Delafield.  The Committee discussed Delafield's recent performance, agreed to remove Delafield, and directed Mercer to explore possible replacements.  Mercer provided the requested research in August, at which point Karazia shared Mercer's findings with the other Committee members, who discussed options over email.  Although one of the three options presented by Mercer—the WEDGE fund—had slightly better performance and lower fees than the Vaughan Nelson fund, the Committee agreed to use Vaughan Nelson as Delafield's replacement.  The Committee then convened a special meeting on September 9, 2015, voting to remove Delafield.

Nothing in this sequence of events suggests undue delay.  Mercer's March 13 email recognizing that the Loomis Sayles Small Cap Value Fund was reasonably similar to Delafield was not a recommendation to immediately remove Delafield and map its assets to that fund. Mercer had no concrete recommendation for a Delafield replacement at that time.  Therefore, the Committee's apparent request that Mercer review Vaughan Nelson did not delay action on Delafield in any way.  Indeed, to replace Delafield without obtaining independent advice from Mercer likely would have been imprudent under the circumstances.  The Committee appropriately deliberated over Mercer's removal recommendation at the June meeting and

reasonably investigated alternatives, including Vaughan Nelson.  And once Mercer did have

concrete replacement recommendations, the Committee promptly discussed them over email and

scheduled a special meeting for the following month.  In light of this expedited process, the

Committee did not act imprudently in waiting until September 2015 to vote on Delafield's

removal.[17]

Nor does the Court find any fault in the Committee's selection of Vaughan Nelson to

replace Delafield.  Plaintiffs have not pressed any potential claim with respect to the selection of

Vaughan Nelson specifically.  In any event, that selection did not breach either the duty of

prudence or the duty of loyalty.  While the Committee apparently asked Mercer to analyze

Vaughan Nelson generally, the first suggestion that it might replace Delafield came not from the

Committee but from Mercer, via Grant's June 2 email.  The Committee did not immediately vote

to replace Delafield with Vaughan Nelson, though.  Instead, it asked Mercer to recommend

potential replacements.  Grant credibly testified that Mercer would not have included Vaughan

Nelson in its final recommendation if it was not a suitable option.  And even then, the Committee

discussed the potential replacements over email and in a meeting, weighing the pros and cons of

Vaughan Nelson and its other top option, the WEDGE fund.  Wilkinson, for example, voted in

favor of Vaughan Nelson because its affiliate status meant the Committee had better insight into

its workings.  See Wildman, 362 F. Supp. 3d at 702 (finding no disloyal motivation where

fiduciaries believed proprietary funds were better option for plan in part because "the

participants were familiar with the [proprietary] funds . . . , had the ability to more closely

monitor their investments, and received direct access to fund managers for consultation").  In

_____

[17] For these reasons, the Committee was neither required to remove Delafield at its earlier June meeting nor imprudent in waiting until the September meeting for the decision.  Plaintiffs do not contend that the Committee should have voted to remove Delafield earlier than the June meeting.

sum, Plaintiffs fail to meet their burden to establish that the Committee acted imprudently or put its own interests ahead of Plan participants' in selecting Vaughan Nelson.

Similarly, executing the decision to swap Vaughan Nelson for Delafield would inevitably and reasonably require some further delay. Plan changes cannot be made overnight. For example, Karazia testified that it was typical for Schwab to take ninety days to actually process the removal of funds from the Plan. And in this case, Schwab may have required additional time, since it also had to add Vaughan Nelson to its platform.[18] About one month after the removal vote, on October 15, 2015, Schwab informed Natixis the change could be made by mid-January 2016. Any delay up to that point, then, was not the result of imprudence. See Wildman, 362 F. Supp. 3d at 709 (noting that changes to plan were "not something that occurs instantaneously").

At some point in or past mid-January 2016, though, the continued delay in removing Delafield amounted to imprudence. Various Committee members testified that the Committee wanted to make the Delafield-for-Vaughn-Nelson swap at the same time as it made changes to several share classes across the Plan in order to limit disruption to Plan participants. Defendants presented no evidence that the Delafield removal and the share-class changes needed to be synced, though. Moreover, the Committee members' reasoning is undercut by the reason motivating the change—Delafield's underperformance. That reason counsels immediate action, not delay to coordinate changes merely for ease of communication to participants. The fact that the Committee did enact one change—the switch to revenue sharing—in January 2017 but continued to delay the Delafield change for another full year further undermines the coordination

---

[18] This additional time would have been required even if the Committee had selected the WEDGE fund to replace Delafield, since that fund also was not on the Schwab platform.

rationale. Delaying in these circumstances, or at least any meaningful period of delay, was unreasonable.

Additionally, the Committee seems to have given little thought to the performance of Delafield during the delay. Although Delafield's performance improved and Vaughan Nelson's declined over the course of 2016, nothing suggests the Committee delayed the swap because of those developments. The Committee met only twice in the more-than-two years between voting to remove Delafield and authorizing Schwab to make the change. No second thought seems to have been given to Delafield until March 2017, when Mercer reached out to Karazia about Vaughan Nelson's poor performance during the delay period. In explaining the delay, Committee member Wilkinson testified that he knew Delafield's performance had improved because he was personally invested in Delafield. But Wilkinson could not recall discussing Delafield at either of the Committee's meetings during the delay or otherwise bringing up the fund's bounce-back performance with the rest of the Committee. The attention of one member acting in his personal capacity does not make the Committee prudent. At the end of the day, prudence is about process, not results. It is not enough that Delafield's performance improved if the Committee's back was turned. In other words, the Committee's lack of attention signaled a lack of prudence. Cf. Wildman, 362 F. Supp. 3d at 709 (finding no imprudence where fiduciaries delayed in making change in order to synchronize multiple changes to plan after they "thoroughly discussed when the change . . . would occur and took into account all reasonable information"). Therefore, the Committee breached its duty of prudence with respect to Delafield sometime between mid-January 2016—the earliest the removal could have occurred—and January 8, 2018—the date the removal took effect. The Court need not pinpoint exactly when

71

patience tipped over into imprudence, though, as Plaintiffs have failed to show a loss resulting from this breach.

###### b.    Loss

Plaintiffs' claim fails on its second element: loss.  Plaintiffs propose three potential comparators for Delafield's performance, not one of which suffices to establish loss.  At base, the problem is one of mismatching loss comparators.  Plaintiffs have alleged and proven a breach arising from the delay in executing Delafield's removal.  Plaintiffs have not proven any breach in the selection of Vaughan Nelson to replace Delafield, only in the time it took to make the change.  Loss must be determined by reference to the proven breach: the difference between what Plan participants actually earned and what they would have earned if not for the breach. Brotherston, 907 F.3d at 31 (defining loss as determined "by reference to what the results would have been if the portion of the trust affected by the breach had been properly administered" (citation modified)).  The proper comparison, then, would be between the returns of Delafield and the returns of Vaughan Nelson from mid-January 2016 (at the earliest) to January 8, 2018. Plaintiff did not offer this comparison.  Even assuming other proper comparisons exist, each of the three comparisons Plaintiffs did offer fails.

First, Dr. Becker's Prospectus Benchmark Scenario compares Delafield to the State Street Russell Small/Mid Cap Index, resulting in a loss of $9,934,052.  The breach alleged with respect to Delafield is that the Committee waited too long in swapping Delafield out for another active fund, Vaughan Nelson.  The resultant loss cannot be measured against a passive fund that would not have absorbed the Plan's Delafield assets even absent that breach.  As such, the State Street Russell Small/Mid Cap Index is not an appropriate comparator in this case.  See Wildman,

362 F. Supp. 3d at 711 (discrediting plaintiff's loss models where they, inter alia, "failed to isolate the effect of the alleged breach").

Second, Dr. Becker's Alternative Fund Scenario provides a comparison between Delafield and the Loomis Sayles Small Cap Value ("LSSCV") Fund for the period from September 1, 2015, to December 31, 2017, resulting in a loss of $2,146,048. There are several deficiencies with this comparison. Foremost, this comparison's dates do not align with the dates of breach. As explained above, the Committee's breach began, at the earliest, in mid-January 2016, and concluded when Delafield was removed from the Plan on January 8, 2018. This comparison, though, begins at least several months before the breach arose. A comparison that encompasses a period when no breach had yet occurred cannot form the basis for a finding of loss. See Sellers, 729 F. Supp. 3d at 184 (explaining that, at less burdensome summary-judgment stage, "the record must allow a reasonable factfinder to identify when an alternative decision ought have been made for purposes of showing loss"). And at the other end, the period of comparison ends too early. Plaintiffs provide no reason why the comparison would end on December 31, 2017, rather than January 8, 2018. Nor have they offered evidence from which the Court could conclude that the calculated loss is not materially altered by ending the period of comparison prematurely in this way. Just as the proper comparison cannot begin before a breach has occurred, nor can it end before the breach has ended. See Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985) ("Herein, there was an actual sale of the [at-issue fund], and therefore the amount realized on the sale should be compared with the earnings, if any, that would have been realized through alternative investment over the same period of time."). Finally, Plaintiffs presented no evidence that LSSCV would have been a prudent alternative to Delafield. Instead, Plaintiffs rely solely on Mercer's fourth-quarter 2014 report listing LSSCV as a reasonably

similar option to Delafield.  But that listing does not mean that Mercer recommended mapping Delafield's assets to LSSCV or that LSSCV would be a proper loss comparator.

Third, Dr. Becker also suggests a comparison between Delafield and the WEDGE Mid Cap Value Fund for the period from January 1, 2016, to December 31, 2017, resulting in a loss of $663,577.  WEDGE was the other frontrunner, alongside Vaughan Nelson, when Mercer presented its analysis of potential Delafield replacements in the summer of 2015.  However, this is still not a proper comparison based on Plaintiffs' theory of breach.  Primarily, Plaintiffs have again presented a mismatched period of comparison.  As with the LSSCV scenario above, this WEDGE scenario both begins before the earliest date that a breach could have occurred—mid-January 2016—and ends before the breach ended—on January 8, 2018.  This alone disqualifies Plaintiffs' WEDGE scenario as a proper loss comparator.  See Turner v. Schneider Elec. Holdings, Inc., No. CV 20-11006-NMG, 2023 WL 387592, at *4 (D. Mass. Jan. 24, 2023) (noting arbitrariness of plaintiffs calculating damages only through June 30, 2020, where theory of breach supported calculating damages past that date).  But this comparator is fundamentally flawed for another reason: it is not tied to the proven breach.  Plaintiffs do not contend—nor does the evidence adduced at trial demonstrate—that the Committee ought to have chosen WEDGE as Delafield's replacement, and they have not proven that the Committee ought not to have chosen Vaughan Nelson at all.  They have proven only that the Committee took too long to replace Delafield with Vaughan Nelson.  Thus, it makes no more sense to compare Delafield to WEDGE than it would to compare it to a passive index.

Plaintiffs have not provided a suitable comparator that outperformed Delafield during the relevant period.  Rather than comparing Delafield to Vaughan Nelson—the logical choice—

Plaintiffs offered three comparisons that failed to demonstrate a loss tied to the proven breach. Accordingly, Plaintiffs do not prevail on their Delafield claim.

### 3. *Gateway Fund*

Plaintiffs next seek damages for breach of the duty of loyalty and the duty of prudence with respect to the Gateway Fund, asserting that Defendants should have removed Gateway from the Plan menu at the start of the Class Period, February 18, 2015. The Court finds that Plaintiffs have not met their burden of proving breach as to either duty.

### a. Duty of Loyalty

Plaintiffs have failed to show that the Committee's operative motive in retaining Gateway breached the duty of loyalty. There is no specific evidence that the Committee added Gateway to the Plan prior to the Class Period or retained it at the start of the Class Period out of a motivation to serve Natixis's business interests over the financial interests of Plan participants. Rather, Plaintiffs' case rests on two contentions: (1) that the Committee sought to include at least one fund from each Natixis affiliate on the Plan; and (2) that the Committee thrice changed the benchmark against which it measured Gateway's performance during the Class Period.

The Court rejects both contentions. First, it has already found the one-fund-from-each-affiliate argument unsupported generally. Granted, the vast majority of peer plans do not include Gateway. That, alone, does not indicate disloyalty, though. See Wildman, 362 F. Supp. 3d at 693 (noting that, while "[n]o other 401(k) plan offers exclusively [defendant's] funds," evidence showed that "41 percent of plans used an all-proprietary lineup"). No credible evidence otherwise establishes a disloyal motive in the inclusion of Gateway on the Plan menu. For these reasons and the reasons previously stated, the Court finds no such motive. Second, the changing of Gateway's benchmark does not necessarily imply disloyalty, either. Each time, Mercer agreed

with the decision to change Gateway's benchmark; in fact, Mercer initiated the third benchmark change. As explained more fully below, these changes were not imprudent, and the changes were not disloyal for similar reasons. They simply reflect ongoing efforts to carefully measure performance. See Ellis, 883 F.3d at 9 (rejecting "the notion that a fiduciary violates ERISA's duty of loyalty simply by picking 'too conservative' a benchmark for a stable value fund"). Without further evidence of an ulterior motive in retaining Gateway—of which there is none—the Court finds no breach of the duty of loyalty.

b.   Duty of Prudence

The Committee's retention of Gateway was not imprudent, either. At no point during the Class Period was the Committee bound by the duty of prudence to remove Gateway from the Plan menu.

The only point at which Gateway's performance necessitated additional review was after the first quarter of 2016. Until then, Gateway's performance had been up and down but was not a cause for alarm. At the start of the Class Period, for example, Gateway had outperformed its 30% S&P 500 / 70% Barclays Aggregate benchmark in only one of the previous four years, but it had positive returns every year and performed in the upper half of peer funds in two of those four years. In its first-quarter 2016 report, though, Mercer noted that Gateway had by then trailed its benchmark over the preceding one-, three-, five-, and ten-year periods. As a result, Mercer recommended Gateway for the Watch List. These results and Mercer's recommendation required additional review from the Committee.

Such review occurred. The Committee discussed Gateway's performance and Mercer's recommendation at its next meeting, in June 2016. The Committee did not take minutes at that meeting, but several Committee members testified to the Gateway discussions. Wilkinson

candidly admitted that the Committee did not realize the extent of Gateway's underperformance of its benchmark prior to that report.  Wilkinson also testified that the Committee discussed Mercer's recommendation and came to the realization that the Barclays Aggregate was not an appropriate benchmark component for Gateway.  That was so because the Barclays Aggregate included sectors—long-term bonds and mortgages—that drove higher returns but were not included in Gateway.  Ultimately, Gross testified, the Committee chose not to put Gateway on the Watch List but asked Mercer to conduct additional research into an appropriate benchmark. Mercer returned in August with its own recommendation for a new benchmark—30% S&P 500 / 70% U.S. Treasury Bills—that the Committee ultimately adopted because it addressed the concerns the Committee had with the Barclays Aggregate component.  This process was thorough, reasoned, and, ultimately, prudent.

Gateway's performance thereafter was not without problems.  As Plaintiffs' expert Stone testified, Gateway underperformed its 30% S&P 500 / 70% Barclays Aggregate benchmark— which the Committee retained alongside the 30% S&P 500 / 70% U.S. Treasury Bill benchmark—on five- and ten-year rolling returns every year from 2015 to 2022.  Yet all of those returns were still positive and largely within two percentage points of that benchmark.  As Stone conceded, if a participant were to invest in Gateway at the beginning of the Class Period, that investment would have yielded a positive return through 2022.  Plaintiffs contend, though, that investment in a more aggressive fund would have yielded a higher return.  That argument misunderstands Gateway's role on the Plan menu.  Gateway was not an aggressive specialty fund; it was a low-risk diversification option that was expected to trail its benchmark when times were good but overperform when times were bad.  This relative performance is relevant not only to the later question of loss but also to the threshold question of whether the fund's performance

necessitated its removal from the Plan.  See Sellers, 729 F. Supp. 3d at 162 ("A showing that an investment was performing poorly relative to its benchmarks, however, is relevant in determining whether the fiduciary engaged in a prudent process in retaining the investment, because underperformance may signal that additional review of the investment may be necessary.").  In this case, Gateway consistently garnered positive returns and was ranked as the top fund in its category by Thompson Reuters in 2017, 2018, and 2021.  Mercer did not recommend Gateway for the Watch List after 2016, and the Court finds no reason for the Committee to have conducted additional review of Gateway post-2016, either.

### 4.  *Oakmark Equity & Income Fund*

Plaintiffs contend that the Oakmark Equity & Income Fund should not have been on the Plan menu at all.  As a result, they assert, Defendants breached their duties of loyalty and prudence by retaining Oakmark E&I past the start of the Class Period.  Finding no cognizable error in Oakmark E&I's inclusion on the Plan menu, the Court concludes that Defendants breached neither duty.

### a.  Duty of Loyalty

As to loyalty, largely for the reasons stated already, Plaintiffs have not established that the Committee improperly considered interests other than those of Plan participants in retaining Oakmark E&I.  Any benefit Defendants derived from Oakmark E&I's inclusion was not at the expense of Plan participants.  See Ellis, 257 F. Supp. 3d at 126 (rejecting duty-of-loyalty claim on summary judgment where plaintiffs failed to show how plan administrator's actions had put its interests ahead of plaintiffs').  As explained in the duty-of-prudence section below, Plaintiffs have failed to show that Oakmark E&I should not have been on the Plan menu.  Given the lack of a detriment to Plan participants, no duty-of-loyalty breach occurred.  Vander Luitgaren, 765

F.3d at 65 ("When the fiduciary's payment of a benefit does not unfairly diminish, impair, restrict, or burden the beneficiary's rights, section 404(a) is not transgressed.").

    b. Duty of Prudence

Plaintiffs' duty-of-prudence claim fails because, simply, Oakmark E&I was not an imprudent investment. Plaintiffs presented no evidence that Oakmark E&I's performance should have raised an alarm at any time during the Class Period. Rather, Plaintiffs argued that Oakmark E&I should have been removed from the Plan only because it was duplicative of the Vanguard TDFs, which represent a more optimal approach to balanced investing. This is not a winning argument.

To start, Oakmark E&I is not duplicative of the Vanguard TDFs. The two serve different purposes. The Vanguard TDFs provide a dynamic allocation between stocks and bonds, acting as the Plan's default for participants who do not want to choose their own investments. Oakmark E&I, in contrast, is a Tier III, actively managed option with a static allocation. As Defendants' expert Mann testified, Oakmark E&I might be used by a sophisticated participant who was looking to complement their non-Plan investments.

Plaintiffs rely heavily on Mercer's 2021 investment structure review, which stated that "balanced funds today are typically replaced with target date funds." JX-37 at 120. But just as the presence of an independent consultant does not have a "talismanic effect" in lending prudence to a Committee's actions, Sellers 279 F. Supp. 3d at 162, the advice of an independent consultant is not the be-all-end-all of prudence. Indeed, the trend toward TDFs is not as pronounced as Mercer's recommendation makes it seem. Grant testified that, in 2021, about 70% of Mercer clients included balanced funds, like Oakmark E&I, on their plans. While that proportion has since dropped, it is still over 50%, according to Grant.

In any case, the Committee was not required to remove Oakmark E&I immediately upon Mercer's recommendation, and the Committee followed a deliberative process in responding to it.  The Committee discussed the matter at its March 2021 meeting and asked Mercer to provide additional research on the demographics of Plan participants in Oakmark E&I versus the Vanguard TDFs.  Committee members corresponded about Oakmark E&I's role in the Plan after the meeting, and Committee member Cove performed his own demographic analysis.  The Committee discussed Oakmark E&I again at its next meeting in June 2021.  In other words, the Committee did not reject Mercer's recommendation out of hand; it discussed, deliberated, and decided Oakmark E&I was not duplicative of the Vanguard TDFs.

Even assuming Oakmark E&I is duplicative of the Vanguard TDFs, though, Plaintiffs' claim is still weak.  It is not imprudent for a Plan to generally include duplicative funds.  See Hughes v. Nw. Univ., 63 F.4th 615, 637 (7th Cir. 2023) (affirming dismissal of unspecific allegations that ERISA fiduciary breached duty of prudence by retaining duplicative funds).  Although Plaintiffs' expert Stone opined that inclusion of Oakmark E&I could cause confusion among Plan participants, he did not opine that the inclusion of Oakmark E&I did cause confusion.  In fact, Mercer's follow-up demographic analysis showed that most of the participants invested in Oakmark E&I were in an age range where Oakmark E&I's balance of stocks and bonds made sense given their anticipated retirement date.  This suggests Plan participants were using Oakmark E&I appropriately.  Without actual confusion, Plaintiffs' claim falters further.  See id. ("[T]he First Amended Complaint does not identify how plaintiffs were confused and personally injured by the multiplicity of funds.").  The lack of evidence supporting Plaintiffs' claim leads the Court to find no breach of the duty of prudence with respect to Oakmark E&I.

5. *Oakmark Select Fund*

Finally, Plaintiffs claim that Defendants breached their duties of loyalty and prudence with respect to the Oakmark Select Fund. Although the Committee removed Oakmark Select from the Plan in January 2021, Plaintiffs contend Oakmark Select should not have been retained past the first day of the Class Period, February 18, 2015. In support, Plaintiffs point to Oakmark Select's underperformance and its overlap with the Oakmark Fund. Because Plaintiffs have not demonstrated that Oakmark Select should have been removed any earlier than it was, the Court finds no breach.

a. Duty of Loyalty

The Committee did not act against the interests of Plan participants in retaining Oakmark Select. To begin with, Plaintiffs have not shown that Oakmark Select should have been removed from the Plan at the start of the Class Period, as discussed in the duty-of-prudence section below. Moreover, Plaintiffs' argument is illogical for two reasons. See Ellis, 883 F.3d at 8 ("Plaintiffs' theory of how [defendant] behaved disloyally suffers from the added disability of making little sense."). First, Plaintiffs' grand theory of disloyalty—that the Committee sought to have one fund from each Natixis affiliate on the Plan—does not apply to Oakmark Select. Oakmark Select was managed by Harris Associates, which had three other funds on the Plan: Oakmark, Oakmark E&I, and Oakmark International. Second, the Committee also had little incentive to retain Oakmark Select, seeing as its assets were simply mapped onto Oakmark, another Harris Associates fund. There is no suggestion in the record that this mapping—which Mercer recommended in both 2010 and 2020—would have been any different had the Committee removed Oakmark Select sooner. In any event, Plaintiffs offer no direct evidence of an ulterior motive. As such, the Court finds that the Committee did not breach its duty of loyalty in having

81

Oakmark Select on the Plan to begin with or in keeping it on the Plan until voting to remove it in September 2020.

b.    Duty of Prudence

Similarly, the Committee did not breach its duty of prudence with respect to Oakmark Select. Oakmark Select was not an imprudent investment at the start of the Class Period. While its performance later dipped, raising cause for concern, the Committee responded with a thorough and reasoned decision-making process that ultimately resulted in Oakmark Select's removal from the Plan.

The Committee did not have reason to be concerned about Oakmark Select coming into the Class Period. Natixis was not unique in offering Oakmark Select on its retirement plan. As of year-end 2014, over 100 total retirement plans included Oakmark Select. In 2015, eighteen out of 2,928 defined-contribution plans of a size similar to the Plan did so, with five of those offering both Oakmark Select and Oakmark. And even though the two funds had substantial overlap in investments, duplication does not imprudence make. Hughes, 63 F.4th at 637. Oakmark Select's performance was not an issue, either. Mercer's first-quarter 2015 report showed that Oakmark Select was underperforming its benchmark over the previous three-month and one-year periods but overperformed when the time was expanded to five years or ten years. And data provided by Plaintiffs' expert Stone at trial indicated that Oakmark Select was in the top quintile in rolling three-year and five-year peer group rankings throughout 2015, though its rolling one-year peer group ranking fell in the bottom quintile for much of 2015. Cf. Wildman, 362 F. Supp. 3d at 707 (refusing to require fiduciary to "adopt a strategy of removing funds based on short-term underperformance"). In sum, Oakmark Select's performance was largely positive throughout the Class Period's first calendar year. Neither the fund's similarity to

Oakmark nor its performance, then, provided the Committee reason to pause at the start of the Class Period.[19]

Reason for concern did later arise, but the Committee responded without imprudence.  By the first quarter of 2018, Oakmark Select trailed its benchmarks over the preceding quarter, year to date, one year, three years, and five years; only its ten-year returns showed overperformance. In its report at the end of that quarter, Mercer recommended placing Oakmark Select on the Watch List.  It did the same in its next two quarterly reports.  Though the Committee did not meet next until December 2018, it discussed and acted on Mercer's recommendation at that meeting.  The evidence does not establish that the Committee acted imprudently.  It would not have been prudent for the Committee to remove Oakmark Select immediately after Mercer made its first Watch List recommendation in its first-quarter report.  See Sellers, 729 F. Supp. 3d at 162 ("An investment's drop in price or value alone is not enough to demonstrate imprudence, nor is it enough to show that better investment opportunities were available at the time of the relevant decisions." (quotations omitted)).  Nor have Plaintiffs proven that the Committee was duty-bound to remove Oakmark Select before its December 2018 meeting.  At that point, the fund's underperformance was reason for concern, but it was not so pronounced that the fund needed to be removed immediately.

The Committee did not otherwise unduly delay Oakmark Select's removal.  At its next meeting, in March 2019, Grant recommended its eventual removal but suggested holding off on

---

[19] Mercer did provide a report in 2010 in which it recommended that the Committee "evaluate [the] need for multiple Harris Associates options and possible removal of Oakmark Select (map to Oakmark fund)."  PX-1004.  To the extent Plaintiffs push this report as reason for the Committee to remove Oakmark Select at the start of the Class Period five years later, the Court disagrees.  In determining whether to remove a fund, an ERISA fiduciary must consider all relevant information.  But five years of intervening data renders Mercer's 2010 report irrelevant to the Committee's 2015 consideration of Oakmark Select.

any action until Mercer could meet with Oakmark Select's management team.  The Committee

agreed.  It also continued to monitor Oakmark Select.  The minutes for every meeting in 2019

and 2020 record a discussion of Oakmark Select.  And in September 2020—roughly ten quarters

after Mercer first recommended Oakmark Select for the Watch List and six quarters after the

Committee acted on that recommendation—the Committee voted to remove Oakmark Select

from the Plan.  Cf. Baird, 403 F. Supp. 3d at 779–80 (finding allegations sufficient at pleading

stage where plaintiff alleged that fiduciary kept proprietary funds on watch list for up to ten

quarters while removing non-proprietary watch-list funds from plan lineup much sooner).

Plaintiffs have not shown that the Committee acted imprudently in failing to dump Oakmark

Select sooner.

### D.    Duty to Monitor Appointed Fiduciaries

Plaintiffs also assert a count against only Natixis for its failure to monitor the

Committee's management of the Plan.  "[W]hen a plan sponsor appoints other fiduciaries, that

appointment is a fiduciary function because it is discretionary and carries an ongoing duty to

monitor."  Moitoso, 451 F. Supp. 3d at 221.  "A fiduciary who violates this ongoing duty to

monitor is responsible for any breaches on the part of the appointed fiduciaries."  Id.  However,

this claim is derivative of Plaintiffs claims for breach of the duties of loyalty and prudence.  Id. at

201.  Because all of Plaintiffs' direct fiduciary-duty claims fail, their duty-to-monitor claim fails,

as well.

## VII.    CONCLUSION

The contours of this case are not etched in black and white but shaded in grey and

charcoal.  Plaintiffs see a Committee alternately lining Natixis's pockets and sleeping on the job.

Defendants present a rosy picture of an exemplary plan with ideal fiduciaries. Neither shows the true colors of this case.

Plaintiffs make much of a series of facts and events they say prove the Committee acted disloyally, seeking to secure at least one spot on the Plan for each Natixis affiliate. The Plan predominantly consisted of proprietary funds. And the Committee often asked its independent consultant to review proprietary funds for addition to the Plan or else only began looking into adding a type of fund when Natixis or its affiliate opened a fund in that space. These facts sufficed at the pleading stage and at summary judgment. They do not, in the Court's view, carry the day at trial. The Plan defaulted participants to a non-proprietary suite of funds and offered all participants an array of passive and active non-proprietary options. The Committee added a proprietary fund only when the choice was supported by both objective evidence and the recommendation of its independent consultants. More to the point, Plaintiffs failed to adduce evidence that the Committee ever prioritized Natixis's interests over those of Plan participants. For these reasons, the Court finds that Plaintiffs have not proven that Defendants breached their duty of loyalty.

As to prudence, at trial, Defendants presented themselves as doing a "great job" and running an "excellent retirement plan." Doc. No. 239 at 69:19–20. But this Committee was not the shining example of prudence promoted by Defendants. Early on, it met infrequently, received reports just as irregularly, and failed to conduct an overall review of the Plan for over a decade. This performance was not "great." But Defendants need not demonstrate the Committee's greatness. Rather, Plaintiffs must prove its imprudence. This, Plaintiffs have not done. Under the totality of relevant circumstances, the Committee's less-than-ideal performance produced no breach, only a collection of grievances untethered to actionable lapses, the one

exception being the Committee's delayed removal of a single fund.  But that exception bears no fruit: Plaintiffs have failed to show that sole breach, as proven, led to a loss for Plan participants. As such, the Court finds for Defendants on Plaintiffs' duty-of-prudence claim.

A separate judgment will enter against Plaintiffs and in favor of Defendants.  Each side shall bear its own costs and fees.

SO ORDERED.


 /s/ Leo T. Sorokin
United States District Judge